## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS,
## AMARILLO DIVISION

_____

DR. RONNY JACKSON, STUART and ROBBI
FORCE, and SARRI SINGER,

      Plaintiffs,

        v.

JOSEPH R. BIDEN, JR., in his official               Civil Action No.
capacity as the President of the United States,
and ANTONY BLINKEN, in his official capacity
as the United States Secretary of State,

      Defendants.

_____

## COMPLAINT
### (For Declaratory Relief)

1.     This case is about the Palestinian Authority's decades-long program of financial payments, social services, misinformation, and indoctrination to incentivize terrorist attacks against persons living in or visiting the State of Israel. The program is known as "Pay to Slay."

2.     Under Pay to Slay, the Palestinian Authority rewards terrorists and/or their families with increased rewards in proportion to the casualties inflicted. Terrorists who are married, or have children, or are Israeli residents/citizens receive an additional payment. Terrorists who spend more than 5 years (in a single term or cumulatively) in prison are paid a guaranteed salary by the Palestinian Authority for the rest of their lives.

3.     Every terrorist, regardless of their affiliations or the identity of their victims, is paid by the Palestinian Authority. This includes members of designated terror organizations, such as Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine, who kill U.S. citizens.

4.     Pay to Slay program beneficiaries include the family of Bashar Masalha who stabbed 11 people and murdered 28-year-old U.S. Army Iraq and Afghanistan war veteran and West Point graduate Taylor Force on March 8, 2016. Mr. Force was visiting Israel as part of his graduate program.

5.     After Mr. Force's murder, Congress passed, and President Donald J. Trump signed, the Taylor Force Act, Pub. L. 115–141, div. S, title X, 132 Stat. 1143 (Mar. 3, 2018). There was considerable bipartisan support for the Taylor Force Act with 22 Republican and 10 Democrat Senators who were co-sponsors, and 164 co-sponsors in the House, 155 of whom were Republicans and 14 Democrats.

6.     In the Taylor Force Act, Congress determined that "The Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror." *Id.* at § 1002(a).

7.     Therefore, Congress prohibited the Executive Branch from providing any grant or award from U.S. taxpayer funds available for assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 that "directly benefits the Palestinian Authority" unless the Secretary of State certifies that the Palestinian

2

Authority is taking credible steps to end acts of violence against Israeli citizens and United States citizens and has terminated Pay to Slay. 22 U.S.C. § 2378c-1(a)(1).

8.      In the Taylor Force Act, Congress made it clear that the Palestinian Authority could directly benefit from U.S. taxpayer-funded projects in the West Bank or Gaza, or operate the Pay to Slay program, but not both.

9.      The Palestinian Authority chose Pay to Slay.

10.     Consequently, the Trump Administration terminated funding.

11.     However, the defendants took power on January 20, 2021, with a new plan: Transfer hundreds of millions of dollars from U.S. taxpayers to the Palestinian Authority despite Pay to Slay and contrary to the Taylor Force Act. Contrary to law, they have transferred nearly half a billion American taxpayer dollars to directly benefit and subsidize the Palestinian Authority. U.S. Dept. of State, *Fact Sheet: U.S. Support for the Palestinian People* (Mar. 26, 2022), https://bit.ly/3yZaMOf. Among other things, the defendants are unlawfully laundering U.S. taxpayer funds through non-governmental organizations to directly benefit the Palestinian Authority.

12.     As of the date of this Complaint, the defendants admit that the Palestinian Authority operates Pay to Slay to encourage terrorist attacks against persons living in and visiting the State of Israel.

13.     The plaintiffs have each been directly and concretely harmed by the defendants' unlawful conduct, and each is a person within the Taylor Force Act's zone of interests.

14.     They sue to stop the defendants' cynical subversion of the Constitution and the Taylor Force Act, and to end the Biden Administration's unlawful transfer of hundreds of millions of U.S. taxpayer dollars to directly benefit the Palestinian Authority.

