**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

_____

RONNY L. JACKSON, *et al.*

                      Plaintiffs,

       v.                              No. 2:22-cv-241

JOSEPH R. BIDEN, JR *et al.*

                      Defendants.
_____

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND..................................................................................................................3

    A.    Assistance to the West Bank and Gaza..................................................................3

    B.    The PA's Prisoner Payment System and Reductions in ESF...........................4

    C.    The Taylor Force Act...........................................................................................6

    D.    ESF Assistance Resumed After Taylor Force Act............................................7

    E.    This Litigation.......................................................................................................9

LEGAL STANDARD..........................................................................................................11

ARGUMENT.......................................................................................................................12

I.       PLAINTIFFS FAIL TO ALLEGE HARMS SUFFICIENT TO ESTABLISH
        ARTICLE III STANDING.........................................................................................13

    A.    Plaintiffs have not plausibly alleged that Defendants' ESF assistance to the
        West Bank and Gaza causes them an increased risk of harm when traveling
        to Israel in the future...........................................................................................16

    B.    Plaintiffs' Alleged Risks of Travel Cannot be Redressed by this Court........16

    C.    Plaintiffs' alleged injury based on the risk of future travel to Israel is both
        speculative and generalized and fails to establish standing..............................18

    D.    Plaintiffs' allegations of emotional distress are insufficient to establish
        standing.................................................................................................................21

II.      PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE
        GRANTED...................................................................................................................23

    A.    Plaintiffs fail to state a claim under the APA. ...................................................23

        i.    The Court cannot review Plaintiffs' APA claim because the
            challenged conduct is committed to agency discretion.........................23

        ii.    Plaintiffs bring an impermissible programmatic challenge to agency
            policy.......................................................................................................25

        iii.    Plaintiffs fail to plausibly allege that Defendants are violating the
            TFA. ........................................................................................................26

    B.    Plaintiffs' Ultra Vires Claim Should be Dismissed..........................................30

i

III.    THE COURT SHOULD IN ANY EVENT EXERCISE ITS DISCRETION TO
        DENY THE REQUESTED EQUITABLE RELIEF........................................................32

CONCLUSION ...............................................................................................................................33

## **TABLE OF AUTHORITIES**

**CASES**

*Abulhawa v. U.S. Dep't of the Treasury,*
   239 F. Supp. 3d 24 (D.D.C. 2017) ..........................................................................15, 16

*Aerotrade, Inc. v. Agency for Int'l Dev., Dep't of State,*
   387 F. Supp. 974 (D.D.C. 1974) ..............................................................................15, 17

*Alabama-Coushatta Tribe of Tex. v. United States,*
   757 F.3d 484 (5th Cir. 2014) ....................................................................................11, 25

*Allen v. Wright,*
   468 U.S. 737 (1984) ........................................................................................................16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .............................................................................11, 26, 27, 29

*Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank,*
   251 F. Supp. 2d 126 (D.D.C. 2003) ..............................................................................17

*Barlow v. Collins,*
   397 U.S. 159 (1970) ........................................................................................................32

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
   502 U.S. 32 (1991) ..........................................................................................................32

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................................11

*Bennett v. Spear,*
   520 U.S. 154 (1997) ........................................................................................................13

*Bernstein v. Kerry,*
   584 F. App'x 7 (D.C. Cir. 2014) ............................................................................14, 18

*Bernstein v. Kerry,*
   962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014)................14, 15, 17

*Builders Bank v. Fed. Deposit Ins. Corp.,*
   846 F.3d 272 (7th Cir. 2017) ..........................................................................................24

*Carney v. Adams,*
   141 S. Ct. 493 (2020) .............................................................................19, 21, 23

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ..............................................................................................13, 18

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ....................................................................................................12

*Dalton v. Specter,*
    511 U.S. 462 (1994) ...............................................................................................23, 31

*Deutsch v. Travis Cnty. Shoe Hosp., Inc.,*
    721 F. App'x 336 (5th Cir. 2018)..............................................................................18

*Drake v. FAA,*
    291 F.3d 59 (D.C. Cir. 2002) ....................................................................................24

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022) ......................................................................................16

*Ellison v. Connor,*
    153 F.3d 247 (5th Cir. 1998) .....................................................................................24

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ...............................................................................15, 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ...................................................................................................16

*Fryshman v. U.S. Comm'n for the Pres. of Am.'s Heritage Abroad,*
    422 F. Supp. 3d 1 (D.D.C. 2019)...............................................................................17

*Geyen v. Marsh,*
    775 F.2d 1303 (5th Cir. 1985).....................................................................................30

*Guidry v. Bank of LaPlace,*
    954 F.2d 278 (5th Cir. 1992) .....................................................................................23

*Harvard Pilgrim Health Care of New Eng. v. Thompson,*
    318 F. Supp. 2d 1 (D.R.I. 2004).................................................................................31

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ...................................................................................................24

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ...................................................................................................22

*Humane Soc'y of the U.S. v. Babbitt,*
    46 F.3d 93 (D.C. Cir. 1995).......................................................................................21

*Inclusive Communities Project, Inc. v. Dep't of the Treasury,*
    946 F.3d 649 (5th Cir. 2019)...........................................................................13, 14, 16

*Indigenous People of Biafra v. Blinken*,
—F. Supp. 3d—, 2022 WL 16551320 (D.D.C. Oct. 31, 2022) .......................................15, 20

*Int'l Union, United Mine Workers of Am. v. CONSOL Energy, Inc.*,
465 F. Supp. 3d 556 (S.D. W. Va. 2020) ................................................................21

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
58 F. Supp. 3d 1191 (D.N.M. 2014)........................................................................31

*Leal v. Azar*,
No. 20-185, 2020 WL 7672177 n.7 (N.D. Tex. Dec. 23, 2020), *judgment vacated on other grounds sub nom.*, *Leal v. Becerra*, No. 21-10302, 2022 WL 2981427 (5th Cir. Jul. 27, 2022...........30, 31

*Leedom v. Kyne*,
358 U.S. 184 (1958) ...............................................................................................32

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
104 F.3d 1349 (D.C. Cir. 1997)..............................................................................24

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ...............................................................................................20

*Louisiana v. Biden*,
No. 21-cv-778, 2021 WL 4312502 (W.D. La. Aug. 23, 2021).................................26

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..........................................................................................*passim*

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ...............................................................................................25

*Mayfield v. LTD Fin. Servs., L.P.*,
No. 20-1966, 2021 WL 4481089 (S.D. Tex. Sept. 30, 2021) ..................................22

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ...............................................................................................12

*Norris v. Hearst Trust*,
500 F.3d 454 (5th Cir. 2007)....................................................................................5

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)..................................................................................................25

*Nyambal v. Mnuchin*,
245 F. Supp. 3d 217 (D.D.C. 2017).....................................................................17, 18

*Nyunt v. Chairman, Broad. Bd. Of Governors*,
589 F.3d 445 (D.C. Cir. 2009).................................................................................32

*Paterson v. Weinberger*,
    644 F.2d 521 (5th Cir. 1981)...................................................................................................11

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007)..............................................................................13, 19, 20

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
    635 F.3d 757 (5th Cir. 2011).................................................................................................12

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
    489 F.3d 1267 (D.C. Cir. 2007)...........................................................................................14

*Rideau v. Keller Indep. Sch. Dist.*,
    819 F.3d 155 (5th Cir. 2016)..........................................................................................21, 22

*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985)......................................................................................32, 33

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*,
    968 F.3d 419 (5th Cir. 2020).....................................................................................19, 20, 21

*Siegel v. U.S. Dep't of the Treasury*,
    304 F. Supp. 3d 45 (D.D.C. 2018).........................................................................................17

*Sierra Club v. Peterson*,
    228 F.3d 559 (5th Cir. 2000)...............................................................................................26

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998).................................................................................................11, 12, 16

*Switchmen's Union v. Nat'l Mediation Bd.*,
    320 U.S. 297 (1943)..............................................................................................................32

*Talenti v. Clinton*,
    102 F.3d 573 (D.C. Cir. 1996)...............................................................................................17

*Tex. Gen. Land Off. v. Biden*,
    —F. Supp. 3d—, 2022 WL 3086333 (S.D. Tx. Aug. 3, 2022) ...................................26, 31, 32

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015)...............................................................................................24

*United States v. Villanueva*,
    No. 15-cv-3556-M, 2016 WL 3390514 (N.D. Tex. May 26, 2016)..........................................23

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ............................................................................................................21

*Webster v. Doe,*
  486 U.S. 592 (1988) .................................................................................................................24

*Williamson v. Tucker,*
  645 F.2d 404 (5th Cir. 1981) ...............................................................................................11

**STATUTES**

5 U.S.C. § 551 .............................................................................................................................25

5 U.S.C. § 701 .............................................................................................................................24

5 U.S.C. § 702 .......................................................................................................................30, 32

5 U.S.C. § 706 .....................................................................................................................*passim*

22 U.S.C. § 2291 ..........................................................................................................................3

22 U.S.C. § 2346 ..........................................................................................................................3

22 U.S.C. § 2349aa .......................................................................................................................3

22 U.S.C. § 2378c-1 ...................................................................................................6, 25, 27, 28

22 U.S.C. § 2395 ..........................................................................................................................3

Consolidated Appropriations Act, 2020,
  Pub. L. No. 116-94, 133 Stat. 2534 (2019) ......................................................................7, 8

Consolidated Appropriations Act, 2021,
  Pub. L. No. 116-260, 134 Stat. 1182 (2020) ........................................................4, 7, 8, 17

Consolidated Appropriations Act, 2022,
  Pub. L. No. 117-103, 136 Stat. 49 .........................................................................................8

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) .......................................................................8

