## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS,
## AMARILLO DIVISION

_____

DR. RONNY JACKSON, STUART and ROBBI
FORCE, and SARRI SINGER,

                *Plaintiffs,*

     v.

JOSEPH R. BIDEN, JR., et al,               No. 2:22-cv-241

                *Defendants.*

_____/

## THE PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................................ii

PRELIMINARY STATEMENT......................................................................1

STANDARD OF REVIEW..............................................................................6

ARGUMENT....................................................................................................8

   I.   THE PLAINTIFFS HAVE STANDING...............................................11

     A. The plaintiffs have plausibly alleged an actual, imminent increased risk of harm..................................................................................................11

        1. Clapper and Bernstein.............................................................11

        2. Even a small reduction in risk is sufficient....................................12

        3. The plaintiffs do not need to please that the defendants are the last step in the causal chain...............................................................13

     B. The plaintiffs' claims are redressable...............................................14

     C. The plaintiff's injuries are concrete and specific...................................15

   II.  THE PLAINTIFFS HAVE STATED A CLAIM.........................................17

     A. Background..................................................................................17

     B. There is law to apply.....................................................................21

     C. This case is not an impermissible "programmatic challenge".....................23

     D. The plaintiff's *ultra vires* claim for relief is properly pled..........................26

   III.  THE COURT SHOULD NOT DISMISS THIS CASE................................27

CONCLUSION...............................................................................................28

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,*
  397 U.S. 150 (1970)............................................................... 13, 15

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015)...................................................................21

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................6, 7

*Axon Enterprises, Inc. v. Federal Trade Commission,*
  143 S. Ct. 890 (2023)...........................................................6, 10

*Baker v. Carr,*
  369 U.S. 186 (1962)........................................................ 6, 9, 17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................ 6

*Bennett v. Spear,*
  520 U.S. 154 (1997)......................................................6, 7, 9, 13

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984)........................................................ 10, 21

*Bostock v. Clayton Cnty., Georgia,*
  140 S. Ct. 1731 (2020)............................................................ 8

*Bowen v. Mich. Acad. of Family Physicians,*
  476 U.S. 667 (1986)............................................................... 8

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971).....................................................10, 20, 23

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)...............................................................11

*Collins v. Yellen,*
  141 S. Ct. 1761 (2021)............................................................ 8

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019)............................................................................... 20, 22

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..........................................................................................16

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)..........................................................................................10

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010)..................................................................................... *passim*

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013)..........................................................................................17

*Leedom v. Kyne*,
    358 U.S. 184 (1958)..........................................................................................26

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)..........................................................................................22

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990)........................................................................................... 6

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007)..........................................................................................13

*Robinson v. Shell Oil Co*,
    519 U.S. 337 (1997)........................................................................................... 7

*SAS Inst., Inc. v. Iancu*,
    138 S. Ct. 1348 (2018)..........................................................................7, 14, 21

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)......................................................................................11

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936).................................................................................. 14, 27

*Yates v. United States*,
    574 U.S. 528 (2015)........................................................................................... 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).................................................................................. 14, 27

## FEDERAL APPELLATE AND DISTRICT COURT CASES

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
   321 F.3d 1166 (D.C. Cir. 2003) ...............................................................27

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
   2023 WL 2825871 (N.D. Tex. Apr. 7, 2023) ......................................... 7, 11, 13, 15

*Bernstein v. Kerry*,
   962 F. Supp. 2d 122 (D.D.C. 2013) ................................................... 11, 12

*Civil Action*,
   No. 2:22-cv-00241-C ......................................................................... 1

*Earl v. Boeing Co*,
   515 F. Supp. 3d 590 (E.D. Tex. 2021)....................................................10

*Fed. Express Corp. v. United States Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ...............................................................26

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir. 2023)..................................................................26

*Inclusive Communities Project, Inc. v. Dep't of Treasury*,
   946 F.3d 649 (5th Cir. 2019).......................................................... 11, 15

*Indigenous People of Biafra v. Blinken, No. CV 21-2068 (JMC),* 2022 WL
   16551320 (D.D.C. Oct. 31, 2022) .........................................................15

*Kent Corp. v. N.L.R.B.*,
   530 F.2d 612 (5th Cir. 1976)..................................................................20

*McCardell v. U.S. Dep't of Hous. & Urb. Dev.*,
   794 F.3d 510 (5th Cir. 2015)..................................................................12

*MKD Mgmt., LLC v. Frigon*,
   2020 WL 5745913 (N.D. Tex. Aug. 5, 2020)......................................... 6

*Mountain States Legal Foundation v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996)...............................................................13

*National Ass'n of Postal Supervisors v. USPS*,
   26 F.4th 960 (D.C. Cir. 2022) ...............................................................26

*Oklahoma v. Tellez,*
    2022 WL 17069132 (N.D. Tex. Nov. 17, 2022)..............................................26, 27

*Paterson v. Weinberger,*
    644 F.2d 521 (5th Cir. 1981)..............................................................................7

*Perales v. Casillas,*
    903 F.2d 1043 (5th Cir. 1990)..........................................................................22

*Sanchez v. R.G.L.,*
    761 F.3d 495 (5th Cir. 2014)............................................................................15

*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C. Cir. 1985).....................................................................10, 27

*Texas Gen. Land Off. v. Biden,*
    619 F. Supp. 3d 673 (S.D. Tex. 2022)..............................................................24

*Texas v. Biden,*
    2021 WL 5399844 (N.D. Tex. Nov. 18, 2021)..................................................20

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015)...................................................................*passim*

*Village of Elk Grove Village v. Evans,*
    997 F.2d 328 (7th Cir. 1993)............................................................................13

*Indigenous People of Biafra v. Blinken, No. CV 21-2068 (JMC),* 2022 WL
    16551320 (D.D.C. Oct. 31, 2022).....................................................................15

## STATUTES

5 U.S.C. § 551.............................................................................................................8

18 U.S.C. § 2339B......................................................................................................3

22 U.S.C. § 2378c-1......................................................................................*passim*

## FEDERAL RULES

Federal Rules of Civil Procedure
    Rule 8 ..............................................................................................................6, 7
    Rule 12 ...........................................................................................................9, 10

**OTHER AUTHORITIES**

66 Fed. Reg. 49079 (Sept. 26, 2001) ............................................................................... 3

## PRELIMINARY STATEMENT

### I.

Taylor Force was a West Point graduate and United States Army veteran of Iraq and Afghanistan. On March 8, 2016, he was walking on a seaside boardwalk in Jaffa, Israel. A Palestinian Arab terrorist named Bashar Masalha attacked, stabbed, and killed Mr. Force. Masalha also stabbed and wounded ten other people before he was neutralized by the police.

