2023 WL 6388815
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

MASSACHUSETTS COALITION FOR
IMMIGRATION REFORM, et al., Plaintiffs,
v.
U.S. DEPARTMENT OF HOMELAND
SECURITY, et al., Defendants.

Case No. 1:20-cv-03438 (TNM)
|
Filed 09/30/2023

### MEMORANDUM ORDER

TREVOR N. McFADDEN, U.S.D.J.

*1 When President Biden took office, he reversed many of his predecessor's immigration policies. Now, a slew of Plaintiffs has sued under the Administrative Procedure Act (APA), arguing that this about-face violated the National Environmental Policy Act (NEPA). And they describe personal injuries they have suffered from the resultant surge in illegal immigration. Plaintiffs ask this Court to declare the revocations unlawful, and to order the Government to perform an environmental analysis of the policies and incorporate such analyses into its immigration policies moving forward. Both parties now move for summary judgment. The Court grants the Government's motion as to certain Plaintiffs and certain claims. But for the rest, it denies both parties' motions. This case will therefore proceed to trial.

### I.

### A.

NEPA was enacted in response to the environmental movement of the 1960s, and it was designed to force federal agencies to reckon with the environmental impacts of their policies. *See RB Jai Alai, LLC v. Sec'y of Fla. Dep't of Transp.*, 112 F. Supp. 3d 1301, 1307–08 (M.D. Fla. 2015). To that end, it requires an agency contemplating a "major Federal action[ ]" that will "significantly affect[ ] the quality of the human environment" to first prepare "a detailed statement ... on the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C) (2020). Such "major federal action[s]" are those "with effects that may be major and which are potentially subject to federal control and responsibility." 40 C.F.R. § 1508.18(a) (2020) (capitalization altered). [1] They most often include the "adoption of official policy," "adoption of formal plans," "adoption of programs," or "approval of specific projects." *Id.* § 1508.18(b) (capitalization altered). However, *inaction* can also constitute a major federal action if that inaction is judicially reviewable. *Id.* § 1508.18.

Under NEPA's implementing regulations, an agency contemplating an action begins by determining whether an environmental impact statement (EIS)—a detailed accounting of the expected environmental consequences of the proposed action, 40 C.F.R. § 1502.1—is necessary. The agency first looks to whether the action is one that ordinarily does or does not require an EIS. *Id.* § 1501.4(a). If it is, the agency treats it accordingly. But if the action is *not* covered by either category, the agency performs an environmental assessment (EA), *id.* § 1501.4(b), to determine whether an EIS is necessary, *see id.* § 1501.4(c). If, upon completion of the EA, the agency concludes that the proposed action will not significantly impact the environment, and therefore no EIS is needed, it must prepare a finding of no significant impact (FONSI) explaining its reasoning. *Id.* § 1501.4(e).

These "action-forcing" provisions of NEPA and its regulations require agencies to take a "hard look" at the environmental consequences of their actions. *Robertson v. Methow Valley Cits. Coun.*, 490 U.S. 332, 350 (1989). Agencies must publish any EIS, *see* 42 U.S.C. § 4332(2)(C), so that potentially affected individuals can comment, *see Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 123 (D.C. Cir. 1990). But NEPA does not tell agencies what to do with the resulting EIS. Instead, it "simply prescribes the necessary process" for proactive environmental analysis without "mandat[ing] particular results." *Robertson*, 490 U.S. at 350. So an agency may disregard the EIS entirely without violating NEPA. The statute "merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351.

### B.

*2 This case involves both organizational and individual Plaintiffs. Plaintiff Massachusetts Coalition for Immigration Reform (the Coalition) is a voluntary membership group whose members care about the environment. *See* Am. Compl.

(Compl.) ¶¶ 25–26, ECF No. 17. Some of those concerns are professional (such as employment as environmental scientists), while others are recreational (such as enjoyment of wildlife photography). *See id.* ¶¶ 27–30. The Coalition believes that mass immigration has had "distinctly negative effects on [the] environment." *Id.* ¶ 26. Indeed, it contends that "[i]f NEPA should apply to *any* government policy, it should be to federal policies that induce population growth." *Id.* ¶ 13. The Coalition alleges that changes to immigration policies "between the Trump and Biden administrations ... ha[ve] already had a profound influence on the 'human environment.' " *Id.* ¶ 14. It asserts that many of the Biden Administration's actions should have undergone environmental impact analyses. *See, e.g.*, *id.* ¶¶ 226–52.

Six individual Plaintiffs join the Coalition's suit. *See* Compl. ¶¶ 31–36. Two—Chance Smith and Gail Getzwiller (Border Plaintiffs)—live and work near the southern border. *See id.* ¶¶ 35–36. They allege that increases in illegal border crossings have damaged the environment in their area. *See generally* Corrected Decl. of Steven Chance Smith (Smith Decl.), ECF No. 47-1; Decl. of Gail Getzwiller (Getzwiller Decl.), ECF No. 34-2. And they contend that the Government should have performed NEPA reviews before taking the actions that caused these harms. *See, e.g.*, Compl. ¶¶ 20–22.

Smith works on a cattle ranch in Arizona and has lived near the border for years. *See* Smith Decl. ¶¶ 1–5. So he has witnessed the effect that immigration policy can have on illegal immigration. *See id.* ¶ 5. He observed distinct changes in immigration patterns across presidential administrations. For example, since President Biden took office, Smith has noticed an increase in trash left behind by border crossers. *See id.* ¶ 14. And, in one instance, a group of illegal migrants buried a gun on Smith's property before being arrested. *See id.* ¶ 10. Smith asserts that this influx of aliens threatens his work as a rancher by damaging the land. *See id.* ¶ 17. Along with leaving trash, Smith alleges that migrants set fires that damage the local environs. *See id.* And he claims that he lives in fear for the safety of his family, and now he is forced to be armed when traversing his ranch. *See id.* ¶ 9. This fear diminishes Smith's enjoyment of his property. *See id.*

Getzwiller owns two cattle ranches near the southern border in Arizona and shares a similar story. *See* Getzwiller Decl. ¶ 1. She claims that local volunteers have cleaned up "10,000 tons of trash on the border left by border crossers" in the last three years. *Id.* ¶ 6. Items left behind include diapers, backpacks, plastic water bottles, and clothing. *See id.* Despite these efforts, Getzwiller worries about the health of her cattle and the broader ecosystem. *See id.* ¶ 7. Large amounts of trash pollute the water, cause soil erosion, and degrade the vegetation and wildlife in her area. *See id.* The situation has markedly deteriorated under President Biden. *See id.* ¶¶ 7–9. Getzwiller has even considered moving out of the area altogether if the environmental degradation continues. *See id.* ¶ 15.

Four other individual Plaintiffs do not live near the border (Interior Plaintiffs). *See* Compl. ¶¶ 31–34. They assert that immigration-induced population growth has caused environmental harm to their communities. *See generally* Decl. of Kevin Lynn (Lynn Decl.), ECF No. 34-4; Decl. of Linda Huhn (Huhn Decl.), ECF No. 34-5; Corrected Decl. of Bruce D. Anderson (Anderson Decl.), ECF No. 41-1; Decl. of Rob Meyer (Meyer Decl.), ECF No. 34-7.

Plaintiff Kevin Lynn lives in Pennsylvania and serves as the Executive Director of Progressives for Immigration Reform. *See* Lynn Decl. ¶ 1. In this role, he seeks to "raise the profile of the intersection between immigration and the environment in our national public debate." *Id.* ¶ 5. He alleges that the significant resettlement of immigrants into his county has exacerbated homelessness. *See id.* ¶¶ 13–14.

**\*3** Plaintiffs Linda Huhn, Bruce Anderson, and Rob Meyer are all long-time Minnesotans. *See* Huhn Decl. ¶ 1; Anderson Decl. ¶ 1; Meyer Decl. ¶ 1. Each laments the environmental impacts of immigration-induced population growth and fears that their nearby environment will continue to degrade. *See, e.g.*, Huhn Decl. ¶¶ 3–9; Anderson Decl. ¶¶ 8–10; Meyer Decl. ¶¶ 5–8. For example, Huhn bemoans the diminished populations of native birds, butterflies, and plants that she grew up enjoying. *See* Huhn Decl. ¶¶ 2–4, 10–11. Anderson, too, has seen his favorite native species dwindle while the population of Minnesota has steadily grown. *See* Anderson Decl. ¶¶ 6, 8–10. And Meyer has noticed changes in lake conditions and traffic congestion. *See* Meyer Decl. ¶¶ 6–7.

