IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| RONNY L. JACKSON, *et al.*, | |
| Plaintiffs, | |
| v. | 2:22-CV-241-Z |
| JOSEPH R. BIDEN, JR., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss ("Motion") (ECF No. 20), filed on April 10, 2023. Plaintiffs filed their response (ECF No. 24) on May 22, 2023. Having reviewed the briefing and the relevant law, the Court **GRANTS** Defendants' Motion **IN PART**.

**BACKGROUND**

Plaintiffs Ronny Jackson, Stuart and Robbi Force, and Sarri Singer regularly visit Israel.[1] ECF No. 1 at 4–6. Their case concerns funding that Defendants provide "to the West Bank and Gaza." ECF No. 20-1 at 10. That funding, according to Plaintiffs, violates both the Constitution and the Taylor Force Act ("TFA") — the latter of which prohibits assistance "that directly benefits the Palestinian Authority." ECF No. 1 at 9. One exception to that prohibition is if the Palestinian Authority ("PA") "terminate[s] payments for acts of terrorism against Israeli citizens and United States citizens." 22 USCA § 2378c–1(a)(1)(B). It has not. Instead, the PA continues to "provide[] payments to individuals — or their families — who are serving sentences in Israeli prisons *for acts of terrorism or who died committing such acts*." ECF No. 20-1 at 13 (emphasis added).

---

[1] Dr. Ronny Jackson is a Member of the United States House of Representatives from the 13th Congressional District of the State of Texas. ECF No. 1 at 4. Stuart and Robbi Force are the parents of Taylor Force, a West Point graduate and veteran after whom the Taylor Force Act is named. *Id.* at 4–5. Sarri Singer is a survivor of a Palestinian terrorist attack conducted by a suicide bomber in Jerusalem, Israel. *Id.* at 5.

In turn, Plaintiffs allege they suffer an increased risk of terrorism in Israel due to Defendants "unlawfully laundering U.S. taxpayer funds through non-governmental organizations to directly benefit the Palestinian Authority." ECF No. 1 at 3. And they ask this Court to declare that funding unlawful and to enjoin its provision. *Id.* at 4.

## LEGAL STANDARDS

Defendants move to dismiss this action for lack of subject-matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and (b)(6). ECF Nos. 20-1 at 20; 24 at 16. This Court "must consider first the Rule 12(b)(1) jurisdictional challenge prior to addressing the merits of the claim." *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 487 (5th Cir. 2014). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 271 (5th Cir. 2021).

To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). And such an injury must be "concrete, particularized, and actual or imminent . . . ." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008). "We have held that '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference" that the defendant is liable. *Iqbal*, 556 U.S. at 678. While a complaint "does not need detailed factual allegations," the facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citing 5 WRIGHT & MILLER, FED. PRAC. & PROC. § 1216, 235–36 (3d ed. 2004)). Lastly, Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

ANALYSIS

I. **Plaintiffs establish Article III standing.**

Defendants argue that Plaintiffs lack standing for three reasons: (1) Plaintiffs' alleged increased risk of harm when traveling to Israel is neither caused by Defendants nor redressable by the relief sought; (2) even if fairly attributable to Defendants and redressable, Plaintiffs' alleged future risk of injury is highly speculative and cannot meet the requirements of a "concrete" or "particularized" injury-in-fact; and (3), Plaintiffs' allegations of emotional distress are insufficient to separately establish standing. ECF Nos. 20-1 at 21; 24 at 16.

**A. Plaintiffs' increased risk of harm is reasonably tied to Defendants and redressable by the relief sought.**

"Article III standing requires 'a causal connection between the injury and the conduct complained of.'" ECF No. 20-1 at 22 (quoting *Lujan*, 504 U.S. at 560); *Nat'l Press Photographers Ass'n v. McCraw*, No. 22-50337, 2024 WL 105019, at *7 (5th Cir. Jan. 10, 2024). That connection is lacking here, per Defendants, because the alleged risks of terrorism hinge not on funds provided by the U.S., but on speculation about the decisions of "independent actors" — namely, the PA and the terrorists it bankrolls. ECF No. 20-1 at 23. In other words, whether the PA continues to fund terrorists and whether those terrorists continue terrorizing is independent of U.S. funding. This argument fails.

