## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS,
## AMARILLO DIVISION

DR. RONNY JACKSON, STUART and ROBBI
FORCE, and SARRI SINGER,

      Plaintiffs,

         v.

JOSEPH R. BIDEN, JR., in his official          No. 2:22-cv-00241-Z
capacity as the President of the United States,
and ANTONY BLINKEN, in his official capacity
as the United States Secretary of State,

      Defendants.

_____/

## FIRST AMENDED COMPLAINT
(For Declaratory and Injunctive Relief)

1.      The Trump Administration terminated Economic Support Fund awards in the West Bank and Gaza and ceased contributions to the United Nations Relief Works Agency in 2018, thereby ending American taxpayer subsidies for Palestinian terrorism and complying with the Taylor Force Act, Pub. L. No. 115-141, div. S, title X, 132 Stat. 1143 (Mar. 3, 2018) (the "Trump Policy").

2.      At all times relevant, the United States Government and the Defendants had actual knowledge that Economic Support Funds awards and United Nations Relief Works Agency contributions support Palestinian terrorism. Multiple agencies, including the Department of State and the Central Intelligence Agency, had known for years that Hamas personnel, terror tunnels, rockets, weapon procurement, and command and control infrastructure were supported and subsidized by United States Government aid to Gaza and the West Bank. *See e.g.,* USAID OFF. OF THE

INSPECTOR GEN., OFF. OF INVESTIGATIONS, GAZA RESPONSE — FRAUD AWARENESS NOVEMBER 2023: RESPONSIBILITY TO IDENTIFY AND REPORT POTENTIAL DIVERSION OF U.S HUMANITARIAN AID TO HAMAS AND OTHER FOREIGN TERRORIST ORGANIZATIONS (Nov. 3, 2023), https://bit.ly/3PdlNE0 (attached as Ex. 2).

3.     At all times relevant, the Defendants knew that reversing the Trump Policy would increase (a) the amount of "material support" as defined in 18 U.S.C. § 2339B provided by the Palestinian Authority and the United Nations Relief Works Agency to Palestinian terrorists, (b) the number and lethality of Palestinian terrorist attacks, and (c) the Plaintiffs' risk of death or injury at the hands thereof. Nevertheless, the Defendants arbitrarily, capriciously, and unlawfully changed the Trump Policy when they took power on January 20, 2021.

4.     On or about March 1, 2021, the Defendants sought a two-year license from the Department of the Treasury Office of Foreign Asset Control allowing government employees, grantees, or contractors to conduct activities in the West Bank and Gaza "that would otherwise be prohibited by the Global Terrorist Sanctions Regulations and the Foreign Terrorist Organization Sanctions Regulations." The license application, which was circulated at approximately 10:26 pm, Thursday, February 25, 2021, for internal Department of State review and clearance by 12:00 pm Friday, February 26, 2021, acknowledged "a high risk" that "Hamas could potentially derive indirect, unintentional benefit from U.S. assistance to Gaza." *See* Ex. 1 at 6, 8–10, United States Dep't of State, Mem. from Andrew Weinschenk to Brad Smith (Mar. 1, 2021). The license was needed because "Hamas is a Foreign

Terrorist Organization (FTO) and Specially Designated Global Terrorist (SDGT). Other terrorist groups are present in the West Bank and Gaza, including Palestinian Islamic Jihad (PIJ), the Palestine Liberation Front (PLF), and the Popular Front for the Liberation of Palestine (PFLP)." *Id.*

6.    At all times relevant, the Defendants formally recognized and acknowledged the Palestinian Authority's responsibility for social services, education and culture, public health, water supply, infrastructure, economic development, and disaster preparedness in Gaza and the West Bank. *See* Declaration of Principles on Interim Self-Government Arrangements, Art. VI § 2 and Art. VII, § 4 (Oct. 8, 1993), https://bit.ly/42wYadW.

7.    Nevertheless, the Defendants are using United States taxpayers, United States government agencies, and a network of domestic and foreign corporations to directly benefit and materially support the Palestinian Authority by relieving it of these responsibilities, knowingly allowing the Palestinian Authority to fund terrorism through the "pay-to-slay" program and benefitting Hamas.

8.    Between January 20, 2021, and the date of this First Amended Complaint, the Defendants have obligated or transferred more than $1.5 billion to Gaza and the West Bank through Economic Support Fund awards and United Nations Relief Works Agency contributions.

9.    The Defendants' unlawful conduct has directly and concretely harmed the Plaintiffs by increasing their risk of injury or death from Palestinian terrorists. Each one of the Plaintiffs is within the Taylor Force Act's zone of interest and has a

reliance interest in the Trump Policy. Pursuant to 5 U.S.C. § 706(2), they seek declaratory and injunctive relief compelling the Defendants to comply with the Taylor Force Act and the Administrative Procedure Act.

## Jurisdiction, Relief, and Venue

10. This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1651. and 5 U.S.C. § 704.

11. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

12. Venue is proper under 28 U.S.C. § 1391(b)(2).

## Parties

13. Plaintiff Ronny L. Jackson, M.D., is a member of the United States House of Representatives from the 13th Congressional District of the State of Texas. He is a resident of the State of Texas and a citizen of the United States. Dr. Jackson has recently visited Israel and, in his official capacity and as a private citizen, intends to visit again soon. Due to the Defendants' intentional and unlawful conduct, he faces an increased risk of physical harm or death when doing so. Dr. Jackson is within the Taylor Force Act's zone of interest.

14. Plaintiffs Stuart and Robbi Force are residents of the State of Texas and citizens of the United States. They are the parents of Taylor Force — the namesake of the Taylor Force Act. Taylor, a West Point graduate and veteran of the U.S. Army Iraq and Afghanistan war, was murdered by a Palestinian terrorist. The Palestinian Authority celebrated the terrorist as a "Martyr" and has paid and continues to pay a

bounty to the terrorist's family. The Defendants have caused Mr. and Mrs. Force extreme emotional and physical distress by knowingly and unlawfully subsidizing these payments. Also, Mr. and Mrs. Force have visited the State of Israel in the past and intend to visit again very soon. Due to the Defendants' intentional and unlawful conduct, they face an increased risk of physical harm or death when doing so. Mr. and Mrs. Force are within the Taylor Force Act's zone of interest.

