**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| RONNY L. JACKSON, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | No. 2:22-cv-241 |
| ) | |
| JOSEPH R. BIDEN, JR., *et al.* ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

BACKGROUND ..........................................................................................................2

I.    Economic Support Funds ................................................................................2

      A.    Legal Framework ..............................................................................2

      B.    Process for Implementing and Awarding Economic Support Funds .........................4

      C.    History of Providing Economic Support Funds to West Bank and Gaza....................5

II.    UNRWA Contributions ...................................................................................8

      A.    Legal Framework ..............................................................................8

      B.    Recent History of UNRWA Contributions and Funding Restrictions.........................9

III.    Procedural History ........................................................................................11

LEGAL STANDARD ..................................................................................................12

ARGUMENT ..............................................................................................................13

I.    This Court Lacks Jurisdiction Over Plaintiffs' Challenge to UNRWA Contributions............14

      A.    Plaintiffs Lacked Standing at the Time They Filed Their UNRWA Challenge..........14

      B.    Alternatively, Plaintiffs' UNRWA Challenge Is Moot ...................................18

II.    Plaintiffs' Amended Complaint Presents an Even More Amorphous Claim, Unmoored from Discrete, Final Agency Action ........................................................................19

CONCLUSION...........................................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Abdullah v. Paxton,*
  65 F.4th 204 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 188 (2023) ............................................16

*Alabama-Coushatta Tribe of Tex. v. United States,*
  757 F.3d 484 (5th Cir. 2014) ....................................................................................20, 24, 25

*Alaska v. U.S. Dep't of Agric.,*
  17 F.4th 1224 (D.C. Cir. 2021) ...............................................................................................17

*Am. Fed'n of Gov't Emps. v. United States,*
  634 F. Supp. 336 (D.D.C. 1986) ............................................................................................17

*Amawi v. Paxton,*
  956 F.3d 816 (5th Cir. 2020) ..................................................................................................18

*Arizona v. Garland,*
  --- F. Supp. 3d ----, 2024 WL 1645417 (W.D. La. Apr. 16, 2024) .......................................15

*AT&T Commc'ns of Sw., Inc. v. City of Austin,*
  235 F.3d 241 (5th Cir. 2000) ..................................................................................................18

*Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs,*
  217 F.3d 393 (5th Cir. 2000) ..................................................................................................19

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................................................19

*Bowles v. Blue Lake Dev. Corp.,*
  504 F.2d 1094 (5th Cir. 1974) ................................................................................................18

*Bowsher v. Am. Fed'n of Gov't Emps,*
  479 U.S. 801 (1986) ................................................................................................................17

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ..................................................................................................................15

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................................................................................16

*Daves v. Dallas Cnty.,*
  No. 18-cv-154, 2022 WL 2473364 (N.D. Tex. July 6, 2022) ................................................18

*Daves v. Dallas Cnty.*,
 64 F.4th 616 (5th Cir. 2023) ............................................................................................18

*Eternal Word Television Network, Inc. v. Sebelius*,
 935 F. Supp. 2d 1196 (N.D. Ala. 2013) ...........................................................................15

*Fantasy Ranch Inc. v. City of Arlington*,
 459 F.3d 546 (5th Cir. 2006) ............................................................................................18

*Focus on the Fam. v. Pinellas Suncoast Transit Auth.*,
 344 F.3d 1263 (11th Cir. 2003) ........................................................................................16

*Fontenot v. McCraw*,
 777 F.3d 741 (5th Cir. 2015) ............................................................................................16

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) ..........................................................................................................23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
 528 U.S. 167 (2000) ..........................................................................................................15

*Greenberg v. Lehocky*,
 81 F.4th 376 (3d Cir. 2023) ..............................................................................................15

*Harvard v. Inch*,
 411 F. Supp. 3d 1220 (N.D. Fla. 2019) ............................................................................16

*In re S. Recycling, LLC*,
 982 F.3d 374 (5th Cir. 2020) ............................................................................................13

*Louisiana ex. rel. Landry v. Biden*,
 64 F.4th 674 (5th Cir. 2023) ............................................................................................17

*Louisiana v. United States*,
 948 F.3d 317 (5th Cir. 2020) ............................................................................19, 20, 23

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ....................................................................................................12, 14

*Lujan v. Nat'l Wildlife Fed'n*,
 497 U.S. 871 (1999) ....................................................................................20, 22, 24

*Lutostanski v. Brown*,
 88 F.4th 582 (5th Cir. 2023) ............................................................................................15

*Lutter v. JNESO*,
 86 F.4th 111 (3d Cir. 2023) ..............................................................................................16

*McGregor v. La. State Univ. Bd. of Supervisors,*
   3 F.3d 850 (5th Cir. 1993) ................................................................................16

*Norton v. Southern Utah Wilderness Alliance, (SUWA),*
   542 U.S. 55 (2004) ...........................................................................................20

*Price v. Medicaid Dir.,*
   838 F.3d 739 (6th Cir. 2016) ............................................................................15

*Randall D. Wolcott, M.D., P.A. v. Sebelius,*
   635 F.3d 757 (5th Cir. 2011) ............................................................................13

*Renne v. Geary,*
   501 U.S. 312 (1991) .........................................................................................15

*Rhone v. City of Texas City,*
   93 F.4th 762 (5th Cir. 2024) .............................................................................19

*Rockwell Int'l Corp. v. United States,*
   549 U.S. 457 (2007) .........................................................................................15

*Schelske v. Austin,*
   No. 22-cv-49, 2023 WL 5986462 (N.D. Tex. Sept. 14, 2023) ........................19

*Sierra Club v. Peterson,*
   228 F.3d 559 (5th Cir. 2000) ...............................................................14, 20, 24

*Spencer v. Kemna,*
   523 U.S. 1 (1998) .............................................................................................19

*Thomas v. Union Carbide Agric. Prods. Co.,*
   473 U.S. 568 (1985) .........................................................................................16

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .........................................................................................12

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs,*
   714 F.3d 186 (4th Cir. 2013) ......................................................................20, 24

## Statutes

5 U.S.C. § 551 ...........................................................................................................19

5 U.S.C. § 704 ...........................................................................................................19

18 U.S.C. § 2334 .........................................................................................................7

22 U.S.C. § 2151 .........................................................................................................4

22 U.S.C. § 2221 ...................................................................................................................9

22 U.S.C. § 2346 ......................................................................................................... 2, 3, 4, 5

22 U.S.C. § 2378c-1 .......................................................................................................... 3, 21

22 U.S.C. § 2413 ...................................................................................................................5

22 U.S.C. § 2601 ...................................................................................................................8

22 U.S.C. § 6592 ...................................................................................................................4

22 U.S.C. § 6593 ...................................................................................................................4

22 U.S.C. §§ 2346 *et seq.* ......................................................................................................2

Pub. L. No. 87-195, 75 Stat. 424 (1961) ..............................................................................2

Pub. L. No. 115-141, 132 Stat. 348 (2018) ..........................................................................3

Pub. L. No. 115-253, 132 Stat. 3183 (2019) ........................................................................6

Pub. L. No. 116-94, 133 Stat. 2534 (2020) ............................................................... 3, 4, 5, 7

Pub. L. No. 116-260, 134 Stat. 1182 (2020) ........................................................................7

Pub. L. No. 117-103, 136 Stat. 49 (2022) ............................................................................7

Pub. L. No. 117-328, 136 Stat. 4459 (2022) .................................................................... 7, 9

