## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS,
## AMARILLO DIVISION

_____

DR. RONNY JACKSON, STUART and ROBBI
FORCE, and SARRI SINGER,

                        *Plaintiffs*,

      v.

JOSEPH R. BIDEN, JR., et al,               Civil Action No. 2:22-cv-241-Z

                    *Defendants*.

_____/

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
## PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF THE CASE ...................................................................................... 1

STANDARD OF REVIEW ............................................................................................ 8

ARGUMENT ............................................................................................................... 10

I.  The Taylor Force Act's "Limitation on Assistance to the West Bank and Gaza"
    — text and purpose ........................................................................................... 13

    A.  Subsection (a)(1) — "Limitation…In general" .......................................... 14

    B.  Subsection (b) — Exception ...................................................................... 15

    C.  Subsection (d) — Initial use and disposition of withheld funds ................ 18

II.  The Plaintiffs' proposed construction is consistent with the Taylor Force
     Act's subject matter and purpose. ...................................................................... 20

CONCLUSION ............................................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*Andrus v. Glover Constr. Co.,*
  446 U.S. 609 (1980) ................................................................................................ 12

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) .......................................................................................... 10

*Bostock v. Clayton Cnty., Georgia,*
  590 U.S. 644 (2020) ................................................................................................ 12

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) .................................................................................................. 9

*Comm'r v. Clark,*
  489 U.S. 726 (1989) ................................................................................................ 12

*D.C. v. Heller,*
  554 U.S. 570 (2008) ................................................................................................ 23

*Davis v. Michigan Dept. of Treasury,*
  489 U.S. 803 (1989) ................................................................................................ 10

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ................................................................................................ 14

*Hibbs v. Winn,*
  542 U.S. 88 (2004) .................................................................................................. 10

*Hillman v. Maretta,*
  569 U.S. 483 (2013) ................................................................................................ 16

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) .................................................................................................... 21

*In re DeBerry,*
  945 F.3d 943 (5th Cir. 2019) .................................................................................... 9

*In re Mirant Corp.,*
  378 F.3d 511 (5th Cir. 2004) .................................................................................. 17

*Kungys v. United States,*
  485 U.S. 759 (1988) ................................................................................................ 17

*Loper Bright Enters. v. Raimondo,*
  144 S. Ct. 2244 (2024) ...................................................................... 9, 11

*Pulsifer v. United States,*
  601 U.S. 124 (2024) ............................................................................ 10

*Schwegmann Bros. v. Calvert Distillers Corp.,*
  341 U.S. 384 (1951) ............................................................................ 12

*Shell Offshore Inc. v. Babbitt,*
  238 F.3d 622 (5th Cir. 2001) ................................................................. 9

*Texas v. United States Dep't of Transportation,*
  No. 5:23-CV-304-H, 2024 WL 1337375 (N.D. Tex. Mar. 27, 2024).......................... 9

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) .............................................................................. 17

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,*
  484 U.S. 365 (1988) ............................................................................ 10

*United States v. Johnson,*
  529 U.S. 52 (2000) .............................................................................. 17

*United States v. Palomares,*
  52 F.4th 640 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 1092 (2024) .................. 10, 14

*United States v. Rand,*
  924 F.3d 140 (5th Cir. 2019) ................................................................. 16

*Util. Air Regul. Grp. v. E.P.A.,*
  573 U.S. 302 (2014) ............................................................................ 10

*W. Virginia v. Env't Prot. Agency,*
  597 U.S. 697 (2022) ........................................................................ 10, 20

*Yates v. United States,*
  574 U.S. 528 (2015) .................................................................... 10, 12, 14

*Ysleta Del Sur Pueblo v. Texas,*
  596 U.S. 685 (2022) ............................................................................ 10

## Statutes

18 U.S.C. § 2339B(a)(1) ........................................................................ 21

22 U.S.C. § 2378c-1 ....................................................................... passim

Consolidated Appropriations Act, 2022,
    H.R. 2471, 117th Cong. § 7037 .............................................................. 22

Consolidated Appropriations Act, 2022,
    H.R. 2471, 117th Cong. § 7039 .............................................................. 22

Consolidated Appropriations Act, 2022,
    H.R. 2471, 117th Cong. § 7040 .............................................................. 22

Consolidated Appropriations Act, 2023,
    H.R. 2617, 117th Cong. § 7037 .............................................................. 22

Consolidated Appropriations Act, 2023,
    H.R. 2617, 117th Cong. § 7039 .............................................................. 22

Consolidated Appropriations Act, 2023,
    H.R. 2617, 117th Cong. § 7040 .............................................................. 22

Further Consolidated Appropriations Act, 2024,
    H.R. 2882, 118th Cong. § 7037 ...................................................... 21, 23

Further Consolidated Appropriations Act, 2024,
    H.R. 2882, 118th Cong. § 7039 .............................................................. 21

Further Consolidated Appropriations Act, 2024,
    H.R. 2882, 118th Cong. § 7040 ............................................... 13, 21, 23

Further Consolidated Appropriations Act, 2024,
    H.R. 2882, 118th Cong. § 7073 .............................................................. 22

## Other Authorities

163 CONG. REC. H9650 (daily ed. Dec. 5, 2017) (statement of Rep. Engel)
    (available at https://perma.cc/4LCM-92Y6) ........................................ 23

163 CONG. REC. H9650 (daily ed. Dec. 5, 2017) (statement of Rep. Royce)
    (available at https://perma.cc/4LCM-92Y6) ........................................ 24

163 CONG. REC. H9652 (daily ed. Dec. 5, 2017) (statement of Rep. Gottheimer)
    (available at https://perma.cc/4LCM-92Y6) ........................................ 22

*Al-Haq Position Paper on the Law by Decree No. 7 of 2021 Concerning the*
    *Amendment of the Law No. 1 of 2000 on Charitable Associations and Civil Society*
    *Organisations and Its Amendments*, AL-HAQ (Mar. 10, 2021),
    https://perma.cc/SY3P-AN62 .................................................................. 6

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
(2012) ................................................................................................................ 17, 20

*Benefit*, MERRIAM-WEBSTER.COM (2024), https://perma.cc/J3DS-ZTT7 .................... 15