## Jurisdiction, Relief, and Venue

15.     This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1651. and 5 U.S.C. § 704.

16.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

17.     Venue is proper under 28 U.S.C. § 1391(b)(2).

## Parties

18.     Plaintiff Dr. Ronny Jackson is a Member of the United States House of Representatives from the 13th Congressional District of the State of Texas. He is a resident of the State of Texas and a citizen of the United States. Dr. Jackson has recently visited and, both as a part of his official duties as a Member of Congress and as a private citizen, will again visit the State of Israel in the immediate near future. Because, as the Congress found, Pay to Slay incentivizes terrorism, he faces a greater risk of physical harm or death when traveling to or visiting Israel because of the defendants' *ultra vires* conduct. Dr. Jackson is a person within the zone of interests protected by the Taylor Force Act.

19.     Plaintiffs Stuart and Robbi Force are residents of the State of Texas and citizens of the United States. They are the parents of Taylor Force, a West Point

graduate and veteran of the U.S. Army Iraq and Afghanistan war. The Palestinian Authority has paid, and continues to pay, a Pay to Slay bounty to the family of Taylor Force's murderer. The defendants' intentional and knowing disregard for and violations of the Taylor Force Act cause Stuart and Robbi Force extreme mental and physical distress because the defendants are facilitating and subsidizing the Palestinian Authority's payments to their son's killer. Also, Stuart and Robbi Force have recently visited and intend to visit the State of Israel in the immediate near future. Because, as the Congress found, Pay to Slay incentivizes terrorism, they face a greater risk of physical harm or death while traveling to and visiting Israel because of the defendants' *ultra vires* conduct. Mr. and Mrs. Force are persons within the zone of interests protected by the Taylor Force Act.

20.     Plaintiff Sarri Singer is a resident of the State of New York and a citizen of the United States. She is a survivor of a Palestinian terrorist attack conducted by a suicide bomber who exploded a bomb on a bus in Jerusalem, Israel, killing seventeen innocent people. The Palestinian Authority has paid, and continues to pay, a Pay to Slay bounty to the murderer's family. The defendants' intentional and knowing disregard for and violations of the Taylor Force Act cause Ms. Singer extreme mental and physical distress because the defendants' knowing disregard for and violations of the law prohibiting U.S. taxpayer funds from being used to directly benefit the Palestinian Authority helps facilitate the Palestinian Authority's payments to the family of the man who tried to kill her. Also, Ms. Singer routinely visits Israel and will do so again in the immediate near future. Because, as the

Congress found, Pay to Slay incentivizes terrorism, she therefore faces a greater risk of physical harm or death because of the defendants' *ultra vires* conduct. Ms. Singer is a person within the zone of interests protected by the Taylor Force Act.

21.     Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

22.     Defendant Antony Blinken is the Secretary of State. He is sued in his official capacity.

## Facts

### The Palestinian Pay to Slay Program

23.     The Palestinian Authority is a corrupt, repressive, and violent oligarchy that exists for two primary reasons: first, to enrich its officials and their clans through extortion, graft, and theft; and second, to terminate the State of Israel.

24.     Accordingly, it shirks basic governance obligations such as building roads, providing water, sanitation, and hygiene, supporting the poor, and building a functional civil society in favor of funding, conducting, and celebrating, *inter alia*, eco-terrorism, hate speech, Islamic supremacy, misinformation, and violent extremism.

25.     At all times relevant, the defendants knew or should have known that the Palestinian Authority has funneled vast sums every year into Pay to Slay bounties for terrorists and their families, with increased rewards in proportion to increased casualties, for the express purpose of promoting terrorist attacks against persons who live in and visit Israel.

26.     The payments, known as "shahids" payments, have been made through an entity called "the Institution for Families of Martyrs (sic) and the Injured." To receive a bounty, the families of deceased terrorists apply with information about the deceased, the date, place, and circumstances of death, the number of Jews, Israelis, or others killed, and proof of death.