Foreign Assistance Act of 1961,
  Pub. L. No. 87-195, 75 Stat. 424 .........................................................................................3

The Taylor Force Act,
  Pub. L. No. 115–141, 132 Stat. 1143 ................................................................................17

**REGULATIONS**

Administration of Foreign Assistance and Related Functions, Exec. Order No. 12,163,
  44 Fed. Reg. 56,673 (Sept. 29, 1979) (reprinted as amended at 22 U.S.C. § 2381 note) ......................3

**RULES**

Fed. R. Civ. P. 12 .................................................................................................................5, 11

Fed. R. Evid. 201 ..........................................................................................................................5

**OTHER AUTHORITIES**

*Country Reports on Terrorism 2021: Israeli, West Bank, and Gaza*, U.S. Dep't of State: Bureau of
  Counterterrorism,
  https://perma.cc/UP3L-GPXM ............................................................................................ 4, 5

*Consideration of the Taylor Force Act: Hearing Before the S. Comm. on Foreign Rels.*,
  115th Cong. 705 (2017) ................................................................................................5, 6, 18

*Foreign Terrorist Organizations*, U.S. Dep't of State,
  https://perma.cc/BE8T-V97B .................................................................................................29

Jim Zanotti & Rhoda Margesson, *U.S. Resumption of Foreign Aid to the Palestinians*,
  Cong. Rsch. Serv. (Apr. 14, 2021),
  https://perma.cc/9RYU-DZSG.........................................................................................*passim*

Letter from Reps. Boebert, et al. (Nov. 2, 2022),
  https://perma.cc/8GJT-HC57 ..................................................................................................29

*Readout of Vice President Biden's Meeting with Israeli Prime Minister Benjamin Netanyahu*,
  The White House (Mar. 9, 2016),
  https://perma.cc/3DUQ-LSNA ..................................................................................................1

*U.S. Support for the Palestinian People*, U.S. Dep't of State (Mar. 26, 2022),
  https://perma.cc/P4RC-GC7Y...........................................................................................28, 29

*Various Measures: Markup Before the H. Comm. On Foreign Affairs*,
  115th Cong. 79 (2017) ...............................................................................................................6

*West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with
  USAID's Antiterrorism Policies and Procedures May Reduce Risks*, GAO (Mar. 29, 2021),
  https://perma.cc/3S6X-4NBQ .............................................................................................. 3, 5

# INTRODUCTION

Plaintiffs—three individuals and a member of Congress—challenge the United States' provision of foreign assistance to the West Bank and Gaza, seeking declaratory relief and an injunction against further U.S. aid.  Plaintiffs argue that U.S. aid violates the Taylor Force Act of 2018 (the TFA), a law Congress passed in response to the Palestinian Authority's (PA) practice of making payments to individuals – or their families – who are serving sentences in Israeli prisons for acts of terrorism or who died committing such acts (hereinafter referred to as "prisoner payments").  The TFA does not restrict all assistance to the people of the West Bank and Gaza or for the PA; rather, Congress, through the TFA, sought only to restrict certain Economic Support Funds (ESF) that "directly benefit[ ]" the PA, which exercises governance authorities in the West Bank.

The United States condemns acts of terrorism, including those that killed Taylor Force and injured Plaintiff Sarri Singer.  *See Readout of Vice President Biden's Meeting with Israeli Prime Minister Benjamin Netanyahu*, The White House (Mar. 9, 2016), https://perma.cc/3DUQ-LSNA (noting then-Vice President Biden's condemnation for the "murder of U.S. citizen, Taylor Force").  The Government expresses its deep sympathy to the Forces for the tragic loss of their son, and to Ms. Singer for the injuries she suffers.  The United States is committed to fighting terrorism and is committed to ending the practice of prisoner payments that the TFA targets.  The Government's position in this case addresses specific legal questions concerning whether the Plaintiffs may bring a lawsuit to halt assistance to the West Bank and Gaza based on alleged violations of the TFA.

As set forth further below, Plaintiffs' Complaint fails at the pleading stage for multiple reasons.  First, Plaintiffs do not plausibly allege any injury sufficient to support Article III standing.  Plaintiffs speculate that they will be harmed because Defendants' ESF assistance, in alleged violation of the TFA, will increase the likelihood that the system of prisoner payments will continue and incentivize terrorism, and that, as a result, they will face an increased risk of terrorism if they travel to Israel in

1

the future.  But this alleged harm is not fairly traceable to the actions of the Defendants in providing foreign assistance.  Rather, Plaintiffs' claimed risk of potential future injury would result from the possible future actions of third parties (the PA and terrorists) overseas.  And any relief sought here could not redress that alleged risk of future injury, which depends on the independent actions of those third parties.  In addition, Plaintiffs' claim that they face an increased risk of harm if they travel to Israel as a result of U.S. policy actions is wholly conjectural and fails to establish any concrete injury for standing purposes.  Lastly, Plaintiffs' claim that they are suffering an emotional injury caused by Defendants' alleged violation of the TFA also fails to meet Article III's requirements.

Even if the Court were to conclude that Plaintiffs have standing, Plaintiffs have otherwise failed to state a claim on which relief can be granted.  Plaintiffs' claim under the APA is foreclosed as Congress committed to the Secretary of State the discretion to determine what ESF assistance for the West Bank and Gaza might "directly benefit" the PA, and because Plaintiffs' bring an impermissible "programmatic" challenge not allowed under the APA.  Plaintiffs' *ultra vires* claim is an impermissible extension of their APA claim and also should be dismissed.  In any event, if the Court reaches the question, Plaintiffs have failed to plausibly allege that the Secretary is violating the TFA, under either of Plaintiffs' theories, when Congress (1) mandated ESF assistance in specific amounts to the West Bank and Gaza, and (2) left to the Secretary to decide how that assistance can be provided such that it does not directly benefit the PA.  Beyond these points, Plaintiffs' allegations that ESF assistance has violated the TFA are entirely speculative and unsupported.  Plaintiffs fill their Complaint with a litany of news articles, congressional oversight letters, and public documents that fail to plausibly allege any violation of the TFA.  To the contrary, documents cited, and therefore incorporated, in the Complaint, demonstrate that the Secretary is faithfully complying with the statute and the relevant Appropriations Acts in allocating ESF to the West Bank and Gaza.  For all of these reasons, set forth further below, the Court should dismiss the Complaint.

2

## BACKGROUND

### A.  Assistance to the West Bank and Gaza

Through the Foreign Assistance Act of 1961 (the Act), related statutes, and the annual appropriation of foreign assistance funds, Congress has authorized the provision of various forms of foreign assistance.  *See, e.g.*, Pub. L. No. 87-195, Pt. II, § 531, 75 Stat. 424, (codified at 22 U.S.C. § 2346) (assistance to promote economic and political stability); *id.* § 481, (codified at 22 U.S.C. § 2291) (counternarcotic and anticrime assistance); *id.* § 571, (codified at 22 U.S.C. § 2349aa) (antiterrorism assistance).  The President has broad discretion to set the terms and conditions on which the United States provides foreign assistance.  *See, e.g., id.* § 635(a) (codified at 22 U.S.C. § 2395(a)) (authorizing assistance to be provided on such terms as may be determined to be best suited to the achievement of the purposes of the Foreign Assistance Act); *id.* § 531(a) (codified at 22 U.S.C. § 2346(a)) (authorizing the President "to furnish assistance to countries and organizations, on such terms and conditions as he may determine, in order to promote economic or political stability").  With certain exceptions, the functions conferred on the President by the Act have been delegated to the Secretary of State.  *See* Administration of Foreign Assistance and Related Functions, Exec. Order No. 12,163, 44 Fed. Reg. 56,673 (Sept. 29, 1979) (reprinted as amended at 22 U.S.C. § 2381 note) (delegating authority under, *inter alia*, the Foreign Assistance Act and as President of the United States).  Section 531(b) of the Act further states that "[t]he Secretary of State shall be responsible for policy decisions and justifications for economic support programs under this part," including ESF.  22 U.S.C. § 2346(b).  The Secretary "exercise[s] this responsibility in cooperation with the Administrator" of the U.S. Agency for International Development (USAID).  *Id.*

Under these authorities, and as confirmed by information referenced in the Complaint, Congress has appropriated millions of dollars in assistance to the West Bank and Gaza over many years.  *See* Compl. ¶ 42 (citing Jim Zanotti & Rhoda Margesson, *U.S. Resumption of Foreign Aid to the*

*Palestinians*, 2, Cong. Rsch. Serv. (Apr. 14, 2021), https://perma.cc/9RYU-DZSG (hereafter "CRS Rept."); *see also* Compl. ¶ 31 (citing *West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks*, GAO (Mar. 29, 2021), https://perma.cc/3S6X-4NBQ (discussing ESF assistance to the West Bank and Gaza from FY2015 to FY2019) (hereafter "GAO Rept.")). This funding falls into multiple categories, including but not limited to: (1) international narcotics control and law enforcement; 2) nonproliferation, antiterrorism, demining and related programs; and (3) economic support funds (ESF). *See* CRS Rept. at 2. This case concerns the provision of ESF to Palestinians through entities in the West Bank and Gaza. As set forth below, bilateral ESF assistance to the West Bank and Gaza was reduced from nearly $400 million in fiscal year (FY) 2012 to roughly half that amount in FY2016 due in part to the PA's prisoner payment system, obligations of additional bilateral ESF were ended for FY2017 to FY2019, then renewed starting in FY2020 – subject to the requirements of, *inter alia,* the TFA.[1]

### B. The PA's Prisoner Payment System and Reductions in ESF

This case concerns the system of prisoner payments undertaken by the PA referred to in the Complaint as "Pay to Slay." *See generally* Compl. ¶¶ 1-2, 23-27. Under this system, the PA provides payments to individuals—or their families—who are serving sentences in Israeli prisons for acts of terrorism or who died committing such acts. *See id.* ¶ 2; *Country Reports on Terrorism 2021: Israeli, West*

---

[1] Although not the bilateral ESF assistance to the West Bank and Gaza apparently at issue in the Complaint, Congress has also authorized the establishment of regional programs to assist both Israelis and Palestinians through the Nita M. Lowey Middle East Partnership for Peace Act of 2020 (MEPPA) and has allocated ESF annually for this program in the annual appropriations acts starting in FY 2021. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 8001 *et seq.,* 134 Stat. 1182 (2020). MEPPA amends the Foreign Assistance Act to create the People-to-People Partnership for Peace Fund (managed by USAID) and the Joint Investment for Peace Initiative. The People-to-People Partnership for Peace Fund is "a program to provide funding for projects to help build the foundation for peaceful co-existence between Israelis and Palestinians and for a sustainable two-state solution." *Id.* § 8004.