The Palestinian Authority glorified Masalha and his crime. A state-run television reporter said that "His family, friends, and people of the region took it upon themselves to ensure that this [burial] would be a large national wedding befitting of Martyrs."[1] He further said that "The Martyr was accompanied to his last resting place in the cemetery for Martyrs in Hajja." He added that "Martyr Bashar Masalha, 22, ascended to Heaven in Jaffa on March 8" and "He returned and was embraced by his homeland as a Martyr within it." The official Facebook page of Fatah, the Palestinian Authority's ruling party, also said Masalha was a "heroic Martyr" for killing Mr. Force. Finally, the state-run outlet Al-Hayat Al-Jadida said "Masalha died as a Martyr on March 8 [2016], after carrying out a stabbing operation in Jaffa, in which he killed an American tourist."[2]

---

[1] The Palestinian Authority celebrates dead terrorist funerals as "Martyr weddings." *See* Itamar Marcus, "'*We love death like our enemies love life' – speaker at funeral of terrorist*", Palestinian Media Watch (Apr. 2, 2023), https://bit.ly/3nYeW6H.
[2] Morgan Chalfant, "*Palestinian Authority Media Glorify Murderer of U.S. Army Veteran*", The Free Beacon (May 24, 2016), https://bit.ly/41MRZ4x.

1

To celebrate Taylor Force's murder, and to incentivize similar crimes, the Palestinian Authority pays Malhasa's family a monthly bounty based on their deceased relation's number of victims. This is "pay-to-slay." Compl. ¶¶ 1-4, 8-9, 11-12, 18-20, 23-25, 35, 59-65, 68, 71.[3] Historically, the Palestinians used hundreds of millions of dollars of foreign humanitarian aid from the United States and others to fund pay-to-slay.[4] According to one authoritative source, the Palestinian Authority's Finance Ministry's 2017 budget allocated approximately half of all the $693 million in foreign aid earmarked specifically for the Authority's budget for payment to imprisoned terrorists or, for dead terrorists, to their survivors.[5]

## II.

Money is terrorism's lifeblood.[6] Therefore, Congress and the Executive Branch historically have taken strong measures to restrict or prohibit direct and indirect

---

[3] The Palestinians forthrightly call their bounties for dead Jews, Israelis, and Americans "Martyr Payments." But the defendants call them a "system of prisoner payments," *see* Memorandum at 4, obscuring the fact that the Palestinians are paying bounties to the families of the terrorists who killed Mr. Force and grievously wounded Ms. Singer so that others will similarly engage in depraved acts of violence. The defendants' circumlocution is, at best, misleading.

[4] *See, e.g.,* Mark Wood and Nick Craven, "*Revealed, how UK aid funds TERRORISTS: After yet more budget cuts, another £12bn of your taxes are being splurged on foreign hand-outs for militants, killers, Palestinian palaces and jobs that don't exist*", The Daily Mail (Mar. 27, 2016), https://bit.ly/44UOkV8; Yossi Kuperwasser, "Incentivizing Terrorism: Palestinian Authority Allocations to Terrorists and their Families", Jerusalem Center for Public Affairs (2017), https://bit.ly/3LVnPpJ.

[5] Dov Lieber, "*PA payments to prisoners, 'martyr' families now equal half its foreign budgetary aid*", The Times of Israel (July 31, 2017), https://bit.ly/42A0tNG.

[6] Dep't of the Treasury, Speech by Under Secretary Jimmy Gurule (Enforcement), "*The Global Fight Against the Financing of Terror: Prevention – A New Paradigm*" (June 26, 2002) ("While twisted ideology fuels their fervor, money is the lifeblood of their activities. By cutting off or freezing their funds, we are striking at the heart of their operations."), https://bit.ly/3Mi6sRf.

support for terrorist organizations and their allies. *See, e.g.,* 18 U.S.C. § 2339B(a)(1); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 29 (2010); Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 26, 2001). "Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy… that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks." *Holder,* 561 U.S. at 30-31 (citations omitted).

The Taylor Force Act, attached as the appendix hereto, is based on this premise. Congress found and declared that the Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror against American and Israeli citizens. *See* 22 U.S.C. § 2378c-1 note. Accordingly, to strike a blow against Palestinian terrorism, it prohibited the defendants from using Economic Support Funds for projects in the West Bank and Gaza that directly benefit the Palestinian Authority. *See* 22 U.S.C. § 2378c-1.

The United States government has formally acknowledged that the Palestinian Authority's governance responsibility specifically includes social services, education and culture, public health, water supply, infrastructure, economic development, and disaster preparedness. *See* Declaration of Principles on Interim Self-Government Arrangements, Art. VI § 2 and Art. VII, § 4 (Oct. 8, 1993), https://bit.ly/42wYadW. At all times relevant, the Palestinian Authority prioritizes pay-to-slay payments over these responsibilities. To comply with the Taylor Force

3

Act, the Trump Administration did not use Economic Support Funds to directly benefit the Palestinian Authority. Compl. ¶ 9.