### C.

Plaintiffs claim that several actions required NEPA analysis but did not get it.[2] Those actions are: ending construction of the southern border wall (Count II); terminating the "Remain in Mexico" Policies (Count III); allowing border patrol agents to permit aliens to stay in the country and help them board buses to other states (Count IV); preventing immigration

officials from detaining and removing aliens (Count V); ending the practice of fining aliens for failing to leave the country (Count VI); reinstating administrative closure in immigration courts (Count VII); and expanding various refugee programs (Counts VIII, IX, and X). *See* Compl. ¶¶ 226–52. Plaintiffs ask the Court to hold unlawful and set aside each action for noncompliance with NEPA under § 706(2) of the APA. *See id.* ¶¶ 228, 231, 234, 237, 240, 243, 246, 249, 252. They also request an injunction requiring the Government to adopt new procedures addressing the environmental effects of immigration-related actions and an injunction requiring a "nationwide EIS" on the nine actions combined. *Id.* at 112.

The Court takes each count in turn. In Count II, Plaintiffs claim that the Department of Homeland Security failed to comply with NEPA when ending construction of the southern border wall. *See* Compl. ¶¶ 226–28. During the Trump Administration, the DHS Secretary waived NEPA requirements related to border wall construction under the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA). Pub. L. No. 104-208, § 102(c), 110 Stat. 3009, 3555 (1996). IIRIRA permits this waiver authority "to ensure expeditious construction of the barriers and roads" at the border. *See id.* On his first day in office, President Biden directed DHS to pause all border wall construction and reassess the future use of dedicated funds. *See* Termination of Emer'y with Respect to the Southern Border of the U.S. and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7225 (Jan. 20, 2021). By June 2021, DHS had—with minor exceptions—suspended all border wall construction. *See* DHS_11–15. [3]

In Count III, Plaintiffs claim that DHS and the Justice Department failed to comply with NEPA in their decision to terminate the so-called "Remain in Mexico Policy." *See* Compl. ¶¶ 229–31. This claim groups together four distinct government policies: (a) the Migrant Protection Protocols (MPP); (b) the Asylum Cooperative Agreements (ACAs); (c) Prompt Asylum Case Review; and (d) the Humanitarian Asylum Review Program. *See id.* ¶ 109.

Plaintiffs first challenge the termination of the MPP program. *See* Compl. ¶ 109. DHS announced the MPP in December 2018 and issued policy guidance for their implementation the next month. *See* DHS_584. Under the MPP, "citizens and nationals of countries other than Mexico" who arrived "by land from Mexico—illegally or without proper documentation—[could] be returned to Mexico ... for the duration of their ... removal proceedings." *Id.* DHS initially terminated the MPP in June 2021. *See* DHS_196. But a court order forced the Government to reinstate them. *See Texas v. Biden*, 10 F.4th 538, 543 (5th Cir. 2021). In October 2021, DHS again terminated them—this time following more thorough procedures. *See* DHS_196–99; DHS_200–38. [4] Plaintiffs' Complaint only challenges the Government's lack of NEPA analysis while ending the MPP the first time. *See* Compl. at 52 n. 48; Gov't Cross-Mot. for Summ. J. and Opp'n at 4 (Gov't MSJ), ECF No. 37.

*4 Plaintiffs next challenge the ACAs. *See* Compl. ¶ 109. In late 2019, the United States entered into separate Agreements with El Salvador, Guatemala, and Honduras. *See* STATE_14–27; STATE_1–13; STATE_28–41. Each Agreement permitted the United States to remove migrants to their native countries to seek humanitarian protection. But the COVID-19 pandemic put the agreements on hold. *See* STATE_63–64. In fact, the Agreements with El Salvador and Honduras were never implemented. *See id*. In any event, the Government terminated the Agreements in early 2021. *See id*.

Plaintiffs also challenge the Prompt Asylum Case Review and Humanitarian Asylum Review Program policies. *See* Compl. ¶ 109. DHS launched both programs in October 2019. *See* DHS_9086. Each program allowed Customs and Border Patrol to retain custody of migrants while screening them. *See* DHS_9091. The two policies applied to "single adults and family units" who were "apprehended ... without a valid asylum claim." *Id*. The programs aimed to complete credible fear evaluations necessary for asylum claims within "7 to 10 days, while applicants remain in CBP custody." *Id*. In September 2022, DHS terminated both without performing NEPA analysis. *See* DHS_8978–79.

In Count IV, Plaintiffs claim that DHS failed to comply with NEPA in its decision to allow border patrol agents to substitute a Notice to Report (NTR) for the standard Notice to Appear (NTA) to illegal aliens. *See* Compl. ¶¶ 232–34. While an NTA starts removal proceedings against an alien, a NTR does not. *See* DHS_8659–60. The NTR policy Plaintiffs challenge no longer exists. *See* Mem. on Parole Plus Alternative to Detention, ECF No. 37-2. In November 2021, DHS replaced the use of NTRs with a policy of using parole along with Immigration and Customs Enforcement's (ICE's) Alternatives to Detention (Parole Plus). *See id*. Parole Plus allowed border patrol agents in overcrowded processing centers to parole aliens as long as they "report to ICE within 15 days to be processed for an NTA." *Id.*

In Count V, Plaintiffs claim that DHS failed to comply with NEPA in its decision to prevent immigration officials from detaining and removing aliens. *See* Compl. ¶¶ 235–37. Plaintiffs contend that an internal memorandum sent by the acting ICE Director (Pekoske Memorandum) prohibited ICE agents from detaining and removing "all foreign nationals unlawfully present except those who meet a few narrow categories." Pls.' Mot. for Summ. J. (Pls.' MSJ) at 11, ECF No. 34; *see also* DHS_3890–96. The February guidance has since been superseded by different guidance, but again, Plaintiffs challenge only the first iteration. *See* Gov't MSJ at 37; *see also* Gov't MSJ, Ex. 5, ECF No. 37-5.

In Count VI, Plaintiffs claim that DHS failed to comply with NEPA in its decision to stop fining aliens who fail to leave the country. *See* Compl. ¶¶ 238–40. In April 2021, ICE "rescinded two delegation orders related to the collection of civil financial penalties for noncitizens who fail to depart the U.S." DHS_9204. The Government took these steps after data showed that the fine collection policy did not promote compliance with immigration laws. *See id.* Indeed, the program only "yielded six fines ... over the course of its implementation." Tr. of Mot. Hr'g on Mots. for Summ. J. (Mot. Hr'g Tr.) at 53:22–23.

In Count VII, Plaintiffs claim that DOJ failed to comply with NEPA in its decision to reinstate administrative closure in immigration courts. *See* Compl. ¶¶ 241–43. Administrative closure is a docket management tool that allows immigration judges to remove cases from their active calendar without deciding the merits. *See id.* ¶ 113. In July 2021, the Attorney General reinstated this practice through an immigration opinion. *See Matter of Cruz-Valdez*, 28 I. & N. Dec. 326 (2021). Plaintiffs contend that administrative closure is used "to close a large number of cases which then remain indefinitely suspended without a final resolution." Compl. ¶ 116.

 *5  In Count VIII, Plaintiffs claim that the State Department failed to comply with NEPA when expanding the refugee resettlement program. *See* Compl. ¶¶ 244–46. In April 2021, State published a notice soliciting proposals for refugee resettlement contracts from various resettlement agencies. *See* STATE_66. The Notice laid out some of the criteria that State would consider when awarding contracts but did not select which agencies would be chosen. *See* STATE_66–107. The 2022 Notice has since closed, and all contracts are completed. *See* Gov't MSJ at 42. Plaintiffs have not challenged more recent funding notices.

In Count IX, Plaintiffs claim that DHS failed to comply with NEPA in its decision to reinitiate and expand the Central American Minors program (Minors Program). *See* Compl. ¶¶ 247–49. Since 2014, this program has allowed lawful residents to request refugee status on behalf of their children who are nationals of El Salvador, Guatemala, or Honduras. *See* DHS_8878–79. The Trump Administration terminated the Minors Program in 2017. *See* DHS_8889. But the Biden Administration reinstated it in March 2021. *See* DHS_8902–03. By that time, the program had admitted fewer than 5,000 children into the United States. *See* DHS_8903.

In Count X, Plaintiffs claim that DHS failed to comply with NEPA in its decision to parole Afghan nationals. *See* Compl. ¶¶ 250–252. In August 2021, the Government circulated a memorandum noting that the United States had been involved in the "processing, transporting, and relocating of vulnerable Afghan nationals, including many who worked for or on behalf of the United States." DHS_8961. The memorandum suggested that it was appropriate for Government officials to use their discretionary authority to parole Afghan nationals. *See id*.