Accepting *arguendo* that U.S. funding is benefiting the PA, no "speculation" is necessary regarding the latter's intentions. In the TFA itself, Congress acknowledged that the PA *incentivizes* terror. *See* 22 USCA § 2378c–1 ("The Palestinian Authority's practice of paying salaries to terrorists . . . as well as to the families of deceased terrorists, is an incentive to commit acts of terror."). And when the PA was forced to choose between U.S. funding for the West Bank and Gaza or continuing to fund terrorists, it chose the latter.[2] ECF No. 1 at 4.

Defendants neither deny the foregoing nor cite a single binding case that casts clear, repeated, and unequivocal expressions of intent as mere speculation. *See, e.g.*, *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79 (D.D.C. 2022); *Aerotrade, Inc. v. Agency for Int'l Dev., Dep't of State*, 387 F. Supp. 974 (D.D.C. 1974); *Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24, 34 (D.D.C. 2017). Further, Article III does not require — and has never required — "a showing of proximate cause or that the defendant's actions are the very last step in the chain of causation." *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (internal marks omitted).

Second, the notion that government-funded terrorists are "independent actors" is untenable. The PA operates a sophisticated terror-support program. ECF Nos. 1 at 1–2; 24 at 26. That program calculates a terrorist's financial award by considering a list of factors. *See* ECF No. 1 at 1 ("[T]he [PA] rewards terrorists and/or their families with increased rewards in proportion to the casualties inflicted. Terrorists who are married, or have children, or are Israeli residents/ citizens receive an additional payment. Terrorists who spend more than 5 years . . . in prison are paid a guaranteed salary by the [PA] for the rest of their lives."). Furthermore, every terrorist

---

[2] In the TFA, Congress clearly communicated that the PA could either (1) directly benefit from U.S. funding in the West Bank and Gaza, or (2) continue to operate its payment program for terrorism. ECF No. 1 at 3. It chose the latter, and the Trump Administration subsequently terminated funding. *Id.* Defendants, however, have allegedly "transferred nearly half a billion American taxpayer dollars to directly benefit and subsidize [the PA]." *Id.*

receives payment regardless of their affiliation — Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, or otherwise. *Id.* at 2. That those subject to this incentive structure and payment plan are not wholly "independent" is uncontroversial.

Lastly, Defendants argue that Plaintiffs' redressability "turn[s] on the unfettered choices made by independent actors not before the courts" whose "discretion the courts cannot presume either to control or predict." ECF No. 20-1 at 25 (quoting *E.T. v. Paxton*, 41 F.4th 709, 720 (5th Cir. 2022). But the foregoing analysis — along with Congress itself — refutes that argument. Indeed, the TFA was predicated on an *existing* link between the PA's financial status and the terrorism it produces. And as Plaintiffs allege, "a favorable decision . . . will likely reduce the flow of American taxpayer funds into the West Bank and Gaza," reduce "the cash available to terrorists," and "thereby relieve the plaintiffs of at least some of the injuries" allegedly caused by Defendants. ECF No. 24 at 22. That link is sufficient to establish redressability. *Inclusive Communities Project, Inc.*, 946 F.3d at 655; *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (a plaintiff "need only show that a favorable ruling could potentially lessen its injury"); *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[Plaintiffs] need not show that a favorable decision will relieve [their] every injury.")

### B. Plaintiffs' alleged future risk of injury meets the requirements of a "concrete" or "particularized" injury-in-fact.

Defendants claim "that Plaintiffs' alleged future harm of an increased risk of danger when traveling to Israel" is "too speculative and generalized . . . ." ECF No. 20-1 at 27. Plaintiffs respond that, on the contrary, they "face an increased risk of terrorism *whenever* they enter Israel" due to Defendants' alleged violations of the TFA. ECF No. 24 at 23 (emphasis added). And they aver that their fear is concrete, particularized, and a direct deterrent to "visiting family, tourism, [and/or] religious pilgrimage." *Id.*

Plaintiffs satisfy their burden at this stage. It is evident from the pleaded chain of causality, the facts alleged, and Plaintiffs' particular circumstances that their claims were — and are — reasonable. And recent world events further substantiate that reasonableness.