15.    Plaintiff Sarri Singer is a resident of the State of New Jersey and a citizen of the United States. She survived an attack by a Palestinian terrorist who exploded a suicide bomb on a bus in Jerusalem, Israel, killing seventeen innocent people. The Palestinian Authority has paid and continues to pay a bounty to the terrorist's family. The Defendants are causing Ms. Singer extreme emotional and physical distress by knowingly and unlawfully subsidizing these payments. Also, Ms. Singer routinely visits Israel. Due to the Defendants' intentional and unlawful conduct, she faces a greater risk of physical harm or death when doing so. Ms. Singer is within the Taylor Force Act's zone of interest.

16.    Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

17.    Defendant Antony Blinken is the Secretary of State. He is sued in his official capacity.

**Facts**

<u>Background</u>

18.   At all times relevant, the Defendants have had actual knowledge that:

a.   The Palestinian Authority and the United Nations Relief Works Agency, their employees, and affiliates incite, celebrate, support, and/or perpetrate terror attacks in the form of, *inter alia*, stabbings, bombings, shootings, and vehicular homicides against Jewish, Christian, Druze, Muslim, and other citizens or residents of, or visitors to, the State of Israel.

b.   The Palestinian Authority and the United Nations Relief Works Agency, their employees, and affiliates knowingly and intentionally provide terrorists, including but not limited to designated foreign terrorist organizations such as the Al-Aqsa Martyrs Brigade, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine; Fatah; and others, including individual "lone wolf" terrorists, with "material support" as defined at 18 U.S.C. § 2339B.

c.   The Palestinian Authority and the United Nations Relief Works Agency, their employees, and their affiliates openly and notoriously use, permit, or sanction the diversion of "humanitarian" and "reconstruction" assistance funded by the United States Government, the European Union, Qatar, and others, including private persons, in Gaza and the

West Bank to benefit Hamas and to provide material support for terrorists.

19.    At all times relevant, the Defendants have had actual knowledge that money is terrorism's lifeblood and that money is fungible. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 29–31 (2010); *see also* 18 U.S.C. § 2339B(a)(1); Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 26, 2001).

20.    At all times relevant, the Defendants have had actual knowledge that American taxpayer-funded assistance to Gaza and the West Bank, including Economic Support Fund awards and United Nations Relief Works Agency contributions, directly provides and/or subsidizes material support for Palestinian terrorists.

21.    At all times relevant, the Defendants have had actual knowledge that American taxpayer-funded assistance to Gaza and the West Bank, including Economic Support Fund awards and United Nations Relief Works Agency contributions, including assistance funneled through nongovernmental organizations, was being diverted to or used for the benefit of Hamas and other terrorists.

22.    For example, responding to the Biden Administration's October 18, 2023, announcement of $100 million in American taxpayer aid for Palestinians in Gaza and the West Bank, the USAID Office of Inspector General, Office of Investigations, issued a situational alert stating that "**The USAID Office of Inspector General (USAID OIG)** has identified this area as high-risk for potential

diversion and misuse of U.S.-funded assistance" by terrorists. *See* Ex. 2 at 1 (emphasis in original).

23.     Since 1993, the United States Government has provided more than $8 billion in American taxpayer-funded bilateral assistance to Gaza and the West Bank, nearly all of which directly benefits the Palestinian Authority. *See e.g.,* USAID, *U.S. Foreign Assistance by Country: West Bank and Gaza*, https://bit.ly/48ROmxu (last visited Mar. 3, 2024); U.S. GOV'T ACCOUNTABILITY OFF., GAO-21-332, WEST BANK AND GAZA AID: SHOULD FUNDING RESUME, INCREASED OVERSIGHT OF SUBAWARDEE COMPLIANCE WITH USAID'S ANTITERRORISM POLICIES AND PROCEDURES MAY REDUCE RISKS (Mar. 29, 2021), https://bit.ly/3Ui7lug. Between FY 2012 and FY 2016 alone, the Obama Administration transferred more than $1.3 billion in Economic Support Funds for assistance that directly benefits the Palestinian Authority. JIM ZANOTTI, CONG. RSCH. SER., IN11649, U.S. RESUMPTION OF FOREIGN AID TO THE PALESTINIANS at 3 (Apr. 14, 2021), https://bit.ly/3sOLPlf.

<u>"Pay-to-Slay"</u>

24.     At all times relevant, the Defendants have had actual knowledge that the Palestinian Authority has, *inter alia*, materially supported and financially incentivized terrorism for decades through a program of sliding-scale bounty payments to terrorists and their families based on the number of Jews, Israelis, and/or tourists killed or maimed ("pay-to-slay").

25.     These bounties, known as "shahids" payments, have been made through an entity called "the Institution for Families of Martyrs [sic] and the Injured." To

claim their money, the families of deceased terrorists apply with information about the deceased, the date, place, and circumstances of death, the number of Jews, Israelis, or others killed, and proof of death. Between 2013 and 2020, the Palestinian Authority paid out over $1.5 billion through this program.

26.     The Palestinians who engaged in the bestial orgy of murder, rape (including the rape of dead bodies), mutilation, binding and burning of live persons, and theft on October 7, 2023, and/or their family members will receive pay-to-slay bounties. *See* The Editorial Board, *Palestinian 'Pay for Slay' Keeps Growing*, WALL ST. J. (Jan. 15, 2024), https://on.wsj.com/3wRZjlB.

27.     On January 7, 2024, the official Palestinian Authority daily *Al-Hayat Al-Jadida* described the perpetrators of these atrocities as "stars who do not disappear from our skies" and said that they "perfume our land with their deep-red and fragrant blood, and they are more honored than us all." Itamar Marcus, *PA's "Pay-For-Slay" Payments to Rise by $1.3 Million Per Month*, PMW (Jan. 10, 2024), https://bit.ly/43hnF4q.

28.     At all times relevant, the Defendants had actual knowledge that Economic Support Fund awards directly benefit the Palestinian Authority, *inter alia*, by relieving it of its recognized civil society and governance obligations. Indeed, this was their intention.