Pub. L. No. 118-47, 138 Stat. 460 (2024) ...................................................................7, 8, 11

Pub. L. No. 118-50, 138 Stat. 895 (2024) ..........................................................................11

**Rules**

Fed. R. Civ. P. 12 ...............................................................................................................12

**Other Authorities**

165 Cong. Rec. H11061 (Dec. 17, 2019) ........................................................................ 5, 7

166 Cong. Rec. H8311 (Dec. 21, 2020) ...............................................................................7

168 Cong. Rec. H2477 (Mar. 9, 2022) .................................................................................7

168 Cong. Rec. S8553 (Dec. 20, 2022) ........................................................................... 7, 9

170 Cong. Rec. H1501 (Mar. 22, 2024) .................................................................................7

Cong. Rsch. Serv., IN11649, *U.S. Resumption of Foreign Aid to the
  Palestinians* (Apr. 14, 2021)................................................................................... 5, 6

CRS, IN12316, *The United Nations Relief and Works Agency for Palestine Refugees in the
  Near East (UNRWA): Overview and the U.S. Funding Pause* (Feb. 9, 2024) ...........8, 9, 10, 22

*Framework for Cooperation Between the United Nations Relief and Works Agency for Palestine Refugees
  in the Near East and the United States of America 2023-2024*,
  https://www.state.gov/wp-content/uploads/2023/06/2023-2024-US-UNRWA-
  Framework-for-Cooperation-FINAL.pdf .........................................................................9

GAO, 24-106243, *West Bank and Gaza Aid: USAID Generally Ensured Compliance with
  Anti-Terrorism Policies and Addressed Instances of Noncompliance* (Dec. 2023) ...................7

H. Rep. No. 116-78 (2019) ................................................................................................7

H. Rep. No. 117-401 (2022) ..............................................................................................9

Hearing before the H. Comm. on Foreign Affairs, Subcomm. on the Middle East, North Africa,
  and International Terrorism, *The FY20 Budget: Examining the Administration's Policy Objectives
  for a Turbulent Middle East* (Oct. 29, 2019). .....................................................................6

Heather Nauert, Press Statement, U.S. Dep't of State (Aug. 31, 2018),
  https://perma.cc/HA8B-NP9Q...............................................................................9, 10, 22

GAO, 21-332, *West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee
  Compliance with USAID's Antiterrorism Policies and Procedures May
  Reduce Risks* (Mar. 29, 2021) ........................................................................... 4, 5, 6 ,7

GAO, 24-106243, *West Bank and Gaza Aid: USAID Generally Ensured Compliance with Anti-Terrorism
  Policies and Addressed Instances of Noncompliance* (Dec. 2023) .......................................7

U.S. Dep't of State, Press Statement, *Statement on UNRWA Allegations* (Jan. 26, 2024),
  https://perma.cc/2E9S-FE6Y ...........................................................................................10

U.S. Dep't of State, Press Statement, *The United States Restores Assistance for the Palestinians*
  (Apr. 7, 2021), https://perma.cc/VAN2-MXDN ...............................................................10

## INTRODUCTION

Plaintiffs here—three private individuals and a member of Congress—seek to challenge two different types of foreign assistance provided by the United States to organizations serving individuals in the West Bank and Gaza.  Initially, Plaintiffs sought to challenge only certain awards of economic support funds.  Defendants moved to dismiss that claim, but this Court allowed it to proceed, concluding that Plaintiffs had sufficiently established their standing and plausibly alleged a valid claim under the Administrative Procedure Act (APA) with respect to those awards.  Defendants do not seek to relitigate any of the issues previously decided in connection with their prior motion to dismiss.  But now, Plaintiffs have amended their complaint and fundamentally changed the nature of their claim.

Specifically, Plaintiffs' claim is no longer limited to challenging certain awards of economic support funds.  Instead, Plaintiffs present a single APA claim challenging the State Department's administration of two different funding programs: not only economic support funds, but also contributions provided to the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA), which is an agency founded by the United Nations.  Plaintiffs' single APA claim is now expressly intended to litigate an abstract policy decision.  They allege that economic support funds to West Bank and Gaza and UNRWA contributions were stopped in 2018—what they call "the Trump Policy," *see* Am. Compl. ¶ 1, ECF No. 43—but that "Defendants . . . unlawfully changed the Trump Policy when they took power on January 20, 2021."  *Id.* ¶ 3.  Thus, the sole claim alleged in the Amended Complaint is framed around challenging "Defendants' decision to reverse the Trump Policy[.]"  *Id.* ¶ 111.  There are two fundamental problems with this re-styled claim.

First, Plaintiffs lack standing to challenge Defendants' UNRWA contributions.  By the time the Amended Complaint was filed—on March 25, 2024—the State Department had already paused contributions to UNRWA for almost two months, and Congress had affirmatively prohibited the State

Department from making any such contributions.  Because the challenged practice had already stopped, Plaintiffs lack standing to seek relief against it, or at minimum the claim is moot.

Second, Plaintiffs' claim is an impermissible programmatic challenge—not challenging any discrete agency decisions with respect to a particular funding program, but instead challenging a purported policy decision applying broadly to multiple different funding programs.  As discussed further below, there was no discrete, final agency action in 2018 that terminated both economic support funds and UNRWA contributions.  Similarly, there was no discrete, final agency action in 2021 regarding the "reversal" of that supposed 2018 decision.  Instead, there were countless individual decisions, made by different decisionmakers at different moments in time, under different funding programs and based on different considerations and legal frameworks.  Plaintiffs' claim—framed as challenging the supposed reversal of the "Trump Policy"—is thus an impermissible programmatic challenge, unmoored from the type of discrete, final agency action subject to review under the APA.  Thus, the sole claim alleged in the Amended Complaint should be dismissed.

## BACKGROUND

Pursuant to a variety of statutes, the United States provides substantial foreign assistance to other countries and populations.  This case involves two different types of foreign assistance: (1) economic support funds, which the United States provides to various organizations within the West Bank and Gaza; and (2) contributions to UNRWA, which is an agency established by the United Nations to provide humanitarian assistance to Palestinian refugees.

## I.    ECONOMIC SUPPORT FUNDS

### A.    Legal Framework

Economic support funds are governed by the Foreign Assistance Act of 1961, *see* Pub. L. No. 87-195, 75 Stat. 424 (1961), and specifically chapter 4 of part II of that Act, codified at 22 U.S.C. §§ 2346 *et seq.*  These funds are intended to "promote economic or political stability," *id.* § 2346(a),

and are administered jointly by the State Department as well as the U.S. Agency for International Development (USAID), which is an independent agency within the Executive Branch. *See id.* § 6563.

Economic support funds are appropriated annually, and are used to provide assistance to a number of different countries and populations. With respect to the West Bank and Gaza specifically, each year's appropriations act frequently includes restrictions on such funds. In FY2020, for example, Congress imposed various oversight and vetting requirements, seeking to "ensure that such assistance is not provided to or through any individual, private or government entity, or educational institution that the Secretary knows or has reason to believe" has certain connections to terrorism. *Department of State, Foreign Operations, and Related Programs, 2020*, Pub. L. No. 116-94, div. G, § 7039(a), (b), 133 Stat. 2534, 2884 (2019); *see also id.* §§ 7040(a), 7041(k), 133 Stat. at 2883, 2890 (additional requirements).