*Biden Blasts Palestinians for Not Condemning Stabbing*, CBS NEWS (Mar. 9, 2016),
https://perma.cc/YG2R-KFPN ................................................................................ 1

Declaration of Principles on Interim Self-Government Arrangements,
Sept. 13, 1993, 32 I.L.M. 1525 (Oslo I Accord) .............................................. 1, 12, 24

*Direct*, MERRIAM-WEBSTER.COM (2024), https://perma.cc/RQR9-MSC4 ................... 15

*Directly*, MERRIAM-WEBSTER.COM (2024), https://perma.cc/TD23-YE2N ................. 15

Dore Feith, *A New Palestinian Authority NGO Decree Might Halt US Aid to the
West Bank and Gaza*, MIDEAST SEC. AND POL'Y STUD. NO. 197, Aug. 2021
(available at https://perma.cc/7A7U-XJNS) ............................................................ 6

Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 26, 2001) .................................... 21

Interim Agreement on the West Bank and the Gaza Strip,
Sept. 28, 1995, 36 I.L.M. 551 (Oslo II Accord) .............................................. 2, 12, 24

Oren Liebermann et al., *American Fatally Stabbed in Israel Terror Attack That
Wounds 10 Others*, CNN (Mar. 9, 2016), https://perma.cc/G2Z5-QMP6 ................. 1

*U.S. Foreign Assistance By Country: West Bank and Gaza*, FOREIGNASSISTANCE.GOV,
https://perma.cc/8HUF-W9EU ................................................................................ 7

*U.S. Relations With Palestinian Territories*, U.S. DEP'T STATE,
https://perma.cc/4MZ7-CXUU ......................................................................... 7, 24

## STATEMENT OF THE CASE

Plaintiffs move for partial summary judgment on the grounds that the Defendants' Economic Support Fund awards to Gaza and the West Bank[1] violate the Taylor Force Act. First Amend. Compl. ¶ 111(f) and (g), ECF No. 43.

These facts are material and undisputed.[2]

Taylor Force was a West Point graduate and United States Army veteran of Iraq and Afghanistan. Answer ¶ 35, ECF No. 61.

On March 8, 2016, Mr. Force, who was visiting Israel as part of his graduate business program at Vanderbilt University, was stabbed to death by a Palestinian terrorist. The Palestinian Authority celebrated his murder and extolled his killer. First. Am. Compl. ¶¶ 35–40.[3]

The Palestinian Authority is responsible for basic education and culture, health, social welfare, economic development, infrastructure, and tourism-related services for the Palestinian people in most of the West Bank and all of Gaza. Answer ¶ 6; *see also* Declaration of Principles on Interim Self-Government Arrangements, Sept. 13, 1993, 32 I.L.M. 1525 (Oslo I Accord), Exhibit 1, App. 5–23; Interim Agree-

---

[1] The Defendants use the term "West Bank" as a shorthand reference for the land area west of the Jordan River that was occupied by the Kingdom of Jordan in 1948 after its attack against the nascent state of Israel. However, from biblical times, this area has been called Judea and Samaria.

[2] The Plaintiffs incorporate by reference the relevant findings in ECF Nos. 38 and 58.

[3] *Compare* Answer ¶¶ 36–40, *with* Oren Liebermann et al., *American Fatally Stabbed in Israel Terror Attack That Wounds 10 Others*, CNN (Mar. 9, 2016), https://perma.cc/G2Z5-QMP6. Reportedly, the terrorist acts occurred "not far from where U.S. Vice President Joe Biden was visiting" who "condemned in the strongest possible terms the brutal attack[.]" *Id*. Defendant Biden "chastised Palestinian leaders" the next day for not condemning the murder. *Biden Blasts Palestinians for Not Condemning Stabbing*, CBS News (Mar. 9, 2016), https://perma.cc/YG2R-KFPN.

ment on the West Bank and the Gaza Strip, Sept. 28, 1995, 36 I.L.M. 551 (Oslo II

Accord), Exhibit 2, App. 24–55. At all times relevant, the Palestinian Authority has,

*inter alia*, incited terrorism and then financially supported the perpetrators through

a program of sliding-scale bounty payments to terrorists and their families based on

the number of Jews, Israelis, and/or tourists killed or maimed (the "pay-to-slay" or

"prisoner and martyr" payments). For example, the Plaintiffs allege that:

- The official Facebook page of Fatah, the Palestinian Authority's ruling party, called the terrorist who murdered Mr. Force a "heroic Martyr" and the Palestinian Authority-controlled news agency said that he "died as a Martyr on March 8 [2016], after carrying out a stabbing operation in Jaffa, in which he killed an American tourist." First Amend. Compl. ¶¶ 39–40.

- Pay-to-slay payments are made through an entity called "the Institution for Families of Martyrs [sic] and the Injured." To claim their money, the families of deceased terrorists apply with information about the deceased, the date, place, and circumstances of death, the number of Jews, Israelis, or others killed, and proof of death. Between 2013 and 2020, the Palestinian Authority paid out over $1.5 billion through this program. *Id.* ¶ 25.

- The Palestinians who engaged in the bestial orgy of murder, rape (including the rape of dead bodies), mutilation, binding and burning of live persons, and theft on October 7, 2023, and/or their family members will receive pay-to-slay bounties from the Palestinian Authority. *Id.* ¶ 26. As of March 4, 2024, the Palestinian Authority was estimated to become responsible for an additional $97 million in pay-to-slay payments to the October 7 terrorists. *Id.* ¶ 100.

- On or about June 5, 2021, Palestinian Authority "president" Mahmoud Abbas authorized a pay-to-slay payment of $42,000 to the family of a terrorist who killed two Israelis. Laila Ghannam, governor of Ramallah's Al-Bireh district, personally handed the money to the family of Muhannad Al-Halabi, a member of the Palestinian Islamic Jihad terror group. Al-Halabi fatally stabbed two Israeli civilians in 2015 before being shot by police. *Id.* ¶ 64.