27.     Between 2013 and 2020, the Palestinian Authority made Pay to Slay payments of more than $1.5 billion. The Palestinian Authority has made Pay to Slay payments under the guise of "diplomatic" salaries to terrorists "working" in Palestinian Authority embassies and ministries, developed a payment system to circumvent banks that refused to move money to terrorists, and scrubbed evidence of the payments from its financial reports.

<u>The Taylor Force Act and the End of U.S. Funding</u>

28.     The Taylor Force Act covers grants and awards authorized to be appropriated or otherwise made available for assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 and available for assistance for the West Bank and Gaza ("Economic Support Funds").

29.     Specifically, it prohibits the U.S. government from making any Economic Support Fund grant or award available for assistance that "directly benefits the Palestinian Authority" unless and until the Secretary of State certifies in writing that the Palestinian Authority has:

   a. Taken "credible steps to end acts of violence against Israeli citizens and United States citizens that are perpetrated or materially assisted by individuals under their jurisdictional control," and

7

     b. "terminated payments for acts of terrorism against Israeli citizens and United States citizens," and

     c. "revoked any law, decree, regulation, or document authorizing or implementing a system of compensation for imprisoned individuals that uses the sentence … of an individual imprisoned for an act of terrorism to determine the level of compensation paid," and

     d. "publicly condemn[ed]" terrorism and taken "steps to investigate or are cooperating in investigations of such acts to bring the perpetrators to justice."

22 U.S.C. § 2378c-1(a)(1).

30.    The only exceptions are for payments made to the East Jerusalem Hospital Network, assistance for wastewater projects not exceeding $5,000,000 in any one fiscal year; and assistance for any other program, project, or activity that provides vaccinations to children not exceeding $500,000 in any one fiscal year. 22 U.S.C. § 2378c-1(b).

31.    Historically, the U.S. taxpayer subsidized the Palestinian Authority's activities. Since 1993, the government has transferred more than $6.3 billion in U.S. taxpayer-funded bilateral assistance, nearly all of which directly benefits the Palestinian Authority. GAO-21-332, *West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks* (Mar. 29, 2021), https://bit.ly/3Ui7lug.

32.    Between FY 2012 and FY 2016, the Obama Administration transferred more than $1.3 billion in U.S. taxpayer-funded Economic Support Funds for assistance that directly benefits the Palestinian Authority. Jim Zanotti, Cong. Res. Ser., *U.S. Resumption of Foreign Aid to the Palestinians* at 3 (Apr. 14, 2021), https://bit.ly/3sOLPlf.

33.     However, because of the Palestinian Authority's incitement, support for terrorism, and corruption, the Trump Administration terminated all Economic Support Fund and other U.S. taxpayer assistance to it.

<u>The Defendants Resume Using U.S. Taxpayer Funds<br>to Directly Benefit the Palestinian Authority</u>

34.     On or about May 6, 2020, candidate Joe Biden promised to reverse, *inter alia*, the Trump Administration's decision to stop sending U.S. taxpayer funds to the Palestinian Authority and its instrumentalities. *See* Yaron Steinbuch, *Joe Biden vows to restore US aid to Palestinians as president,* The New York Post.com (May 7, 2020), https://bit.ly/3Vxc9wU.

35.     On or about September 4, 2020, Rep. Doug Lamborn, one of the Taylor Force Act's original sponsors, said that "You can't restore funding to the Palestinians and comply with the Taylor Force Act except for some very, very limited humanitarian types of funding, Basically, if you agree with the sentiment behind the Taylor Force Act, you don't restore funding to the Palestinians. I think Joe Biden is showing some mental incoherence when [he pledges to restore U.S. funding]." Jackson Richman, *GOP congressman calls Biden's pledge to restore US funding to Palestinians 'mental incoherence',* JNS.org (Sep. 3, 2020), https://bit.ly/3iGQCn6.

36.     Upon information and belief, immediately upon taking power on January 20, 2021, the defendants began executing their plan to circumvent the Taylor Force Act and make U.S. taxpayer funds available for assistance that directly benefits the Palestinian Authority.