*Bank, and Gaza*, U.S. Dep't of State: Bureau of Counterterrorism, https://perma.cc/UP3L-GPXM ("Countering the Financing of Terrorism").[2]

In response to this deplorable practice, Congress has reduced the amount of aid to the PA and the West Bank and Gaza and imposed several conditions on such aid.  For example, Congress restricted the use of ESF for cash assistance to the PA, *see* Appropriations Acts, *infra*, § 7040(a), and also restricted the use of certain assistance for "obligations for salaries of personnel of the Palestinian Authority located in Gaza," *id.* § 7040(f)(1).  Furthermore, starting in FY2015, the Secretary was required to reduce all ESF "by an amount that the Secretary determined to be equivalent to the amount that the PA expended [on prisoner payments] . . . during the previous calendar year."  GAO Rept., *supra*, at 16 n.22 (citations omitted).

As relevant to this case, due in part to the PA's system of prisoner payments, ESF assistance to the West Bank and Gaza has been reduced.  *See* CRS Rept. at 2 (reflecting significantly reduced ESF funding from FY2012 to FY2016); GAO Rept. at 56, Appx. III (discussing reduced obligation of funds); *Consideration of the Taylor Force Act: Hearing Before the S. Comm. on Foreign Rels.*, 115th Cong. 705, at 10 (2017) (statement of Daniel B. Shapiro, former U.S. Ambassador to Israel) ("[S]ince fiscal year 2015, Congress and the Obama administration have already made reductions [in aid] on the basis of [the system of prisoner payments] . . . .").  And starting with FY2017 funds, new obligations of bilateral ESF assistance for the West Bank and Gaza were stopped, until Congress directed a resumption of such funding in FY2020.  *See* CRS Rept. at 2; GAO Rept. at 1.

---

[2] On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6), the Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201(b)(2); *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.").

### C.  The Taylor Force Act

In 2018, after the PA had not yet ended the prisoner payment system, Congress passed the Taylor Force Act, 22 U.S.C. § 2378c-1.  Compl. ¶¶ 4-5.  The Act was named in honor of Taylor Force, the son of plaintiffs Stuart and Robbi Force.  Taylor Force, a 28-year-old U.S. Army Iraq and Afghanistan war veteran and West Point graduate, was murdered by a terrorist on March 8, 2016, while visiting Israel as part of his graduate program.  *Id.* ¶ 5.  The TFA broadened the existing restriction on providing cash assistance to the PA by restricting ESF that "directly benefits" the PA.  22 U.S.C. § 2378c-1(a)(1).  Specifically, unless the Secretary certifies in writing, *inter alia*, that the PA has ended the prisoner payment system, the Secretary may not, with certain exceptions, provide ESF that directly benefits the PA.  *Id.*

The Act does not define its key phrase: "directly benefits" the PA.  Rather, it leaves to the Secretary to submit to Congress a "list of the criteria that the Secretary uses to determine whether assistance for the West Bank and Gaza is assistance that directly benefits the Palestinian Authority." *Id.* § 2378c-1 (f)(1).  As noted in the legislative history, the TFA "has been carefully written in order to target only those funds that directly benefit the Palestinian Authority." *Various Measures: Markup Before the H. Comm. On Foreign Affairs*, 115th Cong. 79, at 182 (2017) (statement of Rep. Ted Deutch).  The language of the Act was crafted "in a way that will pressure the PA to stop [the prisoner payment system] without damaging our vital investments in humanitarian assistance and grassroots people-to-people programs that are essential to achieving our overall objective of peace." *Id.; see also* 115th Cong. 705, at 35 (statement of Sen. Tim Kaine) (Congress ultimately passed the TFA to, at the very least, "discourage . . . bad behavior," while not "withdraw[ing American] support for important goals that the administration shares with respect to Palestine."); *id.* at 10 (statement of Hon. Daniel B. Shapiro) (noting that the "purpose" of the "overall assistance program" is to "keep the West Bank stable," a goal that "may be even more in Israel's interests" than "in the Palestinians'").

6

On May 3, 2018, the Secretary transmitted a list of criteria to Congress that guide the Secretary's evaluation of whether ESF "directly benefits" the PA, namely: (1) the identity of the "intended primary beneficiary or end user of the assistance;" (2) "[w]hether the Palestinian Authority is the direct recipient of the assistance;" (3) "[w]hether the assistance involves payments to Palestinian Authority creditors;" (4) "[t]he extent of ownership or control the Palestinian Authority exerts over an entity or individual that is the primary beneficiary or end user of the assistance;" and (5) "[w]hether the assistance or services provided directly replace assistance or service provided by the Palestinian Authority." U.S. State Dep't, Report Pursuant to Section 1004(f)(1) of the Taylor Force Act, at 2 (May 3, 2018), Exhibit C ("Criteria Rept."); *see also* CRS Rept., at 2 (describing criteria). In short, Congress left to the Secretary the authority to set the criteria as to what "directly benefits" the PA means, and to apply those criteria to funds that Congress designated for the West Bank and Gaza in annual appropriations of ESF assistance.

### D. ESF Assistance Resumed After Taylor Force Act

The Complaint asserts that the current Administration "commenced" renewed ESF funding for the West Bank and Gaza in April 2021, *see* Compl. ¶ 41, but as documents referenced in the Complaint indicate, in December 2019, Congress specifically appropriated ESF funding for FY2020[3] when it designated $75 million in ESF for the West Bank and Gaza. CRS Rept. at 2; *see also* Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, 133 Stat. 2534 (2019), (FY2020 Appropriations Act) (Joint Explanatory Statement accompanying the FY2020 Appropriations Act). Congress directed another $75 million for FY2021, and then further increased that funding to $219 million for FY2022 and $225 million for FY2023. *See* Consolidated Appropriations Act, 2021, Pub.

---

[3] Fiscal years begin on October 1 of the preceding calendar year – *i.e.* FY2020 began on October 1, 2019, and ran through September 30, 2020.

L. No. 116-260, 134 Stat. 1182 (2020), (FY2021 Appropriations Act) (Joint Explanatory Statement accompanying the FY2021 Appropriations Act); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, (FY2022 Appropriations Act) (Joint Explanatory Statement accompanying the FY2022 Appropriations Act); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022), (FY2023 Appropriations Act) (Joint Explanatory Statement accompanying the FY2023 Appropriations Act).[4]

Although the TFA restricts certain U.S. assistance to the West Bank and Gaza, it does not alter the amount that the Secretary must otherwise provide in ESF as specified in the relevant Appropriations Acts. As a general matter, all assistance to the West Bank and Gaza directed by Congress at specific amounts under the relevant Appropriations Acts is mandatory: "funds appropriated by this Act . . . . *shall* be made available at not less than the amounts specifically designated in the respective tables included in the explanatory statement described in section 4 . . . ." Pub. L. No. 116-94 § 7019; Pub. L. No. 116-260 § 7019; Pub. L. No. 117-103 § 7019; Pub. L. No. 117-328 § 7019 (collectively, the "Appropriations Acts"). Thus, Congress, through these annual Appropriations Acts, required the provision of ESF assistance to the West Bank and Gaza, subject to the requirements of the TFA.

Pursuant to the Appropriations Acts, the Secretary must also notify Congress of the planned uses of ESF for the West Bank and Gaza at least 15 days prior to the obligation of funds for that purpose. *Id.* § 7039(f). For example, the FY2020 Program Narrative, submitted pursuant to this congressional notification requirement, detailed that USAID would provide ESF to the West Bank and Gaza for civil society, public health initiatives, water supply and sanitation, social services, private

---

[4] The Program Narrative for ESF assistance to the West Bank and Gaza is incorporated in the Complaint. For convenience of the Court, it is attached hereto, along with the U.S. Agency for International Development, Program Narrative for FY 2021 (Apr. 19, 2022), as Exhibit B.

sector productivity, workforce development, transport services, protection, assistance and recovery, and disaster readiness. *See* U.S. Agency for Int'l Dev., Program Narrative (Mar. 26, 2021), Exhibit A (FY2020 Program Narrative).  For FY2021, the Program Narrative also describes ESF assistance that USAID would provide to the West Bank and Gaza for civil society, public health initiatives, water supply and sanitation, social services, private sector productivity, workforce development, transport services, protection, assistance and recovery, and disaster readiness. *See generally*, U.S. Agency for Int'l Dev., Program Narrative (Apr. 19, 2022), Exhibit B (FY2021 Program Narrative).  As discussed further below, these Program Narratives indicate the funds would be provided to third parties for assistance in particular areas for the benefit of Palestinians, and that no funding would be provided directly for the PA, *see, e.g.* FY2020 Program Narrative at 3 ("USAID will not provide assistance for the PA"), 4 ("Funds will not provide assistance for the PA").