However, from its first day in power, the Biden Administration has knowingly subsidized pay-to-slay and Palestinian terrorism by pouring hundreds of millions of American taxpayer dollars into the West Bank and Gaza to directly benefit the Palestinian Authority. Compl. at ¶¶ 11-12, 34-58. It is spending Economic Support Funds for programs and projects which the Palestinian Authority is responsible for, *see generally* Memorandum Appendix at 7, 15; to support the Palestinian Authority's political claims of sovereignty over Jerusalem, Israel's U.S.-recognized capital city; and to enhance the Palestinian Authority's authority. Compl. at ¶¶ 37-57. Even if laundered through non-governmental organizations, this spending directly benefits the Palestinian Authority; subsidizes terrorism; and violates the Taylor Force Act. *See* Memorandum Appendix at 19; *Holder,* 561 U.S. at 30-31; Maurice Hirsh, "US aid to the Palestinians increases violence and terror, not peace", Palestinian Media Watch (Mar. 13, 2023), https://bit.ly/3Icr8I7.

III.

Plaintiffs are Robbie and Stuart Force, the parents of Taylor Force; Sarri Singer, who survived the June 11, 2003, suicide bombing of a Jerusalem bus that killed sixteen innocent people and wounded one hundred more;[7] and Congressman

---

[7] Doree Lewak, "*Survivor of 2003 Israel bus bombing: 'The impact lasts a lifetime'*", The New York Post (June 13, 2018), https://bit.ly/3McGIG4.

Ronnie Jackson, a member of the House Foreign Affairs Committee who travels frequently to Israel. Compl. ¶¶ 18-20.

The defendants argue that Mr. and Mrs. Force, Ms. Singer, and Congressman Jackson lack standing because their injuries are speculative, insubstantial, not fairly traceable to the government's Taylor Force Act violations, and not redressable, Mem. at 13-23; that even if they do have standing, their claims are not justiciable because the challenged conduct is entirely within the agency's discretion, Mem. at 23-25; that they have made an impermissible "programmatic challenge" and/or failed to allege any Taylor Force Act violations at all, Mem. at 25-32; and finally, that even if they have standing and even if their claims are justiciable, review and relief should be denied because this case involves "a high-level foreign policy matter", Mem. at 32. But the defendants' arguments elide both the statutory text and the controlling authorities.

The plaintiffs have plausibly alleged that the defendants are knowingly, intentionally, and unlawfully using American taxpayers to subsidize and underwrite the Palestinian Authority's support for terrorism and its pay-to-slay bounties on Israeli and American citizens. These plaintiffs, in this case, have standing to sue. The court has the constitutional and statutory power to enforce the Taylor Force Act. It should deny the defendants' motion to dismiss.

## STANDARD OF REVIEW

A district court has jurisdiction if the cause either arises under the Federal Constitution, laws, or treaties (or falls within one of the other enumerated categories of Art. III, § 2); or is a "case or controversy" within the meaning of that section; or is described by any jurisdictional statute. *Baker v. Carr*, 369 U.S. 186, 198 (1962); *see also Axon Enterprises, Inc. v. Federal Trade Commission,* 143 S. Ct. 890, 914 (2023) (Gorsuch, J. concurring) (citations omitted). Fed. R. Civ. Proc. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," to give the defendants fair notice of what the claims are and the grounds upon which they rest. A complaint does not need detailed factual allegations. However, these allegations, which are assumed to be true, must be enough to raise a plausible right to relief even if doubtful in fact. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (emphasis added); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *MKD Mgmt., LLC v. Frigon*, 2020 WL 5745913, at *2 (N.D. Tex. Aug. 5, 2020) (citations omitted).

Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Ashcroft*, 556 U.S. at 679. At the pleading stage, general factual allegations of injury resulting from a defendant's conduct often suffice because there is a presumption that general allegations can embrace the specific facts necessary to support the claim. *Twombly,* 550 U.S. at 555; *see also Bennett v. Spear,* 520 U.S. 154, 167 - 68 (1997) (citations omitted); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990). "Plausibility" does not mean "probability."

6

*Ashcroft*, 556 U.S. at 678; *see also Bennett,* 520 U.S. at 168; *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Rather, the question is whether the well-pleaded facts permit the court to infer more than the mere possibility of misconduct. Fed. Rule Civ. Proc. 8(a)(2); *Ashcroft*, 556 U.S. at 679.

For standing, the plaintiffs must allege a concrete, particularized, actual or imminent injury, fairly traceable to the challenged action, and redressable by a favorable ruling. The presence of even one party with standing is enough to proceed. *Texas v. United States*, 809 F.3d 134, 150-51 (5th Cir. 2015), as revised (Nov. 25, 2015) (citations omitted). A federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging and the trend is toward enlargement of the class of people who may protest administrative action. No explicit statutory provision is necessary for standing. Only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute can it be reasonably assumed that Congress intended to bar judicial review. *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 2:22-CV-223-Z, 2023 WL 2825871, at *8 (N.D. Tex. Apr. 7, 2023) (citations omitted).

Finally, this case requires the court to construe 22 U.S.C. § 2738c-1. The defendants' duty is to follow the Taylor Force Act as written, not to supplant its commands with others they may prefer. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018); *Yates v. United States*, 574 U.S. 528, 537 (2015); *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). There is no such thing as a "canon of donut holes," in which Congress's failure to speak directly to a specific case that falls within a more general

statutory rule creates a tacit exception. Instead, when Congress chooses not to include a given exception to a broad rule, the broad rule controls. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1747 (2020).

<div align="center">

**ARGUMENT**

</div>

The plaintiffs have alleged a claim for relief alleging violations of the separation of powers, Article I, § 1; the appropriations clause, Article I, § 9; and the take care clause, Article II, § 3 because the defendants' knowing violations of the Taylor Force Act are *ultra vires*. Compl. ¶ 72. The separation of powers is designed to preserve liberty and any aggrieved party with standing may file a challenge whenever a violation occurs. *Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021) (citations omitted).

The plaintiffs have also alleged a claim for relief under the Administrative Procedure Act because the defendants' Economic Support Fund grants and awards are final agency action under 5 U.S.C. §§ 551(11)(a) and 13, and grants and awards in violation of the Taylor Force Act are unlawful and contrary to the defendants' constitutional right, power, and privilege, in excess of their statutory authority, and short of their statutory rights. Compl. ¶¶ 76, 77. The Administrative Procedure Act embodies the basic presumption of judicial review which will only be cut off if there is persuasive reason to believe that Congress intended to do so. *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). Any party who alleges that a challenged government action has caused them injury in fact and that the alleged injury was to an interest arguably within the zone of interests to be protected or

<div align="center">

8

</div>

regulated by a statute may obtain judicial review and relief. *Bennett*, 520 U.S. at 174-75 (1997).