## II.

The parties have each moved for summary judgment, so the Court applies the familiar Rule 56 standards to decide the motions. The Court may grant a party summary judgment if that party can show both that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In practical terms, this means that a party is entitled to summary judgment only when no reasonable factfinder could find for the other side at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). That is because the core purpose of summary judgment is to avoid the expense of trial where a trial would be "a useless formality" because no factfinder could find for the nonmoving party. *See Zweig v. Hearst Corp.*, 521 F.2d 1129, 1135–36 (9th Cir. 1975).

Plaintiffs have the burden to prove not only the merits, but standing, too. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). This means that they "must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Dep't of Com. v. U.S. House of Reps.*, 525 U.S.

316, 329 (1999). Unlike at the Rule 12(b) stage, allegations are now insufficient to support standing. *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019). Plaintiffs must instead "introduce[ ] sufficient evidence into the record to at least raise a disputed issue of fact as to each element of standing." *Id.* (quoting *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48–49 (D.C. Cir. 2016)).

The Court starts with a review of the legal principles that drive this case. First, standing. And second, the prerequisites of the NEPA claim.

**A.**

The Court begins, as always, with jurisdiction—its power to decide this case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 94–95 (1998). And standing sits at the heart of that jurisdiction. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Because federal courts "do not possess a roving commission to publicly opine on every legal question" and do not "exercise general legal oversight" of the other branches of the federal government, *id.*, standing doctrine helps ensure that in each case, the proper plaintiff is suing the proper defendant over a kind of injury the Court is able to resolve.

 *6  To have standing to sue, an individual plaintiff must satisfy three requirements. A plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical" (the injury-in-fact requirement); "(2) the injury is fairly traceable to the challenged action of the defendant" (the causation requirement); and "(3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (the redressability requirement). *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–181 (2000).

Some of those requirements need further unpacking. For example, the injury-in-fact requirement's reference to "particularized" injuries has specific meaning. It helps ensure that the issue before the Court implicates "the rights of individuals," not society at large. *TransUnion*, 141 S. Ct. at 2203 (quoting *Marbury v. Madison*, 5 U.S. 137, 170 (1803)). This requires that the injury "affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). A plaintiff cannot simply "employ a federal court as a forum in which to air his generalized grievances about the conduct of government." *United States v. Richardson*, 418 U.S. 166, 175 (1974) (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)). To be sure, an injury does not flunk this requirement just because it affects many people. *Spokeo*, 578 U.S. at 339 n.7. The touchstone, though, is whether the injury affects the plaintiff in a manner distinct from society as a whole. *Id.* at 339.

For example, courts evaluating a NEPA claim look to whether the environmental harm occurs near where the plaintiff lives or frequents. *See*, *e.g.*, *City of Dania Beach v. FAA*, 485 F.3d 1181, 1185–86 (D.C. Cir. 2007). This "geographic nexus" requirement ensures that the environmental injury is one *to the plaintiff*, rather than to the world at large. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (en banc); *see also Lujan*, 504 U.S. at 565–67. Think of this as a way to police the boundaries of the particularization requirement. So when a challenged policy has broad, nationwide effects, courts must apply "even more exacting scrutiny" to ensure that the policy actually injures the plaintiff himself, rather than society as a whole. *Fla. Audubon Soc'y*, 94 F.3d at 667.

Causation is also worth explicating. This requirement forces plaintiffs to show that their injury "fairly can be traced to the challenged action of the defendant, and not ... some third party not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). But that does not mean that the presence of a third party somewhere in the plaintiff's causal chain bars federal jurisdiction. *Lujan*, 504 U.S. at 562. Rather, it means that showing causation is "substantially more difficult" in that context. *Id.*; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013).

For instance, courts will not "endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413. But they *will* endorse standing theories that involve "third parties ... react[ing] in predictable ways." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). So where a plaintiff offers a domino-effect theory of causation, he still has standing to sue. *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004), *abrogated on other grounds by Trudeau v. FTC*, 456 F.3d 178, 187–89 (D.C. Cir. 2006). What matters is that there is a demonstrable relationship between cause and effect. In other words, there must be clear evidence that the defendant's actions were "a substantial factor motivating the decisions of the third parties that were the direct source of the plaintiff's injuries." *Id.* As long as the plaintiff can show that each link in the causal chain predicably causes the next, he

can satisfy the causation requirement for Article III standing. *See id*.

*\*7* While a theory of indirect causation makes it harder to establish standing, Plaintiffs' load is lightened in other respects. For instance, when a plaintiff raises a purely procedural objection to Government action, standing is easier to show. *See, e.g.*, *Fla. Audubon Soc'y*, 94 F.3d at 664. Specifically, "the redressability and imminence requirements" are "relax[ed]." *Ctr. for Bio. Div. v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 664). Because Plaintiffs' NEPA claims assert "archetypal procedural injur[ies]," *Nat'l Parks Conserv. Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005), that special rule applies here.

Causation changes, too. A plaintiff asserting a NEPA claim does not need to argue that "the agency action would have been different but for the procedural violation." *Nat'l Parks Conservation Ass'n*, 414 F.3d at 5. So he likewise need not show that "compliance with the procedure would alter the final result." *Id*. Instead, the Court simply "assumes the causal relationship between the procedural defect and the final agency action," although the plaintiffs "must still demonstrate a causal relationship between the final action and the alleged injuries." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005).

That leaves redressability. Because the complaint in a NEPA case is the failure to follow a process, rather than the specific result reached, the redressability requirement does not require the plaintiff to show that the Government would not have adopted its policy, had it complied with NEPA. *Lujan*, 504 U.S. at 572 n.7. Instead, the plaintiff only needs to show that the defendants have the power to undertake the relevant NEPA procedures if so ordered. *See, e.g.*, *City of Dania Beach*, 485 F.3d at 1186. All this means that while Plaintiffs' burden is high, given their indirect causal chain, it is not insurmountable.

Now, when it comes to organizations, they can either assert standing directly, through so-called organizational standing, or on behalf of their members, through so-called associational standing. To have organizational standing, the organization must show that there has been a "demonstrable injury to the organization's activities" "with [a] consequent drain on the organization's resources," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), such that the "organization's other activities had ... been impaired by the defendant's actions, *Fair Emp. Coun. of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994). By contrast, associational standing requires that at least one of the organization's members "would otherwise have standing to sue in [his] own right"; that "the interests [the organization] seeks to protect are germane to the organization's purpose"; and "neither the claim asserted nor the relief requested requires the participation of [the] individual members in the lawsuit." *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

One last thing: The Government argues that the Court can consider only materials from the administrative record in deciding whether Plaintiffs have standing. Dfts.' Reply in Supp. of Cross-Mot. for Summ. J. at 33–34, ECF No. 45. Not so. When reviewing *the merits* of a challenge to agency action, a federal court is limited to the materials contained in the administrative record. *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013).

But the same is not true when a federal court is reviewing its own jurisdiction. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). And that rule has been settled for decades. *See generally id*. It makes sense, too. Administrative agencies are not bound by Article III of the Constitution or Title 28 of the United States Code. *See Pfizer, Inc. v. Shalala*, 182 F.3d 975, 980 (D.C. Cir. 1999). So they have no incentive to compile an administrative record with the facts necessary for a court to decide whether it has jurisdiction. Adopting the Government's position would enable agencies to evade federal jurisdiction by refusing to include certain relevant facts in the administrative record—and that is no way to run a railroad. While reviewing jurisdiction, then, the Court does not limit itself to solely those factual matters included within the administrative record.

### B.

*\*8* The merits rubric is much simpler. Plaintiffs challenge the Government's policies under § 706 of the APA. So the question for the Court is whether the policies are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). This issue is a purely legal one. Plaintiffs must show for each policy they challenge that the Government (1) was required to perform a NEPA analysis but (2) failed to perform one. No one contests the latter. So Plaintiffs' merits arguments all address whether the Government was required to perform an EIS for each of its challenged policies.

To show that the Government was obligated to perform a NEPA analysis, Plaintiffs must show that each policy constituted a "major Federal action[ ]." 42 U.S.C. § 4332(2)(C). That term is not statutorily defined. But EPA regulations define it as an action "with effects that may be major." 40 C.F.R. § 1508.18. More particularly, such actions "include ... new or revised agency rules, regulations, plans, policies, or procedures." Id. § 1508.18(a). On top of showing that each challenged policy is a major federal action under that framework, Plaintiffs must also show that it does not fall under any of NEPA's exceptions. Most relevant here is that major federal actions "do not include bringing judicial or administrative civil or criminal enforcement actions." Id.

In sum, then: All parties agree that the Government did not perform a NEPA analysis prior to enacting the challenged policies. So Plaintiffs prevail on the merits if the Government was supposed to conduct one. And that turns on whether each policy is a "major Federal action[ ]." 42 U.S.C. § 4332(2)(C). That is, if it is a "new or revised agency ... polic[y]" and *not* a "judicial or administrative civil or criminal enforcement action[ ]." 40 C.F.R. § 1508.18(a).