October 7, 2023 ("October 7") was the bloodiest day in Israel's history.[3] Hamas terrorists, together with the Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, and the Democratic Front for the Liberation of Palestine invaded the nation on Simchat Torah.[4] They murdered at least 12,000 people — the majority of whom were civilians.[5] They took 250 hostages and fired thousands of rockets.[6] They kidnapped women, children, and the elderly.[7] And they subjected untold numbers of Israeli women and girls to unspeakable sexual violence.[8] All said and done, October 7 was the deadliest day for Jews since the Holocaust.[9] And the fighting "shows no sign of ending."[10]

To be sure, this war does not — and cannot — serve as the basis of Plaintiffs' standing. That is because "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Fed. Election Comm'n*, 554 U.S.

---

[3] *Hamas's Attack was the Bloodiest in Israel's History*, ECONOMIST, Oct. 12, 2023, www.economist.com/briefing/2023/10/12/hamass-attack-was-the-bloodiest-in-israels-history.

[4] Yoram Dori, *October 7 Shattered Israel's Flawed Perceptions*, JERUSALEM POST, Dec. 31, 2023, www.jpost.com/opinion/a rticle-780114.

[5] *In 100 Days, the Israel-Hamas War has Transformed the Region*, POLITICO, Jan. 14, 2024, www.politico.com/news/2024/01/14/in-100-days-the-israel-hamas-war-has-transformed-the-region-00135503; Diane Herbst, *Faces of the Americans Slaughtered by Hamas Terrorists in Israel*, MESSENGER, Oct. 31, 2023, https://themessenger.com/news/american-victims-israel-hamas-terrorist-attack-killed-october.

[6] Misty Severi, *American Israeli Woman Believed to Have Been Held Hostage by Hamas was Killed on Oct. 7*, WASHINGTON EXAMINER, Dec. 28, 2023, https://www.washingtonexaminer.com/news/2709009/american-israeli-woman-believed-to-have-been-held-hostage-by-hamas-was-killed-on-oct-7/; Nadav Gavrielov, *Hamas and Other Militant Groups Are Firing Rockets Into Israel Every Day*, N.Y. TIMES, Dec. 27, 2023, www.nytimes.com/2023/12/27/world/middleeast/israel-hamas-gaza-rockets.html.

[7] *'Like Dominos Falling': Young Kfar Aza Residents Recall Carnage of Oct. 7*, TIMES OF ISR., Jan. 18, 2024, www.timesofisrael.com/like-dominos-falling-young-kfar-aza-residents-recall-carnage-of-oct-7/.

[8] Nathan Rennolds, *Hamas Used Horrific Sexual Violence, Raping and Mutilating Israeli Women and Girls*, BUS. INSIDER, Dec. 29, 2023, www.businessinsider.com/hamas-sexual-violence-october-7-attacks-israel-nyt-2023-12.

[9] *See supra* note 1.

[10] *See supra* note 3.

at 734; *Pluet v. Frasier*, 355 F.3d 381, 386 (5th Cir. 2004) ("A party must have standing at the time the complaint is filed."); *Roman Cath. Diocese of Dallas v. Sebelius*, 927 F. Supp. 2d 406, 416 (N.D. Tex. 2013). And Plaintiffs filed their complaint in December of 2022.

However, the October 7 attack may serve as additional *evidence* that Plaintiffs' fear — as expressed in their initial filings — was both legitimate and warranted by the circumstances existing at the time. *See Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1175 (D.N.M. 2016) ("Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events . . . to demonstrate that the plaintiff faced an imminent threat as of the time of filing."); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1155 (10th Cir. 2005).

Defendants' remaining argument — that Plaintiffs' claims do not constitute a "certainly impending injury" — relies on *Biafra*. ECF No. 20-1 at 29. But that case, even if it was binding (it is not), is of limited relevance. The plaintiffs in *Biafra* were not covered by a particular statute's zone of interest, while Plaintiffs here can point to the TFA and its findings about the PA and the terrorists it funds. So too can Plaintiffs point to the link — as recognized by Congress — between funding that benefits the PA and the terrorism that PA supports. Thus, the facts are incompatible. Moreover, the plaintiffs in *Biafra*, unlike Plaintiffs here, failed to establish redressability.