29.     The resumption of Economic Support Fund awards was one part of a large bucket of measures taken by the Defendants to directly benefit the Palestinian Authority and to solidify its claims over the West Bank, Gaza, and Jerusalem.

30.    At all times relevant, the Defendants knew that Economic Support Fund awards subsidize and facilitate the Palestinian Authority's material support for Fatah, Hamas, Palestinian Islamic Jihad, and other terrorists, increasing both the number and lethality of Palestinian terror attacks against Jews and residents of or visitors to the State of Israel, and the risk of death, injury, and other harm to the Plaintiffs and others similarly situated.

31.    The United States has paid the United Nations Relief Works Agency more than $7.18 billion. *See, e.g.* RHODA MARGESSON AND JIM ZANOTTI, CONG. RSCH. SERV., IN12316, THE UNITED NATIONS RELIEF AND WORKS AGENCY FOR PALESTINE REFUGEES IN THE NEAR EAST (UNRWA): OVERVIEW AND THE U.S. FUNDING PAUSE at 3 (Feb. 9, 2024), https://bit.ly/3TvYo2V.

32.    At all times relevant, the United Nations Relief Works Agency has functioned as an instrumentality or affiliate of the Palestinian Authority in the West Bank and of Hamas in Gaza. Hundreds of its employees are members of or affiliated with terrorist groups, including Hamas, Palestinian Islamic Jihad, and Fatah. *See e.g.*, MATTHEW LEVITT, HAMAS: POLITICS, CHARITY, AND TERRORISM IN THE SERVICE OF JIHAD 95 (2006); *Resignation of Suhail Al-Hindi, Chairman of the UNRWA Staff Union in the Gaza Strip, After Exposure of His Election to Hamas' New Gazan Political Bureau*, MEIR AMIT INTEL. & TERRORISM INFO. CTR. (Apr. 24, 2017), https://bit.ly/43dMX38; *see also Fact Checking UNRWA Claims About Teachers and Education*, UN WATCH (Nov. 7, 2023), https://bit.ly/3Tbs2cE; Elliott Abrams, *Which Side Is UNRWA On?* COUNCIL ON FOREIGN RELS. (updated Sep. 1, 2014),

https://on.cfr.org/3Tbs984; Israel Defense Forces (@IDF), X (Mar 4, 2024, 1:16 PM), https://bit.ly/3Piq6Op.

33.     The Relief Works Agency's facilities have served as terrorist command and control centers, weapon storage depots, and rocket launching platforms, and it uses international aid money to indoctrinate Palestinian children into antisemitic terrorist cadres primed to murder Jews and destroy Israel. *See e.g.*, Letter from Michael T. McCaul, Chairman, H. Comm. on Foreign Affs., and Brian Mast, Chairman, Subcomm. on Oversight and Accountability, *et al*, to Mr. Philippe Lazzarini, Commissioner-General, UNRWA (Feb. 28, 2024), https://bit.ly/3VdxMoQ (citations omitted); IMPACT-SE, EDUCATION FOR TERRORISM IN PALESTINIAN SCHOOLS: 2023 ISRAEL-HAMAS WAR at 43–45 (Nov. 2023), https://bit.ly/3VauDWP.

34.     At all times relevant, the Defendants have had actual knowledge that contributions to the United Nations Relief Works Agency from the United States Government and other U.S.-based persons have directly facilitated and subsidized, and will continue to directly facilitate and subsidize, the Relief Works Agency's material support for Fatah, Hamas, Palestinian Islamic Jihad, and other terrorists, increasing both the number and lethality of Palestinian terror attacks against Jews, and residents of, or visitors to, the State of Israel, and the risk of death, injury, and other harm to the Plaintiffs and others similarly situated.

<u>The Taylor Force Act</u>

35.     Taylor Force was a West Point graduate and United States Army veteran of Iraq and Afghanistan.

36.    On March 8, 2016, he was walking on a seaside boardwalk in Jaffa, Israel, when he was murdered by a Palestinian named Bashar Masalha.

37.    Masalha stabbed and wounded ten other people before he was neutralized by the police.

38.    The Palestinian Authority glorified Masalha and his crime.

39.    The official Facebook page of Fatah, the Palestinian Authority's ruling party, called Masalha a "heroic Martyr" for killing Mr. Force.

40.    The Palestinian Authority-controlled *Al-Hayat Al-Jadida* said, "Masalha died as a Martyr on March 8 [2016], after carrying out a stabbing operation in Jaffa, in which he killed an American tourist."

41.    After Mr. Force's murder, Congress passed, and President Donald J. Trump signed, the Taylor Force Act, Pub. L. No. 115-141, div. S, title X, 132 Stat. 1143 (Mar. 3, 2018).

42.    The Act declares that the Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror against American and Israeli citizens.

43.    The Act prohibits the Executive Branch from providing any grant or award from U.S. taxpayer funds available for assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 (Economic Support Funds) that "directly benefits the Palestinian Authority" unless the Secretary of State certifies that the Palestinian

Authority is taking credible steps to end acts of violence against Israeli citizens and

United States citizens and has terminated pay-to-slay. 22 U.S.C. § 2378c-1(a)(1).

44.     Specifically, the Secretary of State must aver that the Palestinian

Authority and any successor or affiliated organizations have:

    a. Taken "credible steps to end acts of violence against Israeli citizens and United States citizens that are perpetrated or materially assisted by individuals under their jurisdictional control," and

    b. "terminated payments for acts of terrorism against Israeli citizens and United States citizens," and

    c. "revoked any law, decree, regulation, or document authorizing or implementing a system of compensation for imprisoned individuals that uses the sentence … of an individual imprisoned for an act of terrorism to determine the level of compensation paid," and

    d. "publicly condemn[ed]" terrorism and taken "steps to investigate or are cooperating in investigations of such acts to bring the perpetrators to justice."

22 U.S.C. § 2378c-1(a)(1).

45.     The only exceptions are for payments made to the East Jerusalem

Hospital Network, assistance for wastewater projects not exceeding $5,000,000 in any

one fiscal year, and assistance for any other program, project, or activity that provides

vaccinations to children not exceeding $500,000 in any one fiscal year. 22 U.S.C. §

2378c-1(b).