In addition to restrictions in annual appropriations laws, in March 2018, Congress enacted the Taylor Force Act. *See* Pub. L. No. 115-141, div. S, title X, 132 Stat. 348, 1143 (2018), codified at 22 U.S.C. § 2378c-1. That Act expressly limits the use of economic support funds in the West Bank and Gaza for certain purposes. *See id.* § 2378c-1(a)(1) (applying to "[f]unds authorized to be appropriated or otherwise made available for assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2346 et seq.; relating to Economic Support Fund) and available for assistance for the West Bank and Gaza"). Under the Taylor Force Act, economic support funding "that directly benefits the Palestinian Authority may only be made available for such purpose if" the Secretary of State certifies, *inter alia*, that the Palestinian Authority has ended the system of payments for acts of terrorism. *Id.* § 2378c-1(a)(1)(B). There are certain exceptions, such as "payments made to the East Jerusalem Hospital Network" as well as certain wastewater and vaccination projects not to exceed a specified threshold. *Id.* § 2378c-1(b). The Act also contains a procedure where, if funds are allocated for programs that would directly benefit the Palestinian Authority, the funds may be withheld and then remain available for obligation for a longer period of time. *Id.* § 2378c-1(d).

### B.       Process for Implementing and Awarding Economic Support Funds

As noted, economic support funds are administered by both the State Department as well as USAID.  The Secretary of State is "responsible for policy decisions and justifications for economic support programs," but the Secretary "shall exercise this responsibility in cooperation with the Administrator of" USAID.  22 U.S.C. § 2346(b).  USAID has "responsibility for coordinating all United States development-related activities" but acts "[u]nder the policy guidance of the Secretary of State."  *Id.* § 2151(b); *see also id.* §§ 6592, 6593.  For the West Bank and Gaza program specifically, the State Department—through its Office of Foreign Assistance—allocates a specific amount of economic support funds, consistent with legal directives from Congress and other policy decisions, and then USAID is responsible for implementation such as awarding and disbursing those funds to specific projects.  *See* GAO, 21-332, *West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks*, at 1 (Mar. 29, 2021) ("The U.S. Agency for International Development (USAID), with overall foreign policy guidance from State, has primary responsibility for administering ESF assistance for Palestinians in the West Bank and Gaza.") (cited in Am. Compl. ¶ 23) [hereafter "GAO, *Should Funding Resume*"].

In particular, after Congress passes an annual appropriations act containing an overall amount of economic support funds, there is an internal process by which the State Department, through the Office of Foreign Assistance (and in coordination with USAID), determines the proper allocation of funds for specific countries and purposes.  This process includes reviewing any earmarks in the appropriations act, as well as directives in the joint explanatory statement accompanying the act, which typically includes instructions on how Congress intended the money to be allocated, some of which are incorporated by reference into the act itself.  For example, the FY2020 appropriations act stated that "funds appropriated by this Act . . . shall be made available at not less than the amounts specifically designated in the respective tables included in the explanatory statement," Pub. L. No. 116-

94, § 7019(a), 133 Stat. at 2855, and the explanatory statement included specific allocations for numerous countries and regions, including West Bank and Gaza. *See* 165 Cong. Rec. H11061, H11430 (Dec. 17, 2019) (explanatory statement, with specific allocations for economic support funds).

Once the State Department completes this initial allocation process, it submits a report to Congress outlining the various allocations. *See* 22 U.S.C. § 2413(a). Even after this initial allocation report is submitted, however, there are additional congressional notification requirements before funds can be obligated for West Bank and Gaza; these congressional notifications are made by USAID. *See, e.g.*, Pub. L. No. 116-94, § 7039(f), 133 Stat. at 2833; MTD App'x, ECF No. 20-2, Exs. A & B (FY2020 and FY2021 congressional notifications submitted by USAID). These congressional notifications provide even more detail about the specific projects that USAID contemplates funding, including the intended partners for certain projects. *Cf.* 22 U.S.C. § 2346(c). If Members of Congress raise concerns in response to these notifications, the State Department and USAID will generally work with Congress to resolve the concerns before obligation of the funds. *See generally* Cong. Rsch. Serv. (CRS), IN11649, *U.S. Resumption of Foreign Aid to the Palestinians*, at 3-4 (Apr. 14, 2021) (cited in Am. Compl. ¶ 61) [hereafter "CRS, *Resumption of Foreign Aid*"]. Because of this lengthy allocation and congressional notification process, economic support funds will frequently remain unobligated until close to the end of their two-year period of initial availability. *Cf.* MTD App'x, Ex. A (congressional notification for FY2020 funds, appropriated in December 2019, occurred in March 2021).

C.     **History of Providing Economic Support Funds to West Bank and Gaza**

The United States has sought to provide economic support funds for the West Bank and Gaza across Presidential administrations. *Cf.* Am. Compl. ¶ 23; *see also* GAO, *Should Funding Resume*, at 2. In August 2018, however, after Congress enacted the Taylor Force Act and following a review of U.S. funding, the State Department reprogrammed its FY2017 economic support funding intended for West Bank and Gaza to other priorities. *See* GAO, *Should Funding Resume*, at 7; *cf.* Am. Compl. ¶ 47.

But USAID "continue[d] to use previously obligated fiscal year 2015 and 2016 appropriated funds to support ongoing projects and activities." GAO, *Should Funding Resume*, at 7.

Shortly thereafter, in October 2018, Congress enacted the Anti-Terrorism Clarification Act of 2018, which provided that, as of February 1, 2019, anyone who accepted certain forms of foreign assistance—including economic support funds—would be deemed to consent to personal jurisdiction in United States courts for certain civil actions. *See* Pub. L. No. 115-253, § 4, 132 Stat. 3183, 3184. Following enactment of that law, the "Prime Minister of the Palestinian Authority notifie[d] the U.S. government that it [would] no longer accept assistance" as specified in that law, "which includes USAID activities implemented with ESF assistance." GAO, *Should Funding Resume*, at 7. Accordingly, on January 31, 2019, "USAID end[ed] programmatic implementation of all assistance in the West Bank and Gaza," including with respect to "implementing the remaining fiscal year 2015 and 2016" economic support funding. *Id.*; *see also* CRS, *Resumption of Foreign Aid*, at 1-2.

Following the full stop of economic support funds for the West Bank and Gaza in January 2019, in October 2019 representatives from the State Department and USAID testified before Congress as part of the FY2020 budget process. In response to a question about "remov[ing] the constraints imposed by the Anti-Terrorism Clarification Act," which would allow "the United States [to] consider resuming certain types of aid to Palestinians," the State Department witness testified that the Administration was "willing to engage with Congress on every level to fix that." Hearing before the H. Comm. on Foreign Affairs, Subcomm. on the Middle East, North Africa, and International Terrorism, *The FY20 Budget: Examining the Administration's Policy Objectives for a Turbulent Middle East* (Oct. 29, 2019), at 18 (testimony of Asst. Sec'y Schenker).

Two months later, in December 2019, Congress passed the FY2020 annual appropriations act, which accomplished two items relevant here. First, the Act included the Promoting Security and Justice for Victims of Terrorism Act of 2019, which eliminated acceptance of economic support funds

6

as triggering consent to personal jurisdiction.  *See* Pub. L. No. 116-94, div. J, § 903(c)(1), 133 Stat. at

3083 (amending 18 U.S.C. § 2334(e)).  Second, the Act's explanatory statement specifically allocated

$75 million in economic support funds for West Bank and Gaza, which set a binding minimum level

of funding with narrow authority to deviate, consistent with section 7019 of that act.  *See id.*, div. G,

§ 7019(a), 133 Stat. at 2882; 165 Cong. Rec. at H11430; *see also id.* at H11434; H. Rep. No. 116-78, at 6

(2019); GAO, *Should Funding Resume*, at 7.