- On or about July 31, 2022, the Palestinian Authority celebrated the twentieth anniversary of the Hebrew University's Frank Sinatra Cafeteria bombing that killed nine people, including five Americans, and injured more than 80, by announcing a fifteen percent increase in its

monthly payments to the terrorists responsible for the attack. At that point, pay-to-slay payments to the persons responsible for the attack totaled approximately $2.6 million. *Id.* ¶ 84.

- The Palestinian Authority, through its official news organ, Al-Hayat Al-Jadida, said Jerusalem "has been Palestinian since it was established 5,000 years ago," that "Jerusalem is Jerusalem of the Arab Palestinians ... [that] belongs only to believers of the religion of Islam," and that it is necessary to "expel from it the Zionist herds who are stealing the Palestinian land and Judaism to their lairs [sic], until it will be liberated peacefully or through other means of struggle." *Id.* ¶ 75.

- On January 7, 2024, the official Palestinian Authority daily Al-Hayat Al-Jadida described the perpetrators of these atrocities as "stars who do not disappear from our skies" and said that they "perfume our land with their deep-red and fragrant blood, and they are more honored than us all." *Id.* ¶ 27.

- U.S. intelligence agencies with ties to the Palestinian Authority's security forces were aware throughout 2023 that the increased flow of United States and other international aid into Gaza and the West Bank was substantially enhancing Hamas's offensive rocket and defensive tunnel capabilities, through diversion, theft, and other methods, and funding a substantial increase in West Bank violence. *Id.* ¶ 98.

- The United States Government has had actual knowledge that Economic Support Fund awards support Palestinian terrorism. Multiple agencies have known for years that Hamas personnel, terror tunnels, rockets, weapon procurement, and command and control infrastructure were supported and subsidized by United States Government aid to Gaza and the West Bank. *Id.* ¶ 2.

The Defendants do not deny any of this. Instead, they plead ignorance. *See* Answer

¶¶ 2, 25–27, 64, 75, 84, 98, 100.[4]

---

[4] The Defendants' claimed lack of information regarding these allegations is puzzling. First, they admit collaborating with and supporting the Palestinian Authority since taking power in January 2021, even opening a separate office for "Palestinian" affairs in the U.S. Embassy in Jerusalem, Israel, that provides "direct diplomatic reporting" to and receives direct guidance from the Department of State's Special Representative for Palestinian Affairs and the Near Eastern Affairs Bureau's Front Office, not the U.S. Ambassador to Israel. *See, e.g.*, Answer ¶¶ 51–53, 62, 68, 71, 81. Second, they concede tracking and reporting to Congress the amount of the Palestinians' pay-to-slay payments. *Id.* ¶ 80. Third, the Defendants are the President and the Secretary of State. Yet they claim not to know if there is information in the

Responding to Mr. Force's murder, and to decades of direct and indirect Palestinian Authority support for terrorism, Congress passed, and President Donald J. Trump signed, the Taylor Force Act, Pub. L. No. 115–141, 132 Stat. 1143 (Mar. 23, 2018), Exhibit 3, App. 56–62; *see* Answer ¶ 41. In enacting this law, Congress found that:

> (1) The Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror;

> (2) The United States does not provide direct budgetary support to the Palestinian Authority but … does pay certain debts held by the Palestinian Authority and funds programs for which the Palestinian Authority would otherwise be responsible;

> (3) The United States Government supports community-based programs in the West Bank and Gaza that provide for basic human needs, such as food, water, health, shelter, protection, education, and livelihoods and that promote peace and development; and

> (4) Since fiscal year 2015, annual appropriations legislation has mandated the reduction of Economic Support Fund aid for the Palestinian Authority as a result of their payments for acts of terrorism.

Pub. L. 115–141, § 1002, 132 Stat. 1143, 1143 (2018), Ex. 3, App. 58.

The Taylor Force Act is codified at 22 U.S.C. § 2378c-1. It states that Economic Support Funds made "available for assistance for the West Bank and Gaza that directly benefits the Palestinian Authority shall only be made available for such

---

hands of the Central Intelligence Agency and other U.S. intelligence agencies with ties to the Palestinian Authority's security forces regarding the role played by U.S. aid in subsidizing Palestinian terrorism. *Id.* ¶¶ 2, 98. Against this background, some skepticism seems facially reasonable.

purpose" if the Secretary of State certifies in writing continuous compliance with four conditions precedent that the Palestinian Authority:

- Is "taking credible steps to end acts of violence against Israeli citizens and United States citizens that are perpetrated or materially assisted by individuals under their jurisdictional control, such as the March 2016 attack that killed former United States Army officer Taylor Force, a veteran of the wars in Iraq and Afghanistan;" *and*

- Has "terminated payments for acts of terrorism against Israeli citizens and United States citizens to any individual, after being fairly tried, who has been imprisoned for such acts of terrorism and to any individual who died committing such acts of terrorism, including to a family member of such individuals;" *and*

- Has "revoked any law, decree, regulation, or document authorizing or implementing a system of compensation for imprisoned individuals that uses the sentence or period of incarceration of an individual imprisoned for an act of terrorism to determine the level of compensation paid, or have taken comparable action that has the effect of invalidating any such law, decree, regulation, or document;" *and*

- Is "publicly condemning such acts of violence and are taking steps to investigate or are cooperating in investigations of such acts to bring the perpetrators to justice."

22 U.S.C. § 2378c-1(a)(1)(A)–(D). This assistance limitation does not apply to payments made to the East Jerusalem Hospital Network, assistance for wastewater projects not exceeding $5,000,000 in any one fiscal year, and assistance for any other program, project, or activity that provides vaccinations to children not exceeding $500,000 in any one fiscal year. § 2378c-1(b).

The Secretary of State has never made the requisite certification because the Palestinian Authority has never satisfied these conditions. Answer ¶¶ 18a, 24–25, 46, 58, 85; First Am. Compl. ¶¶ 26–27, 57, 84, 87, 91.

On or about August 2018, the Trump Administration terminated Economic Support Fund assistance for the West Bank and Gaza. Answer ¶¶ 1, 47.

Defendant Biden, when he was a candidate for president, pledged to restore assistance for the Palestinians. Answer ¶ 48.