37.    On February 7, 2021, in an interview with France 24 Arabic TV, the Palestinian Authority's Prime Minister Dr. Mohammad Shtayyeh said "Yes, there has been a phone call between myself and Mr. Hady Amr – Deputy Assistant Secretary for Israeli and Palestinian affairs. *Mr. Amr reaffirmed what this administration declared during the election campaign: It will restore the aid, it will reopen the PLO office in Washington, and it will open a U.S. consulate in East Jerusalem*." (Emphasis added.) Video clip, *Palestinian PM Mohammad Shtayyeh: Biden Administration Assured Me That It Will Restore Aid, UNRWA, PLO Office In D.C., Open Consulate In East Jerusalem*, MEMRI.org (Feb. 7, 2021), https://bit.ly/3TUpMp3.

38.    On or about March 3, 2021, the Palestinian Authority issued "Law-by-Decree No.7/2021," explicitly taking operational control over all non-governmental organizations operating within its jurisdiction. At all times relevant, the defendants were aware of this decree.

39.    On March 4, 2021, a Palestinian official admitted paying approximately $181 million in Pay to Slay bounties during calendar year 2020. Aaron Boxerman, *PLO says $15 million per month being paid in terror stipends*, The Times of Israel.com (Mar. 4, 2021), https://bit.ly/3gQOckG.

40.    On March 18, 2021, the Biden Administration transmitted a nonpublic report to the Congress advising, *inter alia*, that the Palestinian Authority had not ended Pay to Slay and that the defendants were unable to certify compliance with the Taylor Force Act. Sharon Wrobel, *State Department Report Acknowledges Palestinian*

*Authority Payments to Terrorists as Biden Administration Seeks to Resume Aid*, Algemeiner.com (Mar. 24, 2021), https://bit.ly/3Dlwiya.

41.     On March 26, 2021, the Biden Administration transmitted a nonpublic "program narrative" to Congress appropriating $75,000,000 in Economic Support Funds for "programs that USAID/West Bank and Gaza intends to carry out." These funds were for assistance that directly benefits the Palestinian Authority, and none of the funded programs fell within the Taylor Force Act's exceptions. Nevertheless, the defendants commenced funding on April 10, 2021.

42.     On April 14, 2021, the Congressional Research Service reported that the defendants had provided $150 million in U.S. taxpayer-funded Economic Support Funds for assistance that directly benefits the Palestinian Authority in FY 2020 and FY 2021.

43.     On or about May 11, 2021, Biden sent a letter to the Palestinian Authority promising his direct support for its activities. At the same time, Biden officials, including the Secretary of State and the national security advisor, warned Israel to cease defensive anti-terrorism activities and to stop applying Israeli law in Jerusalem, Israel's U.S.-recognized capital.

44.     On or about May 26, 2021, defendant Blinken confirmed the payment and/or obligation of more than $360 million in U.S. funding directly benefiting the Palestinian Authority. This package, including the above-referenced $75 million Economic Support Funds laundered through Palestinian Authority instrumentalities

for projects that were specifically intended to directly benefit the Palestinian Authority, was clearly prohibited by the Taylor Force Act.

45.     On or about June 5, 2021, Palestinian "president" Mahmoud Abbas authorized a Pay to Slay payment of $42,000 to the family of a terrorist who killed two Israelis. Laila Ghannam, governor of Ramallah's Al-Bireh district, personally handed the money to the family of Muhannad Al-Halabi, a member of the Palestinian Islamic Jihad terror group. Al-Halabi fatally stabbed two Israeli civilians in 2015 before being shot by police.

46.     On June 9, 2021, Sen. James E. Risch, Ranking Member of the Senate Foreign Relations Committee, advised defendant Biden that the Palestinian Authority was incentivizing violence through Pay to Slay. Letter from James E. Risch to Joseph R. Biden, Jr. (June 9, 2021), https://bit.ly/3t6JjXT.