### E.  This Litigation

Plaintiffs, a member of Congress and three private individuals, challenge ESF assistance to the West Bank and Gaza under the APA, and in excess of constitutional authority, on the grounds that this aid violates the TFA's restriction on ESF that directly benefits the PA.  Compl. ¶¶ 11, 72.  They seek a declaration that Defendants' funding violates the TFA and equitable relief in the form of an injunction stopping all ESF provided in violation of the TFA.

Plaintiffs allege that all ESF to the West Bank and Gaza currently violates the TFA. *See, e.g. id.* ¶ 41 (alleging that in 2021, $75 million in ESF funds "were for assistance that directly benefits the Palestinian Authority, and none of the funded programs fell within the TFA's exceptions."); *id.* ¶¶ 42, 50-51.  Plaintiffs allege, without factual elaboration, that Defendants are "laundering" ESF through various non-governmental organizations (NGOs) to "directly benefit" the PA. *Id.* ¶¶ 11, 71.  They allege that Defendants, by providing ESF, seek to "relieve[ ]" the PA of "direct financial responsibility for its infrastructure, governance, and civil society obligations" in the West Bank and Gaza. *Id.* ¶ 71.

9

In support of these claims, Plaintiffs cite a variety of news articles, congressional oversight letters, and public documents, but as explained below none of these sources supports their claim that Defendants are currently violating the TFA.  Plaintiffs also criticize President Biden's decision to implement Congress's direction to provide aid to the Palestinian people in the West Bank and Gaza, *see id.* ¶¶ 10, 34, 36, but fail to note that current ESF assistance for the West Bank and Gaza was appropriated by Congress starting again in FY2020, under the previous administration.[5]

Plaintiffs allege that they suffer two separate injuries from Defendants' alleged violation of the TFA.  First, they argue that Defendants' alleged TFA violation increases the likelihood that the PA will continue prisoner payments (which they refer to as "Pay to Slay") and incentivize terrorism.  *Id.* ¶¶ 6, 59-60, 67.  Congressman Ronny Jackson alleges that he travels to Israel "both as a part of his official duties as a Member of Congress and as a private citizen."  *Id.* ¶ 18.  All Plaintiffs allege that they have visited Israel in the past.  *Id.* ¶¶ 18-20.  They allege that they will travel to Israel in the "immediate near future," and claim to have standing to challenge Defendants' actions because, when traveling, they will face a higher risk of terrorism caused by Defendants' provision of ESF to the West Bank and Gaza.  *Id.* ¶¶ 18-20.

Second, three plaintiffs allege that Defendants' purported TFA violations cause them "extreme mental and physical distress."  *Id.* ¶¶ 19-20.  Specifically, Plaintiffs Stuart and Robbi Force, whose son Taylor was killed in a terrorist attack in Tel Aviv, and Plaintiff Sarri Singer, who was injured in a terrorist attack in Jerusalem, allege that "defendants' intentional and knowing disregard for and violations of the Taylor Force Act cause [them] extreme mental and physical distress because the defendants are facilitating and subsidizing the Palestinian Authority's payments" to those who

---

[5] Plaintiffs also take issue with other aspects of the current Administration's policy, including the creation of an "Office of Palestinian Affairs" in Jerusalem.  That allegation has no bearing on the claims raised in this case.  Compl. ¶¶ 47, 56.

perpetrated the attacks. *Id.* ¶¶ 19-20. The Complaint contains two counts. Count I brings an *ultra vires* claim under the Constitution. Count II alleges a violation of the Administrative Procedure Act, 5 U.S.C. § 706. Plaintiffs seek a declaration that Defendants are violating the TFA and an injunction stopping all funding in violation of the TFA. *See* Claim for Relief.

## LEGAL STANDARD

Defendants move to dismiss this action for lack of subject-matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and (b)(6), respectively. Courts "must consider first the Rule 12(b)(1) jurisdictional challenge prior to addressing the merits of the claim." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 487 (5th Cir. 2014); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). A motion to dismiss under Rule 12(b)(1) may be either "facial" or "factual." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). An attack is "factual" if the defendant "submits affidavits, testimony, or other evidentiary materials." *Id.* An attack is "facial" if it is "based on the lack of jurisdiction on the face of the complaint." *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981). Where, as here, a defendant makes a facial attack, "the plaintiff is left with [the] safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised," *id.*, and the Court must determine whether "[the plaintiff's] jurisdictional allegations are sufficient," *Paterson*, 644 F.2d at 523.

To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted). The 12(b)(6) analysis "may rely on the complaint, its proper attachments, documents incorporated into the

11

complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quotation omitted).

## ARGUMENT

### I.   PLAINTIFFS FAIL TO ALLEGE HARMS SUFFICIENT TO ESTABLISH ARTICLE III STANDING.

Standing is a jurisdictional requirement, and this Court "cannot proceed at all" unless plaintiffs establish this "irreducible constitutional minimum," *Steel Co.*, 523 U.S. at 94, 102 (citation omitted), "for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted); *see also Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992). Plaintiffs can only meet this burden by demonstrating that the challenged action causes them to suffer an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Here, Plaintiffs' claimed injuries are based on the contention that Defendants' provision of ESF to the West Bank and Gaza increases the risk that they will face harm when traveling to Israel in the future and that, with respect to Plaintiffs Stuart and Robbi Force and Sarri Singer, the funding in alleged non-compliance with the TFA causes them emotional distress. These claimed harms are insufficient under all of the elements needed to establish Article III standing.

First, Plaintiffs' alleged increased risk of harm when traveling to Israel is neither caused by Defendants nor redressable by the relief sought. Second, even if fairly attributable to the Defendants and redressable, Plaintiffs' alleged future risk of injury is highly speculative and cannot meet the requirements of a "concrete" or "particularized" injury-in-fact. Third, Plaintiffs' allegations of emotional distress are insufficient to separately establish standing. The Court should therefore dismiss the Complaint for lack of standing.

A.   **Plaintiffs have not plausibly alleged that Defendants' ESF assistance to the West Bank and Gaza causes them an increased risk of harm when traveling to Israel in the future.**

Article III standing requires "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The harm alleged must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). Plaintiffs speculate that Defendants' provision of ESF assistance to the West Bank and Gaza increases their risk of being harmed by Palestinian terrorists when traveling to Israel in the future. But this alleged injury is not fairly traceable to the challenged actions of the Defendants here: providing ESF assistance to the West Bank and Gaza. While Article III does not require "a showing of proximate cause or that the defendant's actions are the very last step in the chain of causation," injuries cannot be "the result of the independent action of some third party not before the court." *Inclusive Communities Project, Inc. v. Dep't of the Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (citations omitted). Indeed, "standing is 'substantially more difficult to establish' where, as here, the parties invoking federal jurisdiction are not 'the object of the government action or inaction' they challenge." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007) (Kavanaugh, J.) (quoting *Lujan*, 504 U.S. at 562); *see also Inclusive Communities Project*, 946 F.3d at 655. Causation may be shown "where the defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury [to Plaintiffs]." *Inclusive Communities Project*, 946 F.3d at 655 (quoting *Bennett*, 520 U.S. at 169).

Plaintiffs' alleged injury cannot meet this high bar. Plaintiffs' claimed injury hinges on "speculation about the decisions of independent actors" that cannot support standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Plaintiffs allege that the provision of ESF assistance to the people of the West Bank and Gaza subsidizes the PA and therefore incentivizes the PA to continue prisoner payments. Compl. ¶¶ 59-60, 67. Plaintiffs further speculate that if and when they travel to

13

Israel, they will suffer an increased risk of harm stemming from Palestinian terrorism. On the face of the pleadings, Plaintiffs' alleged injury—an increased risk of terrorism when they travel in the future to Israel—turns on independent future decisions of not only the PA and whether it maintains its prisoner payment policy, but also on the independent actions of terrorists who may be incentivized to commit acts of violence in Israel as a result of that policy. But Plaintiffs can only speculate how the PA would respond to alterations in U.S. aid, let alone whether those actions might diminish the risk that individuals will engage in acts of terrorism in Israel. *See Inclusive Communities Project*, 946 F.3d at 658-59 (noting that causation rarely exists when there are two or more links in the causal chain). Thus, Plaintiffs do not plausibly allege the causation necessary for Article III standing.

In fact, Plaintiffs' own allegations do not support their theory of causation. Their Complaint highlights that, despite steep reductions in ESF assistance from FY2012 to FY2016, *see* CRS Rept. at 2, and discontinuation of this assistance using FY2017 to FY2019 funds, *see id.*; Compl. ¶¶ 10, 33, the PA's policy of prisoner payments continued. *See, e.g.* Compl. ¶ 12. These allegations contradict Plaintiffs' theory of causation by showing that reductions in, and even a several-year cessation of new obligations of bilateral ESF assistance, had no impact on the prisoner payment policy of the PA. *Cf. Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) ("[T]he undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces."). In these circumstances, it is sheer speculation that discontinuing the challenged funding will have a "determinative or coercive" effect on the PA's decision to continue prisoner payments—indeed, the facts pled and referenced in the Complaint indicate otherwise.