The defendants have moved to dismiss the plaintiffs' complaint under Fed. R. Civ. Proc. 12(b)(1) for lack of standing, and under Fed. R. Civ. Proc. 12(b)(6) for failure to state a claim upon which relief can be granted. Mem. at 13, 24. Also, the defendants invite the court to exercise its discretion and dismiss this case because it is a "sensitive foreign affairs matter." Mem. at 32-33.

The core of the defendants' Fed. R. Civ. Proc. 12(b)(1) argument is that the plaintiffs' harm is speculative and generalized. Mem. at 13, 18. In other words, they claim these plaintiffs do not have the requisite personal stake in the outcome of the controversy needed to ensure concrete adverseness. Mem. at 12; *see also Baker,* 369 U.S. at 204. However, Taylor Force Act violations directly incentivize terrorism and therefore directly increase the plaintiffs' risk of death or injury when they visit Israel, *see* 22 U.S.C. § 2378c-1; 22 U.S.C. § 2378c-1 note; *see also Holder*, 561 U.S. at 30, and cause plaintiffs Force and Singer, both of whom are uniquely invested in this matter, significant emotional distress and physical injury. Compl. ¶¶ 6, 7-11, 19-21, 23-27, 31-33, 35, 37-39, 41-46, 49-56, 62-63, 71-72. [8] This should be enough at the motion to dismiss stage to raise a plausible inference of harm.

---

[8] Paragraph 19 erroneously states that pay-to-slay bounties are being paid to Taylor Force's murderer. They are not. Rather, the bounty payments are being paid to the murderer's family. Plaintiffs will seek leave to amend their complaint to correct this error and to address any other pleading defects that this court should identify after the defendants' motion is decided.

The core of the defendants' Fed. R. Civ. Proc. 12(b)(6) claim is that Congress committed spending decisions in the West Bank and Gaza to their discretion, and they comply with the Taylor Force Act as they construe it. Mem. at 23. However, the defendants have not carried the heavy burden of proving that Congress clearly intended to alter the general presumption favoring judicial review, and it is for the courts, not the defendants, to decide what the Taylor Force Act means. *See Texas,* 809 F.3d at 164 citing *Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 351 (1984); *see also Axon,* 143 S. Ct. at 914; *Gonzales v. Oregon,* 546 U.S. 243, 255-56 (2006) (agency entitled to deference "only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'"); *Earl v. Boeing Co.,* 515 F. Supp. 3d 590, 608 (E.D. Tex. 2021) (citations omitted). Where, as here, there is affirmative agency action (i.e., Economic Support Funds for persons in the West Bank and Gaza), such action at least can be reviewed to determine whether the agency exceeded its statutory powers. *Texas*, 809 F.3d at 168. The statute itself is "law to apply." *Id.* (citations omitted); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

Finally, citing *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), the defendants ask the court to exercise its discretion and dismiss the plaintiffs' case. Mem. at 33-34. But the cited authority is not on point, for the Taylor Force Act controls directly.

## I.       THE PLAINTIFFS HAVE STANDING

Plaintiffs must show (i) that they suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *All. for Hippocratic Med.*, 2023 WL 2825871, at *3. Each element of Article III standing must be supported in the same way as any other matter on which the plaintiffs bear the burden of proof, with the same evidentiary requirements of that stage of litigation. *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019).

### A.       The plaintiffs have plausibly alleged an actual, imminent increased risk of harm

#### 1.       *Clapper* and *Bernstein*

Relying principally on *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410, 414 (2013) and *Bernstein v. Kerry,* 962 F. Supp. 2d 122 (D.D.C. 2013), the defendants claim that the plaintiffs cannot show causation. However, these cases are not on point. In *Clapper,* the plaintiffs were not suing to enforce a remedial statute enacted to protect them and others uniquely situated, as are the plaintiffs here. Rather, their alleged harm was based on a speculative theory requiring the alignment of a highly attenuated chain of five separate possibilities. *See Clapper,* 568 U.S. at 410-412.

Here the plaintiffs are suing to enforce a statute enacted to protect them and others similarly situated. Their chain of causation is that of the Taylor Force Act itself: (1) Money is fungible; (2) Economic Support Funds spent in the West Bank and Gaza that directly benefit the Palestinian Authority subsidize Palestinian terrorism;

11

(3) pay-to-slay demonstrably, not speculatively, incentivizes terror attacks against Israel and American citizens. 22 U.S.C. §§ 2378c-1(a), (d); 22 U.S.C. § 2378c-1 note; Compl. ¶¶ 6, 12, 13, 18-20, 23-27, 44, 47-51, 60-63, 71; *Holder,* 561 U.S. at 30. This chain has fewer steps and no unfounded assumptions, and therefore, *Clapper* does not control. *See McCardell v. U.S. Dep't of Hous. & Urb. Dev.,* 794 F.3d 510, 520 (5th Cir. 2015).

In *Bernstein,* the court's rationale was that it "would have to speculate on whether the defendants' funding policies were aiding terrorists, whether the terrorists were using these funds for activities intended to harm plaintiffs, and whether these activities are leading to a 'certainly impending' injury for plaintiffs." *Bernstein,* 962 F. Supp. 2d at 129. Post-Taylor Force Act, courts do not need to "speculate" whether the government's funding policies regarding the Palestinian Authority are aiding terrorists, whether the Palestinian Authority uses those funds to harm plaintiffs and others similarly situated, and whether the defendants' violations of law lead to the plaintiffs' injury. Now, these are settled questions, so the plaintiffs have done enough to raise a plausible inference of causation at the motion-to-dismiss stage. 22 U.S.C. § 2378c-1; 22 U.S.C. § 2378c-1 note.[9]

### 2.   Even a small reduction in risk is sufficient

The defendants apparently argue that the plaintiffs lack standing because the Palestinian Authority will continue pay-to-slay even if the defendants follow the law.