### III.

Assessing the parties' standing arguments, the Court finds that most, but not all, Plaintiffs lack standing to sue. Specifically, none of the Interior Plaintiffs have suffered an injury that is particularized to them, rather than shared with all Americans. And the Coalition fails to adequately demonstrate either associational or organizational standing. As for the Border Plaintiffs, they too lack standing to bring most of their claims. But the Border Plaintiffs have created a genuine issue of material fact as to whether they have standing on two claims. The Court will therefore allow the Border Plaintiffs to proceed to trial on their border wall and MPP claims.

### A.

First, the Interior Plaintiffs. Each Interior Plaintiff lives hundreds, if not thousands, of miles from the southern border, where they claim the Biden Administration's policies have increased illegal immigration. Three live near Minneapolis-St. Paul, Huhn Decl. ¶¶ 1, 6–7; Anderson Decl. ¶ 1; Meyer Decl. ¶ 1; and one lives in southeastern Pennsylvania near Philadelphia, Lynn Decl. ¶ 1. The Interior Plaintiffs' remoteness from the southern border means that they experience harms from immigration only to the extent that immigrants move to their local communities and cause harms there.

But for the most part, the Interior Plaintiffs simply point to general trends of population growth and development and then speculate that immigration policies are responsible. For example, one Plaintiff complains about a "significant increase in homelessness" in his area. Lynn Decl. ¶ 14. He also complains that development of affordable housing there will further degrade the local environment. *Id*. Another complains of increased housing construction. Anderson Decl. ¶ 7. But these nationwide changes are the definition of generalized injuries. *See TransUnion*, 141 S. Ct. at 2203. They affect broad swaths of the American public, and the Interior Plaintiffs experience them no differently from the rest of the country. They therefore cannot serve as the basis of a federal lawsuit.

**\*9** And many harms these Plaintiffs point to significantly predate the Biden Administration, meaning they could not possibly be caused by the challenged policies. For example, one Plaintiff complains that the nature around Los Angeles was destroyed by construction of mansions "a few years ago." Lynn Decl. ¶ 9. But changes from "pastoral to suburban, public space to exclusive estates, and hiking trails to backyards" starting in "the mid-1990's" are not the doing of the Biden Administration. *Id*. And even if they were, query whether the construction of mansions is attributable to illegal immigration across the southern border. The same Plaintiff also claims that his local area took in large numbers of refugees "[b]etween 2013 and 2017." *Id*. ¶ 13. Again, these pre-2021 harms cannot confer standing here.

To be sure, some of the Interior Plaintiffs claim that the Biden Administration has sent refugees to their communities. *See, e.g.*, Huhn Decl. ¶¶ 7–8; Anderson Decl. ¶ 15. But they do not argue that *the challenged policies* have this effect. And that is what is necessary for the Interior Plaintiffs to have standing to challenge these policies. In short, there is little evidence that the challenged policies, which have a nationwide effect, impact the Interior Plaintiffs in any manner distinct from the rest of the country. *See Spokeo*, 578 U.S. at 339. Their injuries are therefore either not particularized or clearly not attributable to the Biden Administration, and they therefore lack standing to sue it on these claims.

This is not their only problem. For example, Plaintiffs' complaint about the transition from NTAs to NTRs is now moot. The Government has since replaced that policy with a new one, using Parole Plus to manage interdicted illegal immigrants. Mem. on Parole Plus Alternative to Detention at 1. Because of that durable transition to a new substantive policy, Plaintiffs' challenge to the old policy is now moot. *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020). And their challenge to the Government's enforcement priorities under the Pekoske memorandum is foreclosed by *United States v. Texas*, 143 S. Ct. 1964 (2023). That case specifically addressed the Pekoske memorandum and found that federal courts lack jurisdiction to hear challenges to it. *See id*. at 1968 (holding that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution" (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973))). Last, although Plaintiffs challenge the Government's decision to stop issuing fines for failures to depart, the record shows "no indication that these penalties promoted compliance with noncitizens' departure obligations," DHS_9204, and Plaintiffs have acknowledged that fact. Mot. Hr'g Tr. at 26:16–17 (Plaintiffs' counsel stating, "I don't know that the fines all by themselves are that meaningful."). Thus, there is no genuine dispute as to whether the Court has jurisdiction over these claims. It does not.

### B.

Now, consider the Coalition itself. Recall that the Coalition can point to either "associational standing" or "organizational standing" to invoke federal jurisdiction. But here, it satisfies the requirements for neither. It therefore lacks standing to sue.

For associational standing, the Coalition needs to point to some member who "would otherwise have standing to sue in [his] own right"; to show that "the interests [the Coalition] seeks to protect are germane to the organization's purpose"; and to satisfy the Court that "neither the claim asserted nor the relief requested requires the participation of [the] individual members in the lawsuit." *Hunt*, 432 U.S. at 343. The Court's review begins and ends with the first prong.

*10 The Coalition has provided the Court scant evidence of its membership. It provides evidence of only two members: Steve Kropper and Henry Barbaro. Decl. of Steve Kropper ¶ 1 (Kropper Decl.), ECF No. 34-3; Decl. of Henry L. Barbaro ¶ 2 (Barbaro Decl.), ECF No. 34-8; *see also* Pls.' MSJ at 26, 31. Neither is a party to this case. But both stand in essentially the same position as the Interior Plaintiffs—they are longtime residents of Massachusetts, Kropper Decl. ¶ 1; Barbaro Decl. ¶ 1, with no personal connection to the southern border. They therefore lack standing to challenge these policies for the same reasons as the Interior Plaintiffs. *See* Part III.A. Because the Coalition has identified no member with standing to challenge any of the policies, it lacks associational standing to challenge them. *See Hunt*, 432 U.S. at 343.

And the Coalition cannot invoke organizational standing, either. Recall that organizational standing requires the Coalition to show a "concrete and demonstrable injury to the organization's activities" "with [a] consequent drain on the organization's resources." *Havens Realty*, 455 U.S. at 379. In particular, the Coalition would need to show that its "other activities had ... been impaired by the defendant's" actions. *BMC Mktg. Corp.*, 28 F.3d at 1277. But the Coalition has shown no such diversion of resources. None of the declarations submitted to the Court indicates that the Coalition has had to divert resources to respond to the Government's policies. And the filing of this lawsuit alone cannot qualify as a diversion of resources, otherwise organizations would always be able to manufacture standing simply by filing suit. *Id*. So the Coalition lacks standing on either theory.

### C.

Finally, the Border Plaintiffs. As discussed, the Court lacks jurisdiction over Plaintiffs' challenges to the NTR policy, the Pekoske memorandum, and the civil fines rescission. *Supra* Part III.A. But it also lacks jurisdiction over several others, too. Several of the challenged policies are nationwide policies with no special connection to the border and, hence, to the Border Plaintiffs. Take, for instance, the Attorney General's reinstatement of administrative closure. That policy changed the Justice Department's regulations for every immigration proceeding in the country, irrespective of location. *See Matter of Cruz-Valdez*, 28 I. & N. Dec. at 328–29. It applied with equal force to immigration proceedings in Montana and Arizona. So any alleged injuries that the Border Plaintiffs claim stem from it are not particularized. *See Richardson*, 418 U.S. at 175.

And the challenges to the Prompt Asylum Case Review and the Humanitarian Asylum Review Process also fail on

standing grounds. At the time the programs were rescinded, they had been paused for over 18 months. *See* DHS_8980–96. The Trump Administration suspended them during the COVID-19 pandemic, *id.*, and Plaintiffs raise no challenge to that suspension. But the termination of an inoperative program cannot cause Plaintiffs an injury—it is simply a change in legal circumstances with no factual effect. *See California v. Texas*, 141 S. Ct. 2104, 2114 (2021). So they lack standing on that claim, too. *Id.* at 2116.

Still other claims falter on other grounds. Take the challenge to the Notice of Funding. The Border Plaintiffs articulate no injury stemming from that action. Indeed, they admit that it "itself does not admit refugees." Pls.' Opp'n to Gov't MSJ at 34, ECF No. 41. But if it does not admit refugees, then it does not contribute to population growth. And Plaintiffs' entire theory of standing is predicated on the notion that population growth harms the environment. *See*, *e.g.*, Getzwiller Decl. ¶ 6. So, by Plaintiffs' own admissions, they lack standing to challenge the Notice of Funding.