Plaintiffs demonstrate that their increased risk of harm is reasonably tied to Defendants, redressable by the relief sought, and sufficiently concrete and particularized. Hence, the requirements of standing are satisfied, and further analysis concerning Plaintiffs' alternative theories of standing is unnecessary.

## II. Plaintiffs state a claim under the Administrative Procedure Act.

Defendants argue that (1) the Court cannot review Plaintiffs' Administrative Procedure Act ("APA") claim because the challenged conduct is committed to agency discretion; (2) Plaintiffs

bring an impermissible programmatic challenge; and (3) Plaintiffs fail to plausibly allege that Defendants are violating the TFA. ECF No. 20-1 at 23–30. Each argument fails at this stage.

### A. The challenged conduct is not committed to agency discretion.

An agency action is "committed to agency discretion" — and thus unreviewable — when "statutes are drawn in such broad terms that . . . there is no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (internal marks omitted), and when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Such actions are unreviewable because "the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose . . . ." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (internal marks omitted).

Here, the challenged agency action — providing funding that directly benefits the PA — is governed by 22 USCA § 2378c-1(f)(1). It reads:

> Not later than 15 days after March 23, 2018, the Secretary of State shall submit to the appropriate congressional committees *a list of the criteria that the Secretary uses to determine whether assistance for the West Bank and Gaza is assistance that directly benefits the Palestinian Authority* for purposes of carrying out this section.

22 USCA § 2378c-1(f)(1) (emphasis added). Defendants are quick to argue that such language "commits to the discretion of the Secretary . . . the determination of what assistance 'directly benefits' the PA." ECF No. 20-1 at 33. They are wrong.

First, courts read the exception for action committed to agency discretion "quite narrowly." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). "And [courts] have generally limited the exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion, such as a decision not to institute enforcement proceedings, or a decision by

8

an intelligence agency to terminate an employee in the interest of national security." *Dep't of Com.*, 139 S. Ct. at 2568 (internal marks omitted). This case is neither.

To be sure, "the Act confers broad authority on the Secretary." *Id.* But the mere fact that a statute "grants broad discretion to an agency does not render [that] agency's decisions completely unreviewable under the 'committed to agency discretion by law' exception" unless "the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (quoting *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985)). And guidance is provided here: the Secretary is specifically directed to (1) create a list of criteria, (2) use that criteria to evaluate how to proceed, and then (3) *turn that list over* to "the appropriate congressional committees" — presumptively for their review. 22 USCA § 2378c-1(f)(1).

Furthermore, the plain meaning of "directly benefits" is neither vague nor ambiguous, and it becomes even clearer in the context of the TFA — a statute conceptualized to *limit* discretion over aid that benefits the PA. 22 USCA § 2378c–1; ECF No. 24 at 29. Indeed, the Secretary may only distribute such aid if, *inter alia*, he routinely certifies that the PA and others (1) "are taking credible steps to end acts of violence" against Israelis and Americans; (2) "have terminated payments for acts of terrorism"; (3) "have revoked any law, decree, regulation, or document authorizing or implementing a system of compensation . . . for an act of terrorism"; and (4) "are publicly condemning such acts . . . ." 22 USCA § 2378c–1(a)(1)(A)–(D).

The Secretary is further limited by (1) notification and reporting requirements, (2) additional certification requirements, (3) rules governing the use and disposition of withheld funds, (4) those funds' periods of availability, and more. *See generally* 22 USCA § 2378c–1. The foregoing illustrates that the challenged conduct is not committed to agency discretion.

### B. Plaintiffs' challenge is not programmatic.

"The first requirement under Section 706(1) is that a plaintiff must challenge discrete agency action." *Fort Bend Cnty. v. United States Army Corps of Engineers*, 59 F.4th 180, 197 (5th Cir. 2023). And in Defendants' view, Plaintiffs' "undifferentiated challenge" to ESF assistance to the West Bank and Gaza is programmatic because "it does not constitute [a challenge to] a 'discrete' agency action as the APA requires." *Id.* at 35.