46.     No Secretary of State has ever made the requisite certification because

the Palestinian Authority has not taken credible steps to end acts of violence against

Israeli citizens and United States citizens, terminated payments for acts of terrorism,

or publicly condemned such acts of violence as the Taylor Force Act requires.

47.    In 2018, the Trump Administration terminated all Economic Support Funds awards in the West Bank and Gaza due to the Palestinian Authority's support for terrorism and complied with the Taylor Force Act. In 2018, the Trump Administration also terminated all contributions to the United Nations Relief Works Agency, calling it irredeemably flawed because of its support for terrorism.

<u>The Defendants Promise to Subsidize Terrorism</u>

48.    On or about May 6, 2020, candidate Joe Biden promised to reverse, *inter alia*, the Trump Administration's decision to stop sending U.S. taxpayer funds to the Palestinian Authority and its instrumentalities, including the United Nations Relief Works Agency. *See* Yaron Steinbuch, *Joe Biden Vows to Restore US Aid to Palestinians as President,* N.Y. POST (May 7, 2020), https://bit.ly/3Vxc9wU.

49.    On or about September 4, 2020, Rep. Doug Lamborn, one of the Taylor Force Act's original sponsors, said, "You can't restore funding to the Palestinians and comply with the Taylor Force Act except for some very, very limited humanitarian types of funding. Basically, if you agree with the sentiment behind the Taylor Force Act, you don't restore funding to the Palestinians. I think Joe Biden is showing some mental incoherence when [he pledges to restore U.S. funding]." Jackson Richman, *GOP Congressman Calls Biden's Pledge to Restore US Funding to Palestinians 'Mental Incoherence,'* JNS.org (Sept. 3, 2020), https://bit.ly/3iGQCn6.

50.    Upon information and belief, immediately upon taking power on January 20, 2021, the Defendants began executing their plan to circumvent the

Taylor Force Act and make U.S. taxpayer funds available for assistance that directly benefits the Palestinian Authority.

51.    On February 7, 2021, in an interview with France 24 Arabic TV, the Palestinian Authority's Prime Minister, Dr. Mohammad Shtayyeh, said, "Yes, there has been a phone call between myself and Mr. Hady Amr — Deputy Assistant Secretary for Israeli and Palestinian affairs. *Mr. Amr reaffirmed what this administration declared during the election campaign: It will restore the aid, it will reopen the PLO office in Washington, and it will open a U.S. consulate in East Jerusalem.*" Video clip, *Palestinian PM Mohammad Shtayyeh: Biden Administration Assured Me That It Will Restore Aid, UNRWA, PLO Office In D.C., Open Consulate in East Jerusalem*, MEMRI (Feb. 7, 2021) (emphasis added), https://bit.ly/3TUpMp3.

<u>The Defendants Resume Subsidizing Terrorism</u>

52.    On or about March 1, 2021, the Biden Administration applied for a license from the United States Department of Treasury Office of Foreign Asset Control to undertake activities in Gaza and the West Bank that would "otherwise be prohibited by the Global Terrorist Sanctions Regulations and the Foreign Terrorist Organization Sanctions Regulations."

53.    The Defendants sought "broad authorization" to support their "foreign policy objectives," eschewing the "typical comprehensive list of activities we want authorized" for a recitation of "foreign policy objectives" and "illustrative examples of our programming." Ex. 1 at 6, 8–11. The application recited that:

> The Administration seeks to restart economic, humanitarian, and security assistance activities in the West Bank and Gaza that will benefit all

Palestinians and address critical issues that further progress toward peace. Our assistance programs improve the lives of millions of Palestinians through support to health, infrastructure, humanitarian relief, and economic development activities. Moreover, our support for the development of the Palestinian economy, civil society, and other private and public institutions helps improve the lives of Palestinians and ensure the viability of a future Palestinian state.

*Id.* at 9.

54.     There is no indication that the Defendants evaluated the consequences of reversing the Trump Policy or considered alternatives that, instead of subsidizing increased support for terrorism, might decrease the rate or lethality of Palestinian attacks, reduce the amount of material support for terrorism provided by the Palestinian Authority or the United Nations Relief Works Agency, stop the misappropriation or diversion of American taxpayer assistance by Hamas and other terrorists, or preserve the reliance interest of the Plaintiffs and others similarly situated who benefitted from the Trump Policy.

55.     Also on March 1, 2021, Hady Amr emailed George Noll and other Department of State officials touting the Biden Administration's Israeli election interference "progress." Email from Hady A. Amr to George Noll *et al.*, *Election analysis next steps* (Mar. 1, 2021) (attached as Ex. 3).

56.     On or about March 3, 2021, the Palestinian Authority issued "Law-by-Decree No.7/2021," explicitly taking operational control over all nongovernmental organizations operating within its jurisdiction. At all times relevant, the Defendants were aware of this decree.

57. On March 4, 2021, a Palestinian official admitted to paying approximately $181 million in pay-to-slay bounties during the calendar year 2020. Aaron Boxerman, *PLO Says $15 million per Month Being Paid in Terror Stipends*, TIMES OF ISRAEL (Mar. 4, 2021), https://bit.ly/3gQOckG.

58. On March 18, 2021, the Defendants transmitted a nonpublic report to Congress advising, *inter alia*, that the Palestinian Authority had not ended pay-to-slay, and therefore Defendants could not certify compliance with the Taylor Force Act. Sharon Wrobel, *State Department Report Acknowledges Palestinian Authority Payments to Terrorists as Biden Administration Seeks to Resume Aid*, THE ALGEMEINER (Mar. 24, 2021), https://bit.ly/3Dlwiya.

59. On March 26, 2021, the Biden Administration transmitted a nonpublic "program narrative" to Congress appropriating $75,000,000 in Economic Support Funds for "programs that USAID/West Bank and Gaza intends to carry out."

60. These funds were for assistance directly benefitting the Palestinian Authority but outside the Taylor Force Act's exceptions. Nevertheless, the Defendants commenced making awards on April 10, 2021.

61. On April 14, 2021, the Congressional Research Service reported that the Defendants had provided $150 million in U.S. taxpayer-funded Economic Support Funds for assistance directly benefitting the Palestinian Authority in FY 2020 and FY 2021.

62. On or about May 11, 2021, Defendant Biden sent a letter to the Palestinian Authority promising his direct support for its activities. At the same time,

Biden officials, including the Defendant Blinken and the National Security Advisor, warned Israel to cease defensive anti-terrorism activities and to stop applying Israeli law in Jerusalem, Israel's U.S.-recognized capital.

63.   On or about May 26, 2021, the Defendant Blinken confirmed the payment and/or obligation of more than $360 million in U.S. funding directly benefiting the Palestinian Authority. This package, including the above-referenced $75 million Economic Support Funds laundered through Palestinian Authority instrumentalities for projects that were specifically intended to directly benefit the Palestinian Authority, was facially prohibited by the Taylor Force Act.

64.   On or about June 5, 2021, Palestinian "president" Mahmoud Abbas authorized a pay-to-slay payment of $42,000 to the family of a terrorist who killed two Israelis. Laila Ghannam, governor of Ramallah's Al-Bireh district, personally handed the money to the family of Muhannad Al-Halabi, a member of the Palestinian Islamic Jihad terror group. Al-Halabi fatally stabbed two Israeli civilians in 2015 before being shot by police.

65.   On June 9, 2021, Sen. James E. Risch, Ranking Member of the Senate Foreign Relations Committee, advised the Defendant Biden that the Palestinian Authority was incentivizing violence. Letter from the Hon. James E. Risch, to Joseph R. Biden, Jr. (June 9, 2021), https://bit.ly/3t6JjXT.

66.   On or about July 1, 2021, the Defendants falsely reported to Congress under the PLO Commitments Compliance Act of 1989, Title VIII of Public Law 101-246 (1990), by deleting derogatory information regarding the Palestinian Authority's

support for terrorism. Adam Kredo, *Biden Admin Deletes References to Palestinian Terror Incitement from Congressional Report; State Dept Silent on Removing References to Malign Palestinian Behavior in Congressionally mandated report*, WASH. FREE BEACON (July 6, 2021), https://bit.ly/3h02Oyv.

67.     Upon information and belief, the Defendants deleted the derogatory information to "smooth" the transfer of U.S. taxpayer funds for its benefit.

<u>The Defendants Circumvent the Taylor Force Act</u>

68.     On December 14, 2021, the Defendants issued a Joint Statement on the U.S.-Palestinian Economic Dialogue. It stated, in relevant part:

e.  "Participants recognized the importance of restored political and economic relations between the U.S. government and the Palestinian Authority and pledged to expand and deepen cooperation and coordination across a range of sectors."

f.  "[S]enior U.S. and Palestinian officials discussed key topics, including infrastructure development, access to U.S. markets, U.S. regulations, free trade, financial issues, renewable energy and environmental initiatives, connecting Palestinian and American businesses, and addressing obstacles to Palestinian economic development."

g.  "The U.S. government outlined programs that could support the Palestinian Authority's efforts towards financial issues, trade, and promoting foreign direct investment. This year's dialogue was a testament to the importance of U.S.-Palestinian economic relations and the opportunity to increase collaboration on economic issues of shared importance."

h.  "The U.S. delegation included Acting Assistant Secretary of State for Near Eastern Affairs Yael Lempert (U.S. Chair), Deputy Assistant Secretary for Israel and Palestinian Affairs Hady Amr, U.S. Palestinian Affairs Unit Chief George Noll, Deputy Assistant Secretary for Treasury Eric Meyer, Senior Commerce Official Robyn Kessler, USAID Deputy Assistant Administrator Megan Doherty, USAID West Bank and Gaza Mission Director Aler Grubbs, Development Finance Corporation Senior Advisor Kyle Murphy and other officials from the Departments of State, Treasury, Agriculture, Commerce and Energy; the U.S. Agency for

International Development; and the Development Finance Corporation."

*Joint Statement on United States and Palestinian Authority Renewal of the U.S.-Palestinian Economic Dialogue*, U.S. DEP'T OF STATE (Dec. 14, 2021), https://bit.ly/3DPHTXG.

69. During these meetings, the Defendants' representatives repeatedly affirmed that the United States would increase funding, including Economic Support Funds, and political support to the Palestinian Authority and enhance the Central Intelligence Agency's work with, and support for, the Palestinian Authority's leadership. Upon information and belief, the Taylor Force Act was discussed during at least two of the meetings. Participants recognized it as a "challenge, though not insurmountable," to more direct U.S. support for the Palestinian Authority and its leaders; Palestinian and U.S. officials also discussed concrete avenues for circumventing the Taylor Force Act's requirements.

70. On March 16, 2022, shortly after the Defendants' meeting with the Palestinian Authority, the Defendants announced "significant increases" in Economic Support Fund assistance, from $75 million in FY 2021 to $219 million in FY 2022, for assistance that directly benefits the Palestinian Authority by, *inter alia*, relieving it of its civic and governance obligations. According to USAID, "The nearly threefold increase in economic and development assistance *will greatly increase the U.S. government's ability to support the Palestinian people*.", *Appropriations Act for FY 2022 Increases Assistance for the West Bank and Gaza*, USAID (Mar. 15, 2022), https://bit.ly/3Pkofsi (emphasis added).

71.    On March 26, 2022, the Defendants issued a "Fact Sheet" asserting that they had transferred over half a billion U.S. taxpayer dollars, all directly benefitting the Palestinian Authority, since April 2021. *U.S. Support for the Palestinian People*, U.S. DEPT. OF STATE (Mar. 26, 2022), https://bit.ly/3yZaMOf.

72.    The "Fact Sheet" shed light on the Defendants' strategy for evading the Taylor Force Act and using Economic Support Funds to directly benefit the Palestinian Authority by laundering money through nongovernmental organizations.

<u>To Directly Benefit the Palestinian Authority, the Defendants Use Economic Support Funds to Undermine Israel's Control Over Jerusalem</u>

73.    The United States, under the Trump Administration, recognized Jerusalem as Israel's capital. Proclamation No. 9683, 82 Fed. Reg. 58331 (Dec. 11, 2017) (available at https://bit.ly/3Y3rJlQ).

74.    The Palestinian Authority, however, rejects Israeli control over that city.

75.    For example, in a statement published by its official news organ, *Al-Hayat Al Jadida*, the Palestinian Authority stated Jerusalem "has been Palestinian since it was established 5,000 years ago," that "Jerusalem is Jerusalem of the Arab Palestinians … [that] belongs only to believers of the religion of Islam," and that it is necessary to "expel from it the Zionist herds who are stealing the Palestinian land and Judaism to their lairs [sic], until it will be liberated peacefully or through other means of struggle." Itamar Marcus, *PA Wants Religious War, Calls to Fight Jerusalem Flag Parade*, PMW (May 29, 2022), https://bit.ly/3fjwTZr.

76.    Accordingly, the Defendants began working to undermine Israeli sovereignty over Jerusalem through Economic Support Funds and other measures to directly benefit the Palestinian Authority.

77.    In June 2021, the Defendants attempted, but failed, to stop Israelis from celebrating the reunification of Jerusalem. Email from Michael Ratney to Wendy Sherman re: "Flag March" (June 7, 2021) (attached as Ex. 4).

78.    The Defendants' initiative to undermine Israeli sovereignty was being carried out by "an entire team on the ground," according to the President of a leftist anti-Israel group who had a direct pipeline to senior political leaders at the Department of State. Email from Jeremy Ben-Ami, President, J Street, to Wendy Sherman (June 6, 2021) (attached as Ex. 5). The Defendants were so intent on directly supporting the Palestinian Authority and eviscerating Israel's control over its own capital city that senior U.S. officials monitored municipal zoning disputes. *See* Email from George A. Noll to Hady A. Amr re: Details on Silwan demolition (June 29, 2021) and Email from Hady A. Amr to George A. Noll re: Eviction? (Jan. 12, 2022) (attached as Ex. 6).

79.    The Defendants used Economic Support Funds to advance the Defendants' initiative, *inter alia*, "[partnering] with Palestinian and American organizations to support projects in Jerusalem that increase exchange between our two peoples and advance shared goals. Our American Spaces in Jerusalem serves as a venue and hub for many of these programs." *U.S. Support for the Palestinian People: Fact Sheet, supra* ¶ 71 (cleaned up).

22

80.     On May 10, 2022, the Defendants submitted a non-public report to Congress documenting payments made by the Palestinian Authority of over $150 million to convicted terrorists and another $191 million to the families of terrorists who were "martyred" while attacking persons living in or visiting the State of Israel. They admitted that "The [Palestinian Authority] has not terminated payments for acts of terrorism against Israeli and U.S. citizens to any individual, after being fairly tried, who has been imprisoned for such acts of terrorism and to any individual who died committing such acts of terrorism, including to a family member of such individual."

81.     On or about June 8, 2022, the Defendants confirmed that they had opened a separate diplomatic office for the benefit of the Palestinian Authority, called the "Office of Palestinian Affairs," in Israel's capital.

82.     This office acts independently of the U.S. Embassy in Jerusalem and reports directly to Biden Administration political officials in Washington.

83.     Upon information and belief, the Office of Palestinian Affairs has operational responsibility for ensuring the Economic Support Funds being laundered through non-governmental organizations are directly benefiting the Palestinian Authority.

The Defendants Knowingly Subsidize Material Support for Palestinian Terrorism

84.     On or about July 31, 2022, the Palestinian Authority celebrated the twentieth anniversary of the Hebrew University's Frank Sinatra Cafeteria bombing that killed nine people, including five Americans, and injured more than 80, by

announcing a fifteen percent increase in its monthly payments to the terrorists responsible for the attack. At that point, pay-to-slay payments to the persons responsible for the attack totaled approximately $2.6 million. Maurice Hirsch, *PA to Raise Salaries of Terrorists Who Bombed the Hebrew University in Jerusalem*, PMW (July 31, 2022), bit.ly/3DpGjKF.

85.     On or about October 15, 2022, the Defendants reported to Congress that the Palestinian Authority was continuing to fund pay-to-slay. Adam Kredo, *Palestinian Government Still Pays Terrorists as US Aid Dollars Flow, Non-Public State Department Report Confirms Palestinians Are Not Living up to Promises*, WASH. FREE BEACON (Oct. 18, 2022), https://bit.ly/3DqjEPz.

86.     On September 14, 2022, a fatal attack was carried out by a terrorist who was a member of the Central Intelligence Agency-supported Palestinian Authority security forces "by day" and a member of the terrorist "Al-Aqsa Martyrs' Brigade" by "night." Nan Jacques Zilberkik, *PA Security Forces/Fatah Terrorist Becomes Fatah's New Poster Boy to Incite More Attacks,* PMW (Sep. 29, 2022), https://bit.ly/3fmszZp.

87.     On October 27, 2022, the Palestinian Authority's "Deputy Chairman" Mahmoud Al-Aloul, whose position was created especially for him by Palestinian Authority President Mahmoud Abbas, affirmed that there was no separation between the U.S.-trained and funded Palestinian Authority security forces—that are meant to be combatting terror—and the terrorists themselves. *Abbas Deputy Admits PA Security Forces Are Working Together with Terrorists*, PMW (Oct. 27, 2022), https://bit.ly/3DvAH1u; *see also* ADV. YONA ADMONI (COBLENTZ), REGAVIM

Movement, Officers by Day, Terrorists by Night at 27–48, 65 (Feb. 2024), https://bit.ly/4alLV7N.

88.    At all times relevant, the Defendants knew or should have known that officers and members of the Palestinian Authority's security forces "serve" as officers and members of the Al-Aqsa Martyrs Brigade, a designated foreign terrorist organization, with the Palestinian Authority's approval and/or at its direction.

89.    At all times relevant, the Defendants knew or should have known that officers and members of the Palestinian Authority's security forces commit terrorist attacks against Israelis and Americans.

90.    At all times relevant, the Defendants knew or should have known that the Palestinian Authority provides the officers and members of the Palestinian Authority's security forces who commit terrorist attacks against Israelis and Americans, and the family members of such terrorists, with, *inter alia*, pay-to-slay bounties, military funerals, official condolence visits, and memorials in public institutions.

91.    On November 2, 2022, thirty-eight Members of Congress wrote to Defendant Blinken stating that they were concerned because the hundreds of millions of dollars sent by the Defendants to the Palestinians are "tragically enabling the Palestinian Authority's payments to terrorists and the families of terrorists who kill innocent Americans and people of Jewish descent — also commonly referred to as 'pay-to-slay.'" *See* Letter from the Hon. Lauren Boebert and the Hon. Doug Lamborn, *et al.*, to the Hon. Antony J. Blinken (Nov. 2, 2022), https://bit.ly/3UzFjtW.

92.     This letter requested answers to a series of questions regarding the Biden Administration's funding of the Palestinian Authority, with a return date of on or before November 7, 2022. Upon information and belief, the Defendants never responded substantively to these information requests.

93.     In 2022, the Defendants obligated Economic Support Fund awards totaling approximately $151 million for Gaza and the West Bank. *U.S. Foreign Assistance by Country: West Bank and Gaza*, USAID, https://bit.ly/3Vc5f2L (last visited Mar. 12, 2024). They contributed approximately $364 million to the Relief Works Agency. Rhoda Margesson and Jim Zanotti, *supra* ¶ 31, at 3.

94.     In 2023, the Defendants obligated Economic Support Fund awards totaling approximately $282.45 million for Gaza and the West Bank. *U.S. Foreign Assistance by Country: West Bank and Gaza*, USAID, https://bit.ly/3TfXc2h (last visited Mar. 12, 2024). They contributed approximately $371 million to the Relief Works Agency. Rhoda Margesson and Jim Zanotti, *supra* ¶ 31, at 3.

95.     The Defendants' increased spending in Gaza and the West Bank correlates to a massive increase in the number and severity of terror attacks against citizens and residents of or visitors to the State of Israel.

96.     At all times relevant, the Defendants knew increasing Economic Support Fund and Relief Works Agency spending in Gaza and the West Bank materially supports increased Palestinian terrorism.

97.     Among other things, the Defendants worked with the United Nations to ensure the increased movement of goods for "reconstruction" into Gaza. Email from

26

Lynn Hastings to George A. Noll re: Access issues (May 24, 2021) (attached as Ex. 7). At all times relevant, the Defendants and the United Nations knew or should have known that Hamas was using "reconstruction" goods to expand the terrorists' tunnel network.

98.     Upon information and belief, U.S. intelligence agencies with ties to the Palestinian Authority's security forces were aware throughout 2023 that the increased flow of United States and other international aid into Gaza and the West Bank was substantially enhancing Hamas's offensive rocket and defensive tunnel capabilities, through diversion, theft, and other methods, and funding a substantial increase in West Bank violence.

99.     Hamas's terror attack on October 7, 2023, was the result of long-term planning materially supported by international aid funding, including but not limited to the Defendants' Economic Support Fund awards and contributions to the United Nations Relief Works Agency. *See U.S. Senator Blackburn: UN Watch Report Exposes UNRWA's Teachers of Hate*, UN WATCH (Oct. 7, 2023), https://bit.ly/49NulJH ("something that hasn't gotten nearly enough attention is how our tax dollars are radicalizing the next generation of Hamas extremists."). UN Watch published a report in March exposing UNRWA-affiliated schools for what they are: indoctrination centers. *See* UN WATCH, UNRWA EDUCATION: REFORM OR REGRESSION?: A REVIEW OF UNRWA TEACHERS AND SCHOOLS CONCERNING INCITEMENT OF HATE AND VIOLENCE (Mar. 2023), https://bit.ly/48Tb8p1; *see also*

*Evidence of UNRWA Aid on or After October 7th*, UN WATCH (Feb. 14, 2024), https://bit.ly/49P1t3R; @IDF, X, (Mar 4, 2024, 1:16 PM).

100.   Accounting for Hamas's 13,000 casualties and captured since October 7, 2023, the Palestinian Authority is estimated to become responsible for an additional $97 million in pay-to-slay payments this year. Andrew Tobin, *Palestinian Authority, Key to Biden's Mideast Peace Plan, Commits To Pay $97M a Year to Hamas*, WASH. FREE BEACON (Mar. 4, 2024), https://bit.ly/3VaAFXs.

101.   Upon information and belief, statistics gathered by agencies of the United States Government that are now in the Defendants' possession and control show that the number and lethality of Palestinian terrorist attacks declined while the Trump Policy was in effect. These statistics also show that the number and lethality of Palestinian terrorist attacks increased substantially after the Defendants reversed the Trump Policy and commenced making $1.4 billion in Economic Support Fund awards to Gaza and the West Bank and United Nations Relief Works Agency contributions.

### Claim for Relief
(Section 706(2)(A)-(D) of the Administrative Procedure Act)

102.   The Plaintiffs repeat paragraphs 1–101.

103.   A key goal and purpose of the Defendants' course of conduct as described herein, including their Economic Support Funds awards and contributions to the United Nations Relief Works Agency for Gaza and the West Bank, is to directly benefit the Palestinian Authority, *inter alia*, by relieving it of financial and

operational responsibility for its infrastructure, governance, education, and civil society obligations in the West Bank and Gaza.

104.   The Defendants are pursuing this course of conduct with actual knowledge that such awards and contributions directly subsidize and facilitate the Palestinian Authority's funding of pay-to-slay, and through the Palestinian Authority and the United Nations Relief Works Agency, provide material support to Hamas, Fatah, the Al-Aqsa Martyrs Brigade, and other Palestinian terrorists.

105.   The Defendants claim that they comply with the Taylor Force Act and all other U.S. laws. Staff, *Renewed U.S. Aid to Palestinians 'Consistent' with U.S. Law - State Department Spokesman*, REUTERS (Apr. 7, 2021), https://reut.rs/3F6H0ex.

106.   This is false.

107.   For example, to circumvent Congress and the Taylor Force Act and fund the Palestinian Authority, *inter alia*, the Defendants are intentionally laundering Economic Support Fund grants and awards through non-governmental organizations that are Palestinian Authority affiliates or instrumentalities, whether directly or by operation of "Law-by-Decree 7/2021."

108.   The Court should hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A)–(D).

109.   At all times relevant, the Defendants knew that by changing the Trump Policy, they were facially violating United States anti-terrorism laws and regulations and/or the Taylor Force Act, subsidizing pay-to-slay, increasing the risk of death and injury faced by the Plaintiffs and others similarly situated at the hands of Palestinian terrorists, and that their conduct was *ultra vires* and contrary to U.S. CONST. Art. I, §§ 1 (separation of powers) and 9, cl. 7 (appropriations clause), U.S. CONST. Art. II, § 3 (take care clause), and 5 U.S.C. § 706(2)(B) (prohibiting actions contrary to constitutional power).

110.   The Defendants' decision to reverse the Trump Policy and resume Economic Support Fund awards and United Nations Relief Works Agency contributions, and each Economic Support Fund award or Relief Works Agency contribution made thereafter, are each final agency actions under 5 U.S.C. §§ 551(11)(a) and (13), for which there is no other adequate remedy in a court.

111.   The Defendants' decision to reverse the Trump Policy and change the *status quo ante* by making over $ 1.4 billion in Economic Support Fund awards and contributions to the United Nations Relief Works Agency was unlawful in that:

   a. The Defendants failed to engage in reasoned decision-making by failing to consider and address the facts that money is fungible and that the infusion of well over $1.4 billion dollars in U.S. taxpayer funds into Gaza, the West Bank, and the United Nations Relief Works Agency within approximately twenty-four months was likely to increase the frequency and lethality of Palestinian terrorism.

   b. The Defendants failed to follow procedures established in *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020), namely 5 U.S.C. § 553 procedures concerning recission of prior administrative actions and replacement with new policies. When rescinding or altering the Trump Administration's policy of denying funds to the West Bank, Gaza, and the United Nations Relief Works

Agency, reasoned decision-making required the Defendants to consider the alternatives that were within the ambit of the existing policy and to assess whether there were reliance interests, determine whether those interests were significant, and weigh any such interests against competing policy concerns. However, the Defendants did not consider alternatives when changing from the Trump Policy and failed to adequately assess the reliance interests of the Plaintiffs and others similarly situated, so it was impossible for them to properly weigh the relevant interests against competing policy concerns while considering alternatives.

c.  Because the Defendants' policy of massive Economic Support Funds for the West Bank and Gaza and huge infusions of cash into the United Nations Relief Works Agency apparently rested upon factual findings that contradicted those which underlay the Trump Policy, Congressional enactments, and the United States Government's generally applicable anti-terrorism regulations and policies aimed at denying funds to limit material support for terrorism, the Defendants had to provide a detailed justification for their decision to deviate from prior practice and turn on the taxpayer spigot.

d.  The Defendants have repeatedly failed to explain the justification for their decision to resume Economic Support Funds awards in Gaza and the West Bank and to resume contributions to the United Nations Relief Works Agency as required under *Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) and by the Administrative Procedure Act.

e.  The Defendants unlawfully failed to publish in the Federal Register a reasoned explanation for their decision to resume funding the United Nations Relief Works Agency and use Economic Support Funds for projects in the West Bank and Gaza

f.  The Defendants' use of Economic Support Funds for grants and awards in the West Bank and Gaza that directly benefit the Palestinian Authority by, *inter alia*, relieving it of governance, economic development, education, and infrastructure responsibilities subsidizes terrorism, violates the Taylor Force Act, and is contrary to the Defendants' constitutional right, power, and privilege, in excess of their statutory authority, and short of their statutory rights.

g.  The Defendants have acted outside the law and in excess of their authority contrary to 5 U.S.C. §§ 706(2)(A) & (C).

112.    The Defendants' wrongful conduct has concretely and foreseeably damaged the Plaintiffs by increasing their risk of death or injury from Palestinian terrorism when visiting Israel, causing them emotional and physical injury and distress, ignoring their reliance interest in the protections they were provided under the Trump Policy, and violating the separation of powers.

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    A declaration under 28 U.S.C. § 2201 that the Defendants have violated and are in continuing violation of the Taylor Force Act, 22 U.S.C. § 2378c-1.

B.    A declaration under 28 U.S.C. § 2201 that the Defendants' awards of Economic Support Fund and Relief Works Agency financing for Gaza and the West Bank are arbitrary and capricious and unlawful under the Administrative Procedure Act.

C.    A declaration under 28 U.S.C. § 2201 that the Defendants' Economic Support Fund awards and United Nations Relief Works Agency contributions for Gaza and the West Bank are contrary to law and in excess of their statutory authority under the Administrative Procedure Act.

D.    Under 5 U.S.C. § 705, all necessary and appropriate process to freeze all Economic Support Fund awards and/or United Nations Relief Works Agency contributions that directly benefit the Palestinian Authority, and to preserve status or rights pending conclusion of the review requested in this case.

E.    An injunction barring the Defendants from reversing the Trump Policy and making any Economic Support Funds awards available for assistance in the West

Bank and Gaza and/or any contribution to the United Nations Relief Works Agency unless and until they comply with the Administrative Procedure Act.

      F.    An award to the Plaintiffs of their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

      G.    Such other relief as this Court deems just.

Dated: March 22, 2024

Respectfully submitted,

/s/ *Reed D. Rubinstein*
REED D. RUBINSTEIN
D.C. Bar No. 400153
reed.rubinstein@aflegal.org
JULIE A. STRAUSS
D.C. Bar No. 387262
julie.strauss@aflegal.org
MICHAEL DING
Texas Bar No. 24129788
America First Legal Foundation
611 Pennsylvania Ave SE #231
Washington, D.C. 20003
(202) 964-3721
*Counsel for the Plaintiffs*

CHRISTOPHER E. MILLS*
D.C. Bar No. 1021558
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law
*Counsel to America First Legal
Foundation*
***Application for Pro Hac Vice
Admission Forthcoming**

/s/ *Christian D. Stewart*
CHRISTIAN D. STEWART
Texas Bar No. 24013569
Morgan Williamson LLP
701 S. Taylor, Suite 440, LB 103
Amarillo, TX 79101
(806) 358-8116
cstewart@mw-law.com
*Local Counsel for Plaintiffs*

MORA NAMDAR
Texas Bar No. 24090288
Namdar Law PLLC
3811 Turtle Creek Blvd #275
Dallas, TX 75219
(972) 925-9061
mora@namdarlaw.com
*Counsel to America First Legal
Foundation*