    Based on Congress's direction with respect to those FY2020 funds, the State Department and

USAID resumed providing economic support funds to the West Bank and Gaza.  *See generally* MTD

App'x, Ex. A (USAID congressional notification relating to FY2020 funds); Am. Compl. ¶ 59.  In

subsequent years (FY2021, FY2022, FY2023, and FY2024), Congress continued to specifically allocate

economic support funds for the West Bank and Gaza:

- In FY2021, another $75 million in economic support funds, *see Department of State, Foreign Operations, and Related Programs Appropriations Act, 2021*, Pub. L. No. 116-260, div. K, § 7019, 134 Stat. 1182, 1732 (2020); Joint Explanatory Statement, 166 Cong. Rec. H8311, H8785 (Dec. 21, 2020).

- In FY2022, $219 million in economic support funds, *see Department of State, Foreign Operations, and Related Programs Appropriations Act, 2022*, Pub. L. No. 117-103, div. K, § 7019, 136 Stat. 49, 605 (2022); Joint Explanatory Statement, 168 Cong. Rec. H2477, H2998, H3004 (Mar. 9, 2022).

- In FY2023, $225 million in economic support funds, *see Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023*, Pub. L. No. 117-328, div. K, § 7019, 136 Stat. 4459, 5014 (2022); Joint Explanatory Statement, 168 Cong. Rec. S8553, S9291 (Dec. 20, 2022).

- In FY2024, $175 million in economic support funds, *see Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024*, Pub. L. No. 118-47, div. F, § 7019, 138 Stat. 460, 771 (2024); Joint Explanatory Statement, 170 Cong. Rec. H1501, H2091 (Mar. 22, 2024) (describing it as "Assistance subject to section 7041(k)(1)," which refers to the West Bank and Gaza).

    Consistent with the allocation and notification process described above, USAID has informed

Congress how the FY2020, FY2021, and FY2022 funds allocated to West Bank and Gaza are intended

to be used.  *See* MTD App'x; *see also* Suppl. MTD App'x, Ex. D (FY2022 congressional notification) (attached hereto).  The allocation and approval process for FY2023 and FY2024 funds remains ongoing, and Congress has not yet been notified about those funds' intended uses.  As of December 2023, much of the FY2020 and FY2021 funding has already been obligated and expended.  *See* GAO, 24-106243, *West Bank and Gaza Aid: USAID Generally Ensured Compliance with Anti-Terrorism Policies and Addressed Instances of Noncompliance*, at 17 (Dec. 2023).

## II.    UNRWA CONTRIBUTIONS

Separate from economic support funds, Plaintiffs' Amended Complaint now also challenges contributions the United States has provided to UNRWA.  UNRWA is a United Nations agency founded in 1949 to provide humanitarian assistance to Palestinian refugees, including by "operating temporary shelters for those displaced, running mobile health teams, and distributing food, water, and other necessities."  CRS, IN12316, *The United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA): Overview and the U.S. Funding Pause*, at 2 (Feb. 9, 2024) (cited in Am. Compl. ¶¶ 23, 31, 93-94) [hereafter "CRS, *U.S. Funding Pause*"].

### A.    Legal Framework

The United States primarily provided contributions to UNRWA pursuant to the Migration and Refugee Assistance Act of 1962, which authorizes "contributions to the activities of the United Nations High Commissioner for Refugees . . . and to other relevant international organizations[.]"  22 U.S.C. § 2601(b)(1).  Unlike economic support funds to the West Bank and Gaza, this assistance was administered solely by the State Department (generally by its Bureau of Population, Refugees, and Migration (PRM)); it did not involve USAID.

The State Department generally used the Migration and Refugee Assistance (MRA) account to provide contributions to UNRWA, which (again unlike economic support funds) contains funds not earmarked or directed for specific countries or programs.  *See, e.g.*, Pub. L. No. 118-47, div. F,

8

§ 7019; *see generally*, CRS, *U.S. Funding Pause*, at 2 (noting that "Congress does not usually specify a funding amount for UNRWA; it appropriates a lump sum to the MRA account, and the executive branch allocates funds based on humanitarian needs and U.S. foreign policy priorities").[1]  After the State Department allocated money for UNRWA contributions, throughout the year it would "issue[] voluntary contributions . . . by issuing a contribution letter, accompanied by voluntary contribution terms and conditions."  *Framework for Cooperation Between the United Nations Relief and Works Agency for Palestine Refugees in the Near East and the United States of America 2023-2024*, at 3, https://www.state.gov/wp-content/uploads/2023/06/2023-2024-US-UNRWA-Framework-for-Cooperation-FINAL.pdf.

### B.     Recent History of UNRWA Contributions and Funding Restrictions

Over the years, Congress imposed varying restrictions on the United States' contributions to UNRWA, but consistent with those restrictions allowed the contributions to continue.  Am. Compl. ¶ 31; *see generally*, CRS, *U.S. Funding Pause*, at 2-3 (describing the history of United States contributions). In August 2018, however, the State Department announced that it "will not make additional contributions to UNRWA," describing how the United States had "shoulder[ed] [a] very disproportionate share of the burden of UNRWA's costs . . . for many years," and characterizing the organization's "business model and fiscal practices" as "unsustainable[.]"  Heather Nauert, Press Statement, U.S. Dep't of State (Aug. 31, 2018), https://perma.cc/HA8B-NP9Q ("2018 State Dep't Press Release"); *see* Am. Compl. ¶ 47.  The United States remained "mindful of and deeply concerned

---

[1] In FY2023, the State Department also provided a contribution to UNRWA from the International Organizations and Programs (IO&P) account, consistent with the allocation in the joint explanatory statement accompanying the annual appropriations act.  *See Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023*, Pub. L. No. 117-328, div. K, § 7019 (2022); Explanatory Statement, 168 Cong. Rec. S8553, S9291 (Dec. 20, 2022); *see also* H. Rep. No. 117-401, at 74 (2022).  This IO&P funding is authorized pursuant to the Foreign Assistance Act, *see* 22 U.S.C. § 2221(a), but in FY2024 Congress did not direct further UNRWA contributions from IO&P funds.

regarding the impact upon innocent Palestinians," and thus stated it would "intensify dialogue with the United Nations, host governments, and international stakeholders about new models and new approaches" for aid, potentially including "direct bilateral assistance from the United States and other partners[.]" 2018 State Dep't Press Release.  Following this announcement, the United States did not provide any contributions to UNRWA in 2019 or 2020.  *See* CRS, *U.S. Funding Pause*, at 3.

Approximately two-and-a-half years later, on April 7, 2021, the State Department announced that it was "resuming support for UNRWA's services."  U.S. Dep't of State, Press Statement, *The United States Restores Assistance for the Palestinians* (Apr. 7, 2021), https://perma.cc/VAN2-MXDN.  The statement described the funding as supporting "education for over 500,000 Palestinian boys and girls," as well as "critical COVID-19 assistance, including healthcare, medicine, and medical supplies, as well as cash and food assistance to families severely impacted by COVID-19."  *Id.*  The United States continued to provide contributions to UNRWA in 2022 and 2023.  *See* CRS, *U.S. Funding Pause*, at 3.

On January 26, 2024, however, the State Department announced that it had paused further contributions to UNRWA.  Specifically, in response to "allegations that twelve UNRWA employees may have been involved in the October 7 Hamas terrorist attack on Israel," the United States announced it was "extremely troubled" and had therefore "temporarily paused additional funding for UNRWA while [it] review[s] these allegations and the steps the United Nations is taking to address them."  U.S. Dep't of State, Press Statement, *Statement on UNRWA Allegations* (Jan. 26, 2024), https://perma.cc/2E9S-FE6Y.  It furthermore noted that "Secretary of State Antony J. Blinken spoke with United Nations Secretary General Antonio Guterres on January 25 to emphasize the necessity of a thorough and swift investigation of this matter."  *Id.*  The State Department "also welcome[d] the UN's announcement of a 'comprehensive and independent' review of UNRWA."  *Id.*

On March 23, 2024, the President signed into law the FY2024 full-year appropriations act for the State Department, which prohibited the State Department from using appropriated funds to make contributions, grants, or other payments to UNRWA.  That law provides:

> Notwithstanding any other provision of any other division of this Act, funds appropriated or otherwise made available by this Act or other Acts making appropriations for the Department of State . . . may not be used for a contribution, grants, or other payment to the United Nations Relief and Works Agency, notwithstanding any other provision of law—
>
> (1) for any amounts provided in prior fiscal years or in fiscal year 2024; or
>
> (2) for amounts provided in fiscal year 2025, until March 25, 2025.

*Further Consolidated Appropriations Act, 2024*, Pub. L. No. 118-47, div. G, tit. III, § 301, 138 Stat. 460, 858 (2024).  Under this provision, all currently appropriated funds are prohibited from being provided to UNRWA.  Additionally, in the event that Congress appropriates future funding that could be made available to UNRWA, such funds cannot be provided to UNRWA until March 25, 2025, at the earliest.

Congress also enacted supplemental appropriations for the State Department on April 24, 2024.  *See* Israel Security Supplemental Appropriations Act, 2024, Pub. L. No. 118-50, div. A, tit. III, 138 Stat. 895, 899.  That law also makes clear that funding may not be provided to UNRWA:

> None of the funds appropriated or otherwise made available by this division and prior Acts making appropriations for the Department of State, foreign operations, and related programs may be made available for a contribution, grant, or other payment to the United Nations Relief and Works Agency, notwithstanding any other provision of law.

*Id.* § 308.

## III.   PROCEDURAL HISTORY

Plaintiffs, a member of Congress and three individuals, filed their original Complaint on December 20, 2022, challenging the provision of economic support funds to West Bank and Gaza as contrary to the Taylor Force Act.  *See* Compl., ECF No. 1.  The Complaint named only President Biden and the Secretary of State as defendants in their official capacities.  *Id.* ¶¶ 21-22.  Defendants

moved to dismiss the Complaint, *see* Defs.' Mem. in Supp. of their Mot. to Dismiss the Compl., ECF No. 20-1 ("MTD"), and this Court granted that motion in part and denied it in part—concluding that Plaintiffs' claim under the Administrative Procedure Act (APA) could proceed, but dismissing their *ultra vires* claim.  Mem. Op. & Order, ECF No. 38 ("MTD Op. & Order").

After this Court's ruling on the motion to dismiss, on March 22, 2024, Plaintiffs sought leave to amend their Complaint, including to add new allegations about events occurring after the filing of their original Complaint.  *See* ECF No. 41.  This Court granted leave on March 25, 2024, *see* Order, ECF No. 42, and Plaintiffs' Amended Complaint was docketed later that day.  *See* Am. Compl.

The Amended Complaint again asserts a single count under the APA against only the President and the Secretary of State.  *Id.* ¶¶ 102-112.  Rather than challenging only the provision of economic support funds, however, the Amended Complaint now frames the claim as challenging the reversal of the "Trump Policy," which Plaintiffs define as the decision to "terminate[] Economic Support Fund awards in the West Bank and Gaza and cease[] contributions to the United Nations Relief Works Agency in 2018[.]" *Id.* ¶¶ 1-3.  Plaintiffs allege that "Defendants' decision to reverse the Trump Policy and change the *status quo ante* by making over $ 1.4 billion in Economic Support Fund awards and contributions to the United Nations Relief Works Agency was unlawful" for at least six reasons.  *Id.* ¶ 111.  Accordingly, they seek a declaration that all such awards and contributions are unlawful, and "[a]n injunction barring the Defendants from reversing the Trump Policy and making any Economic Support Funds awards available for assistance in the West Bank and Gaza and/or any contribution to the United Nations Relief Works Agency unless and until they comply with the [APA]." *Id.* at 32, ¶ E.

## LEGAL STANDARD

Defendants hereby move to dismiss the Amended Complaint for lack of subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  Plaintiffs bear the burden of showing subject-matter jurisdiction, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Additionally, because "standing is

not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

"A trial court may find that subject matter jurisdiction is lacking based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011) (citation omitted). "When a motion to dismiss is decided solely on the pleadings, the plaintiff is entitled to a generous construction similar to a 12(b)(6) dismissal." *In re S. Recycling, LLC*, 982 F.3d 374, 381 n.1 (5th Cir. 2020); *see also Randall D. Wolcott*, 635 F.3d at 763 (discussing the Rule 12(b)(6) standards, including "accepting all well-pleaded facts as true" but remaining free to "rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

## **ARGUMENT**

Defendants continue to believe that Plaintiffs' Amended Complaint should be dismissed for each of the threshold reasons set forth in their prior motion to dismiss, *see* MTD, and Defendants reserve the right to renew those arguments at a later stage in this proceeding. Defendants recognize, however, that the Court previously rejected several of those arguments in connection with their prior motion to dismiss. *See* MTD Op. & Order. Accordingly, Defendants raise in this motion only those arguments specific to the Amended Complaint that were not previously considered.

In particular, Plaintiffs' expanded Amended Complaint suffers from two fundamental defects. First, Plaintiffs lack standing to raise their challenge to UNRWA contributions. Plaintiffs were not plausibly suffering any injury from UNRWA contributions at the time they filed their Amended Complaint, given that no such contributions were occurring and Congress had affirmatively prohibited such contributions. Even if mootness (rather than standing) were the appropriate framework, their UNRWA challenge would plainly be moot.

13

Second, Plaintiffs' Amended Complaint now purports to bring an even more amorphous claim—challenging reversal of the so-called "Trump Policy," which Plaintiffs define as the decision to "terminate[] Economic Support Fund awards in the West Bank and Gaza and cease[] contributions to the United Nations Relief Works Agency in 2018." Am. Compl. ¶ 1.  But Plaintiffs' own Amended Complaint demonstrates that there was no single "Trump Policy" announced in 2018, let alone a singular decision to "change[] the Trump Policy when [Defendants] took power on January 20, 2021." *Id.* ¶ 3.  Instead, the decisions about when and how to provide contributions to UNRWA and economic support funds for the West Bank and Gaza occurred at numerous different points in times, and by multiple different decisionmakers—such as Congress, the State Department, and USAID. Plaintiffs' expanded Amended Complaint has thus recast their single claim at an even higher level of generality, thereby creating an impermissible programmatic challenge over which this Court also lacks jurisdiction.  *See Sierra Club v. Peterson*, 228 F.3d 559, 569-70 (5th Cir. 2000) (en banc) (holding that a district court lacked jurisdiction over a programmatic challenge, because "[u]nder the APA, the district court only had jurisdiction over challenges to identifiable final agency actions").

I.   **THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CHALLENGE TO UNRWA CONTRIBUTIONS**

A.   **Plaintiffs Lacked Standing at the Time They Filed Their UNRWA Challenge**

Plaintiffs lack standing to challenge the State Department's contributions to UNRWA because by the time this claim was presented in Plaintiffs' Amended Complaint—filed on March 25, 2024— the State Department had already stopped providing such contributions for almost two months, and Congress had further prohibited the State Department from using any appropriated funds to make such contributions.  The challenged conduct had already ceased, and therefore Plaintiffs were not suffering any injury-in-fact at the time they brought their claim.

"[T]he irreducible constitutional minimum of standing contains three elements," one of which is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest

which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted).  Normally, standing is evaluated "at the outset of the litigation."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Thus, when a plaintiff files a lawsuit seeking prospective relief against conduct that has already stopped, courts routinely hold that the plaintiff lacks a cognizable injury-in-fact.  *See, e.g., id.* at 191; *Renne v. Geary*, 501 U.S. 312, 320 (1991); *see also Lutostanski v. Brown*, 88 F.4th 582, 587 (5th Cir. 2023) ("[A] single instance of past harm cannot support a claim in federal court for forward-looking injunctive relief." (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983))).

Although standing is normally evaluated at the outset of a case, here standing for Plaintiffs' UNRWA challenge is evaluated at the time that challenge was first presented—*i.e.*, at the time of Plaintiffs' Amended Complaint.  *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."); *Price v. Medicaid Dir.*, 838 F.3d 739, 746 (6th Cir. 2016) ("The plaintiffs have standing to assert only the claims they had standing to assert when the claims themselves were first pled."); *Arizona v. Garland*, --- F. Supp. 3d ----, 2024 WL 1645417, at *9 n.13 (W.D. La. Apr. 16, 2024) ("[W]here, as here, Plaintiffs amended the complaint, the Supreme Court has held that standing is assessed as of the time of the amendment."); *Eternal Word Television Network, Inc. v. Sebelius*, 935 F. Supp. 2d 1196, 1214 n.16 (N.D. Ala. 2013) ("Certainly, were [plaintiff] to add new claims, standing for those claims would be assessed as of [the date of the amended complaint].");  *see also, e.g., Greenberg v. Lehocky*, 81 F.4th 376, 384 n.4 (3d Cir. 2023), *petition for cert. docketed,* No. 23-833 (U.S. Feb. 2, 2024).

Plaintiffs plainly lacked standing over the UNRWA challenge at the time their Amended Complaint was filed on March 25, 2024.  *See* Am. Compl.  By that point, the State Department had already paused UNRWA contributions two months prior (as announced on January 26, 2024); and

just two days earlier (on March 23, 2024), Congress had prohibited the State Department from using *any* currently appropriated funds to make contributions to UNRWA.  *See* Background, Part II.B, *supra*. Thus, Plaintiffs were not plausibly suffering any injury-in-fact as of March 25.

Indeed, this situation is indistinguishable from the Fifth Circuit's decision in *Fontenot v. McCraw*, 777 F.3d 741 (5th Cir. 2015).  There, the plaintiff would have had standing for a claim at the time the lawsuit was originally filed, but by the time she amended her complaint to add the claim against the Director of the Texas Department of Public Safety, the Director "had already provided a complete remedy for [the plaintiff's] claim" and she therefore lacked standing to raise it.  *Id.* at 746-47.  Similarly here, by the time Plaintiffs amended their Complaint to add the UNRWA allegations, the challenged conduct had already stopped and therefore they lack standing to seek relief against such conduct.[2]

Nor can Plaintiffs claim that they have standing based on the hypothetical risk that, at some point in the future, the State Department might resume providing contributions to UNRWA.  Any such theory fails because a claimed injury "cannot be speculative, conjectural, or hypothetical." *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)), *cert. denied*, 144 S. Ct. 188 (2023).  An injury must be "*certainly impending*" to constitute injury-in-fact, and "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409

---

[2] Some courts have evaluated standing at the time of the original complaint when the amended complaint's allegations "relate back" under Rule 15(c).  *See, e.g.*, *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003); *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1236 (N.D. Fla. 2019).  Even if that were the correct analysis, however, Plaintiffs' UNRWA claim plainly does not relate back to their original complaint's claims regarding only economic support funds subject to the Taylor Force Act.  The two funding programs are distinct, *see* Part II, *infra*, and Plaintiffs' original Complaint said nothing about the invalidity of UNRWA contributions, which are not funded from economic support funds and therefore not subject to the Taylor Force Act.  *See McGregor v. La. State Univ. Bd. of Supervisors* 3 F.3d 850, 864 (5th Cir. 1993) (holding that an "amendment attempt[ing] to add a new legal theory unsupported by factual claims raised in the original complaint" does not relate back under Rule 15).  Moreover, the UNRWA claim is based in part on events occurring *after* the filing of the original complaint—as Plaintiffs themselves have acknowledged, *see* Pls.' Mot. for Leave ¶ 3— and courts agree that standing to raise claims in supplemental pleadings must be evaluated as of the time of that pleading.  *See, e.g.*, *Lutter v. JNESO*, 86 F.4th 111, 126 (3d Cir. 2023).

(citation omitted); *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (observing that courts dismiss as unfit for judicial review cases based on "contingent future events that may not occur as anticipated, or indeed may not occur at all" (citation omitted)).

There are currently no appropriated funds that the State Department could provide to UNRWA. And any future appropriated funds, which would necessarily require Congress to pass a new appropriations act, cannot be provided to UNRWA until, at the earliest, March 2025—over ten months away. Thus, any possible future injury relies on a chain of speculative assumptions, namely that: (1) Congress will appropriate funding in the future that is legally available for the State Department to make contributions to UNRWA, notwithstanding that the past two appropriations acts have included such restrictions; (2) the State Department's own position in March 2025 will have changed from its current position such that the State Department will conclude that providing contributions to UNRWA is appropriate, notwithstanding the January 2024 pause; and (3) there will have been no other changes in the factual or legal landscape such that the State Department's decision to provide contributions in March 2025 is materially the same as its prior decisions to provide contributions that Plaintiffs challenge here. Any one of these contingencies, by itself, demonstrates that this theory is too speculative to satisfy Article III, particularly in the face of ample precedent recognizing that Plaintiffs cannot establish injury from hypothetical future legislative or agency action. *See, e.g., Am. Fed'n of Gov't Emps. v. United States*, 634 F. Supp. 336, 340 (D.D.C. 1986) ("[W]e know of no case in which a plaintiff has successfully argued that he had standing because he was likely to be injured by legislation that had not yet been passed."), *aff'd sub nom., Bowsher v. Am. Fed'n of Gov't Emps*, 479 U.S. 801 (1986); *Louisiana ex. rel. Landry v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) ("It is well accepted that the mere 'possibility of regulation' fails to satisfy injury in fact."); *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) (declining to "speculate about future actions by

policymakers," particularly where the policy is "controversial" and "[i]ntervening events . . . are unpredictable" such that "[t]he content of any future regulation is currently unknowable").

In short, the appropriate time for evaluating Plaintiffs' injury-in-fact with respect to their UNRWA challenge is when that challenge was first pled in the Amended Complaint on March 25, 2024. But the challenged conduct had already stopped by that point, and it is wholly speculative whether or how it might resume. Thus, Plaintiffs lack standing to pursue their UNRWA claims.

### B.    Alternatively, Plaintiffs' UNRWA Challenge Is Moot

Even if this Court concluded that mootness (rather than standing) were the correct framework, Plaintiffs' UNRWA challenge would also be moot. Here, Congress has affirmatively prohibited the State Department from using any appropriated funding to provide contributions, grants, or other payments to UNRWA. Courts routinely hold that intervening legislation stopping the challenged practice renders a case moot. *See Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546, 564 (5th Cir. 2006) ("[S]tatutory changes that discontinue a challenged practice are usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed." (quotation omitted)); *see also Daves v. Dallas Cnty.*, No. 18-cv-154, 2022 WL 2473364, at *4 (N.D. Tex. July 6, 2022), *aff'd in relevant part*, 64 F.4th 616, 634 (5th Cir. 2023) (en banc), *cert. denied*, 144 S. Ct. 548 (2024); *AT&T Commc'ns of Sw., Inc. v. City of Austin,* 235 F.3d 241, 244 (5th Cir. 2000); *Bowles v. Blue Lake Dev. Corp.,* 504 F.2d 1094, 1098 (5th Cir. 1974). Now that Congress has foreclosed providing contributions or other funding to UNRWA, there is no live dispute before this Court.

Nor would any exception to mootness apply. The exception for voluntary cessation is generally inapplicable to legislative amendment cases. *See Amawi v. Paxton*, 956 F.3d 816, 821 (5th Cir. 2020); *see also Daves*, 64 F.4th at 634; *Fantasy Ranch*, 459 F.3d at 564. And in any event, no conceivable litigation posturing occurred here given that the State Department paused contributions to UNRWA in January 2024, two months before Plaintiffs added their UNRWA challenge to this suit.

Plaintiffs' challenge also does not qualify as capable of repetition but evading review. There is nothing about UNRWA contributions that makes the "challenged action . . . 'inherently capable of evading review,' meaning it 'is always so short as to evade review.'" *Schelske v. Austin*, No. 22-cv-49, 2023 WL 5986462, at \*13 (N.D. Tex. Sept. 14, 2023) (quoting *Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 399 (5th Cir. 2000) and *Spencer v. Kemna*, 523 U.S. 1, 18 (1998)). Moreover, there is only a "theoretical possibility," *Rhone v. City of Texas City*, 93 F.4th 762, 767 (5th Cir. 2024), that any future decision to restart UNRWA contributions would involve the same alleged flaws that Plaintiffs claim with respect to the State Department's past contributions. *See* Part I.A, *supra*. Even if viewed through the lens of mootness, then, this Court still lacks jurisdiction over the UNRWA challenge.

## II. PLAINTIFFS' AMENDED COMPLAINT PRESENTS AN EVEN MORE AMORPHOUS CLAIM, UNMOORED FROM DISCRETE, FINAL AGENCY ACTION

Apart from the lack of jurisdiction over Plaintiffs' UNRWA challenge, the single claim presented in their Amended Complaint independently fails because it does not challenge discrete, final agency action. Plaintiffs do not challenge a particular funding decision, nor do they limit their claim to a specific fiscal year or even a single funding program. Instead, they challenge Defendants' overall provision of economic support funds to West Bank and Gaza and contributions to UNRWA—which are separate programs, administered by multiple agencies, consisting of numerous discrete decisions— thereby highlighting the amorphous nature of their claims.

Under the APA, "the person claiming a right to sue must identify some 'agency action.'" *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020) (citation omitted). And "[a]s defined by § 551(13) of the APA, 'agency action' includes 'an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'" *Id.* (quoting 5 U.S.C. § 551(13)). Additionally, the APA permits review only over "final agency action," 5 U.S.C. § 704, which means that the action "must mark the consummation of the agency's decisionmaking process," and "the action must be one

by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

These final agency actions must be "circumscribed [and] discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004). The APA does not provide for "general judicial review of [an agency's] day-to-day-operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1999), like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (cited approvingly in *Louisiana*, 948 F.3d at 321). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club*, 228 F.3d at 566). This required "case-by-case approach" *Nat'l Wildlife Fed'n*, 497 U.S. at 894, allows the dispute to be "reduced to more manageable proportions, and its factual components fleshed out," *id.* at 891, which facilitates meaningful review.

Here, Plaintiffs' Amended Complaint does not challenge a discrete, final agency action, and instead seeks to superintend Defendants' funding decisions generally. Defendants raised a similar argument in their prior motion to dismiss, *see* MTD at 25-26, and this Court allowed Plaintiffs' prior claim to proceed, concluding that "Plaintiffs do not challenge *all* [economic support] funding to the West Bank and Gaza" and instead they objected only to certain awards of economic support funds. MTD Op. & Order at 10. But Plaintiffs' Amended Complaint is no longer limited to challenging only certain awards of economic support funds; instead, the Amended Complaint now contains a new, expanded claim presented at a still-higher level of generality.

Specifically, the Amended Complaint now contains a single claim framed as challenging "Defendants' decision to reverse the Trump Policy." Am. Compl. ¶ 111. The Amended Complaint defines the "Trump Policy" as the purported decision to "terminate[] Economic Support Fund awards

in the West Bank and Gaza and cease[] contributions to the United Nations Relief Works Agency in 2018[.]" *Id.* ¶ 1. And Plaintiffs allege that "Defendants arbitrarily, capriciously, and unlawfully changed the Trump Policy when they took power on January 20, 2021." *Id.* ¶ 3; *see id.* ¶ 50. But this framing of the Amended Complaint—purporting to challenge a single decision to reverse a prior policy—obscures that, in reality, Plaintiffs are challenging countless individual decisions, in connection with multiple different programs, over a multi-year period, some of which are still being made today. The Amended Complaint thus presents an even-more amorphous claim, suffering from numerous factual and legal defects.

*First*, the premise that there was a single "Trump Policy" put into effect in 2018 is contrary to Plaintiffs' own Amended Complaint. As discussed above, there was no single decision in 2018 to cease both economic support funding to West Bank and Gaza and UNRWA contributions; those two types of funding come from different sources, are administered by different agencies, and are subject to different legal frameworks. *See* Background, Parts I-II. Notably, the Taylor Force Act applies only to economic support funds (not UNRWA contributions, which are funded from other accounts), *see* 22 U.S.C. § 2378c-1(a), which further undermines Plaintiffs' notion that there was a single "Trump Policy" established in 2018 that governed both types of funding and was intended to "comply[] with the Taylor Force Act," Am. Compl. ¶ 1.

Even solely with respect to economic support funds, there was no single decision in 2018 to suspend those funds. Plaintiffs' prior claim in the Complaint was not tied to the purported "Trump Policy" (or the supposed reversal of the "Trump Policy"), and thus there was no need for the Court to address this issue previously. But now, the programmatic nature of Plaintiffs' challenge is apparent by virtue of its focus on the "Trump Policy," which did not exist as a discrete agency action even in 2018. Instead, there was (1) one or more decisions in August 2018 to reprogram FY2017 economic support funds from West Bank and Gaza to other priorities; (2) a simultaneous decision that, despite

this reprogramming, disbursement of FY2015 and FY2016 economic support funds would continue; (3) a decision *by Congress* in October 2018 to deem acceptance of economic support funds to be consent to personal jurisdiction in U.S. courts; and (4) a subsequent decision *by the Palestinian Authority* to stop accepting all economic support funds as of January 31, 2019. *See* Background, Part I.C.

As for the decision to end UNRWA contributions in 2018, the State Department described that decision as being based on UNWRA's "business model and fiscal practices" being "unsustainable," while still expressing openness to other forms of aid. 2018 State Dep't Press Release. Nothing about that announcement suggests a decision to end all forms of aid to organizations serving the West Bank and Gaza, much less a single decision intended (as Plaintiffs allege) to "end[] American taxpayer subsidies for Palestinian terrorism and comply[] with the Taylor Force Act." Am. Compl. ¶ 1. Thus, there was no single "Trump Policy" of not providing economic support funds and UNRWA contributions; there were multiple decisions, by multiple decisionmakers, occurring at different points in time—which highlights that this claim inherently targets programs, not a discrete agency action (let alone a final one). *Cf. Nat'l Wildlife Fed'n*, 497 U.S. at 890 ("The term 'land withdrawal review program' . . . does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM[.]").

*Second*, even if the "Trump Policy" were an isolated decision, Plaintiffs have not established that the agency action they wish to challenge—the supposed reversal of the "Trump Policy"— occurred through a discrete agency action subject to challenge. To the contrary, Plaintiffs again ignore that UNRWA contributions and economic support funds to the West Bank and Gaza are different programs governed by different legal regimes and decision-making processes, administered by different agencies. As discussed above, UNRWA contributions resumed in April 2021. *See* CRS, *U.S. Funding Pause*, at 2. With respect to economic support funds, however, any purported "reversal" of

the "Trump Policy" would have occurred through the series of actions in 2019 when (1) the Administration expressed openness to a legislative "fix" that would allow funding to West Bank and Gaza to resume; (2) Congress and the Administration enacted legislation in December 2019 removing the personal jurisdiction provision that had caused economic support funding to fully cease; and (3) through that same legislation directed that $75 million of FY2020 economic support funds be allocated to West Bank and Gaza.  Contrary to Plaintiffs' allegations, then, there was no single policy decision on January 20, 2021 to "reverse" a prior position, *see* Am. Compl. ¶¶ 3, 50—and thus no discrete "reversal" decision subject to APA challenge.

*Third*, even if the "Trump Policy" were a single decision that was reversed through a discrete agency action on January 20, 2021, that still would not allow for APA review.  Reversal of the "Trump Policy" does not, by itself, constitute a final agency action—*i.e.*, it would not mark the consummation of any funding decision, nor would it determine any legal rights or consequences with respect to any funds.  As discussed above (Background, Part I), the State Department's preliminary allocation and policy decisions have "no direct effect" on the disbursement of funds until after several more funding and implementation decisions are made.  *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992).

Moreover, Plaintiffs have not "suffered legal wrong because of" any purported reversal of the "Trump Policy."  *Louisiana*, 948 F.3d at 321.  They do not point to any harm caused by that preliminary policy decision allegedly occurring on January 20, 2021; instead, Plaintiffs claim harm from the multitude of *subsequent* decisions, *i.e.*, all of the funding that later flowed to UNRWA and to organizations within West Bank and Gaza.  *See* Am. Compl. ¶¶ 59-61, 63, 70-72, 93-96, 103-12.  But each contribution to UNRWA, and each award of economic support funds, is inherently unique: occurring at a particular moment in time, under a specific appropriations act, subject to that particular appropriations act's requirements and restrictions, and frequently intended to be used for a specific purpose or program.  Just as Plaintiffs cannot challenge an abstract policy decision supposedly

occurring on January 20, 2021, they likewise cannot bring a single APA claim seeking relief against each and every individualized funding decision that occurred after that date. *Cf. id.* ¶ 110.

In this respect, Plaintiffs' claim is indistinguishable from the numerous other programmatic challenges that courts have held to be improper.  Plaintiffs do not challenge a particular funding decision or award, and instead claim that "by changing the Trump Policy," Defendants are "facially violating" United States law.  *Id.* ¶ 109.  That is exactly what Justice Scalia's opinion in *National Wildlife Federation* rejected, in holding that plaintiffs could not challenge a single purported "program" that was in actuality made up of "1250 or so individual classification terminations and withdrawal revocations." 497 U.S. at 890 (cleaned up).  A plaintiff's obligation to limit their challenge to "some concrete action" applies regardless of whether they believe that "violation of the law is rampant within th[e] program." *Id.* at 891; *see also, e.g., Sierra Club*, 228 F.3d at 567 (rejecting a claim where plaintiffs did not "limit their challenge to individual sales," but instead "used these sales as evidence to support their sweeping argument that the Forest Service's 'on-the-ground' management of the Texas forests over the last twenty years violates the [law]"); *Vill. of Bald Head Island*, 714 F.3d at 194 (even where claims limited to specific project at specific physical location, plaintiffs could not challenge "implementation" of the project because it would require "general judicial review of the [agency's] day-to-day operations").

Indeed, Plaintiffs' claims here are not limited to a discrete universe of agency actions at all— they expressly seek to adjudicate Defendants' *ongoing* compliance with legal requirements.  *See, e.g.,* Am. Compl. at 32, ¶ (A) (requesting a declaration "that the Defendants . . . are in continuing violation of the Taylor Force Act"); *id.* ¶ (E) (requesting "[a]n injunction barring the Defendants from reversing the Trump Policy").  Seeking forward-looking relief against agency actions that have not yet occurred is a telltale sign of an impermissible programmatic challenge.  *See Alabama-Coushatta Tribe*, 757 F.3d at 490 ("These are allegations of past, ongoing, and future harms, seeking 'wholesale improvement' and cover actions that have yet to occur."); *Sierra Club*, 228 F.3d at 567-68.

24

Nor can Plaintiffs avoid dismissal simply by disavowing a challenge to *all* UNWRA contributions or economic support funds.  For one thing, this Court highlighted that option for Plaintiffs in the prior motion to dismiss opinion, yet Plaintiffs still chose to file an Amended Complaint that attacks the legality of all such funding.  *See, e.g.*, Am. Compl. ¶¶ 109-11.  Plaintiffs instead moved in the *opposite* direction—making their claim more amorphous—by asserting a single claim in their Amended Complaint combining economic support funds with UNRWA contributions.  And even if Plaintiffs excluded some isolated awards or contributions from the scope of their claim, that would not change its essential character—it is still seeking to challenge the overarching policy of providing contributions to UNRWA and economic support funds to West Bank and Gaza, rather than any specific, discrete contributions or awards within those programs.  Again, that is the hallmark of a programmatic challenge.  *See Alabama-Coushatta Tribe*, 757 F.3d at 490-91 ("The fact that the Tribe is not seeking wholesale reform of every single mineral permit, lease, or sale . . . does not diminish the scale of the relief sought . . . The challenge is to the way the Government administers these programs and not to a particular and identifiable action taken[.]").

In short, Plaintiffs cannot bring a single APA claim against the State Department and thereby obtain judicial review over multiple different funding programs, comprised of numerous individual funding decisions, made by multiple different agencies over a lengthy period of time.  Because Plaintiffs' Amended Complaint fails to challenge a discrete, final agency action taken by the State Department, the sole claim in the Amended Complaint should be dismissed.

## CONCLUSION

For the reasons stated herein, the Court should dismiss this action.

Dated:  May 9, 2024                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       *Principal Deputy Assistant Attorney General*

ALEXANDER K. HAAS
*Director*

DANIEL SCHWEI
*Special Counsel*

*/s/ Samuel Rebo*
SAMUEL REBO (DC Bar # 1780665)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 514-6582
Samuel.a.rebo@usdoj.gov
*Counsel for Defendants*

26