Biden took power on January 20, 2021. On or before February 7, 2021, the Palestinian Authority was advised by an authorized U.S. government official that the Defendants had "reaffirmed" that aid would be restored. Answer ¶ 51.

On or before March 1, 2021, the Defendants sought a license to conduct activities in the West Bank and Gaza that would "otherwise be prohibited by the Global Terrorist Sanctions Regulations and the Foreign Terrorist Organization Sanctions Regulations." Answer ¶¶ 52. The Defendants' stated purpose was the "development of the Palestinian economy, civil society, and other private and public institutions [to help] improve the lives of Palestinians and ensure the viability of a future Palestinian state." Answer ¶ 53.

On or about March 3, 2021, the Palestinian Authority issued "Law-by-Decree No. 7/2021" regulating non-governmental organizations operating within the West Bank and Gaza. Answer ¶ 56.[5]

On December 14, 2021, the Defendants issued a Joint Statement on the U.S.-Palestinian Economic Dialogue. It stated, in relevant part, that:

- The "Participants recognized the importance of restored political and economic relations between the U.S. government and the Palestinian

---

[5] The parties dispute the reach and effect of this decree. However, for background, see Dore Feith, *A New Palestinian Authority NGO Decree Might Halt US Aid to the West Bank and Gaza*, MIDEAST SEC. AND POL'Y STUD. NO. 197, Aug. 2021 (available at https://perma.cc/7A7U-XJNS); *Al-Haq Position Paper on the Law by Decree No. 7 of 2021 Concerning the Amendment of the Law No. 1 of 2000 on Charitable Associations and Civil Society Organisations and Its Amendments*, AL-HAQ (Mar. 10, 2021), https://perma.cc/SY3P-AN62.

Authority and pledged to expand and deepen cooperation and coordination across a range of sectors."

- "[S]enior U.S. and Palestinian officials discussed key topics, including infrastructure development, access to U.S. markets, U.S. regulations, free trade, financial issues, renewable energy and environmental initiatives, connecting Palestinian and American businesses, and addressing obstacles to Palestinian economic development."

- "The U.S. government outlined programs that could support the Palestinian Authority's efforts towards financial issues, trade, and promoting foreign direct investment. This year's dialogue was a testament to the importance of U.S.-Palestinian economic relations and the opportunity to increase collaboration on economic issues of shared importance."

Answer ¶ 68.

The Defendants admit undertaking "shared efforts with the Palestinian Authority" to "reduce poverty, corruption, and unemployment and renew economic stability for the benefit of the Palestinian people." *U.S. Relations With Palestinian Territories*, U.S. DEP'T STATE, https://perma.cc/4MZ7-CXUU. These shared efforts have included Economic Support Funds for projects, programs, and activities for which the Palestinian Authority itself would otherwise be responsible. Answer ¶¶ 9, 59, 68–71, 93–94. Specifically, the Defendants report making $154,291,184 in Economic Support Funds available for assistance in the West Bank and Gaza between April 2021 and the present. *U.S. Foreign Assistance By Country: West Bank and Gaza*, FOREIGNASSISTANCE.GOV, https://perma.cc/8HUF-W9EU.[6] Specifically, the Defendants' data is:

---

[6] The data from ForeignAssistance.gov has been compiled into Exhibit 4, Economic Support Fund Awards in the West Bank and Gaza, App. 63–95.

- 46 Economic Support Fund awards made directly to the "Governance" in the West Bank and Gaza totaling $118,436,585. Exhibit 4A, App. 63–66.

- 20 Economic Support Fund awards for basic education and culture projects, programs, and activities totaling $48,815,699. Exhibit 4B, App. 67–70.

- 14 Economic Support Fund awards for public health projects, programs, and activities totaling $84,192,000. Exhibit 4C, App. 71–72.

- 13 Economic Support Fund awards for social services projects, programs, and activities totaling $34,431,309. Exhibit 4D, App. 73–75.

- 34 Economic Support Fund awards for economic development projects, programs, and activities totaling $114,680,668. Exhibit 4E, App. 76–79.

- 25 Economic Support Fund awards for infrastructure projects, programs, and activities totaling $20,129,069. Exhibit 4F, App. 80–83.

- 3 Economic Support Fund awards for security projects, programs, and activities totaling $4,211,079. Exhibit 4G, App. 84–85.

- 24 Economic Support Fund awards made for projects, programs, and activities that have been excepted from the assistance limitation by subsection (b) of the Act, totaling $124,247,063, Exhibit 4H, App. 86–88, but exceeding the $5,000,000 limit for wastewater projects in fiscal years 2022 and 2023. *See* Exhibits 4I, 4J, App. 89–93.

## STANDARD OF REVIEW

The Court should grant the Plaintiffs' motion for partial summary judgment if the record shows there is no genuine issue as to any material fact and the Plaintiffs

are entitled to judgment as a matter of law. *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001) (quoting FED. R. CIV. P. 56).

The Plaintiffs allege, *inter alia*, that the Defendants have acted in excess of their statutory authority. First Amend. Compl. ¶ 111(f). Accordingly, the Administrative Procedure Act provides the relevant standard of review. *Texas v. United States Dep't of Transportation*, No. 5:23-CV-304-H, 2024 WL 1337375, at *6 (N.D. Tex. Mar. 27, 2024) (citing *Shell Offshore Inc.*, 238 F.3d at 627). In such cases, the Court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority" and should set aside agency action it deems inconsistent with the Act. 5 U.S.C. § 706(2)(A), (C); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261, 2273 (2024) (overruling *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). It should not defer to the Defendants' statutory interpretation but should decide for itself "whether the law means what the" Defendants say. *Id.* at 2261.

The Court's analysis, of course, begins with the Taylor Force Act's text. *In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha.") Statutory construction is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme because, for example, the same terminology is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law. *See United*

*Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (Scalia, J.) (citations omitted).

Accordingly, the Taylor Force Act's words and phrases should not be construed in isolation but read in their context and with a view to their place in the overall statutory scheme. *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014); *United States v. Palomares*, 52 F.4th 640, 642–43 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 1092 (2024); *see also Pulsifer v. United States*, 601 U.S. 124, 133 (2024) (choosing between "two grammatically permissible ways" to read a sentencing statute "by reviewing text in context"); *Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring); *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022); *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989). The Act's titles and headings can be useful tools for shedding light and resolving doubts about the relevant context and purpose. *Yates v. United States*, 574 U.S. 528, 540 (2015). Finally, the statute should be construed so that effect is given to all its operative provisions — the rule against superfluities complements the principle that courts are to interpret the words of a statute in context. *Hibbs v. Winn*, 542 U.S. 88, 101 (2004); *see also Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698–99 (2022).

## ARGUMENT

Named for a young American murdered by a Palestinian terrorist, the Taylor Force Act was enacted to limit U.S. taxpayer-funded assistance to the West Bank and Gaza. *See* 22 U.S.C. § 2378c-1. It provides that "Funds authorized to be appropriated or otherwise made available for assistance under chapter 4 of part II of the Foreign

Assistance Act of 1961 (22 U.S.C. 2346 et seq.; relating to Economic Support Fund) and available for assistance for the West Bank and Gaza that directly benefits the Palestinian Authority" may only be made available if the Secretary of State certifies that the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations comply with four specific anti-terrorism conditions. *See* 22 U.S.C. § 2378c-1(a)(1)(A)–(D). The Act has three, and only three, exceptions to the limitation: (A) payments made to the East Jerusalem Hospital Network; (B) assistance for wastewater projects not exceeding $5,000,000 in any one fiscal year; and (C) assistance for any other program, project, or activity that provides vaccinations to children not exceeding $500,000 in any one fiscal year. 22 U.S.C. § 2378c-1(b)(1).

The general limitation applies here without doubt because the Palestinian Authority continues to pay terrorists to slay Israelis and Americans. *See* Answer ¶¶ 24, 46, 58. Therefore, the sole interpretative question presented is whether subsection (a)(1)'s phrase "that directly benefits the Palestinian Authority" is a loop-hole through which the Defendants may lawfully drive over $150 million dollars of Economic Support Fund assistance into the West Bank and Gaza.

Traditional statutory construction tools, fairly applied, demonstrate that the Defendants have exceeded their authority. *See Loper Bright*, 144 S. Ct. at 2268. Based on the Taylor Force Act's text, context, and structure, there are at least two bases for holding that the Defendants are violating the law. First, subsection (b)(1) defines the *only* permissible exceptions to the general funding limitation, and these exceptions

11

should be read narrowly to preserve the primary operation of the general limitation. *See Comm'r v. Clark,* 489 U.S. 726, 739 (1989); *see also Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 669 (2020); *Andrus v. Glover Constr. Co.*, 446 U.S. 609, 616–17 (1980); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 389 (1951) ("Otherwise, the exception swallows the proviso and destroys its practical effectiveness."). As a textual matter, each of the enumerated exceptions — payments to a hospital system, assistance for wastewater projects, and assistance for childhood vaccinations — *must* be assistance that "directly benefits the Palestinian Authority" and that is subject to subsection (a)(1)'s general limitation. Otherwise, subsection (b)(1)'s carve-out is wholly superfluous.

Alternatively, the exceptions in subsection (b)(1) are for health and wastewater programs. These are programs for which the Palestinian Authority would otherwise be responsible. Answer ¶ 6; Olso I Accord, Ex. 1, App. 5–23; Oslo II Accord, Ex. 2, App. 24–55; *see also* Pub. L. 115–141, § 1002(2), 132 Stat. 1143, 1143 (2018), Ex. 3, App. 58. Nearly all the Economic Support Fund assistance made available by the Defendants for the West Bank and Gaza falls outside the subsection (b)(1) exceptions but within the Palestinian Authority's areas of responsibility. *See* Exhibit 4, App. 63–95. Informed by the content of the carve-out in subsection (b)(1), and with an eye toward statutory context and purpose, such assistance "directly benefits" the Palestinian Authority as a matter of law. *See, e.g., Yates*, 574 U.S. at 543.

## I. The Taylor Force Act's "Limitation on Assistance to the West Bank and Gaza" — text and purpose

Congress passed the Taylor Force Act to address the Palestinian Authority's long-standing practice of paying terrorists for their heinous acts. However, the Act was by no means the first time that Congress sought to remedy this problem. At the time of enactment, the United States did not provide direct budgetary support to the Palestinian Authority. In fact, since fiscal year 2015, annual appropriations legislation had mandated reductions in Economic Support Fund aid for the Palestinian Authority "equivalent to the amount expended" in payments for terrorism. Instead, the United States paid certain of the Palestinian Authority's debts and funded programs for which the Palestinian Authority "would otherwise be responsible," including water, health, education, and livelihoods. 22 U.S.C. § 2378c-1 note; Pub. L. 115–141, Title X, §§ 1002(2)–(4), App. 58.

Plainly, the Taylor Force Act was not intended to be simply "more of the same" — that is, yet another duplicative restriction on U.S. funding *to* the Palestinian Authority. Instead, Congress aimed to expand the field. 22 U.S.C. § 2378c-1 is titled "Limitation on Assistance to the West Bank and Gaza," not "Limitation on Assistance to the Palestinian Authority." *Compare* 22 U.S.C. § 2378c-1(a) with Further Consolidated Appropriations Act, 2024, H.R. 2882, 118th Cong. § 7040 (available at https://perma.cc/FL5D-X552) ("None of the funds appropriated by this Act to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961 may be obligated or expended with respect to providing funds *to* the Palestinian Authority.") (emphasis added). Although the caption is not commanding, it does cue the Cong-

13

ressional object. *Yates*, 574 U.S. at 540. And, as explained below, the Taylor Force Act, properly construed, is consistent with this object.

Three of the Taylor Force Act's subsections — subsection (a)(1), subsection (b), and subsection (d) — have interpretative salience.[7]

## A.    Subsection (a)(1) — "Limitation...In general"

To begin with, subsection (a)(1), titled "Limitation … In general," provides in relevant part that "Funds authorized to be appropriated or otherwise made available for assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2346 et seq.; relating to Economic Support Fund) and available for assistance for the West Bank and Gaza that directly benefits the Palestinian Authority" may only be made available if the Secretary of State certifies that the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations comply with four specific anti-terrorism conditions. 22 U.S.C. § 2378c-1(a)(1).

---

[7] Judge Oldham makes an important point:

> Hyper-literalism is bad for two reasons. The first is perhaps the most obvious: hyper-literalism is bad textualism. A statute's "text may never be taken out of context." That's because "words are given meaning by their context, and context includes the purpose of the text." As Justice Scalia once quipped, without context, we could not tell whether the word draft meant a bank note or a breeze.

*Palomares*, 52 F.4th at 648–49  (Oldham, J., concurring) (citations omitted). Put another way, statutory construction presupposes at least some degree of common sense. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000).

The relevant words for our purposes are "directly benefits." The Taylor Force Act uses the word "directly" as an adverb meaning "in a direct manner" to modify the verb, "benefits." *Directly*, MERRIAM-WEBSTER.COM (2024), https://perma.cc/TD23-YE2N; *see also Direct*, MERRIAM-WEBSTER.COM (2024), https://perma.cc/RQR9-MSC4 (meaning "natural, straightforward"). The word "benefits" is used in its transitive form meaning "to be useful or profitable to." *Benefit*, MERRIAM-WEBSTER.COM (2024), https://perma.cc/J3DS-ZTT7. As such, to "directly benefit" the Palestinian Authority means "to be useful or profitable to" the Palestinian Authority "in a natural, straightforward way."

Based on text, context, and structure, the phrase "directly benefits" should be construed to include *anything* useful or profitable to the Palestinian Authority — not just direct monetary payments — but all the direct benefits flowing to the Palestinian Authority from the Defendants' making available Economic Support Fund assistance to pay for programs, projects, and activities within the areas of basic education and culture, health, social welfare, economic development, and infrastructure in the West Bank and Gaza. When the Defendants use the American taxpayer to fund Palestinian roads, schools, and public health, they relieve the Palestinian Authority of its obligation to pay for these things and free it to fund terrorists and their families, including the families of the terrorists who killed Mr. Force and wounded the Plaintiff Singer.

### B.    Subsection (b) — Exception

Then there is subsection (b), titled "Exception." It provides:

**(1) In general.** Subject to paragraph (2), the limitation on assistance under subsection (a) shall not apply to — **(A)** payments made to the East Jerusalem Hospital Network; **(B)** assistance for wastewater projects not exceeding $5,000,000 in any one fiscal year; and **(C)** assistance for any other program, project, or activity that provides vaccinations to children not exceeding $500,000 in any one fiscal year.

**(2) Notification.** The Secretary of State shall notify in writing the appropriate congressional committees not later than 15 days prior to making funds available for assistance under subparagraph (A), (B), or (C) of paragraph (1).

22 U.S.C. § 2378c-1(b).

Subsection (b) is a key proof text for the Plaintiffs' proposed construction of the Act. Among other things, this subsection clarifies the meaning of the phrase "directly benefits" used in subsection (a)(1). Here, without ever mentioning the Palestinian Authority, Congress carved out three, and only three, exceptions to subsection (a)(1)'s general limitation. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *United States v. Rand*, 924 F.3d 140, 144 (5th Cir. 2019) (quoting *Hillman v. Maretta*, 569 U.S. 483, 496 (2013)).[8] "The proper inference … is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *In re Mirant Corp.*, 378 F.3d 511, 522 (5th

---

[8] A statement made by the Taylor Force Act's principal House sponsor, Rep. Doug Lamborn (R-Co.), reinforces this construction. "You can't restore funding to the Palestinians and comply with the Taylor Force Act except for some very, very limited humanitarian types of funding. Basically, if you agree with the sentiment behind the Taylor Force Act, you don't restore funding to the Palestinians." First Amend. Compl. ¶ 49; Answer ¶ 49.

Cir. 2004) (first quoting *United States v. Johnson*, 529 U.S. 52, 58 (2000); then citing

*TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)).

The exceptions, therefore, prove the rule; the Defendants' policy of making Economic Support Fund assistance available in the West Bank and Gaza for programs, projects, and activities outside the ambit of the exceptions specified in sub-section (b) is unlawful. Congress plainly considered payments to the East Jerusalem Hospital Network, wastewater project assistance not exceeding $5 million in any one fiscal year, and vaccinations to children not exceeding $500,000 in any one fiscal year to "directly benefit" the Palestinian Authority and therefore subject to subsection (a)(1)'s general limitation. However, Congress made no exception for projects, pro-grams, and activities such as "Governance" (Ex. 4A, App. 63–66), all of which are funded by the Defendants. Therefore, these things, too, must be subject to subsection (a)(1)'s general limitation. Any other construction of subsection (b) renders it sur-plusage and "violates the cardinal rule that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 788 (1988) (Scalia, J.) (plurality opinion); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

### C.    Subsection (d) — Initial use and disposition of withheld funds

Absent a Secretary of State certification pursuant to subsection (a)(1),[9] the Defendants lack discretion over the use and disposition of funds authorized to be appropriated or made available for Economic Support Fund assistance for the West Bank and Gaza. Instead, subsection (d), titled "Initial use and disposition of withheld funds," mandates what comes next. It provides:

(1) **Period of availability.** Funds withheld pursuant to this section are authorized to remain available for an additional 2 years from the date on which the availability of such funds would otherwise have expired.

(2) **Use of funds.** Funds withheld pursuant to this section may be made available for assistance for the West Bank and Gaza that directly benefits the Palestinian Authority upon a certification by the Secretary of State that the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations have met the conditions set forth in subsection (a). Except as provided in paragraph (3), *such funds may not be made available for any purpose other than for assistance for the West Bank and Gaza that directly benefits the Palestinian Authority.*

(3) **Disposition of unused funds.** Beginning on the date that is 180 days after the last day on which the initial availability of funds withheld pursuant to this section would otherwise have expired, such funds are authorized to be made available to the Department of State for assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2346 et seq.; relating to Economic Support Fund) in the following manner—(A) 50 percent for purposes of assistance other than

---

[9] Subsection (a)(1) requires the Defendants to withhold appropriated Economic Support Fund assistance for the West Bank and Gaza that directly benefits the Palestinian Authority unless and until the Secretary of State certifies the Palestinian Authority's compliance with the anti-terrorism conditions specified in subsections (a)(1)(A)–(D). Certification is not a one-time thing; Congress was so intent on keeping the Executive Branch and the Palestinian Authority honest, and so skeptical of their conduct and good faith, that it required the Secretary to certify Palestinian compliance every 180 days thereafter as a condition of continued Economic Support Fund assistance. *Id.*

that deemed benefiting the Palestinian Authority; and (B) 50 percent for purposes other than assistance for the West Bank and Gaza.

22 U.S.C. § 2378c-1(d) (emphasis added).

Subsection (d) reinforces the case for construing subsection (b) as the only exceptions to subsection (a)(1)'s general limitation, and reading the phrase "directly benefits the Palestinian Authority" broadly. By withholding Economic Support Fund assistance that directly benefits the Palestinian Authority (subsection (a)(1)), but then segregating those funds and extending their availability for two years with the proviso that they are reserved for assistance that does directly benefit the Palestinian Authority (subsection (d)(1),(2)), the Taylor Force Act creates a meaningful economic incentive for the Palestinian Authority to meet the statute's anti-terrorism conditions. However, if the Defendants may simply ignore the Act's guardrails by, for example, pouring over $150 million of Economic Support Funds into the West Bank and Gaza and otherwise supporting and collaborating with the Palestinian Authority, *see* Answer ¶ 68, then the Taylor Force Act is nullified.

Furthermore, subsection (d) divests the Defendants of discretion. By requiring the Defendants to withhold Economic Support Funds that directly benefit the Palestinian Authority for at least two years, *see* subsection (d)(1), (2), and then authorizing redistribution of "50 percent for assistance other than that deemed benefitting the Palestinian Authority" and "50 percent for purposes *other than* assistance for the West Bank and Gaza," *see* subsection (d)(3) (emphasis added), Congress cut off the possibility of Defendants circumventing subsection (a)(1)'s general limitation on assistance by using nongovernmental organizations and other third

parties as sock-puppets to carry out programs, projects, and activities for which the Palestinian Authority would otherwise be responsible — and then claiming that the Palestinian Authority's benefit, if any, is indirect. Granting the Defendants authority to redirect Economic Support Fund assistance and thereby end-run the statutory requirements would be nothing more or less than a nullification of the Taylor Force Act itself. Congress, therefore, could not be any clearer it would not allow indirectly that which it disallowed directly.

## II.    The Plaintiffs' proposed construction is consistent with the Taylor Force Act's subject matter and purpose.

It is axiomatic that the interpretative inquiry "must be shaped, at least in some measure, by the nature of the question presented" — here, whether Congress intended to allow the Defendants to circumvent the Taylor Force Act's general limitation on Economic Support Fund assistance for the West Bank and Gaza, particularly with respect to programs for which the Palestinian Authority would otherwise be responsible. *See W. Virginia*, 597 U.S. at 721 (citation omitted). As demonstrated *supra,* the Plaintiffs' proposed construction of the Taylor Force Act is firmly grounded in the relevant text. And as explained below, it is true to the statutory context and purpose. "[I]nterpretation always depends on context," "context always includes evident purpose," and "evident purpose always includes effectiveness." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012). Interpretation should "further[], not hinder[]" the text's "manifest purpose." *Id.*

First, the U.S. government historically has restricted or prohibited support for terrorist organizations and their allies on the premise that money is fungible. *See, e.g.*, 18 U.S.C. § 2339B(a)(1); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 29, 30–31 (2010) ("Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy … that makes it easier for those groups to persist, to recruit members, and to raise funds — all of which facilitate more terrorist attacks."); Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 26, 2001). The Taylor Force Act, enacted to prevent U.S. taxpayer dollars from subsidizing the Palestinian Authority's acknowledged support for terrorism, is based on this self-same premise.

Second, Palestinian support for terrorism has long troubled Congress. Accordingly, its appropriations bills contain multiple provisions restricting the flow of money to the Palestinian Authority and into the West Bank and Gaza. *See* Further Consolidated Appropriations Act, 2024, H.R. 2882, 118th Cong. §§ 7037 (titled "Palestinian Statehood," requiring the Secretary of State to certify that nascent Palestinian state is taking appropriate measures to counter terrorism and terrorist financing), 7039 (titled "Assistance for the West Bank and Gaza," requiring the Secretary of State to assure Congress and the Comptroller General that funding from the Economic Support Fund will not go to terrorists or terrorism advocates), 7040 (titled "Limitation on Assistance for the Palestinian Authority," requiring a report detailing steps taken by the Palestinian Authority to arrest terrorists, confiscate weapons, and dismantle terrorist infrastructure, and certification that the PA is

acting to counter incitement of violence against Israelis if the President invokes the waiver provision), 7073 (titled "Gaza Oversight," requiring oversight procedures for the Department of State and U.S. Agency for International Development to prevent the diversion of assistance to Hamas) (2024).[10]

It is crystal clear that Congress intended to do significantly more through the Taylor Force Act than it had done through appropriations riders.

> Israel has the right and obligation to defend itself and its civilians who have been the targeted victims of brutal attacks and murders while going about their daily lives. The United States ought to stand with them by condemning Palestinian incitement. Members of both parties have been working together to do just that. Since fiscal year 2015, Congress has reduced, dollar for dollar, the amount of money that the PA and PLO pay to terrorists and their families from the Economic Support Fund aid that the U.S. provides. While this has resulted in the reduction of our foreign aid, it has not yet brought an end to this practice.
> . . . .
> The United States must use every tool at our disposal to counter violence and terrorism. The PLO and the PA may well continue down the path of more hatred, violence, and terror without regard for the damage inflicted or for their role in diminishing the prospects for peace. But so long as they pay citizens to murder civilians, then they will do so without benefiting from the support of the United States taxpayer.

163 CONG. REC. H9652 (daily ed. Dec. 5, 2017) (statement of Rep. Gottheimer) (available at https://perma.cc/4LCM-92Y6).

The Taylor Force Act's text, structure, and subject matter demonstrate that it was designed to *restrict* the flow of Economic Support Fund assistance into the areas ruled by the Palestinian Authority, until and unless the Palestinian Authority

---

[10] *See also* Consolidated Appropriations Act, 2023, H.R. 2617, 117th Cong. §§ 7037, 7039, 7040 (2023); Consolidated Appropriations Act, 2022, H.R. 2471, 117th Cong. §§ 7037, 7039, 7040 (2022) (nearly identical provisions).

complied with the anti-terrorism conditions at subsection (a)(1)(A)–(D). Notably, the Taylor Force Act does not contain a waiver provision. *But see* Further Consolidated Appropriations Act, 2024, H.R. 2882, 118th Cong. §§ 7037, 7040 (2024) (containing waiver provisions which the President may invoke).

Also, the pre-enactment statements of the legislators who voted for the Taylor Force Act shed light on Congress's contemporaneous thinking and concerns.[11] In support of the legislation, Eliot Engel, then-Ranking Member of the House Committee on Foreign Affairs, stated:

> The question we face is: How do we compel the PA, the Palestinian Authority, to end the martyr payment system? In 2015, appropriations bills began to include language cutting off funds for the Palestinian Authority by the amount that they spent on so-called martyr payments, but that didn't curb the practice. We stopped giving the Palestinian Authority direct assistance, but the Palestinian Authority hasn't budged. *We are now considering this legislation, which cuts all funds* that directly benefit the Palestinian Authority if the Palestinian Authority continues to make these payments. This will make it crystal clear to the Palestinian Authority that so-called martyr payments are unacceptable, period.

163 CONG. REC. H9650 (daily ed. Dec. 5, 2017) (statement of Rep. Engel) (available at https://perma.cc/4LCM-92Y6) (emphasis added). Likewise, Ed Royce, then-Chairman of the House Committee on Foreign Affairs, stated:

> Too many grieving families go to sleep every night knowing that money is changing hands as a reward for violence that killed one of their loved ones. With this bill, we are using the weight of U.S. law to help see that no more families — American, Israeli, or anyone — join their tragic

---

[11] *See D.C. v. Heller*, 554 U.S. 570, 605 (2008) ("[T]he pre-enactment statements of those who drafted or voted for a law … is considered persuasive by some, not because they reflect the general understanding of the disputed terms, but because the legislators who heard or read those statements presumably voted with that understanding.").

ranks. We do this in the name of one brave American, Taylor Force, to honor the memories of all victims and, importantly, help prevent future victims. We also do it in the hopes of peace.

163 CONG. REC. H9650 (daily ed. Dec. 5, 2017) (statement of Rep. Royce) (available at https://perma.cc/4LCM-92Y6).

The Defendants are spending hundreds of millions of Economic Support Fund dollars in "shared efforts with the Palestinian Authority" to "advanc[e] development across sectors such as health, infrastructure, economic growth, private sector development, and civil society," "renew economic stability for the benefit of the Palestinian people," and "seek job creation including through the private sector for the next generation of Palestinians," *see U.S. Relations With Palestinian Territories*, U.S. DEP'T STATE, https://perma.cc/4MZ7-CXUU, all the while also paying third parties to carry out programs for which the Palestinian Authority would otherwise be responsible. Answer ¶ 6; Oslo I Accord, Ex. 1, App. 5–23; Oslo II Accord, Ex. 2, App. 24–55. The Taylor Force Act was enacted to stop Economic Support Fund assistance to the West Bank and Gaza, except as provided in subsection (b). By flooding the West Bank and Gaza with U.S. taxpayer money, the Defendants have gutted the law, ignoring the intent and language of the Taylor Force Act. In so doing, the Defendants have rewarded and continue to reward and further incentivize the very acts of terror Congress sought to eradicate.

## CONCLUSION

The Defendants have obligated or awarded over $100 million Economic Support Fund dollars for projects, programs, and activities in the West Bank and Gaza

24

that are outside of the exceptions specified in 22 U.S.C. § 2378c-1(b) and/or for which the Palestinian Authority is otherwise responsible. All such assistance "directly benefits" the Palestinian Authority as a matter of law and violates the Taylor Force Act. Accordingly, the Plaintiffs respectfully request that this Court grant their motion for partial summary judgment, set aside the Economic Support Fund obligations and awards listed in Exhibit 4, App. 63–95, that do not fall within the exceptions provided under 22 U.S.C. § 2378c-1(b)(1) as being in excess of statutory authority, order the Defendants to comply with 22 U.S.C. § 2378c-1(d), and declare that all future Economic Support Fund obligations and awards funding programs, projects, and activities outside of the three enumerated exceptions specified in 22 U.S.C. § 2378c-1(b) and/or for which the Palestinian Authority is otherwise responsible are unlawful, unless and until such time as the Defendant Blinken can certify the Palestinian Authority is in compliance with 22 U.S.C. § 2378c-1(a)(1)(A)–(D).

[signature page follows]

Respectfully submitted this 30th day of September, 2024,

/s/ *Reed D. Rubinstein*
REED D. RUBINSTEIN
D.C. Bar No. 400153
reed.rubinstein@aflegal.org
JULIE A. STRAUSS
D.C. Bar No. 387262
julie.strauss@aflegal.org
MICHAEL DING
Texas Bar No. 24129788
michael.ding@aflegal.org
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, D.C. 20003
(202) 964-3721
*Counsel for the Plaintiffs*


CHRISTOPHER E. MILLS
D.C. Bar No. 1021558
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law
*Counsel to America First Legal
Foundation*

CHRISTIAN D. STEWART
Texas Bar No. 24013569
Morgan Williamson LLP
701 S. Taylor, Suite 440, LB 103
Amarillo, TX 79101
(806) 358-8116
cstewart@mw-law.com
*Local Counsel for the Plaintiffs*

MORA NAMDAR
Texas Bar No. 24090288
Namdar Law PLLC
3811 Turtle Creek Blvd #275
Dallas, TX 75219
(972) 925-9061
mora@namdarlaw.com
*Counsel to America First Legal
Foundation*

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2024, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

/s/ *Michael Ding*
MICHAEL DING