47.     On or about July 1, 2021, the defendants falsely reported to Congress under the PLO Commitments Compliance Act of 1989, Title VIII of Public Law 101-246 (1990). Specifically, derogatory information regarding the Palestinian Authority's support for terrorism was intentionally and wrongly deleted. Adam Kredo, *Biden Admin Deletes References to Palestinian Terror Incitement From Congressional Report; State Dept silent on removing references to malign Palestinian behavior in congressionally mandated report*, The Free Beacon (July 6, 2021), https://bit.ly/3h02Oyv. Upon information and belief, the defendants deleted the derogatory information to cover up terrorist activities and incitement by the

Palestinian Authority and its non-governmental instrumentalities, thereby "smoothing" the transfer of U.S. taxpayer funds for its benefit.

48.     On December 14, 2021, the defendants issued a "Joint Statement on United States and Palestinian Authority Renewal of the U.S.-Palestinian Economic Dialogue," https://bit.ly/3DPHTXG. It stated, in relevant part:

e.   "Participants recognized the importance of restored political and economic relations between the U.S. government and the Palestinian Authority and pledged to expand and deepen cooperation and coordination across a range of sectors."

f.   "[S]enior U.S. and Palestinian officials discussed key topics, including infrastructure development, access to U.S. markets, U.S. regulations, free trade, financial issues, renewable energy and environmental initiatives, connecting Palestinian and American businesses, and addressing obstacles to Palestinian economic development."

g.   "The U.S. government outlined programs that could support the Palestinian Authority's efforts towards financial issues, trade, and promoting foreign direct investment. This year's dialogue was a testament to the importance of U.S.-Palestinian economic relations and the opportunity to increase collaboration on economic issues of shared importance."

h.   "The U.S. delegation included Acting Assistant Secretary of State for Near Eastern Affairs Yael Lempert (U.S. Chair), Deputy Assistant Secretary for Israel and Palestinian Affairs Hady Amr, U.S. Palestinian Affairs Unit Chief George Noll, Deputy Assistant Secretary for Treasury Eric Meyer, Senior Commerce Official Robyn Kessler, USAID Deputy Assistant Administrator Megan Doherty, USAID West Bank and Gaza Mission Director Aler Grubbs, Development Finance Corporation Senior Advisor Kyle Murphy and other officials from the Departments of State, Treasury, Agriculture, Commerce and Energy; the U.S. Agency for International Development; and the Development Finance Corporation."

49.     Upon information and belief, the Taylor Force Act was recognized as an "obstacle" to U.S. support for the Palestinian Authority. However, the defendants' representatives repeatedly affirmed that the United States would continue providing

13

U.S. taxpayer funds and political support to the Palestinian Authority, notwithstanding the Taylor Force Act, Pay to Slay, or the Palestinian Authority's virulent eliminationist anti-Semitism, misinformation, Islamic supremacy, and support for violent extremism against people who visit or live in Israel.

50.     On March 16, 2022, the defendants announced "significant increases" in Economic Support Fund assistance, from $75 million in FY 2021 to $219 million in FY 2022 for assistance that directly benefits the Palestinian Authority by, *inter alia*, relieving it of its civic and governance obligations. According to USAID, "The nearly threefold increase in economic and development assistance *will greatly increase the U.S. government's ability to support the Palestinian people*." USAID, Bureau for the Middle East, *Appropriations Act for FY 2022 Increases Assistance for the West Bank and Gaza* (Mar. 16, 2022) (emphasis added), https://bit.ly/3SXERou.

51.     On March 26, 2022, the defendants issued a "Fact Sheet" asserting that they had transferred over half a billion U.S. taxpayer dollars, all of it directly benefitting the Palestinian Authority, since April 2021. U.S. Dept. of State, *Fact Sheet: U.S. Support for the Palestinian People* (Mar. 26, 2022), https://bit.ly/3yZaMOf. Among other things, this "Fact Sheet" shed light on the defendants' strategy for evading the Taylor Force Act and benefitting the Palestinian Authority by laundering money through non-governmental organizations.

52.     The Palestinian Authority claims Jerusalem as its capital. In a statement published by its official news organ, *Al-Hayat Al Jadida*, the Palestinian Authority stated Jerusalem "has been Palestinian since it was established 5,000

years ago," that "Jerusalem is Jerusalem of the Arab Palestinians...[that] belongs only to believers of the religion of Islam" and that it is necessary to "expel from it the Zionist herds who are stealing the Palestinian land and Judaism to their lairs (sic), until it will be liberated peacefully or through other means of struggle." Itamar Marcus, *PA wants religious war, calls to fight Jerusalem flag parade*, Palestinian Media Watch.org (May 29, 2022), https://bit.ly/3fjwTZr.

53.    The U.S. recognizes Jerusalem as Israel's capital. The White House, *Proclamation 9683, Recognizing Jerusalem as the Capital of the State of Israel and Relocating the United States Embassy to Israel to Jerusalem*, 82 Fed. Reg. 58311 (Dec. 6, 2017), https://bit.ly/3Y3rJlQ.

54.    However, to directly benefit the Palestinian Authority, the defendants, through the U.S. Palestinian Affairs Unit Public Diplomacy Section, are funneling U.S. taxpayer funds to actively subvert Israeli sovereignty in that city by, *inter alia*, "[partnering] with Palestinian and American organizations to support projects in Jerusalem that increase exchange between our two peoples and advance shared goals. Our American Spaces in Jerusalem serves as a venue and hub for many of these programs." [Cleaned up.] U.S. Dept. of State, *Fact Sheet: U.S. Support for the Palestinian People* (Mar. 26, 2022), https://bit.ly/3yZaMOf.

55.    On May 10, 2022, the defendants submitted a non-public report to Congress documenting payments made by the Palestinian Authority of over $150 million to convicted terrorists and another $191 million to the families of terrorists who were "martyred" while attacking persons living in or visiting the State of Israel.

They admitted that "The [Palestinian Authority] has not terminated payments for acts of terrorism against Israeli and U.S. citizens to any individual, after being fairly tried, who has been imprisoned for such acts of terrorism and to any individual who died committing such acts of terrorism, including to a family member of such individual."

56.     On or about June 8, 2022, the defendants confirmed that they had opened a separate diplomatic office for the benefit of the Palestinian Authority, called the "Office of Palestinian Affairs," in Israel's capital. This office acts independently of the U.S. Embassy in Jerusalem and reports directly to Biden Administration political officials in Washington. Upon information and belief, the Office of Palestinian Affairs has operational responsibility for ensuring the Economic Support Funds being laundered through non-governmental organizations are directly benefiting the Palestinian Authority.

57.     On or about July 31, 2022, the Palestinian Authority celebrated the twentieth anniversary of the Hebrew University's Frank Sinatra Cafeteria bombing that killed nine people, including five Americans, and injured more than 80, by announcing a fifteen percent increase in its monthly payments to the terrorists responsible for the attack. At that point, Pay to Slay payments to the persons responsible for the attack totaled approximately $2.6 million. Maurice Hirsch, *PA to raise salaries of terrorists who bombed the Hebrew University in Jerusalem*, Palestinian Media Watch.org (July 31, 2022), bit.ly/3DpGjKF.

58.     On or about October 15, 2022, the defendants reported to Congress that the Palestinian Authority continues to fund Pay to Slay. Adam Kredo, *Palestinian Government Still Pays Terrorists as US Aid Dollars Flow, Non-public State Department report confirms Palestinians are not living up to promises*, Free Beacon.com (Oct. 18, 2022), https://bit.ly/3DqjEPz.

<u>U.S. Funds Encourage Palestinian Terrorism</u>

59.     Since April 2021, the defendants have transferred over half a billion dollars in Economic Support Funds and other assistance to the West Bank and Gaza for the benefit of the Palestinian Authority. U.S. Dept. of State, *Fact Sheet: U.S. Support for the Palestinian People* (Mar. 26, 2022), https://bit.ly/3yZaMOf.

60.     The defendants transferred these funds with actual knowledge that U.S. taxpayer dollars, whether in the form of Economic Support Funds or otherwise, are subsidizing Pay to Slay, Palestinian incitement, and violent extremism.

61.     For example, on September 14, 2022, a fatal attack was carried out by a terrorist who was a member of the defendant-subsidized Palestinian Authority security forces "by day," and a member of the terrorist "Al-Aqsa Martyrs' Brigade" by "night." Nan Jacques Zilberkik, *PA Security Forces/Fatah terrorist becomes Fatah's new poster boy to incite more attacks,* Palestinian Media Watch.org (Sep. 29, 2022), https://bit.ly/3fmszZp.

62.     On October 27, 2022, the Palestinian Authority's "Deputy Chairman" Mahmoud Al-Aloul, whose position was created especially for him by Palestinian Authority President Mahmoud Abbas, affirmed that there was no separation between

the U.S. trained and funded Palestinian Authority security forces that are meant to be combatting terror and the terrorists themselves. *Abbas deputy admits PA security forces are working together with terrorists*, Palestinian Media Watch.org (Oct. 27, 2022), https://bit.ly/3DvAH1u.

63.    On November 2, 2022, thirty-eight Members of Congress wrote to defendant Blinken stating that they were concerned because the hundreds of millions of dollars sent by the defendants to the Palestinians are "tragically enabling the Palestinian Authority's payments to terrorists and the families of terrorists who kill innocent Americans and people of Jewish descent – also commonly referred to as 'pay-to-slay.'" *See Letter to the Hon. Antony J. Blinken from Rep. Lauren Boebert and Rep. Doug Lamborn, et al* (Nov. 2, 2022), https://bit.ly/3UzFjtW.

64.    This letter requested answers to a series of questions regarding the Biden Administration's funding of the Palestinian Authority, with a return date of on or before November 7, 2022, for Congressional oversight purposes.

65.    Upon information and belief, the defendants have failed to respond.

**First Claim for Relief**
(Non-Statutory Review of Ultra Vires Action)

66.    The plaintiffs repeat paragraphs 1-65.

67.    Congress found specifically that the Palestinian Authority's Pay to Slay program is an incentive for terrorism against persons who live in or visit the State of Israel. Pub. L. 115–141, title X, §1002(1) (Mar. 23, 2018).

68.    Therefore, it enacted the Taylor Force Act and conditioned the defendants' authority to make Economic Support Funds available for projects that

directly benefit the Palestinian Authority on a certification by defendant Blinken that the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations: (A) are taking credible steps to end acts of violence against Israeli citizens and United States citizens that are perpetrated or materially assisted by individuals under its jurisdictional control; (B) have terminated payments for acts of terrorism against Israeli and United States citizens; (C) have revoked any law, decree, regulation, or document authorizing or implementing a system of compensation for imprisoned individuals that uses the sentence of an individual imprisoned for an act of terrorism to determine the level of compensation paid; and (D) are "publicly condemning" terrorism and taking appropriate steps to investigate or are cooperating in investigations of such acts to bring the perpetrators to justice. 22 U.S.C. § 2378c-1(a)(1).

69.    The defendant Blinken has not and cannot so certify.

70.    The defendants have claimed that they comply with the Taylor Force Act and all other U.S. laws. Staff, *Renewed U.S. aid to Palestinians 'consistent' with U.S. law - State Department spokesman*, Reuters.com (Apr. 7, 2021), https://reut.rs/3F6H0ex. This is false.

71.    For example, to circumvent Congress and the Taylor Force Act and fund the Palestinian Authority, *inter alia*, the defendants are intentionally laundering Economic Support Fund grants and awards through non-governmental organizations that are in fact or by operation of "Law-by-Decree 7/2021" Palestinian Authority affiliates or instrumentalities. The goal and purpose of the defendants' conduct is to

19

directly benefit the Palestinian Authority by relieving it of direct financial responsibility for its infrastructure, governance, and civil society obligations in the West Bank and Gaza, thereby allowing it to fund Pay to Slay, among other things.

72.    At all times relevant, the defendants knew that they were subsidizing Pay to Slay and violating the Taylor Force Act, and that their conduct was *ultra vires* and contrary to U.S. Const. Art. I, §§ 1 (separation of powers) and 9, cl. 7 (appropriations clause), and U.S. Const. Art. II, § 3 (take care clause).

73.    The defendants' conduct as described herein has concretely and foreseeably damaged the plaintiffs by causing them emotional and physical injury and distress, by increasing their risk of injury and/or death when visiting Israel, and by violating the separation of powers.

74.    Non-statutory judicial review is appropriate because the defendants' conduct in this case is utterly lawless. They have exceeded their delegated power and are knowingly and intentionally violating the Taylor Force Act. Also, without judicial review, plaintiffs will be wholly deprived of a meaningful opportunity to vindicate their rights.

**Second Claim for Relief**
(5 U.S.C. § 706)

75.    The plaintiffs repeat paragraphs 1-74.

76.    The defendants' grants and awards of Economic Support Funds are final agency action under 5 U.S.C. §§ 551(11)(a) and (13), for which there is no other adequate remedy in a court.

77.     Pursuant to 5 U.S.C. § 706, this court should declare unlawful all Economic Support Fund grants and awards that directly benefit the Palestinian Authority, including but not limited to all grants and awards to persons and/or non-governmental organizations under its jurisdiction, for such grants and awards are contrary to the defendants' constitutional right, power, and privilege, in excess of their statutory authority, and short of their statutory rights.

WHEREFORE, the plaintiffs respectfully request the following relief:

A.     A declaration that the defendants have violated and are in continuing violation of the Taylor Force Act, 22 U.S.C. § 2378c-1.

B.     Under 5 U.S.C. § 705, all necessary and appropriate process to freeze all Economic Support Fund grants or awards that directly benefit the Palestinian Authority, and to preserve status or rights pending conclusion of the review requested in this case.

C.     A permanent injunction barring the defendants from making Economic Support Funds available for assistance in the West Bank and Gaza that directly benefits the Palestinian Authority except in compliance with 22 U.S.C. § 2378c-1(a).

D.     Such other relief as this Court deems just.


Respectfully submitted,

/s/ *Gene P. Hamilton*
GENE P. HAMILTON
Virginia Bar No. 80434
America First Legal Foundation
300 Independence Ave S.E.
Washington, D.C. 20003
(202) 964-3721
gene.hamilton@aflegal.org
*Counsel for Plaintiffs*

REED D. RUBINSTEIN*
D.C. Bar No. 400153
reed.rubinstein@aflegal.org
JULIE A. STRAUSS*
D.C. Bar No. 387262
julie.strauss@aflegal.org
America First Legal Foundation
300 Independence Ave. S.E.
Washington, D.C. 20003
(202) 964-3721
*Counsel for Plaintiffs*
* *Application for Pro Hac Vice Admission Pending*

CHRISTOPHER E. MILLS*
D.C. Bar No. 1021558
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law
*Counsel to America First Legal Foundation*
* *Application for Pro Hac Vice Admission Pending*

MORA NAMDAR
Texas Bar No. 24090288
Namdar Law PLLC
3811 Turtle Creek Blvd #275
Dallas, TX 75219
(972) 925-9061
mora@namdarlaw.com
*Counsel to America First Legal Foundation*

/s/ *Christian D. Stewart*
CHRISTIAN D. STEWART
Texas Bar No. 24013569
Morgan Williamson LLP
701 S. Taylor, Suite 440, LB 103
Amarillo, TX 79101
(806) 358-8116
cstewart@mw-law.com
*Local Counsel for Plaintiffs*