Courts have already considered this sort of speculative and attenuated causal chain in similar lawsuits challenging U.S. foreign aid and have, without exception, found it insufficient to support standing. Most notably, in *Bernstein v. Kerry,* 962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014), the court rejected a theory of standing advanced by U.S. citizens residing in Israel

who alleged injuries at the hands of terrorists supported by the PA.  Like Plaintiffs here, the plaintiffs in *Bernstein* alleged that the United States failed to faithfully certify that assistance to the PA and non-governmental organizations in the West Bank and Gaza would not violate several restrictions intended to counter-terrorism and promote peace in the region, including that no funds for the West Bank and Gaza would be "made available for the purpose of recognizing or otherwise honoring individuals who commit, or have committed acts of terrorism."  *Id.* at 124-25.   In finding that the plaintiffs lacked standing to enjoin U.S. aid to the PA, the court characterized the plaintiffs' argument that a change in the U.S. Government's policy would reduce the threat of terrorism as "at best, mere speculation."  *Id.* at 129-30.  The court elaborated:

> To trace the alleged injury in this case to the challenged actions of defendants, this Court would have to speculate on whether defendants' funding policies were in fact aiding terrorists, whether the terrorists were using these funds for activities intended to harm plaintiffs, and whether these activities are leading to a "certainly impending" injury for plaintiffs.

*Id.* at 129 (concluding that plaintiffs' alleged standing required the Court to speculate about a "protracted chain of causation" that federal funding to the PA increased their risk of suffering a terrorist attack) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996)).

Other courts have also rejected similar claims for a lack of causation in the broader context of foreign assistance. *See, e.g. Indigenous People of Biafra v. Blinken*, —F. Supp. 3d—, 2022 WL 16551320, at *4 (D.D.C. Oct. 31, 2022) (concluding that Plaintiff Biafrans challenging the Secretary of State's decision to sell military aircraft to the Nigerian government lacked standing because their argument that the Nigerian government would then use the aircraft against Biafrans in Nigeria required the court to speculate about the resulting actions by the Nigerian government, the actual party alleged to cause the future harm); *Aerotrade, Inc. v. Agency for Int'l Dev., Dep't of State*, 387 F. Supp. 974, 975 (D.D.C. 1974) (noting "considerable uncertainty as to whether [plaintiff's requested relief of suspending aid to Haiti] would aid plaintiff in collecting its debt" owed by the Haitian government); *Abulhawa v. U.S.*

*Dep't of the Treasury*, 239 F. Supp. 3d 24, 34 (D.D.C. 2017) (concluding that plaintiffs challenging the Treasury Department's decision to grant tax-exempt status to pro-Israeli settlement organizations lacked standing because plaintiffs' argument that the settlement organizations' alleged criminal activity would not have occurred but for their tax exempt status was "attenuated" and relied upon "speculative inferences about the independent actions of some third parties not before the Court" (quoting *Allen v. Wright*, 468 U.S. 737, 757, 759 (1984))). As in these cases, Plaintiffs' "protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts" to the alleged injury. *Fla. Audobon Soc'y*, 94 F.3d at 670. The Court should therefore dismiss Plaintiffs' Complaint to the extent it claims injury based on a future risk of traveling to Israel.

### B. Plaintiffs' Alleged Risks of Travel Cannot be Redressed by this Court.

For similar reasons, Plaintiffs have not plausibly alleged that an injunction against Defendants' ESF assistance to the West Bank and Gaza will redress their alleged harms. "To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.'" *Inclusive Communities Project,* 946 F.3d at 655 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). However, when Plaintiffs do not sue the party directly causing their alleged harm, "they leave redressability to turn on the unfettered choices made by independent actors not before the courts," whose "discretion the courts cannot presume either to control or predict." *E.T. v. Paxton*, 41 F.4th 709, 720 (5th Cir. 2022) (quoting *Lujan*, 504 U.S. at 562). Ultimately, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Inclusive Communities Project*, 946 F.3d at 655 (quoting *Steel Co.,* 523 U.S. at 107 (1998)).

Plaintiffs cannot show that ending any current ESF funding would "likely" stop the system of prisoner payments. Indeed, how to stop prisoner payments is exactly the foreign policy dilemma with which policymakers have concerned themselves for years, *see supra*, page 5 (describing congressional

efforts to end the prisoner payment system since 2015), and all previous efforts based on curtailing funding have been unsuccessful, *see* Compl. ¶¶ 68-69.  Stopping ESF assistance cannot be relied upon to have Plaintiffs' desired effect.  *See Aerotrade, Inc.*, 387 F. Supp. at 975 (noting "considerable uncertainty as to whether such action would aid plaintiff in collecting its debt or would tend to drive [the foreign government] into even greater intransigence"); *cf. Fryshman v. U.S. Comm'n for the Pres. of Am.'s Heritage Abroad*, 422 F. Supp. 3d 1, 8 (D.D.C. 2019) ("Federal courts are simply not well-suited to draw the types of inferences regarding foreign affairs and international responses to U.S. policy that Plaintiffs' theory of causation posits." (citation omitted)).

Once again, Plaintiffs are not the first to argue that altering U.S. foreign aid would change the behavior of a foreign authority, and courts have long been skeptical that such relief would "remedy" any alleged harm.  *See, e.g. Siegel v. U.S. Dep't of the Treasury*, 304 F. Supp. 3d 45, 53–55 (D.D.C. 2018) (foreign aid to Israelis); *Talenti v. Clinton*, 102 F.3d 573, 575–78 (D.C. Cir. 1996) (foreign aid to Italy); *Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank*, 251 F. Supp. 2d 126, 129 (D.D.C. 2003) (foreign aid to Guyana); *Aerotrade Inc.*, 387 F. Supp. at 975 (foreign aid to Haiti); *Nyambal v. Mnuchin*, 245 F. Supp. 3d 217, 224 (D.D.C. 2017) (funding to the International Monetary Fund).  Thus, "[i]t is nothing more than conjecture to argue that changing U.S. funding policies will reduce terrorism or plaintiffs' subjective fears." *Bernstein*, 962 F. Supp. 2d at 130.  Indeed, it is more plausible that the elimination of ESF assistance to the West Bank and Gaza to help meet needs of the people could *increase* the risk of instability and therefore, terrorism.  The Taylor Force Act, Pub. L. 115–141, div. S, title X, §1002, Mar. 23, 2018, 132 Stat. 1143 (finding that assistance programs are important tools for promoting peace); *e.g.* FY2021 Appropriations Act, § 8002 ("According to the 2018 Joint Strategic Plan of the Department of State and the United States Agency for International Development, assistance can help prevent new recruitment to terrorist organizations, reduce levels of violence, promote legitimate governance structures that strengthen inclusion, and reduce policies that marginalize communities."

(quotations omitted)); *see also* CRS Rept. at 3 ("Secretary Blinken explained that resuming aid for the Palestinians would serve important U.S. interests such as . . . stability that can lead toward a negotiated two-state solution."); 115th Cong. 705, at 10 (statement of Hon. Daniel B. Shapiro) *supra*, (noting that the "purpose" of the "overall assistance program" is to "keep the West Bank stable," a goal that "may be even more in Israel's interest" than "in the Palestinians'"); *c.f. Nyambal*, 245 F. Supp. 3d at 225 (quotation omitted) (concluding "there is considerable uncertainty'" as to whether the actions proposed by plaintiff would aid him or drive the challenged entity "into even greater intransigence"). For these reasons, Plaintiffs cannot plausibly allege that their requested relief is likely to redress their alleged harm. *Accord Bernstein v. Kerry,* 584 F. App'x 7 (D.C. Cir. 2014) (affirming the district court's dismissal of the case on grounds that the plaintiff's "belief that a change in [U.S. foreign aid] policy would reduce the threat of terrorism is, at best, mere speculation").

### C.  Plaintiffs' alleged injury based on the risk of future travel to Israel is both speculative and generalized and fails to establish standing.

Wholly apart from the fundamental causation and redressability problems detailed above, Plaintiffs' alleged future harm of an increased risk of danger when traveling to Israel—purportedly caused by U.S. foreign aid to the West Bank and Gaza—is too speculative and generalized to satisfy the injury-in-fact requirement for standing.  "To establish injury in fact for Article III standing, a plaintiff must show that he or she has "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Deutsch v. Travis Cnty. Shoe Hosp., Inc.*, 721 F. App'x 336, 340 (5th Cir. 2018) (citation omitted).

As a preliminary matter, Plaintiffs' theory of harm does not claim any actual, existing injury but rather a hypothetical, future risk of injury.  "Imminent," however, means that future threatened injury must be "*certainly impending*" to constitute injury-in-fact, and "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted).

Here, Plaintiffs have alleged a future harm—specifically an increased risk of danger when traveling to Israel—purportedly caused by U.S. foreign aid to the West Bank and Gaza. But that alleged injury is far too speculative and generalized to satisfy the injury-in-fact requirement for standing. To begin with, Plaintiffs' mere allegation that they plan to travel to Israel in the "immediate near future," Compl. ¶¶ 18-20, is certainly not enough to establish standing, as "some day intentions do not support a finding of the 'actual or imminent' injury that our cases require." *Carney v. Adams*, 141 S. Ct. 493, 502 (2020) (quoting *Lujan*, 504 U.S. at 564); *see also Lujan*, 504 U.S. at 564 (concluding no injury-in-fact existed when there was no "description of concrete plans" to travel).

But even if Plaintiffs had tickets to travel to Israel tomorrow, their claim that, on arrival in Israel, they will face an increased risk of harm due to Defendants' alleged funding to the West Bank and Gaza, Compl. ¶¶ 18-20, is entirely conjectural and does not establish their standing. Regrettably, the threat of terrorism is the result of many historic and current circumstances, and the independent actions of organizations, entities, and people who pursue violence. Given the myriad factors that lead to an increased risk of terrorism, it has not been credibly alleged that ESF assistance to the West Bank and Gaza increases any risk of harm to Plaintiffs, let alone one sufficient to establish standing. As noted, Plaintiffs can only speculate how the provision of this assistance impacts the PA's prisoner payment policy or the actions of persons intent on violence, and it more plausible that such assistance may reduce the threat of terrorism by addressing vital needs in the West Bank and Gaza. In any event, Article III standing cannot be based on conjecture as to how policy actions in the United States may increase the risk of harm at the hands of third parties acting independently overseas.

Moreover, courts have observed generally that "increased risk is [not by] *itself* [a] concrete, particularized, and actual injury for standing purposes." *Pub. Citizen*, 489 F.3d at 1297-98. Indeed, the Fifth Circuit does not "recognize the concept of 'probabilistic standing' based on a non-particularized 'increased risk'—that is, an increased risk that equally affects the general public." *Shrimpers & Fishermen*

19

*of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (quoting *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014)). And even if increased risk claims were particularized, the court observed:

> Opening the courthouse to these kinds of increased-risk claims would drain the 'actual or imminent' requirement of meaning, expand the 'proper – and properly limited' – constitutional role of the Judicial Branch beyond deciding actual cases or controversies, and entail the Judiciary exercising some part of the Executive's responsibility to take care that the law be faithfully executed.

*Id.* (quoting *Pub. Citizen*, 489 F.3d at 1295).

Nor does the fact that some of the Plaintiffs have suffered (or had family members suffer) a terrorist attack alter this conclusion. The murder of Taylor Force was a horrific act of terrorism, as was the attack that injured plaintiff Singer. But it remains conjectural that the Forces or Ms. Singer will be at an increased risk of a terrorist attack in Israel *because of* U.S. foreign assistance to the West Bank and Gaza. Likewise, Rep. Jackson has alleged nothing to suggest that U.S. foreign assistance increases his risk of harm when travelling to Israel. Indeed, in *Indigenous People of Biafra*, the plaintiff— a group representing the Biafran ethnic and religious group located predominantly in Nigeria—sued the United States to enjoin the Secretary of State from selling military planes to Nigeria, on the theory that the Nigerian government had attacked Biafrans in the past, and therefore it would use the planes to continue attacking Biafrans in the future. 2022 WL 16551320, at * 3. Notwithstanding the history of "decades-long persecution of the Biafran people at the hands of the Nigerian government," the court held that the allegations of most of plaintiffs—who actually lived in the area where hostilities were occurring —did not plausibly allege a "certainly impending injury." *Id.* (citation omitted)

Plaintiffs' alleged injury is also akin to a generalized grievance. Here, Plaintiffs allege that "Pay to Slay [ ] encourage[s] terrorist attacks against persons living in and visiting the State of Israel": a.k.a., the public at large. Compl. ¶ 12. Plaintiffs do not allege that terrorists specifically target them or that they are otherwise more at risk than the Israeli public. Accordingly, Plaintiffs' claim that U.S. foreign

assistance increases that risk amounts to a generalized, not a "particularized" injury-in-fact. *See Lujan*, 504 U.S. at 573-74 (holding that a generalized grievance applies "no more directly and tangibly [to Plaintiffs] than it does the public at large"); *see also Shrimpers & Fishermen of RGV*, 968 F.3d at 424 (rejecting standing based on an increased risk that "equally affects the general public").

### D.   Plaintiffs' allegations of emotional distress are insufficient to establish standing.

Plaintiffs Robbi and Stuart Force and Sarri Singer also claim that Defendants' "disregard for and violations of the Taylor Force Act" cause them "extreme mental and physical distress." Compl. ¶¶ 19-20. But even assuming that emotional distress could, in certain circumstances, qualify as an injury (*see infra*), Plaintiffs' emotional distress does not suffice here because Plaintiffs complain of an alleged failure to follow the law in a way that applies to all U.S. citizens. *See Carney,* 141 S. Ct. at 498 ("[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.'"). The Supreme Court has noted that "the psychological consequence presumably produced by observation of conduct with which one disagrees . . . . is not an injury sufficient to confer standing under Art[icle] III." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). "[G]eneral emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes." *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (citing *Valley Forge*, 454 U.S. at 485); *see also Carney*, 141 S. Ct. at 499 ("[N]o matter how sincere or deeply committed" (citation omitted)).

Moreover, while emotional distress can sometimes establish injury-in-fact, *see Rideau v. Keller Indep. Sch. Dist.,* 819 F.3d 155, 168 (5th Cir. 2016), generalized anxiety is not sufficiently distinct to serve as injury-in-fact. *Int'l Union, United Mine Workers of Am. v. CONSOL Energy, Inc.*, 465 F. Supp. 3d 556, 575 (S.D. W. Va. 2020) ("[I]njury must be particularized and not merely abstract"). Indeed, when courts in the Fifth Circuit have accepted emotional harm as a cognizable Article III injury, the

21

challenged action causing the emotional harm was, in some way, directed at the plaintiff.  For example, in *Rideau*, the Fifth Circuit held that "[t]he emotional pain that results from seeing one's child abused [by an agent of a school] seems to be a sufficiently concrete injury for standing purposes" in a challenge against that school under the Individuals with Disabilities Education Act.  819 F.3d at 168.  In *Mayfield*, the Southern District of Texas held that the emotional distress suffered from receiving a letter from a debt collection agency provided a concrete and particularized injury when suing that collection agency under the Fair Debt Collection Practices Act.  *Mayfield v. LTD Fin. Servs., L.P.*, No. 20-1966, 2021 WL 4481089, at *4 (S.D. Tex. Sept. 30, 2021).  But here, the United States' alleged unlawful provision of foreign aid to the West Bank and Gaza is not directed towards Plaintiffs, let alone in a way similar to the kind of direct action taken by a defendant against a particular plaintiff.

Nor does a plaintiff's belief that he or she is an intended beneficiary of a law transform a generalized grievance into a concrete and particularized harm.  *See Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013).  For example, in *Hollingsworth*, the Supreme Court considered whether the original proponents of Proposition 8 (a California ballot proposition that amended the California state constitution to define marriage as a union between a man and a woman) had standing in federal court to defend the Proposition's constitutionality after the state government declined to appeal a court's decision striking down the Proposition under the federal Constitution.  *Id.* at 697-704.  The Supreme Court, answering in the negative, held that Proposition 8 became a "duly enacted constitutional amendment or statute" after it was passed by California voters.  *Id.* at 707 (citation omitted).  However strongly Proposition 8's original proponents felt that the district court's decision should be appealed, they had "no 'personal stake' in defending its enforcement that [was] distinguishable from the general interest of every citizen of California."  *Id.* (citation omitted).  As in *Hollingsworth*, whatever interest Plaintiffs here might think they have in compliance with the law, that interest cannot render their alleged emotional harm "concrete" and "particularized" for the purposes of this lawsuit.  Thus,

22

Plaintiffs cannot establish Article III standing based on emotional distress caused to the Forces and Ms. Singer by what is at heart a policy disagreement by concerned citizens over the provision of ESF to the West Bank and Gaza in alleged non-compliance with law. The Court should therefore decline Plaintiffs' invitation to engage in this kind of "general oversight of the elected branches of government" and dismiss the Complaint for a lack of standing. *Carney*, 141 S. Ct. at 499 (citation omitted).

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Even if Plaintiffs' allegations were sufficient to establish jurisdiction, the Complaint fails to state a claim for which the Court can provide relief. As set forth below, Plaintiffs cannot state an APA claim because the challenged action is committed to agency discretion, and because they bring an impermissible programmatic challenge. In addition, a plaintiff may not base *ultra vires* claims on the exact same underlying conduct as an APA claim, *see Dalton v. Specter*, 511 U.S. 462, 472 (1994). Finally, "[p]leadings must show specific, well-pleaded facts, not mere conclusory allegations to avoid dismissal," *United States v. Villanueva*, No. 15-cv-3556-M, 2016 WL 3390514, at *2 (N.D. Tex. May 26, 2016) (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992)), and Plaintiffs do not plausibly allege any violation of the TFA. Therefore, assuming *arguendo* the Court finds it has jurisdiction, Plaintiffs' Complaint still should be dismissed.

### A.   Plaintiffs fail to state a claim under the APA.

#### i.   The Court cannot review Plaintiffs' APA claim because the challenged conduct is committed to agency discretion.

Plaintiffs claim that the provision of all ESF assistance to the West Bank and Gaza violates the APA on the ground that it is in excess of statutory authority—specifically the TFA—because such aid allegedly "directly benefits" the PA. Plaintiffs allege that "the defendants' grants and awards of Economic Support Funds are final agency action" and request that the Court, pursuant to 5 U.S.C. §

706, declare unlawful all ESF grants and awards that directly benefit the PA, including but not limited to all grants and awards to persons and/or non-governmental organizations who received funds, as contrary to law. *See* Compl. ¶ 77. However, Plaintiffs fail to state an APA claim because the TFA commits to the discretion of the Secretary of State the determination of what assistance "directly benefits" the PA.[6]

It is well established that the APA does not provide a cause of action in cases where the challenged agency action is committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2). The reason for this exception to the APA is that a statute committing an action to the discretion of the agency provides no justiciable standards by which a court may review the agency's decision. *Webster v. Doe*, 486 U.S. 592, 599–600 (1988). This is true "even where Congress has not affirmatively precluded review[.]" *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). In looking for a judicially manageable standard with which to interpret the Secretary's authority and discretion to provide ESF assistance in compliance with the TFA, the Court should consider the statutory language and structure as well as the nature of the agency decision. *See Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997); *Texas v. United States*, 809 F.3d 134, 165 (5th Cir. 2015) ("[T]here is no judicial review of agency action where statutes granting agency discretion are drawn in such broad terms that in a given case there is no law to apply, such as the allocation of funds from a lump-sum appropriation." (cleaned up)).

Here, the TFA requires only that the Secretary provide to Congress "a list of the criteria *that the Secretary uses to determine* whether assistance for the West Bank and Gaza is assistance that directly

---

[6] There is a circuit split on whether arguments that agency action is committed to agency discretion by law, 5 U.S.C. § 701(a)(2,) concern a court's jurisdiction or go to the merits of a case. *See Builders Bank v. Fed. Deposit Ins. Corp.*, 846 F.3d 272, 274-75 (7th Cir. 2017) (discussing disagreement). The Fifth Circuit has not ruled on the issue, although it has previously assumed the that the argument concerns a court's jurisdiction. *See, e.g. Ellison v. Connor*, 153 F.3d 247, 254 (5th Cir. 1998). In any event, the claim cannot proceed past the pleading stage.

benefits the Palestinian Authority for purposes of carrying out this section." *See* 22 U.S.C. § 2378c-1(f) (emphasis added). The Secretary provided that list of criteria to Congress. *See* Criteria Rept. Beyond that, the TFA prescribes only where limitations on assistance in the TFA do *not* apply: "(A) payments made to the East Jerusalem Hospital Network; (B) assistance for wastewater projects not exceeding $5,000,000 in any one fiscal year; and (C) assistance for any other program, project, or activity that provides vaccinations to children not exceeding $500,000 in any one fiscal year." 22 U.S.C. § 2378c-1(b)(1).

Otherwise, while the Secretary is required to provide ESF to the West Bank and Gaza in specific amounts, as mandated by the Appropriation Acts, the TFA—the statute that the Plaintiffs claim the Secretary has violated—leaves entirely to the Secretary's discretion what criteria apply in providing ESF to particular entities in the West Bank and Gaza. In sum and substance, Congress directed the Secretary to decide what "directly benefitting" the PA means. In these circumstances, where the Act does not prescribe how the Secretary should exercise his discretion to decide what assistance would directly benefit the PA, the challenged conduct—providing appropriated ESF funds that allegedly "directly benefit" the PA—has been committed to agency discretion. Accordingly, the Court lacks jurisdiction to review Plaintiffs' APA claim.

### ii. Plaintiffs bring an impermissible programmatic challenge to agency policy.

Plaintiffs fail to state an APA claim for a separate reason: that their claim raises an impermissible broad programmatic challenge. To state a claim under the APA, Plaintiffs must point to an "identifiable action or event" as opposed to seeking "wholesale improvement" of an agency program. *Alabama-Coushatta Tribe of Tex.*, 757 F.3d at 490 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891, 899 (1990)); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-66 (2004) (holding that the APA only permits the Court to compel "discrete agency action," tracking the categories of 5 U.S.C. § 551(13), and not "[g]eneral deficiencies in compliance" with a statutory mandate). Beyond

its textual basis, "this prohibition is motivated by institutional limits on courts which constrain [their] review to narrow and concrete actual controversies." *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000). This enables courts to "not only avoid encroaching on the other branches of government, but [also] to respect the expert judgment of agencies specifically created to deal with complex and technical issues." *Id.*

Here, Plaintiffs broadly challenge "all Economic Support Fund grants and awards that directly benefit the Palestinian Authority[.]" Compl. ¶ 77. In addition, they challenge the Secretary's compliance with the TFA with respect to all ESF assistance provided to the West Bank and Gaza. This undifferentiated challenge to ESF assistance to the West Bank and Gaza does not constitute challenging a "discrete" agency action as the APA requires. 5 U.S.C. § 706(1); *see also Louisiana v. Biden*, No. 21-cv-778, 2021 WL 4312502, at *13 (W.D. La. Aug. 23, 2021) (concluding that a challenge to agency action was not a programmatic challenge when it identified specific Bureau of Land Management leases that allegedly violated the law); *Tex. Gen. Land Off. v. Biden*, —F. Supp. 3d—, 2022 WL 3086333, at *14 (S.D. Tx. Aug. 3, 2022) (concluding that a challenge to the "June 2021 DHS Plan" that suspended all "southwest border barrier construction activities except safety cleanup" constituted a challenge to a discrete action and not on attack on a "general and nondiscrete" program (citation omitted)).

### iii. Plaintiffs fail to plausibly allege that Defendants are violating the TFA.

Assuming none of the threshold arguments set forth above dispose of the claims, the Court should find that Plaintiffs have not otherwise plausibly alleged a violation of the TFA. While courts accept well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Iqbal*, 556 U.S. at 678, 681. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is

entitled to relief.'"  *Id.* at 679 (citation omitted).  Here, Plaintiffs have not plausibly alleged that the Defendants have provided ESF assistance in violation of statutory authority.

In the first place, it bears emphasis that Congress specifically appropriated ESF for the West Bank and Gaza.  The Complaint suggests that the Defendants simply made "taxpayer funds available" to the West Bank and Gaza, Compl. ¶ 36, that it "transmitted a non-public 'program narrative' to Congress appropriating $75,000,000 in Economic Support Funds[,]" *id.* ¶ 41, that "defendants had provided $150 million in U.S. taxpayer-funded Economic Support Funds for assistance" to the PA, *id.* ¶ 42, and that Defendants "announced 'significant increases'" in ESF assistance for FY 2022, *id.* ¶ 50.  All of these averments elide the crucial point that Congress appropriated these funds and specifically directed that they be used for ESF assistance in the West Bank and Gaza.[7]  Thus, as an initial matter, Defendants were required to provide that assistance to the West Bank and Gaza, subject to the TFA and other relevant requirements.

Nor have Plaintiffs plausibly alleged any violation of the TFA related to the Defendants' provision of ESF to the West Bank and Gaza.  As explained above, the TFA directed the Secretary to submit a "list of the criteria that [he] uses to determine whether assistance for the West Bank and Gaza is assistance that directly benefits the Palestinian Authority[.]" 22 U.S.C. § 2378c-1(f)(1).  The Secretary complied and submitted this list to Congress on May 3, 2018, *see* Criteria Rept; CRS Rept., at 3, after which Congress *resumed* appropriating ESF specifically for West Bank and Gaza.

In this context, the Complaint otherwise fails to plausibly allege a violation of the TFA— indeed, the materials referenced in the Complaint either do not support that claim or contradict it. Most notably, the Program Narratives for this assistance (*see, e.g.,* Compl. ¶ 41) demonstrate that ESF

_____

[7] Plaintiffs also omit that, as noted above, the first $75 million appropriated to resume ESF assistance for the West Bank and Gaza occurred in December 2019 for FY2020 under the prior Administration.

was provided to various non-governmental entities to address specific needs of the Palestinian people. The Narratives describe what the assistance was for and the non-governmental entities that received the funds to implement the programs.  For example, the FY2020 Program Narrative describes the amount of funds targeted to meet particular needs, such as funding for clean water projects and sanitation, for programs to assist for Palestinian youth, for business and job creation, and to assist persons seeking employment, and for disaster readiness.  *See* FY 2020 Program Narrative.[8]  The FY2020 Program Narrative also specifically acknowledges the TFA, *see id.* at 1, and identifies specific implementing partners, such as Catholic Relief Services, *see id.* at 5.  It further expressly states that "USAID will not provide assistance for the PA[.]"  FY2020 Program Narrative, at 3, 4 ("Funds will not provide assistance for the PA…").  Nothing in the Program Narratives indicate that ESF funds are being provided to "directly benefit" the PA in violation of the TFA.  *See also* FY2021 Program Narrative, at 3 (stating that "Assistance will be implemented consistent with the Taylor Force Act").

Plaintiffs also cite a Department of State fact sheet which explains the Department "partners with Palestinian and American organizations to support projects in Jerusalem, the West Bank and Gaza that increase exchange between our two peoples and advance shared goals on topics such as education, entrepreneurship, environmental protection, English language learning, science and technology, art and culture, gender equality, human rights, and democracy, among others."  *U.S. Support for the Palestinian People*, U.S. Dep't of State (Mar. 26, 2022), https://perma.cc/P4RC-GC7Y (cited in Compl. ¶¶ 51. 54).  Again, nothing in this document suggests a violation of the TFA.[9]

---

[8] The FY2020 narrative also describes funding to the East Jerusalem Hospital Network—funding that is explicitly excepted from the TFA's restriction.  *See* 22 U.S.C. § 2378c-1(b)(1)(A); FY2020 Program Narrative.; *see also* CRS Rept., at 2 (identifying $10 million in ESF "to pay for Palestinian patients with the East Jerusalem Hospital Network").

[9] Plaintiffs also mischaracterize the content of a variety of public reports.  For instance, the Complaint cites a Government Accountability Office report for the proposition that "since 1993 the government

In the face of these materials referenced in the Complaint, Plaintiffs' apparent theory is that "the defendants are unlawfully laundering U.S. taxpayer funds through non-governmental organizations to directly benefit the Palestinian Authority." Compl. ¶ 11; *see also id.* ¶¶ 38, 54, 56, 71. Plaintiffs further assert that by providing ESF, Defendants seek to "relieve[ ]" the PA of "direct financial responsibility for its infrastructure, governance, and civil society obligations" in the West Bank and Gaza. *Id.* ¶ 71. But this understates the breadth of Plaintiffs' claims. Plaintiffs object to *all funding* to the West Bank and Gaza through non-governmental entities. Their claim that this funding "directly benefits" the PA is a mere conclusory statement and a "legal conclusion couched as . . . factual allegation" that is "disentitle[d] . . . to the presumption of truth." *Iqbal*, 556 U.S. at 678, 681 (citation omitted). Under Plaintiffs' theory, it would be impossible for the Secretary, as directed by Congress, to provide *any* assistance to the West Bank and Gaza through NGOs, because that would purportedly reduce the financial burden on the PA. Put differently, there is no limiting principle to

---

has transferred more than $6.3 billion in U.S. taxpayer-funded bilateral assistance, nearly all of which directly benefits the Palestinian Authority." Compl. ¶ 31. But this report, submitted pursuant to § 7039(e) of the relevant Appropriations Acts, audited funding to ensure that none fell into the hands of the terrorist organizations, not to assess compliance with the TFA. *Foreign Terrorist Organizations*, U.S. Dep't of State, https://perma.cc/BE8T-V97B. The Complaint also alleges that the Congressional Research Service reported that the defendants had provided $150 million in U.S. taxpayer-funded Economic Support Funds for assistance that directly benefits the Palestinian Authority in FY 2020 and FY 2021." Compl. ¶ 42. But this CRS report details only that Defendants obligated $75 million in ESF for the West Bank and Gaza for FY2020 and FY2021—it does *not* state that this funding "directly benefitted" the PA, as Plaintiffs maintain. CRS Rept., at 3. Plaintiffs also cite a State Department fact sheet for the proposition that, "[s]ince April 2021, the defendants have transferred over a half a billion dollars in Economic Support Funds and other assistance to the West Bank and Gaza for the benefit of the Palestinian Authority." Compl. ¶ 59; *see also id.* ¶ 51. But this claim is not supported by the Fact Sheet itself, which details that between April 2021 and March 2022, Defendants provided only $75 million in ESF for the Palestinian people, without any indication that the ESF "directly benefits" the PA. *U.S. Support for the Palestinian People, supra*. Plaintiffs also cite a letter from Congressional representatives worried about "potential violations of the spirit, if not the letter of the [TFA]." Letter from Reps. Boebert, et al. (Nov. 2, 2022), https://perma.cc/8GJT-HC57 (cited in Compl. ¶ 63). But this letter asks the Administration *if* it is complying with the TFA. *Id.* Not a single cited source supports Plaintiffs' claim that ESF assistance to the West Bank and Gaza violates the TFA.

Plaintiffs' claim: any funds going to NGOs in the West Bank and Gaza would violate the TFA.  That is not a remotely plausible reading of the TFA; indeed, under Plaintiffs' theory, the Appropriations Acts that require this assistance would be a nullity.  Leaving aside that Plaintiffs, at most, are alleging an "indirect" benefit to the PA, Congress left to the Secretary to determine how ESF funds may be provided to comply with the Appropriations Acts and the TFA.  Plaintiffs have failed to plausibly allege a violation of any statutory law.[10]

### B. Plaintiffs' *Ultra Vires* Claim Should be Dismissed.

To challenge the same allegedly unlawful provision of foreign aid to the West Bank and Gaza, Plaintiffs also seek to bring a constitutional *ultra vires* claim.  But Plaintiffs' *ultra vires* claim is an impermissible extension of their deficient APA claim, and Plaintiffs cannot salvage that claim with an appeal to the *ultra vires* doctrine which would permit circumvention of the APA's limits.

First, as this Court itself has acknowledged, "it is an open question whether the 1976 amendments to the APA abrogated the *Larson* doctrine in suits against federal agency officials."  *Leal v. Azar*, No. 20-185, 2020 WL 7672177, at *6 n.7 (N.D. Tex. Dec. 23, 2020) (citing, *inter alia*, *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985)), *judgement vacated on other grounds sub nom.*, *Leal v. Becerra*, No. 21-10302, 2022 WL 2981427 (5th Cir. Jul. 27, 2022).  The Fifth Circuit observed in *Geyen* that, through the enactment of the APA in 1976, Congress waived sovereign immunity for suits seeking nonmonetary relief (codified at 5 U.S.C. § 702), for "the principal purpose" of "do[ing] away with the ultra vires doctrine and other fictions surrounding sovereign immunity."  *Geyen*, 775 F.2d at 1307.  But

---

[10] The Complaint also refers to a PA document: "Law-by-Decree No. 7/2021," in which, Plaintiffs allege, the PA took "operational control over all non-governmental organizations operating within its jurisdiction."  Compl. ¶ 38.  But even assuming Plaintiffs' characterization of the decree is correct, Plaintiffs do not allege that Defendants have granted ESF funds to *any* organization that the PA purportedly "controls," including any of the NGOs listed in the Program Narratives.  *See generally*, FY2020 and FY2021 Program Narratives.

whatever viability there may be to *ultra vires* claims in other settings, here Plaintiffs invoked the APA to seek judicial review of a purported agency action. Among the issues raised in this motion are whether the claim satisfies the limitations on APA review where an action is committed to agency discretion (*see supra*), and whether the claim raises a broad programmatic challenge. But, as one court recently observed, where plaintiffs bring an APA claim, they "should not be entitled to circumvent statutes or obtain a more favorable standard of review via ultra vires claims." *Tex. Gen. Land Off.*, 2022 WL 3086333, at *16.[11] Moreover, the APA itself establishes a cause of action for alleged constitutional violations, and thus any challenge also must be brought pursuant to the APA applying its procedural strictures. *See* 5 U.S.C. § 706(2)(B); *e.g., Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237–38 (D.N.M. 2014); *Harvard Pilgrim Health Care of New Eng. v. Thompson*, 318 F. Supp. 2d 1, 10–11 (D.R.I. 2004).

Still other authority rejects "the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. 462 at 472. To state a constitutional claim, Plaintiffs must allege how Defendants' actions violate the Constitution in a way "distinct" from their statutory claims. *Texas Gen. Land Off.*, 2022 WL 3086333, at *15. However, Plaintiffs' alleged basis for their *ultra vires* claim is identical to their APA claim, *see* Compl. ¶¶ 66-77, and they have not articulated a basis to separate them.

---

[11] Also, the circumstances of this case differ considerably from *Leal*, where this Court found that the *ultra vires* doctrine could supply a waiver of sovereign immunity. First, this Court noted that the plaintiffs there were "*not* bringing an APA claim nor are they challenging final agency action." 2020 WL 7672177, at *6. The Plaintiffs here do raise an APA claim. Second, unlike in *Leal,* there is no issue here concerning whether sovereign immunity has been waived for the APA claim—the APA itself contains that waiver. Third, the Court in *Leal* also noted that the government did not challenge the invocation of the *ultra vires* claim there, *see id.* at *6, n.7. The government does so here and explains why the doctrine does not apply in this case.

Non-statutory review of alleged *ultra vires* agency action is a highly limited doctrine that plaintiffs may only invoke when they would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating [their] statutory rights" and when Congress has not precluded judicial review. *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)).[12] Here, Plaintiffs have not established that the TFA provided them any such statutory rights. That is, they do not allege that Congress created any "private rights," *Barlow v. Collins*, 397 U.S. 159, 166 (1970), or that "rights which [Congress otherwise] create[d]" are at stake. *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943); *see also Leedom*, 358 U.S. at 189 ("deprived . . . of a 'right' assured to them by Congress"). Nor could they, as the TFA restricts the provision of certain ESF to the West Bank and Gaza—it does not regulate or otherwise directly grant benefits to any U.S. citizen. Nor does the TFA create any private right of action for alleged violations of its requirements. Accordingly, the law clearly forecloses the applicability of *ultra vires* review in this case. And even if reached, Plaintiffs' Complaint fail to state a plausible claim on the merits for the same reasons set forth above.

## III.   THE COURT SHOULD IN ANY EVENT EXERCISE ITS DISCRETION TO DENY THE REQUESTED EQUITABLE RELIEF.

Even if the Court concluded that Plaintiffs have standing and that they state a plausible claim, it should still exercise its discretion to dismiss the case. Equitable remedies are discretionary, and the APA did not abrogate or alter courts' discretionary ability to decline to provide equitable relief. *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (quoting 5 U.S.C. § 702). In *Sanchez-Espinoza*, then-Circuit Judge Scalia held that discretionary equitable relief should be withheld when it

---

[12] Then-Circuit Judge Kavanaugh described this doctrine as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Tex. Gen. Land Off.*, 2022 WL 3086333, at *15 (quoting *Nyunt v. Chairman, Broad. Bd. Of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.)).

seeks to "interject[ ]" courts into "so sensitive a foreign affairs matter" (in that case to terminate U.S. support for the "Contras," a group then fighting the Nicaraguan government). *Id.* Judge Scalia explained that, even if the dispute were justiciable, the court should still withhold equitable relief because the alleged U.S. support had "received the attention and approval" of senior government officials, and "involve[d] the conduct of our diplomatic relations" with multiple foreign states. *Id.*

Here too, Plaintiffs' allegations illustrate that this is a high-level foreign policy matter involving the decision making of the Congress, the President, the Secretary of State, and other senior foreign policy officials. *See* Compl. ¶¶ 34, 37, 46, 48. Plaintiffs' allegations also demonstrate that this matter involves our "diplomatic relations" with countries and entities in the Middle East. *See id.* ¶¶ 37, 43, 48, 56. And as explained above, Plaintiffs effectively seek the cessation of ESF assistance to the West Bank and Gaza—relief that would constitute a sweeping judicial intrusion on the nation's foreign affairs and would have broad and unforeseen consequences in the region and to U.S. foreign relations. Accordingly, if none of the foregoing grounds for dismissal suffice, then as in *Sanchez-Espinoza*, the Court should exercise its discretion and dismiss Plaintiffs' Complaint.

## CONCLUSION

For the reasons stated herein, the Court should dismiss this action.

Dated: April 10, 2023

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

ANTHONY J. COPPOLINO
*Deputy Director*

/s/ Samuel Rebo
SAMUEL REBO (DC Bar # 1780665)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 514-6582

33

Samuel.a.rebo@usdoj.gov
*Counsel for Defendants*

34

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Samuel Rebo*
SAMUEL REBO
U.S. Department of Justice