---

[9] The Taylor Force Act and Congress's findings in support thereof render all defendants' cited authorities inapposite. *See generally* Memorandum at 14-16.

Mem. at 14. But the plaintiffs are not required to plead that the defendants' compliance with the Taylor Force Act will cause the Palestinian Authority to *stop* supporting terrorists. Rather, as persons within the Taylor Force Act's zone of interests, *see e.g.,* Compl. ¶ 13, *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 154 (1970) and *Texas,* 809 F. 3d at 162, it is enough if the defendants' compliance will *reduce* terrorism. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 526 n.23 (2007) citing *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) ("The more drastic the injury that government action makes more likely, the lesser the increment in probability to establish standing"); *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) ("[E]ven a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability"). The complaint adequately alleges this. *See* Compl. ¶¶ 59-65.

### 3. The plaintiffs do not need to plead that the defendants are the last step in the causal chain

The plaintiffs have pled that the defendants' violations of the Taylor Force Act increase *their* risk of being a victim of Palestinian terrorists and directly cause plaintiffs Force and Singer emotional and physical harm. Compl. ¶¶ 13, 18-20, 72-74. By necessary implication, the defendants' compliance with the law will *reduce* that risk and remedy that harm. *Accord* Hirsch, *supra*. Article III does not require a showing of proximate cause or that the defendants' "actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 169; *All. for Hippocratic Med.*, 2023 WL 2825871, at *7 (citations omitted).

13

**B.      The plaintiffs' claims are redressable**

Reducing the flow of money that directly benefits the Palestinian Authority reduces terrorism. 22 U.S.C. § 2378c-1; Compl. ¶¶ 33, 35; *Holder,* 561 U.S at 29-31. Yet the defendants have flooded the West Bank and Gaza with American cash knowing full well that this would increase the risk of terrorism faced by the plaintiffs and others similarly situated. Compl. ¶¶ 8-10, 18-20, 59-69, 71-73. Funding the Palestinian Authority notwithstanding its support for terrorism is the defendants' priority. Compl. ¶¶ 34-58. Nevertheless, when it comes to the distribution of Economic Support Funds in the West Bank and Gaza, the defendants may not substitute their preferences for the Congressional directive. *SAS*, 138 S. Ct. at 1355; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 641-43 (1952) (Jackson, J., concurring); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–320 (1936).

The defendants claim that the plaintiffs' complaint is not redressable. They argue "Stopping ESF assistance cannot be relied upon to have Plaintiffs' desired effect"; "it is nothing more than conjecture to argue that [complying with the Taylor Force Act] will reduce terrorism or plaintiffs' subjective fears"; and American taxpayer money "can help prevent recruitment to terrorist organizations." Mem. at 17-18. However, Congress sees things differently. Beyond the narrow permission granted in § 2378c-1(b), the defendants lacked the lawful authority to spend appropriated Economic Support Funds in the West Bank and Gaza that directly benefit the Palestinian Authority through any means and for any purpose because

14

such spending subsidizes the Palestinian Authority's pay-to-slay bounty payments to the families of Taylor Force's murderer and Sarri Singer's assailant, thereby incentivizing terrorism. 22 U.S.C. §§ 2378c-1(a), (d); 2378c-1 note.

Therefore, a favorable decision for the plaintiffs will likely reduce the flow of American taxpayer funds into the West Bank and Gaza, reduce the cash available to terrorists, and thereby relieve the plaintiffs of at least some of the injuries allegedly caused by the defendants. *See* Hirsch, *supra*. This is enough for redressability. *See All. for Hippocratic Med.*, 2023 WL 2825871, at \*8 (citations omitted); *Inclusive Communities,* 946 F.3d 649, 655 (5th Cir. 2019); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014).

## C.   The plaintiffs' injuries are concrete and specific

The defendants argue that the plaintiffs' alleged injuries based on future travel to Israel are "too speculative and generalized" for standing. Mem. at 18.[10] However, the plaintiffs' visits to Israel are squarely within the Taylor Force Act's zone of interests. *Camp*, 397 U.S. at 154. Because of the defendants' unlawful conduct, the plaintiffs face an increased risk of terrorism whenever they enter Israel. *See* Compl. ¶¶ 6, 18-20, 24-27, 49, 59-63, 71-73; *compare Indigenous People of Biafra v. Blinken*, No. CV 21-2068 (JMC), 2022 WL 16551320, at \*3 (D.D.C. Oct. 31, 2022). There is nothing improbable about the proposition that the defendants' violations of the Taylor

---

[10] The defendants repeat that it "remains conjectural" that the plaintiffs will be at an "increased risk of a terrorist attack in Israel *because of*" the defendants' violations of the Taylor Force Act. Memorandum at 20 (emphasis added). Congress did not think so, and the complaint plausibly alleges otherwise.

Force Act will cause the plaintiffs a reasonable fear of increased terrorism when they visit Israel, and that such fear might deter them from visiting family, tourism, or religious pilgrimage. *See* 22 U.S.C. § 2378c-1 note; *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 184 (2000).

The defendants rely on *Blinken* as persuasive authority for dismissal. Mem. at 15, 20. However, *Blinken* is not on point. First, that case did not involve a specific statute (the Taylor Force Act) with specific findings (pay-to-slay payments incentivize terrorism) limiting the defendants' spending of Economic Support Funds in a specific location (the West Bank and Gaza) for the direct benefit of a specific actor (the Palestinian Authority) to protect a specific class of individuals (the plaintiffs), as this case does. Second, the injury there was not redressable, ("the Court has no tools at its disposal to compel the Nigerian government to return the aircraft"), and there was no evidence of prospective injury. Here, as discussed above, the injury is redressable and there is substantial evidence of prospective injury if the defendants continue to violate this terror financing law. *See* 22 U.S.C. § 2738c-1 note; *Holder,* 561 U.S at 29-31.

Finally, Robbie and Stuart Force and Sari Singer have alleged standing based on past injuries and on the mental and physical harm caused by the defendants knowingly and intentionally subsidizing the Palestinian Authority's support for terrorism and for its pay-to-slay bounty payments to the families of the terrorists who murdered Taylor and blew up a city bus, killing sixteen innocent people who were sitting there with Ms. Singer. Compl. ¶¶ 19-20, 71-73. Although plaintiffs Force and

plaintiff Singer both plead emotional *and* physical harm, the defendants assert they lack the requisite personal stake in this litigation. Mem. at 21-23. The defendants claim that the distress and physical injury they have caused these plaintiffs by unlawfully using American taxpayer dollars to subsidize, *inter alia*, the Palestinian Authority's pay-to-slay payments to the families of the terrorists who harmed them is merely a generalized grievance and that this case is nothing more than "policy disagreement by concerned citizens." Mem. at 22-23.

These plaintiffs are not litigating generalized grievances. Rather, they seek relief to protect or vindicate a legally protected interest of their own. *These* plaintiffs have the direct personal stake in the outcome of the controversy needed to assure concrete adverseness. *Compare Baker,* 369 U.S. at 206-207; *Hollingsworth v. Perry,* 570 U.S. 693, 706 (2013).

## II.   THE PLAINTIFFS HAVE STATED A CLAIM

### A.   Background

This is a statutory interpretation case. The defendants repeatedly claim to comply with the law. Mem. at 26-30. Remarkably, however, they do not analyze or engage with the controlling text.

Taylor Force Act § 2378c-1(a), titled "Limitation", prohibits the defendants from spending any Economic Support Funds for assistance in the West Bank and Gaza that "directly benefits the Palestinian Authority" absent certification by the Secretary of State that both pay-to-slay and terror incitement have ceased.

17

Section 2378c-1(b), titled "Exception", carves out three narrow exceptions to the general prohibition: payments to the East Jerusalem Hospital Network, wastewater projects not exceeding $5,000,000 in any one fiscal year, and vaccinations for children not exceeding $500,000 in any one fiscal year.

Section 2378c-1(d), titled "Initial use and disposition of withheld funds", provides in § 2378c-1(d)(1), titled "Period of availability", that funds withheld are authorized to remain available for an additional two years from the date on which the availability of such funds would otherwise have expired. Subsection 2378c-1(d)(2), titled "Use of funds", further specifies that "Except as provided in paragraph (3), such funds may not be made available for any purpose *other than for assistance for the West Bank and Gaza that directly benefits the Palestinian Authority*." (Emphasis added.) That is, the government is specifically prohibited from redirecting Economic Support Funds to non-governmental organizations or anyone else. Finally, subsection 2378c-1(d)(3), titled "Disposition of unused funds," then provides:

> Beginning on the date that is 180 days after the last day on which the initial availability of funds withheld pursuant to this section would otherwise have expired, such funds are authorized to be made available to the Department of State for assistance under [the Economic Support Fund] in the following manner—(A) 50 percent for purposes of assistance *other* than that deemed benefiting the Palestinian Authority; and (B) 50 percent for purposes other than assistance for the West Bank and Gaza.

Statements by the Taylor Force Act's key sponsors make it clear why Congress structured the Act this way. According to Republican Rep. Doug Lamborn, a principal House co-sponsor:

> In March 2016, a member of the Palestinian terrorist organization Hamas murdered U.S. Army veteran Taylor Force in Tel Aviv, Israel. The terrorist that stabbed Taylor also severely wounded ten others before being killed by

Israeli police. Soon thereafter, the terrorist's family started receiving "martyr payments" from the Palestinian Authority (PA) as a reward for his actions.

Martyr payments are financial "pay to slay" contributions by the PA to injured or imprisoned terrorists, and the family members of deceased terrorists who attacked Israel. *These inducements significantly incentivize acts of terrorism and are often directly proportional in size to the number of those injured or killed during the attack.*

In 2018, Congress passed the bipartisan Taylor Force Act, which significantly restricts non-humanitarian U.S. aid to the PA until it ends its "pay to slay" program. *The Taylor Force Act recognized the fact that money is fungible and that U.S. aid, even if restricted towards good governance programs, frees up money for the PA to spend more on martyr payments.*[11]

A key Senate cosponsor, Senate Majority Leader Chuck Schumer, said:

While the United States does not provide direct budgetary support to the Palestinian Authority, *it does pay certain debts and funds programs which the Palestinian Authority would otherwise be responsible for.*

The Taylor Force Act will restrict U.S. funds to the West Bank and Gaza that directly benefit the Palestinian Authority until the Secretary of State can certify that the Palestinian Authority terminates payments to individuals or family members of individuals who have been tried and imprisoned for acts of terrorism, and revokes any law, decree, regulation, or document authorizing or implementing the payment system for terrorists, and is taking credible steps to end acts of violence against Israeli citizens and United States citizens perpetrated by citizens under its jurisdictional control.[12]

The plain text, read it context, therefore make it clear Congress intended to stop Economic Support Funds, even if dedicated to ostensibly peaceful projects, from being used to subsidize the Palestinian Authority's support for terrorism and pay-to-slay. In 2018, the government acknowledged this. For oversight, Congress mandated

---

[11] Press Release, Rep. Doug Lamborn (May 18, 2022) (emphasis added), https://bit.ly/3VWz5qj.
[12] Statement of the Senate Majority Leader Chuck Schumer, "Federal Spending Bill Includes 'Taylor Force Act'; Senator Co-Sponsored Legislation, Which Cuts U.S. Funds That Directly Benefit The Palestinian Authority Unless Payments to Terrorists and their Families are Halted" (March 22, 2018), https://bit.ly/42rshni.

that the Secretary of State submit to the relevant congressional committees a list of the criteria used to determine whether "assistance for the West Bank and Gaza is assistance that directly benefits the Palestinian Authority for purposes of carrying out this section." 22 U.S.C. § 2378c-1(f)(1). The criteria identified by the Trump Administration included the identity of the intended primary beneficiary or end user; whether the Palestinian Authority is the direct recipient of the assistance; whether the assistance involves payment to Palestinian Authority creditors; the extent of ownership or control the Palestinian Authority exerts over an entity or individual who is the primary beneficiary or end user of the assistance; and whether the assistance or services provided directly replace assistance or services provided by the Palestinian Authority. Mem. Appendix at 19. These criteria apparently have not changed.

The defendants claim to comply with the law, even as they tout "restored political and economic relations between the U.S. government and the Palestinian Authority."[13] However, the defendants' program narratives do not prove compliance.

_____

[13] Mem. at 26-32; Compl. at ¶ 48. The plaintiffs, however, have plausibly alleged that the defendants have knowingly and willfully violated statutory limits. Compl. ¶¶ 11, 13, 18-20, 34-56, 67-73. Therefore, effective judicial review may require discovery depositions of the defendants' program officials regarding their formal findings of Taylor Force Act compliance for each Economic Support Funds grant or award made in the West Bank or Gaza that is outside the exceptions specified in 22 U.S.C. § 2378c-1(b). It may also require discovery regarding the defendants' promises to the Palestinian Authority and response to "Law-by-Decree 7/2021," *see* Compl. ¶¶ 36-38, 71, especially as the defendants' good faith compliance may be an open question. *See* Compl. ¶¶ 11, 40, 41, 44, 47-48, 50-51, 52-55, 70-71. *Texas v. Biden*, 2021 WL 5399844, at *4 (N.D. Tex. Nov. 18, 2021) (citations omitted); *see also Overton Park, Inc.*, 401 U.S. at 420; *Dep't of Commerce*, 139 S. Ct. at 2573-74; *Kent Corp. v. N.L.R.B.,*

20

*See, e.g.,* Mem. Appendix at 2-7; Mem. at 26-30. The defendants acknowledge that the certifications mandated in § 2378c-1(a) cannot be made. However, there is nothing reflecting compliance with § 2378c-1(d), not with respect to the withholding of funds (§ 2378c-1(d)(2)) nor with respect to the disposition of unused funds (§ 2378c-1(d)(3)). The defendants' duty is to follow the Taylor Force Act as written, not to supplant its commands with others they may prefer. *SAS*, 138 S. Ct. at 1355.

### B.    There is law to apply

The defendants claim that Congress committed Palestinian Authority funding to agency discretion by law and that there are no justiciable standards for judicial review. Mem. at 23-24. However, they have not carried the "heavy burden" of proving that Congress clearly intended to alter the general presumption favoring judicial review of illegal executive action. *See Texas,* 809 F.3d at 164; *Block,* 467 U.S. at 351; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Where, as here, there is affirmative agency action (i.e., funding persons in the West Bank and Gaza) that action at least can be reviewed to determine whether the agency exceeded its statutory powers. *Texas*, 809 F.3d at 168.

The defendants overreach on the "committed to agency discretion" exception to judicial review. This exception is meant to be read quite narrowly, and restricted to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of

---

530 F.2d 612, 621 n.21 (5th Cir. 1976); *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 5399844, at *4 (N.D. Tex. Nov. 18, 2021).

discretion. Furthermore, the exception has been generally limited to categories of administrative decisions that courts traditionally have regarded as committed to agency discretion, such as a decision not to institute enforcement proceedings, to allocate funds from a lump-sum appropriation, or a decision by an intelligence agency to terminate an employee in the interest of national security. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019); *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993). None of these categories are at issue here.

Second, the Taylor Force Act's point and purpose is to cabin the defendants' discretion, *see* 22 U.S.C. §§ 2378c-1(a)(1); 2378c-1(d), and the statute itself furnishes a meaningful standard to judge the defendants' actions. *Dep't of Com*. 139 S. Ct. at 2568. The phrase "directly benefits the Palestinian Authority" is clear enough, and the limiting language in §§ 2378c-1(a), (b), and (d) makes it abundantly clear what the defendants can and cannot do with congressionally appropriated Economic Support Fund monies in the West Bank and Gaza. The statute is certainly amenable to judicial construction based on its plain and ordinary meaning. *See Texas,* 809 F.3d at 165.

In any event, the mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under the "committed to agency discretion by law" exception unless the statutory scheme, taken together with other relevant materials – in this case, including the Department of State's criteria - provide absolutely no guidance as to how that discretion is to be exercised. *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (citation omitted). This is

because even without clear statutory guidelines, courts often can still discern from the statutory scheme a congressional intention to pursue a general goal. Thus, the rule is that if the agency's action is found not to be reasonably consistent with this goal, then the courts must invalidate it. *Id.*

Here, Congress was quite explicit in its instructions: The Palestinian Authority supports terrorism. Therefore, Economic Support Funds may not be spent for its direct benefit, which would include spending on its recognized governance obligations, including social services, education and culture, public health, water supply, infrastructure, economic development, and disaster preparedness. *See* 22 U.S.C. § 2378c-1(a); Declaration of Principles on Interim Self-Government Arrangements, Art. VI § 2 and Art. VII, § 4, *supra;* Mem. Appendix at 19; Statement by Sen. Schumer, *supra.* But the defendants are spending on just these things. Mem. Appendix at 2-14.

Simply put, there is law to apply in this case. *Accord Texas,* 809 F.3d at 168 (citations omitted); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

### C.    This case is not an impermissible "programmatic challenge"

The defendants argue that the plaintiffs have at once brought an impermissible "programmatic challenge" while failing to plausibly allege *any* Taylor Force Act violations. Defendants' Mem. at 25-27. But these arguments do not carry any weight.

First, the defendants claim that the plaintiffs "object to *all funding* to the West Bank and Gaza through non-governmental entities." Mem. at 29. This is not so. The plaintiffs object only to the defendants spending Economic Support Funds in West Bank and Gaza funding, whether through non-governmental entities that directly benefit the Palestinian Authority and do not comply with the Taylor Force Act. *See generally* Compl. ¶¶ 41-42, 44, 48, 50-51; *see also* 22 U.S.C. §§ 2378c-1(b), (d) (describing permissible Economic Support Fund spending); Mem. Appendix at 19.

Regardless, it is well-established that a challenge to discrete agency action is permissible even when such a challenge requires a whole program to be revised by the agency. *Texas Gen. Land Off. v. Biden*, 619 F. Supp. 3d 673, 698 (S.D. Tex. 2022). Interestingly, the defendants' argument that this case *is* a programmatic challenge arguably validates the plaintiffs' allegations and Congressional concerns that the government's Taylor Force Act violations are *also* programmatic. *See* Compl. ¶¶ 34-58, 63-65.

Second, the defendants claim that the plaintiffs have failed to plausibly allege Taylor Force Act violations. Mem. at 26-27. But given the Palestinian Authority's broad governance obligations and the Taylor Force Act's plain language, every Economic Support Fund grant or award that is not for one of the three excepted categories under § 2378c-1(b), or made in strict compliance with § 2378c-1(d), facially violates the law, whether the grant or award is for "civil society," "social services," "public health," "workforce development," "transport services," "private sector productivity," "disaster readiness," or otherwise. *See* Mem. Appendix at 3-5; Compl.

24

¶ 24; Declaration of Principles on Interim Self-Government Arrangements, Art. VI §
2 and Art. VII, § 4, *supra*.

Third, the plaintiffs have alleged that once the Biden Administration took
control over the United States government, it resumed using Economic Support
Funds and other American taxpayer dollars to directly benefit the Palestinian
Authority. Compl. ¶¶ 36-37. Then, the Palestinian Authority issued a decree taking
operational control over all non-governmental organizations operating within its
jurisdiction. Compl. ¶ 38. Thereafter, the defendants began pouring tens of millions
of dollars into the West Bank and Gaza through such organizations. Compl. ¶¶ 11,
41-48, 60. It is not clear whether the Palestinian Authority's decision to take control
over all non-governmental organizations in its jurisdiction was the result of
consultations with the defendants. However, the plaintiffs' allegations at least
plausibly allege a scheme or artifice to circumvent the Taylor Force Act and support
the Palestinian Authority. *Accord* Compl. ¶¶ 47-48.

The defendants dismiss these allegations as factually incorrect, *see* Mem. at
28-29, and argue that it does not matter if the Palestinian Authority has taken
operational control over all non-governmental organizations in its jurisdiction for
Taylor Force Act compliance purposes. *See e.g.,* Mem. at 30 n.10; *contra* Mem.
Appendix at 19 (the extent of ownership or control by the Palestinian Authority and
whether assistance or services provided replace Palestinian Authority assistance or
services are both criteria for determining whether Economic Support Fund assistance

violates the Taylor Force Act). But these arguments lack traction at the pleading stage.

> **D.**     **The plaintiffs' *ultra vires* claim for relief is properly pled**

The defendants claim that the plaintiffs' *ultra vires* claim for relief is deficient because the plaintiffs have pled an Administrative Procedure Act claim for relief as well. Mem. at 30-31. However, judicial review for ultra vires agency action 'rests on the longstanding principle that where, as here, the defendants have openly crossed a congressionally drawn line in the sand, the courts generally have jurisdiction to grant relief in equity. *Oklahoma v. Tellez*, No. 7:22-CV-00108-O, 2022 WL 17069132, at *3 (N.D. Tex. Nov. 17, 2022) (citations omitted); *see also Feds for Med. Freedom v. Biden*, 63 F.4th 366, 397 (5th Cir. 2023) (Higginson, J, and Southwick, J., concurring in part); *Fed. Express Corp. v. United States Dep't of Com.,* 39 F.4th 756, 763-64 (D.C. Cir. 2022)*; National Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022). This non-statutory form of judicial review survived the Administrative Procedure Act's enactment and is available when there is no express statutory preclusion of all judicial review, there is no alternative procedure for review of the statutory claim, and the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory. *Tellez*, 2022 WL 17069132, at *4; *see also Leedom v. Kyne*, 358 U.S. 184, 188 (1958); *USPS,* 26 F.4th at 970.

The plaintiffs' *ultra vires* and Administrative Procedure Act claims for relief are separate and independent. If, as the defendants contend, Administrative

<div align="center">26</div>

Procedure Act review is unavailable, then an *ultra vires* challenge is the proper way to challenge the defendants' unlawful conduct. *Tellez*, 2022 WL 17069132, at *4 citing *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003) (noting the availability of *ultra vires* review despite foreclosure of Administrative Procedure Act review).

## III.   THE COURT SHOULD NOT DISMISS THIS CASE

Finally, the defendants cite *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) and ask this court to use its discretion and deny the plaintiffs all relief because this case is a sensitive foreign affairs matter. Mem. at 33. But *Spinoza* is not on point. Because that case involved "statutes no more specifically addressed to such concerns than the Alien Tort Statute and the [Administrative Procedure Act], we think it would be an abuse of our discretion to provide discretionary relief." 770 F.2d at 208. Here, by contrast, the Taylor Force Act controls directly and in detail. As a constitutional matter, the defendants are bound to comply. *See Youngstown Sheet & Tube Co.*, 343 U.S. at 641-43 (Jackson, J., concurring); *Curtiss-Wright Export Corp.*, 299 U.S. at 319–320.

## CONCLUSION

The plaintiffs have standing, and this court has jurisdiction. The Taylor Force Act sets clear and precise boundaries on the defendants' use of appropriated funds in the West Bank and Gaza, and they are constitutionally bound to comply with its terms. Accordingly, the defendants' motion to dismiss should be denied.

Dated:        May 22, 2023            Respectfully submitted,

<div style="margin-left: 40%">

/s/ Reed D. Rubinstein
REED D. RUBINSTEIN
D.C. Bar No. 400153
reed.rubinstein@aflegal.org
JULIE A. STRAUSS
D.C. Bar No. 387262
julie.strauss@aflegal.org
America First Legal Foundation
300 Independence Ave. S.E.
Washington, D.C. 20003
(202) 964-3721
*Counsel for Plaintiffs*

</div>

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM / ECF system. Counsel in the case are registered CM / ECF users and service will be accomplished by the CM / ECF system.

<u>*/s/ Reed D. Rubinstein*</u>
REED D. RUBINSTEIN

29