The same is true of their challenges to the Central American Minors and Afghan refugee parole programs. The Minors program allowed certain lawful residents who are citizens of Central American countries to apply to have their children granted refugee status. DHS_8888. And the Afghan refugee program allowed certain Afghan nationals to be paroled into the United States under the Immigration and Nationality Act (INA). DHS_8961. But the Border Plaintiffs have not alleged, much less provided evidence, that the beneficiaries of either policy have settled anywhere near them. And without that evidence of local settlement, there is no ground on which to conclude that the Border Plaintiffs have suffered any injury from these policies at all, let alone a particularized one. *See Spokeo*, 578 U.S. at 339 n.7.

**\*11**  And the Border Plaintiffs' challenge to the termination of the ACAs runs headlong into the political question doctrine. This claim takes issue with the President's decision to suspend and subsequently terminate international agreements with three other countries. *See* STATE_42–55; STATE_108–09. But treatymaking (and breaking) is "textually committed to a coordinate branch of government." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) ("The conduct of the foreign relations ... is committed by the Constitution to the Executive and Legislative ... Departments of the Government, and ... is not subject to judicial inquiry or decision." (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918))). The Court therefore "lacks the authority to decide" this claim. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). [5]

But Count II and the MPP component of Count III fare better. These claims, dealing with the southern border wall and the MPP, do present a viable theory of standing. That theory goes like this: The Biden Administration enacted policies that caused aliens to believe they will have an easier time unlawfully entering and remaining in the country. Then, because "people who cross [the border] are extremely attentive to the promises made by those" in charge of immigration policy, Smith Decl. ¶ 5; Getzwiller Decl. ¶ 9, those foreign nationals attempt to illegally enter the country and succeed in doing so. Finally, some of those illegal immigrants pass through or settle in areas near the Border Plaintiffs, littering or setting fires and causing environmental harm. Smith Decl. ¶ 14; Getzwiller Decl. ¶¶ 4–6. The Court refers to this as the "enticement theory" of standing. The Border Plaintiffs have introduced enough evidence for a reasonable factfinder to conclude that they have standing on the enticement theory.

First, Customs and Border Patrol Chief Raul Ortiz testified in a prior case that "there have been increases in migration 'when there are no consequences' and migrant populations believe they will be released into the country." *Florida v. United States*, No. 3:21-cv-1066, 2023 WL 2399883, at *6 (N.D. Fla. March 8, 2023). [6] This is competent evidence for the first two links in the enticement theory's causal chain—that the relevant policies encourage increased illegal immigration into the United States.

**\*12**  Next, the Border Plaintiffs testify that they have seen an uptick in migrant activity near them since President Biden's inauguration. Smith Decl. ¶¶ 12–13; Getzwiller Decl. ¶¶ 8–9. This likewise provides sufficient proof to create a genuine issue of material fact as to whether those attempts at unlawful immigration are successful and the illegal immigrants pass through or settle near the Border Plaintiffs. It is also a matter of common sense that the number of successful illegal immigrants will rise with the number of attempted illegal immigrants. Unless the Government manages to increase its rate of successful interdiction, any increase in efforts to immigrate will translate into more successful immigrants.

Finally, the Border Plaintiffs have shown that there is a genuine issue of material fact as to whether there is environmental damage because of illegal immigrant activity near them. They have pointed to evidence of increased litter,

Smith Decl. ¶ 14, brush fires, *id*. ¶ 17, buried detritus, *id*. ¶ 10, and other environmental impacts caused by the illegal immigration near them. This proof suffices to show a genuine issue of material fact as to whether the rescission of the border wall construction and MPP has caused the environmental damage that the Border Plaintiffs have observed.

The Government responds that, notwithstanding that evidence, standing is foreclosed by *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015). There, the D.C. Circuit confronted a challenge to the Obama Administration's Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans (DAPA) policies, which suspended immigration enforcement for certain classes of illegal immigrants and their families. *Id*. at 16–17. The plaintiff, then-Sheriff Joe Arpaio, relied on a similar enticement-based theory to argue that he had standing to challenge the policies. *Id*. at 19–20.

His argument went like this: Foreign nationals would learn of DACA and DAPA and, despite not being eligible for either, would mistakenly believe that they *were* eligible, or that the policies would be extended to cover them in the future. *Arpaio*, 797 F.3d at 20. These foreign nationals would then choose to unlawfully enter the country based on the expectation that they would not be subject to immigration enforcement. *Id*. Next, some number of those illegal immigrants would travel to or settle in Maricopa County, Arizona, Arpaio's jurisdiction. *Id*. And finally, those new illegal immigrants would commit crimes, requiring Arpaio to expend government funds on policing. *Id*.

The D.C. Circuit found that Arpaio lacked standing. The lynchpin of its analysis was the fact that Arpaio's theory required the illegal immigrants to make egregious mistakes as to the meaning of the DACA and DAPA policies. *Arpaio*, 797 F.3d at 20. Each of those policies applied only to individuals who entered the country *before* 2010, so there was no way for them to cover aliens who immigrated in response to their issuance. *Id*. And they required an immigrant to have had no "involvement, or only minimal and minor involvement with the criminal justice system." *Id*. at 17–18. But that meant that Arpaio's entire causal theory was based on a speculative assertion that individuals would "risk life and limb" based on a gross misreading of the relevant policies. *Id*. at 21. And because that error was at the first stage of Arpaio's causal chain, it tainted every causal inference that followed it.

Setting aside that problem, though, the D.C. Circuit did not categorically prohibit the enticement theory of standing in that case. Nor did it reject standing wherever a plaintiff's causal chain has multiple links. Although it noted that proving standing in that context would "ordinarily [be] substantially more difficult," *Arpaio*, 797 F.3d at 20, it noted that it was still possible. All a plaintiff needed to do, according to the Circuit, was advance "substantial evidence of a causal relationship" between the Government's conduct and plaintiff's injury. *Id*. In other words, he needed to put forward some evidence showing the relationship between cause and effect for each link in the causal chain. *See id*.

**\*13** Although not binding on this Court, the Ninth Circuit recently reached a similar outcome. *See Whitewater Draw Nat. Res. Conserv. Dist. v. Mayorkas*, 5 F.4th 997 (9th Cir. 2021). The plaintiff there relied on an enticement theory nearly identical to Arpaio's, and the Ninth Circuit quoted heavily from *Arpaio* in response. Indeed, the Ninth Circuit agreed with the D.C. Circuit's bottom line: *On the facts in that case*, the enticement theory failed because it hinged on "the unreasonable response of third parties," who needed to have "mistakenly believe[d] [DACA] applicable to them or that they might obtain similar relief from a future administration." *Id*. at 1014–15.

Additionally, *Whitewater Draw*, unlike *Arpaio*, was decided at the summary judgment stage. So the plaintiffs there had the opportunity to "marshal evidence supporting their claims." *Dupree v. Younger*, 598 U.S. 729, 731 (2023). But despite this, their evidence (including expert testimony) "failed to allege even the barest of connections between DACA and an increase in immigration." *Whitewater Draw*, 5 F.4th at 1015. Because *Whitewater Draw* and *Arpaio* relied on essentially the same reasoning, the Court responds to the Government's invocation of them together.

Despite some superficial similarities, the Border Plaintiffs stand in marked contrast to those in *Arpaio* and *Whitewater Draw*. They do not rely on any kind of mistake as to the content of the law; instead, they argue that the Government has *actually* ceased construction of the wall and has *actually* terminated the MPP. And both claims are true. This alone serves to distinguish *Arpaio*, as that case relied heavily on the notion that it was improper to find standing based on speculation that immigrants would woefully misinterpret the law. *Arpaio*, 797 F.3d at 20.

Without *Arpaio*'s unreasonable mistake of law reasoning, the Government is left to rely on its language about "substantial evidence" and "allegations that are really predictions." *Arpaio*, 797 F.3d at 20–21. Here, though, the Border Plaintiffs have cleared those hurdles.

Consider first *Arpaio*'s demand for "substantial evidence" of causation. *Arpaio*, 797 F.3d at 20. As the Court has already addressed, such evidence is present here. The Border Plaintiffs have offered declarations, testimony from competent officials, and a developed administrative record. This evidence suffices to enable a reasonable factfinder to conclude that the Government's conduct caused the Border Plaintiffs' injuries. *Liberty Lobby*, 477 U.S. at 248. And because a reasonable factfinder could find for Plaintiffs on this point, "summary judgment will not lie" against them. *Id.*

Consider too *Arpaio*'s mention of "allegations that are really predictions." *Arpaio*, 797 F.3d at 21. That line has no application in a case like this one, which has proceeded past the motion to dismiss to the summary judgment stage. The D.C. Circuit reviewed *Arpaio* under motion to dismiss standards. *Id.* at 19. That meant that it was required to accept as true all factual allegations in Arpaio's complaint. *Iqbal*, 556 U.S. at 678. So, when the Circuit rejected "allegations that are really predictions," it was simply noting that it did not need to presume the truth of such predictions. *Arpaio*, 797 F.3d at 21. But this case is at the summary judgment—not the motion to dismiss—stage. So the Court reviews "the compiled factual record," and not "the bare allegations of the complaint." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1061 (9th Cir. 2023). It would be "novel and unjustifiable" to "travel back in time" and again apply *Arpaio*'s motion to dismiss standards at this stage. *Id.*; *see also Ríos-Campbell v. Dep't of Com.*, 927 F.3d 21, 25–26 (1st Cir. 2019).

**\*14** In sum, the Border Plaintiffs rely on far more than the "speculation about the complex decisions made by non-citizens" at issue in *Arpaio*. *Arpaio*, 797 F.3d at 21. Indeed, much of their case does not rest on "speculation" at all. The Border Plaintiffs have offered affidavits attesting to increases in illegal immigrants on their property and resulting environmental destruction. Smith Decl. ¶¶ 12–15; Getzwiller Decl. ¶¶ 5, 8–10. The only question is whether a reasonable factfinder could conclude that Government's conduct caused those harms. The Court finds that one could.

The Government also notes that various segments of the border near the Border Plaintiffs were never scheduled to have a wall at all. *See* Ariz. Border Wall Map at 10, *Arizona v. Mayorkas*, No. 2:21-cv-00617 (D. Ariz.), ECF No. 24-1. So, the argument goes, the failure to build the wall did not cause their injuries, because those gaps would be present regardless. But the presence of planned gaps in the border wall does not defeat causation. Although some areas were never slated to have a barrier, that in no way suggests that construction of the barrier elsewhere would not have contributed to decreased migratory flows. After all, the construction of additional barriers might have imposed a sufficient obstacle to cause some attempted migrants to give up. Or construction of the barrier near the Border Plaintiffs may have rerouted the migrants elsewhere, averting their injuries. And it is undoubtedly true that there were areas either adjacent to or nearby each Border Plaintiff's property that were slated to have a barrier constructed, but had the construction suspended. *See id*. Finally, it is unclear on this record why no border wall was planned in these areas. It may well have been because the local terrain is already impassible enough to function like a barrier. The Border Plaintiffs have therefore created a genuine issue of material fact as to whether they have standing on the border wall claim.

This analysis largely applies to the MPP claims as well. If anything, the evidence is still more lopsided on the MPP claim. The Government itself determined that the MPP likely contributed to a reduction in unlawful immigration while it was in effect. DHS_220, 222. But that means that rescinding the MPP would necessarily lead to increased immigration, unless immigration levels were totally unresponsive to enforcement patterns. And if that is true, and the rescission of the MPP led to an increase in illegal immigration, then the Border Plaintiffs need only show that some amount of that immigration caused environmental harm near them, and they have done so. In declarations, each has pointed to increases in litter, brush fires, and similar environmental harms that were near in time to the rescission of the MPP. *E.g.*, Smith Decl. ¶¶ 9, 17. Those datapoints, taken together, are more than enough to create a genuine issue of material fact as to whether standing exists on the enticement theory. Accordingly, the Court finds that the two Border Plaintiffs have created a genuine issue of material fact as to whether they have standing on Count II and the MPP component of Count III.

**D.**

In a last-ditch effort to argue that there is no jurisdiction over the MPP claim, the Government argues that Plaintiffs'

challenge to the MPP is moot. Gov't MSJ at 31–32. Plaintiffs challenge the June 2021 memorandum rescinding the MPP program. But a district court in Texas found that rescission to be arbitrary and capricious, and vacated the memorandum. *Texas v. Biden*, 554 F. Supp. 3d 818, 857 (N.D. Tex. 2021). So the Government issued a *new* rescission memorandum, in October 2021, which provided "several 'new reasons' " for the rescission and generally bolstered the Government's reasoning for rescinding the MPP. *Biden v. Texas*, 142 S. Ct. 2528, 2544 (2022). The Government argues that because Plaintiffs challenged the June memorandum, but not the October memorandum which supplanted it, the Plaintiffs' challenge to the MPP rescission is moot. This argument is too cute by half.

**\*15**  It is certainly true in some sense that the MPP rescission memorandum Plaintiffs challenge is outdated. The Government has since promulgated a newer, better memorandum that "supersede[s] and rescind[s]" the June 1 memorandum. *Biden*, 142 S. Ct. at 2544. But those memoranda are substantively the same. They both enact precisely the same policy: discontinuation of the MPP with no replacement. The only difference between them is the reasoning. Like the June memorandum, the October memorandum "again announced the termination of the MPP," *id*. at 2537, but this time included "a 39-page addendum explaining [the] reasons for doing so." *Id*. The new memorandum, though, was not different in any manner relevant to this case. It did not impose a different substantive policy. It did not address NEPA's requirements. Its promulgation simply did not affect the conduct of this suit at all. The Government therefore cannot credibly claim that its issuance has mooted Plaintiff's challenge.

But assume for the moment that the Government is right, and this new memorandum is different. That would make no difference. Because the mootness arises from the Government's own conduct, the voluntary cessation doctrine would kick in. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct ... does not make the case moot.").[7] Under that doctrine, a government action is generally not moot simply because the Government has voluntarily rescinded or ceased it, unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). But how can one say that the allegedly wrongful behavior here cannot "reasonably be expected to recur?" It *has* recurred—the Government has reissued substantively the same memorandum, inflicting substantively the same harm. The very thing the Government claims mooted the case proves that it is not moot. Either way, the Government's mootness argument fails. The Government's memorandum did not substantively change the policy at issue and, even if it did, the voluntary cessation doctrine means that this "get out of jail free" card does not work.

E.

By the same measure, though, Plaintiffs' Motion for Summary judgment founders on standing. While the Government has failed to show that no reasonable factfinder could conclude that Plaintiffs *have* standing on Counts II and III, so too have the Border Plaintiffs failed to show that no reasonable factfinder could conclude that they *lack* standing on those counts. Plaintiffs' standing theory is based on an extended chain of causation that relies on lay and expert testimony about the behavior of independent third parties. *Supra* Part III.C. At trial, a factfinder would be entitled to conclude that Plaintiffs' evidence made it more likely than not that the Government's conduct induced illegal immigrants to cause the harm Plaintiffs identify. But the factfinder would also be free to conclude that Plaintiffs had failed to carry their burden on that point.

Take a few examples. First, the Government points to planned gaps in the border wall. *See* Ariz. Border Wall Map at 10. It argues that those gaps mean there would never have been a wall near the Border Plaintiffs at all. So the suspension of construction did not affect them. Recall that a reasonable factfinder would not have to accept the Government's interpretation of those facts. *See* Part III.C. But neither would a reasonable factfinder have to *reject* that interpretation. Looking at the map, at least one Border Plaintiff lives near a large stretch of border for which no wall was ever planned. *Id*. Compared to the planned gap, the area where construction was suspended is quite small. *Id*. A reasonable factfinder may take away from that comparison that the suspension had little effect on migration near the Border Plaintiffs. And it might therefore conclude that the Border Plaintiffs' injuries did not flow from that suspension.

**\*16**  On the MPP, too, a reasonable factfinder could go either way on causation. On the one hand, the Government itself found that "CBP encounters along the [southwestern border] decreased dramatically over a number of months in which MPP was fully operational." DHS_220. Specifically, they

dropped by 64%. DHS_222. Based on that, the Government found it "likely" that the "MPP contributed to a decrease in migration flows." DHS_222. That certainly is enough to enable a reasonable factfinder to conclude that the MPP decreased migration flows.

But on the other hand, the Government has also provided evidence that would enable a reasonable factfinder to conclude otherwise. It identified "push and pull factors, both known and unknown," that may have driven the change in migration. DHS_222. One notable example is that, around the time the MPP was implemented, "Mexico surged its own enforcement, thus increasing their level of apprehensions and returns." *Id*. A reasonable factfinder could decide that the change in enforcement level was more likely the result of Mexico's enforcement policies. Or that it was the result of some complex combination of "known and unknown" "push and pull factors." The Border Plaintiffs have not ruled those options out. So summary judgment in their favor is not warranted. *Liberty Lobby*, 477 U.S. at 248.

And for both claims, Plaintiffs face the tough burden at this stage of showing that no reasonable factfinder could conclude that the increase in immigration was based on the "myriad economic, social, and political realities in the United States and in foreign nations." *Arpaio*, 797 F.3d at 21. That might include factors like the change in Mexico's enforcement policies. DHS_222. Or it might include the relative economic conditions in each country, especially during the volatile past few years. Still more possible is that some amount of the decline was attributable to the COVID-19 pandemic. One, or several, or none of these could be true. But the Border Plaintiffs have not provided enough evidence to rule them out. And because a factfinder could conclude that some other source caused the changes in immigration levels, the Plaintiffs' motion must be denied. *Liberty Lobby*, 477 U.S. at 248.

Plaintiffs carry a heavy burden at the summary judgment stage. Just like the Government, they must show that no reasonable factfinder could conclude that they lose at trial. Here, that means categorically excluding the possibility that some other factor—whether economic, social, or political—drove their injuries. See *Arpaio*, 797 F.3d at 21. And they simply have not met that burden. So Plaintiffs are not entitled to summary judgment on standing. Fed. R. Civ. P. 56(a). And because of that, the Court must deny their motion. *Dep't of Com.*, 525 U.S. at 329.

IV.

The Court now addresses the merits. Because Plaintiffs failed to carry their burden to show that there is no genuine issue of material fact on standing, *see Lujan*, 504 U.S. at 561, they are likewise not entitled to summary judgment on the merits. *Dep't of Com.*, 525 U.S. at 329. The Court therefore addresses only the Government's motion here, which it denies.

A.

The Government raises three main arguments about the border wall claim. First, it says, the cessation of construction "does not alter the environmental status quo," so it was not a "major federal action[ ]" requiring NEPA analysis. Gov't MSJ at 29. Second, the Government claims that a waiver under IIRIRA absolved it of its NEPA obligations. *Id*. at 30. And third, the Government argues that requiring a NEPA analysis "would lead to nonsensical results." *Id*. None avails.

**\*17** Start with the Government's claim that stopping construction of the border wall did not alter the status quo. This argument stems from the notion that "[t]he duty to prepare an EIS normally is triggered when there is a proposal to change the status quo." *Comm. for Auto. Resp. v. Solomon*, 603 F.2d 992, 1002–03 (D.C. Cir. 1979). The Government argues that the relevant status quo is the *environmental* status quo. That is, that an EIS is required only when the Government plans to do something that will change the environment itself. This argument runs contrary to NEPA's text, and the Court rejects it.

NEPA requires that an EIS be prepared for "every recommendation or report on proposals for legislation and other major Federal actions." 42 U.S.C. § 4332(C). But this immediately reveals the problem with the Government's theory. A proposal for legislation (and even the legislation, once enacted) does not change the environmental status quo. Instead, it alters only the "legal or regulatory status quo." *See Humane Soc. of U.S. v. Johanns*, 520 F. Supp. 2d 8, 29 (D.D.C. 2007). And because NEPA refers to "proposals for legislation or *other* major Federal actions," 42 U.S.C. § 4332(C) (emphasis added), proposals for legislation must be a subset of major federal actions. But that means that "major Federal actions" includes actions that alter only the "legal or regulatory status quo," instead of the environmental status quo. So the Government's reading—that a "major Federal

action" must change the *environmental* status quo—simply makes a hash of NEPA's text.

The Government's reading is circular, too. The whole point of an EIS is to determine whether a federal action would impact the environment and, if so, how. *See* 40 C.F.R. § 1502.1. It would therefore make little sense to only require one when the Government already knows that what it is doing will impact the environment. That would both render the EIS of minimal value and enable the Government to dodge NEPA's requirements simply by remaining willfully blind to the potential environmental consequences of its actions. The Court will not read Congress to have enacted so incoherent a statute.

In this case, that status quo was the Government's previous policy: constructing the border wall. Thus, the decision to freeze construction was unmistakably a change in the status quo. It therefore constitutes a major federal action that requires NEPA review.

But even assuming that the *environmental* status quo is what matters, this still qualifies. The Government did not merely halt construction of the wall, freezing the environment in place. Its decision to abruptly stop construction and leave behind equipment, building materials, and detritus had a significant environmental impact, which it anticipated. *See* DHS_75, 149–55. That abrupt cessation contributed to runaway erosion and other environmental degradation. *Id*. So whichever way the Government slices it, the border wall freeze *was* a change to the status quo and therefore qualifies under NEPA.

Now turn to the Government's argument about IIRIRA's waiver provision. The Court has already decided this issue—against the Government. *Mass. Coal. for Immigr. Reform v. DHS*, 621 F. Supp. 3d 84, 100 (D.D.C. 2022). But the Court will reiterate why the Government's argument fails. "Through IIRIRA, Congress tasked the Secretary of Homeland Security to 'take such actions as may be necessary' to install 'physical barriers' on the border 'to deter illegal crossings in areas of high illegal entry into the United States.' " *Ctr. for Bio. Div. v. Trump*, 453 F. Supp. 3d 11, 35 (D.D.C. 2020) (quoting IIRIRA § 102(c)). To that end, it allows the DHS Secretary to "waive all legal requirements ... necessary to ensure expeditious construction of ... barriers and roads." IIRIRA § 102(c). But the Government argues that this waiver provision for the "expeditious construction of ... barriers and roads" nonetheless includes the decision *not to construct* barriers and roads. The Court disagrees.

 **\*18**  "Construction" is best read to mean what it says: construction. And construction does not include the halting of construction. *See Construct*, Merriam Webster's Collegiate Dictionary (Merriam Webster Collegiate) (10th ed. 1996) ("[T]o make or form by combining or arranging parts of elements: BUILD, also"). More, Congress chose to modify "construction" with the adjective "expeditious." IIRIRA § 102(c) ("... waive all legal requirements ... necessary to ensure *expeditious* construction ..." (emphasis added)). And the Government's reading of "construction" is not compatible with that word choice either. After all, how could one "expeditiously" refrain from building something?

Additionally, the surrounding context of IIRIRA makes clear that Congress used "construction" to mean the active building of border barriers. Just look at § 102(b). There, Congress directed the Attorney General to "commence construction of fences immediately following" the acquisition of certain easements. IIRIRA § 102(b). But that direction would make no sense if the Attorney General were free to read "construction" as terminating construction. In essence, the Government would be free to simply ignore Congress's command by giving "construction" a capaciously broad meaning.

Congress left other clues about construction's meaning, too. The title of IIRIRA's § 102 is "Waiver of Legal Requirements Necessary for Improvement of Barriers at Borders; Federal Court Review." IIRIRA § 102. "Improvement" necessarily connotes some action being taken to change present affairs, not simply freezing things as they currently stand. *See Improve*, Merriam Webster's Collegiate Dictionary ("To make advantageous additions or changes"). Stopping construction on the wall is thus not an "improvement" of a barrier.

And the Government's reading would turn the purpose of IIRIRA (and the REAL ID Act that amended it) on its head. *See* Antonin Scalia, Response *in* A Matter of Interpretation: Federal Courts and the Law 144 (Amy Gutmann ed., 1997) ("[T]he import of language depends upon its context, which includes the occasion for, and hence the evident purpose of, its utterance."). In § 102, Congress directed the Attorney General to do what was necessary to "deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). And it passed IIRIRA with the intent to "improve[ ] enforcement at the border," *see* IIRIRA Subtitle A, in part by

"improv[ing] ... barriers at [the] border." *Id*. § 102. But what the Government proposes—the cessation of border barrier construction—is at cross-purposes with that goal. *See also Ctr. for Bio. Div. v. McAleenan*, 404 F. Supp. 3d 218, 228–29 (D.D.C. 2019) (explaining the background behind the waiver provision). The Court therefore concludes that IIRIRA's waiver provision does not justify the Government's alleged failure to comply with NEPA, and it therefore provides no ground on which to grant summary judgment.

The Court now turns to the Government's last argument on the border wall claim: that subjecting the cessation of border wall construction to NEPA review would lead to "nonsensical results." Gov't MSJ at 30–31. The Government does not make clear how this would justify summary judgment. But the Court construes this argument as sounding in the absurdity doctrine: that the Court should not read NEPA to lead to absurd ends or be internally inconsistent. Even so construed, this argument fails. The absurdity doctrine applies only if the "statutory outcome ... defies rationality." *Landstar Exp. Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 499 (D.C. Cir. 2009). And there is nothing irrational about the idea that NEPA requires an EIS to halt construction. NEPA also requires an EIS to *begin* construction, and that symmetrical approach is the baseline from which to assess rationality. That the Secretary may, at his discretion, waive that requirement in some cases does not make the statutory results absurd.

**\*19** Because the Court rejects each of these arguments, it concludes that the Government is not entitled to summary judgment on the border wall claim.

### B.

Now on to the MPP. The Government again makes three arguments. First, that the termination decision is unreviewable because it was "committed to agency discretion by law." Gov't MSJ at 31–32 (quoting 5 U.S.C. § 701(a)(2)). Second, that the rescission is not a "major federal action" under NEPA because it was a "[j]udicial or administrative civil or criminal enforcement action[ ]." *Id*. at 32 (quoting 40 C.F.R. § 1508.18(a)). And third, that the rescission was not a "major federal action" because "nothing in the record suggests that MPP directly caused a significant reduction in immigration." *Id*. at 33. All fail.

*First*, the Government argues that the decision whether to follow NEPA in discontinuing the MPP was a matter "committed to agency discretion by law," and is therefore unreviewable. *See* 5 U.S.C. § 701(a)(2). The Court again notes that it has already rejected this argument. *Mass. Coal. for Immigr. Reform*, 621 F. Supp. 3d at 101–02. But, in any event, "NEPA's procedural requirements" are not "somehow discretionary." *Calver Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971) (internal quotation marks omitted). Instead, Congress has set "a high standard for ... agencies," which "must be rigorously enforced by the reviewing courts." *Id*.

More, the "the APA embodies a basic presumption of judicial review," *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000) (cleaned up), and the exception the Government invokes is "a very narrow one, reserved for those rare instances where statutes are drawn in such broad terms that ... there is no law to apply." *Id*. (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)) (cleaned up). This is no such situation.

The question for § 701(a)(2) purposes is whether there is "no law to apply" *for the exercise of discretion being challenged*. It therefore does not matter whether the Government has discretion to rescind MPP or not. That question is not before the Court. What is before the Court is the decision *not to comply with NEPA* in rescinding the MPP. And on that, the Government has no discretion. *See Calver Cliffs' Coordinating Comm.*, 449 F.2d at 1114. So the Government finds no safe harbor in § 701(a)(2).

The Government's reliance on *Heckler v. Chaney*, 470 U.S. 821 (1985), is entirely misplaced. But it is nonetheless instructive. That case illustrates a situation where the governmental action *is* so discretionary as to be nonreviewable. There, the question was whether the Government's choice to exercise its enforcement discretion was judicially reviewable. *Id*. at 823. That discretion—which is a unique prerogative of the Executive—is subject to nearly no guideposts or legal limits. *Id*. at 831. But the relevant discretion there was the choice of whom to prosecute. *Id*. at 831–32. It was, in other words, the *substantive* discretion afforded to the Government. No such discretion exists when it comes to the Government's obligation to comply with procedural rules in exercising that enforcement discretion. Under any reading of § 701(a)(2), the Government's decision whether to comply with its procedural obligations is emphatically *not* committed to agency discretion by law. The mere availability of substantive

discretion, standing alone, does not convert § 701 into cover for the flouting of procedural requirements.

**\*20**  *Second*, the Government argues that the rescission of the MPP is not subject to NEPA because it is a "civil or criminal enforcement action[ ]" and is therefore not a "major federal action." Gov't MSJ at 32. But the MPP itself is not an enforcement action. Applications of the MPP to individual immigrants might fit that bill. *See* 40 C.F.R. § 1508.18(a) (specifying that major federal actions do not include "*bringing* judicial or administrative civil or criminal enforcement actions" (emphasis added)). But the MPP itself goes well beyond the decision whether to enforce the law in individual cases. Instead, it sets enforcement policy on a class-wide basis, and it couples that decision with related decisions regarding international transportation and other implementing measures. The Supreme Court has recognized in another context that the combination of enforcement decisions with related implementing measures may render the putative enforcement action reviewable. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (addressing whether a policy "merely 'refus[ed] to institute proceedings' against a particular entity or even a particular class"). Thus, the Government's rescission of the MPP is not immune from NEPA's requirements.

The Government's last argument fails on both the law and the facts. First, nothing in NEPA requires that the MPP have "*directly* caused a significant reduction in immigration." Gov't MSJ at 33. NEPA accounts for indirect effects of federal actions, and imposing a direct causation requirement would be in the teeth of the statutory text and implementing regulations. *See* 40 C.F.R. § 1508.8(b) ("*Effects* include: ... (b) Indirect effects."). Further, the record unequivocally does include evidence that would permit a factfinder to conclude that the MPP led to decreased migration flows. The Government itself, for instance, found it "likely ... that MPP contributed to a decrease in migration flows." DHS_221–23. Indeed, border encounters decreased 64% in three months while the MPP was fully active. *Id*. Although it may be true that other factors contributed to or drove that decline, that determination is one for trial. The fact alone that there could be a genuine dispute on that factual question precludes summary judgment.

The Court therefore rejects each of the Government's arguments on the MPP claim and denies its Motion for Summary Judgment as a result.

\* \* \*

To be sure, this ruling leads to an unusual result. This case will proceed to a trial in which the only disputed factual issues go to the Court's jurisdiction. And the factfinder at trial will be the Court, just as the Court decided this motion. But despite that oddity, such a result is what the Federal Rules compel. *See* Fed. R. Civ. P. 56(a). For now, the question is whether *any* reasonable factfinder must agree with one party or the other. At trial, the question is different: whether Plaintiffs persuade *this* factfinder. And, at trial, the Court will be able to hear the testimony of the witnesses, make credibility determinations, and accept other evidence the parties may offer. Thus, full summary judgment for either party would be inappropriate.

Accordingly, the Court **ORDERS** that Plaintiffs' Motion for Summary Judgment is **DENIED**. It **FURTHER ORDERS** that the Government's Cross-Motion for Summary Judgment is **GRANTED IN PART**. The case is **DISMISSED** as to Massachusetts Coalition for Immigration Reform, Kevin Lynn, Linda Huhn, Rob Meyer, and Bruce Anderson. Fed. R. Civ. P. 12(h)(3). It is also **DISMISSED** as to Chance Smith and Gail Getzwiller for each claim except Count II and the MPP portion of Count III. In all other respects, the Government's Cross-Motion for Summary Judgment is **DENIED**.

**All Citations**

Slip Copy, 2023 WL 6388815

---

**Footnotes**

| | |
|---|---|
| 1 | Unless otherwise stated, all references to the United States Code or Code of Federal Regulations are to the version in effect in 2020, the time at which this suit was filed. |

2       Plaintiffs initially alleged 11 causes of action. *See generally* Compl. The Court dismissed Counts I and XI, so nine claims remain. *See Mass. Coal. for Immigr. Reform v. DHS*, 621 F. Supp. 3d 84, 103 (D.D.C. 2022).

3       The Government submitted a three-part administrative record with documents from each agency. The Court mirrors its citation format, including the use of abbreviated Bates numbers to excise unnecessary zeros.

4       The Supreme Court recently held that the October Guidance constituted a final agency action, but it remanded the case to the district court to consider the merits of the APA challenges. *See Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022).

5       By contrast, the MPP claim is not barred by the political question doctrine. The Government has not advanced this argument but, as a jurisdictional issue, *Al-Tamimi v. Adelson*, 916 F.3d 1, 7–8 (D.C. Cir. 2019), the Court must address it *sua sponte*. *Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023). Unlike the ACA claim, the MPP claim is not inextricably bound up with the Government's foreign affairs powers. The ACA claim asks the Court to "supplant a foreign policy decision of the political branches," *Zivotofsky*, 566 U.S. at 196, whereas the MPP claim merely asks the Court to decide whether the Government improperly failed to implement NEPA review prior to exercising its statutory discretion. *See id*. at 196–97. Although diplomatic consequences may follow from that exercise of statutory discretion, *see* Gov't MSJ at 5, that is not the same as the decision being one of foreign policy itself. Because the MPP is simply an implementation of the INA's statutory text, *see id*. at 3, its review is "a familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196. The Court's review of the MPP claim is thus not precluded by the political question doctrine. *Id*. at 196–97.

6       The Government argues that this testimony is inadmissible because it runs afoul of both Federal Rule of Civil Procedure 32 and Federal Rule of Evidence 802. Not so. Rule 32(a)(8) allows parties to rely on a deposition from a prior case if its use is consistent with the Federal Rules of Evidence. Fed. R. Civ. P. 32(a)(8). So the admissibility of the Ortiz deposition turns on the Government's hearsay argument. But Ortiz's deposition is not hearsay because he is an officer of DHS, one of the Defendants in this case. Fed. R. Evid. 801(d)(2)(D). The Ortiz deposition is therefore admissible.

7       The fact that the Government's issuance of a new memorandum postdates a court order does not make it involuntary. What the district court ordered was the *vacatur* of the June memorandum. Had the Government stopped there, it might have a valid argument. But the Government instead reissued a new memorandum implementing the same policy. And it was this voluntary conduct that the Government argues mooted Plaintiffs' claims. *See* Gov't MSJ at 31. Because the issuance of the October memorandum was not compelled by a court order, it was voluntary, and the voluntary cessation doctrine applies.

---

End of Document                                                                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.