But Plaintiffs do not challenge *all* funding to the West Bank and Gaza. ECF No. 24 at 31. Rather, they object only to Defendants' inclusion of "Economic Support Funds in West Bank and Gaza funding, whether through non-governmental entities" or otherwise "that directly benefit the Palestinian Authority and do not comply with [the TFA]." *Id.*; ECF No. 1 at 11. And in doing so, Plaintiffs challenge a discrete agency action. ECF Nos. 1 at 20; 24 at 31.

Moreover, a challenge is not programmatic merely because it may have "the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency." *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000). True, "this ability does not allow [a plaintiff] to challenge an entire program by simply identifying specific allegedly improper final agency actions within that program." *Id.* But Plaintiffs have not done so — and "their allegations," "their evidence," and "their requested relief" make that clear. *Id.*

### C. Plaintiffs plausibly allege Defendants are violating the TFA.

Finally, Defendants argue that Plaintiffs "have not plausibly alleged that the Defendants have provided ESF assistance in violation of statutory authority." ECF No. 20-1 at 36. Nor, they aver, "have Plaintiffs plausibly alleged any violation of the TFA related to the Defendants' provision of ESF to the West Bank and Gaza." *Id.* Plaintiffs respond that, "given the Palestinian Authority's broad governance obligations and the Taylor Force Act's plain language," every

10

Economic Support Fund grant or award "that is not for one of the three excepted categories under Section 2378c-1(b), or made in strict compliance with Section 2378c-1(d), facially violates the law." ECF No. 24 at 31. And that is so, per Plaintiffs, "whether the grant or award is for 'civil society,' 'social services,' 'public health,' 'workforce development,' 'transport services,' 'private sector productivity,' 'disaster readiness,' or otherwise." *Id.*

The foregoing satisfies Plaintiffs' burden at this stage. But in any event, Plaintiffs' claim that Defendants "began pouring tens of millions of dollars into the West Bank and Gaza through [non-governmental organizations]" shortly after the PA "issued a decree taking operational control over all non-governmental organizations operating within its jurisdiction" plausibly alleges a circumvention of the TFA on its own. *Id.*

### III.   Plaintiffs' *ultra vires* claim should be dismissed.

"Long before the APA, the 'main weapon in the arsenal for attacking federal administrative action' was a suit in equity seeking injunctive relief." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting Kenneth Culp Davis & Richard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE § 18.4, at 179 (3d ed. 1994)). Such a claim — an *ultra vires* claim — is available where (1) "there is no express statutory preclusion of all judicial review"; (2) "there is no alternative procedure for review of the statutory claim"; and (3) "the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp.*, 39 F.4th at 763.

The Court's analysis *supra* makes clear that there *is* an alternative procedure for review of Plaintiffs' claims: the APA. Nevertheless, Plaintiffs aver "that where, as here, Defendants have openly crossed a congressionally drawn line in the sand, the courts generally have jurisdiction" to review *ultra vires* agency action under that standard. ECF No. 24 at 33. But the key word is

"generally" — *i.e.*, not always. And the cases Plaintiffs cite are inapplicable to the circumstances before this Court. *Oklahoma v. Tellez*, No. 7:22-CV-00108-O, 2022 WL 17069132, at *3 (N.D. Tex. Nov. 17, 2022); *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 397 (5th Cir. 2023).

### IV. Foreign policy concerns do not require dismissal of this case.

Lastly, Defendants impress that all "discretionary equitable relief should be withheld when it seeks to 'interject' courts into 'so sensitive a foreign affairs matter.'" ECF No. 20-1 at 42 (quoting *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985)). And they note that "Plaintiffs' allegations illustrate that this is a high-level foreign policy matter involving the decision making of the Congress, the President, the Secretary of State, and other senior foreign policy officials." ECF No. 20-1 at 42.

This Court recognizes that arguments appealing to national security, defense, and/or foreign affairs "are of the *utmost* seriousness." *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *15 (N.D. Tex. Nov. 2, 2023). But the relief requested here would be granted only if Defendants are in violation of the TFA. And assuring fidelity to the TFA and Congress's directives therein would serve U.S. interests, not undermine them.

### CONCLUSION

Defendants' Motion is **GRANTED IN PART** as to Plaintiffs' *ultra vires* claim. Otherwise, Plaintiffs have successfully demonstrated standing and stated a plausible claim (under the APA) at this stage of litigation.

**SO ORDERED**.

February 2, 2024

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE