**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| _____ ) | |
| RONNY L. JACKSON, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | No. 2:22-cv-241 |
| ) | |
| JOSEPH R. BIDEN, JR., *et al.* ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 3

I.  Economic Support Funds ................................................................................................ 3

    A.  Legal Framework ..................................................................................................... 3

    B.  Process for Implementing and Awarding Economic Support Funds ........................ 5

    C.  History of Providing Economic Support Funds to the West Bank and Gaza ............. 7

II. Procedural History ......................................................................................................... 10

LEGAL STANDARD ............................................................................................................... 11

ARGUMENT ............................................................................................................................. 11

I.  Plaintiffs Have Not Carried Their Burden to Establish Standing at Summary Judgment ........................................................................................................................ 11

II. The Taylor Force Act Allows the Provision of Economic Support Funds that Do Not "Directly Benefit" the Palestinian Authority .................................................................. 14

    A.  The Plain Text Prohibits Only Those Economic Support Funds that "Directly Benefit" the Palestinian Authority ......................................................................... 15

    B.  The Exceptions in Subsection (b) Do Not Alter This Conclusion ........................... 21

    C.  Defendants' Interpretation is Consistent with the Taylor Force Act's Purpose ........ 24

    D.  Congress Has Confirmed Defendants' Interpretation of the Taylor Force Act by Consistently Appropriating Economic Support Funds for West Bank and Gaza ........................................................................................................................ 27

III. Plaintiffs Have Not Proven That Any Particular Award of Economic Support Funds Was Unlawful .......................................................................................................... 29

CONCLUSION .......................................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abulhawa v. U.S. Dep't of the Treasury,*
    239 F. Supp. 3d 24 (D.D.C. 2017),
    *aff'd*, No. 17-5158 (D.C. Cir. June 19, 2018) ................................................................. 13

*Aerotrade, Inc. v. Agency for Int'l Dev., Dep't of State,*
    387 F. Supp. 974 (D.D.C. 1974) ....................................................................................... 13

*Allen v. Wright,*
    468 U.S. 737 (1984) .......................................................................................................... 13

*Baskin v. Bottini & Bottini, Inc.,*
    -- F. Supp. 3d --, 2024 WL 3343019 (S.D. Tex 2024) ................................................... 19

*Bernstein v. Kerry,*
    962 F. Supp. 2d 122 (D.D.C. 2013),
    *aff'd* 584 F. App'x 7 (D.C. Cir. 2014) .............................................................................. 13

*Camp v. Pitts,*
    411 U.S. 138 (1973) ................................................................................................... 11, 29

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................................... 13, 14

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................................... 12, 13

*Dep't of Com. v. U.S. House of Reps.,*
    525 U.S. 316 (1999) .......................................................................................................... 12

*Dethrow v. Parkland Health Hosp. Sys.,*
    204 F.R.D. 102 (N.D. Tex. 2001) ..................................................................................... 14

*Dubin v. United States,*
    599 U.S. 110 (2023) .......................................................................................................... 20

*Dunn v. Sw. Airlines Co.,*
    No. 3:21-CV-01393-X, 2022 WL 19006363 (N.D. Tex. Oct. 20, 2022) ........................... 14

*Ex parte Endo,*
    323 U.S. 283 (1944) .......................................................................................................... 27

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ................................................................................................... 11, 29

*Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,*
    554 U.S. 33 (2008) ..............................................................................................20

*Food & Drug Admin. v. All. for Hippocratic,*
    *Med.,* 602 U.S. 367 (2024) ................................................................................13

*Fulton v. Philadelphia,*
    593 U.S. 522 (2021) ............................................................................................20

*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006) ............................................................................................16

*Indigenous People of Biafra v. Blinken,*
    639 F. Supp. 3d 79 (D.D.C. 2022) ....................................................................13

*Kovac v. Wray,*
    109 F.4th 331 (5th Cir. 2024)............................................................................28

*Lefemine v. Wideman,*
    568 U.S. 1 (2012) ...............................................................................................19

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................... 11, 12

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    583 U.S. 109 (2018) ............................................................................................16

*NCMIC Ins. Co. v. Allied Professionals Ins. Co.,*
    110 F.4th 1072 (8th Cir. 2024) ..........................................................................20

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,*
    469 U.S. 189 (1985) ............................................................................................19

*Pulsifer v. United States,*
    601 U.S. 124 (2024) ............................................................................................18

*Ricci v. DeStefano,*
    557 U.S. 557 (2009) ............................................................................................17

*Sierra Club v. U.S. Dep't of Interior,*
    990 F.3d 909 (5th Cir. 2021) .............................................................................11

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ............................................................................................12

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ..............................................................................................13

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) ...........................................................................11

*United States v. Johnson*,
  632 F.3d 912 (5th Cir. 2011),
  *cert. denied*, 565 U.S. 834 (2011) ...............................................................................11

*Young v. Tenn. Valley Auth.*,
  606 F.2d 143 (6th Cir. 1979),
  *cert. denied*, 445 U.S. 942 (1980) ...............................................................................28

**Legislative Materials**

163 Cong. Rec. H9648 (2017) .......................................................................... 23, 24, 26, 27

165 Cong. Rec. H11061 (2019) .................................................................................. 6, 8

*Business Meeting*, S. Cmte. on Foreign Relations (Aug. 3, 2017) ....................................... 17, 23

*Consideration of the Taylor Force Act:* Hearing Before the Senate Subcomm. on Foreign Relations,
  S. Hrg. 115-705 (July 12, 2017)....................................................................................*passim*

*Department of State, Foreign Operations, and Related Programs Appropriations Act, 2022*,
  168 Cong. Rec. H2477 (Mar. 9, 2022)..........................................................................9

House Rep. No. 116-78 (2019) ............................................................................... 6, 8

H.R. 1164, 115 Cong. (Feb. 16, 2017) .........................................................................16

H.R. 1164, 115 Cong. (Dec. 5, 2017) ..........................................................................16

*Various Measures: Markup Before the H. Comm. On Foreign Affairs*,
  115th Cong. 79 (2017) .................................................................................. 4, 17, 23

Joint Explanatory Statement,
  166 Cong. Rec. H8311 (Dec. 21, 2020)........................................................................9

Joint Explanatory Statement,
  168 Cong. Rec. S8553 (Dec. 20, 2022)........................................................................9

Joint Explanatory Statement,
  170 Cong. Rec. H1501 (Mar. 22, 2024)........................................................................9

**Statutes**

5 U.S.C. § 706 ................................................................................................. 11, 29

5 U.S.C. § 706(2)(A)...........................................................................................11

18 U.S.C. § 2334(e) ..........................................................................................................8

20 U.S.C. § 40(e)(5) ........................................................................................................20

22 U.S.C. § 2346(b) ..........................................................................................................5

22 U.S.C. § 2346(c) ..........................................................................................................7

22 U.S.C. § 2346d ...........................................................................................................28

22 U.S.C. § 2378c-1 ............................................................................................... 1, 3, 24

22 U.S.C. § 2378c-1(a)(1) ....................................................................................1, 4, 14, 16

22 U.S.C. § 2378c-1(b) .....................................................................................................21

22 U.S.C. § 2378c-1(d)(1) .................................................................................................18

22 U.S.C. § 2378c-1(f)(1) ..................................................................................................17

22 U.S.C. § 2413(a) ...........................................................................................................6

22 U.S.C. §§ 2346 *et seq.* ..................................................................................................3

22 U.S.C. § 2346(b) ..........................................................................................................5

22 U.S.C. § 2346(c) ..........................................................................................................7

Pub. L. No. 87-195, 75 Stat. 424 (1961) .............................................................................3

Pub. L. No. 115-141, 132 Stat. 348 (2018) ..................................................................... 1, 3

Pub. L. No. 115-253, 132 Stat. 3183 (2018) .......................................................................7

Pub. L. No. 116-94, 133 Stat. 2534 (2019) .................................................................. 3, 6, 8

Pub. L. No. 116-260, 134 Stat. 1182 (2020) .......................................................................9

Pub. L. No. 117-328, 136 Stat. 4459 (2022) .......................................................................9

Pub. L. No. 118-47, 138 Stat. 460 (2024) ...........................................................................9

**Rules**

Fed. R. Civ. P. 12(h)(3)....................................................................................................13

Fed. R. Civ. P. 56 ..................................................................................................... 11, 12

**Other Authorities**

*Benefit*, Black's Law Dictionary (12th Ed. 2024) ...........................................................................19

Cong. Rsch. Serv., IN11649, *U.S. Resumption of Foreign Aid to the Palestinians* (Apr. 14, 2021) ........................................................................ 7, 8

*Direct*, Black's Law Dictionary (12th Ed. 2024) ............................................................................19

*Direct*, Merriam-Webster.com Dictionary (2024)..........................................................................19

GAO, 21-332, *West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks* (Mar. 29, 2021) ................................................................ 5, 7, 8, 9

## INTRODUCTION

Concerned with the Palestinian Authority's prisoner payment system, while understanding the need to "support[] community-based programs in the West Bank and Gaza," Congress enacted the Taylor Force Act in March of 2018. *See* Pub. L. No. 115-141, div. S, title X, 132 Stat. 348, 1143 (2018), codified at 22 U.S.C. § 2378c-1 note. Under the Taylor Force Act (or, "the Act"), Congress limited the use of Economic Support Funds—a specific type of foreign assistance—when these funds "directly benefit[] the Palestinian Authority." *See id.* § 2378c-1(a)(1). The Act directs the Secretary of State to submit to Congress a "list of the criteria that the Secretary uses to determine whether assistance for the West Bank and Gaza is assistance that directly benefits the Palestinian Authority." *Id.* § 2378c-1(f)(1).

Plaintiffs here—three private individuals and a member of Congress—bring their claim under the Administrative Procedure Act (APA). Although their amended complaint challenges two different types of foreign assistance provided by the United States to organizations serving communities in the West Bank and Gaza (and certain other locations), Plaintiffs have moved for partial summary judgment, without the benefit of an administrative record, "on the grounds that the Defendants' Economic Support Fund awards to Gaza and the West Bank violate the Taylor Force Act." Pls.' Mot. for Partial Summ. J., 1, ECF No. 69-1. (Pls.' MSJ). Their argument is that, although the Taylor Force Act prohibits only assistance that "directly benefits" the Palestinian Authority, 22 U.S.C. § 2378c-1(a)(1), the Court should instead broadly construe the Act's prohibition "to include *anything* useful or profitable to the Palestinian Authority[.]" Pls.' MSJ at 15.

There are three fundamental problems with Plaintiffs' motion. *First*, Plaintiffs have not proven that they have standing to challenge Defendants' provision of Economic Support Funds to the West Bank and Gaza. Although this Court concluded at the motion to dismiss stage that Plaintiffs had plausibly alleged their standing, to prevail on a motion for summary judgment, Plaintiffs bear the

burden of proving that standing exists. Plaintiffs, however, have submitted *no* evidence supporting their standing. Whatever presumption they, and the Court, may have relied on under Rule 12 is no longer legally permissible and dismissal for lack of jurisdiction is now required.

*Second*, even if jurisdiction existed to consider the merits, Plaintiffs fail to show that Defendants' actions violate the Taylor Force Act. Plaintiffs argue that the phrase "'directly benefits' should be construed to include anything useful or profitable to the Palestinian Authority." Pls.' MSJ at 15. But this argument is inconsistent with the plain text, structure, and purpose of the Taylor Force Act, as well as with the intent and actions of Congress. The phrase "directly benefits" was purposefully added by Congress to qualify the Taylor Force Act's prohibition on Economic Support Funds in the West Bank and Gaza to only those funds immediately supporting the Palestinian Authority. Plaintiffs' interpretation of the phrase would not only render that qualifier a nullity but would also leave superfluous other subsections of the Act. Further, Defendants' application also conforms with the twin aims of the Taylor Force Act—prohibiting funds that support the Palestinian Authority while supporting community-based programs in the West Bank and Gaza—and has been affirmed by Congress's consistent appropriation of economic support funding expressly directed for the West Bank and Gaza. Thus, Plaintiffs' statutory theory is incorrect, and the Court should deny Plaintiffs' motion for partial summary judgment.

*Third*, even if this Court had jurisdiction and were inclined to agree with Plaintiffs' statutory theory, Plaintiffs still have not proven their entitlement to their requested relief—*i.e.*, invalidation of the approximately 179 individual Economic Support Fund awards listed in their Exhibit 4. Plaintiffs' motion simply lists these awards, and essentially asks this Court to assume that each one was unlawful. It would be inappropriate for the Court to enter Plaintiffs' requested relief given that Plaintiffs have not proven that any individual award was actually unlawful. For this reason, too, their motion for partial summary judgment should be denied.

**BACKGROUND**

I.      **ECONOMIC SUPPORT FUNDS**

     A.      **Legal Framework**

Congress has authorized the provision of foreign assistance, including the provision of Economic Support Fund assistance, through the Foreign Assistance Act of 1961 (FAA). Pub. L. No. 87-195, 75 Stat. 424 (1961); 22 U.S.C. §§ 2346 *et seq.* These funds "promote economic or political stability," *id.* § 2346(a), and are administered jointly by the State Department as well as the U.S. Agency for International Development (USAID), which is an independent agency within the Executive Branch. *See id.* § 6563.

Economic Support Funds are appropriated annually by Congress and provide assistance to populations in a number of different countries and territories, including the West Bank and Gaza. Congress has included restrictions on assistance to the West Bank and Gaza in its appropriation acts. In FY2020, for example, Congress continued to impose various, long-standing oversight and vetting requirements, seeking to "ensure that such assistance is not provided to or through any individual, private or government entity, or educational institution that the Secretary knows or has reason to believe" has certain connections to terrorism. *Department of State, Foreign Operations, and Related Programs, 2020*, Pub. L. No. 116-94, div. G, § 7039(a), (b), 133 Stat. 2534, 2884 (2019); *see also id.* §§ 7040(a), 7041(k), 133 Stat. at 2883, 2890 (additional requirements).

In addition to the restrictions in annual appropriations laws, in March 2018, Congress enacted the Taylor Force Act. *See* Pub. L. No. 115-141, div. S, title X, 132 Stat. 348, 1143 (2018), codified at 22 U.S.C. § 2378c-1. The Taylor Force Act reflects Congress's careful balancing between its concern for the Palestinian Authority's (PA) prisoner payment system and the Government's commitment to "support[ing] community-based programs in the West Bank and Gaza." 22 U.S.C. § 2378c-1 (notes).

Thus, the Taylor Force Act limits the use of Economic Support Funds in the West Bank and Gaza when the funds "directly benefit[] the Palestinian Authority." *See id.* § 2378c-1(a)(1) (applying to "[f]unds authorized to be appropriated or otherwise made available for assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2346, *et seq.;* relating to Economic Support Fund and available for assistance for the West Bank and Gaza"); *see also Various Measures: Markup Before the H. Comm. On Foreign Affairs*, 115th Cong. 79, at 182 (2017) (statement of Rep. Ted Deutch) (noting the Taylor Force Act "has been carefully written in order to target only those funds that directly benefit the Palestinian Authority."); *see also* 115th Cong. 705, at 35 (statement of Sen. Tim Kaine) (Congress ultimately passed the Taylor Force Act to, at the very least, "discourage . . . bad behavior," while not "withdraw[ing American] support for important goals that the administration shares with respect to Palestine"); *id.* at 10 (statement of Hon. Daniel B. Shapiro) (noting that the "purpose" of the "overall assistance program" is to "keep the West Bank stable," a goal that "may be even more in Israel's interests" than "in the Palestinians'").

Under the Taylor Force Act, economic support funding "that directly benefits the Palestinian Authority may only be made available for such purpose if" the Secretary of State certifies, *inter alia,* that the Palestinian Authority has ended the system of payments for acts of terrorism. *Id.* § 2378c-1(a)(1)(B). Payments made to the East Jerusalem Hospital Network, as well as certain wastewater and vaccination projects, are exempted under subsection (b). *Id.* § 2378c-1 (b). Under subsection (d), the Taylor Force Act also contains a procedure where, if funds are allocated for programs that would directly benefit the Palestinian Authority, the funds may be withheld and then remain available for obligation for a longer period of time. *Id.* § 2378c-1(d).

The Taylor Force Act leaves to the Secretary of State to submit to Congress a "list of the criteria that the Secretary uses to determine whether assistance for the West Bank and Gaza is assistance that directly benefits the Palestinian Authority." *Id.* § 2378c-1(f)(1). On May 3, 2018, the

Secretary transmitted a list of criteria to Congress that guide the Secretary's evaluation of whether ESF "directly benefits" the Palestinian Authority, namely: (1) the identity of the "intended primary beneficiary or end user of the assistance;" (2) "[w]hether the Palestinian Authority is the direct recipient of the assistance;" (3) "[w]hether the assistance involves payments to Palestinian Authority creditors;" (4) "[t]he extent of ownership or control the Palestinian Authority exerts over an entity or individual that is the primary beneficiary or end user of the assistance;" and (5) "[w]hether the assistance or services provided directly replace assistance or service provided by the Palestinian Authority." *See* MTD Exhibit C, U.S. State Dep't, Report Pursuant to Section 1004(f)(1) of the Taylor Force Act, at 2 (May 3, 2018) (Criteria Rept.).

### B.     Process for Implementing and Awarding Economic Support Funds

The State Department and USAID jointly administer Economic Support Funds. The Secretary of State is "responsible for policy decisions and justifications for economic support programs," but the Secretary "shall exercise this responsibility in cooperation with the Administrator of" USAID. 22 U.S.C. § 2346(b). USAID has "responsibility for coordinating all United States development-related activities" but acts "[u]nder the policy guidance of the Secretary of State." *Id.* § 2151(b); *see also id.* §§ 6592, 6593. For the West Bank and Gaza program specifically, the State Department—through its Office of Foreign Assistance—allocates a specific amount of Economic Support Funds, consistent with statutory directives from Congress and other policy decisions, and then USAID is responsible for implementation such as awarding and disbursing those funds to specific projects. *See* GAO, 21-332, *West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks*, at 1 (Mar. 29, 2021) ("The U.S. Agency for International Development (USAID), with overall foreign policy guidance from State, has primary responsibility for administering ESF assistance for Palestinians in the West Bank and Gaza.") [hereafter "GAO, *Should Funding Resume*"].

In particular, after Congress passes an annual appropriations act containing an overall amount of Economic Support Funds, there is an internal process by which the State Department, through the Office of Foreign Assistance (and in coordination with USAID), determines the proper allocation of funds for specific countries and purposes. This process includes reviewing any earmarks or other requirements in the appropriations act, as well as directives in the joint explanatory statement accompanying the act, which typically includes instructions on how Congress intended the money to be allocated, some of which are incorporated by reference into the act itself. For example, the FY2020 appropriations act stated that "funds appropriated by this Act . . . shall be made available at not less than the amounts specifically designated in the respective tables included in the explanatory statement," Pub. L. No. 116-94, § 7019(a), 133 Stat. at 2855, and the explanatory statement included specific allocations for numerous countries and regions, including West Bank and Gaza. *See* 165 Cong. Rec. H11061, H11430 (Dec. 17, 2019) (explanatory statement, with specific allocations for Economic Support Funds); *see also* House Rep. No. 116-78, at 6 (2019) ("The Committee recommendation also restores humanitarian and development assistance to the Palestinians as part of a broader policy objective to keep the goal of a two-state solution viable by providing resources through international organizations to address human needs in the West Bank and Gaza.").

Congress primarily contemplated legislative oversight of appropriations activities. Indeed, once the State Department completes this initial allocation process, it submits a report to Congress outlining the various allocations. *See* 22 U.S.C. § 2413(a). Even after this initial allocation report is submitted, however, there are additional congressional notification requirements before funds can be obligated for West Bank and Gaza; these congressional notifications are made by USAID. *See, e.g.*, Pub. L. No. 116-94, § 7039(f), 133 Stat. at 2833; MTD App'x, ECF No. 20-2, Exs. A & B (FY2020 and FY2021 congressional notifications submitted by USAID). These congressional notifications provide even more detail about the specific projects that USAID contemplates funding,

including the intended partners for certain projects. *Cf.* 22 U.S.C. § 2346(c). If Members of Congress raise concerns in response to these notifications, the State Department and USAID will generally work with Congress to resolve the concerns before obligation of the funds. *See generally* Cong. Rsch. Serv. (CRS), IN11649, *U.S. Resumption of Foreign Aid to the Palestinians*, at 3-4 (Apr. 14, 2021) (cited in First Am. Compl. ¶ 61, ECF No. 43 ("Am. Compl.")) [hereafter "CRS, *Resumption of Foreign Aid*"]. Because of this lengthy allocation and congressional notification process, Economic Support Funds will frequently remain unobligated until close to the end of their two-year period of initial availability. *Cf.* MTD App'x, Ex. A (congressional notification for FY2020 funds, appropriated in December 2019, occurred in March 2021).

### C.    History of Providing Economic Support Funds to the West Bank and Gaza

The United States has sought to provide Economic Support Funds for the West Bank and Gaza across Presidential administrations. Answer ¶ 23, ECF No. 64. In August 2018, however, after Congress enacted the Taylor Force Act and following a review of U.S. funding, the State Department reprogrammed its FY2017 economic support funding intended for the West Bank and Gaza to other priorities. Answer ¶ 47. But USAID "continue[d] to use previously obligated fiscal year 2015 and 2016 appropriated funds to support ongoing projects and activities." GAO, *Should Funding Resume*, at 7.

Shortly thereafter, in October 2018, Congress enacted the Anti-Terrorism Clarification Act of 2018, which provided that, as of February 1, 2019, anyone who accepted certain forms of foreign assistance—including Economic Support Funds—would be deemed to consent to personal jurisdiction in United States courts for certain civil actions. *See* Pub. L. No. 115-253, § 4, 132 Stat. 3183, 3184. Following enactment of that law, the "Prime Minister of the Palestinian Authority notifie[d] the U.S. government that it [would] no longer accept assistance" as specified in that law, "which includes USAID activities implemented with ESF assistance." GAO, *Should Funding Resume*, at 7. Accordingly, on January 31, 2019, "USAID end[ed] programmatic implementation of all

7

assistance in the West Bank and Gaza," including with respect to "implementing the remaining fiscal year 2015 and 2016" economic support funding. *Id.*; *see also* CRS, *Resumption of Foreign Aid*, at 1-2.

Following the full stop of Economic Support Funds for the West Bank and Gaza in January 2019, representatives from the State Department and USAID testified before Congress as part of the FY2020 budget process. A witness for USAID testified in April 2019 that, in restarting economic support fund assistance to the West Bank and Gaza, the agency would "absolutely comply with the Taylor Force Act and ha[s] drawn up implementation guidelines." *FY 2020 Foreign Assistance Budget and Policy Priorities* (Apr. 9, 2019), at 53 (testimony of USAID Administrator Green). In an October 2019 hearing, in response to a question about "remov[ing] the constraints imposed by the Anti-Terrorism Clarification Act," which would allow "the United States [to] consider resuming certain types of aid to Palestinians," the State Department witness testified that the Administration was "willing to engage with Congress on every level to fix that." Hearing before the H. Comm. on Foreign Affairs, Subcomm. on the Middle East, North Africa, and International Terrorism, *The FY20 Budget: Examining the Administration's Policy Objectives for a Turbulent Middle East* (Oct. 29, 2019), at 18 (testimony of Asst. Sec'y Schenker).

Two months later, in December 2019, Congress passed the FY2020 annual appropriations act, which incorporated two items relevant here. First, the Act included the Promoting Security and Justice for Victims of Terrorism Act of 2019, which eliminated acceptance of Economic Support Funds as triggering consent to personal jurisdiction under the Anti-Terrorism Clarification Act. *See* Pub. L. No. 116-94, div. J, § 903(c)(1), 133 Stat. at 3083 (amending 18 U.S.C. § 2334(e)). Second, the Act's explanatory statement specifically allocated $75 million in Economic Support Funds for West Bank and Gaza, which set a minimum level of funding with narrow authority to deviate, consistent with section 7019 of that act. *See id.*, div. G, § 7019(a), 133 Stat. at 2882; 165 Cong. Rec. at H11430; *see also id.* at H11434; H. Rep. No. 116-78, at 6 (2019); GAO, *Should Funding Resume*, at 7.

Based on Congress's direction with respect to those FY2020 funds, the State Department and USAID resumed providing Economic Support Funds to the West Bank and Gaza. *See generally* MTD App'x, Ex. A (USAID congressional notification relating to FY2020 funds); Answer ¶ 59. In subsequent years (FY2021, FY2022, FY2023, and FY2024), Congress continued to specifically allocate Economic Support Funds for the West Bank and Gaza:

- In FY2021, another $75 million in Economic Support Funds, *see Department of State, Foreign Operations, and Related Programs Appropriations Act, 2021*, Pub. L. No. 116-260, div. K, § 7019, 134 Stat. 1182, 1732 (2020); Joint Explanatory Statement, 166 Cong. Rec. H8311, H8785 (Dec. 21, 2020).

- In FY2022, $219 million in Economic Support Funds, *see Department of State, Foreign Operations, and Related Programs Appropriations Act, 2022*, 168 Cong. Rec. H2477, H3004 (Mar. 9, 2022).

- In FY2023, $225 million in economic support funds, *see Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023*, Pub. L. No. 117-328, div. K, § 7019, 136 Stat. 4459, 5014 (2022); Joint Explanatory Statement, 168 Cong. Rec. S8553, S9291 (Dec. 20, 2022).

- In FY2024, $175 million in economic support funds, *see Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024*, Pub. L. No. 118-47, div. F, § 7019, 138 Stat. 460, 771 (2024); Joint Explanatory Statement, 170 Cong. Rec. H1501, H2091 (Mar. 22, 2024) (describing it as "Assistance subject to section 7041(k)(1)," which refers to the West Bank and Gaza).

Consistent with the allocation and notification process described above, USAID has informed Congress how prior fiscal years' funds allocated to the West Bank and Gaza are intended to be used. *See, e.g.*, MTD App'x; *see also* Suppl. MTD App'x, Ex. D (FY2022 congressional notification). The allocation and approval process for FY2024 funds remains ongoing, and Congress has not yet been notified about those funds' intended uses. As of December 2023, much of the FY2020 and FY2021 funding has already been obligated and expended. *See* GAO, 24-106243, *West Bank and Gaza Aid: USAID Generally Ensured Compliance with Anti-Terrorism Policies and Addressed Instances of Noncompliance*, at 17 (Dec. 2023).

## II.    PROCEDURAL HISTORY

Plaintiffs, a member of Congress and three individuals, filed their original Complaint on December 20, 2022, challenging the provision of Economic Support Funds to the West Bank and Gaza as contrary to the Taylor Force Act. *See* Compl., ECF No. 1. The Complaint named only President Biden and the Secretary as defendants in their official capacities. *Id.* ¶¶ 21-22. Defendants moved to dismiss the Complaint, *see* Defs.' Mem. in Supp. of their Mot. to Dismiss the Compl., ECF No. 20-1 (MTD), and this Court granted that motion in part and denied it in part—concluding that Plaintiffs' claim under the APA could proceed, but dismissing their *ultra vires* claim. Mem. Op. & Order, ECF No. 38.

After this decision, Plaintiffs sought leave to amend their Complaint, including to add new allegations about events occurring after the filing of their original Complaint. *See* ECF No. 41. This Court granted leave in March 2024, *see* Order, ECF No. 42, and Plaintiffs' Amended Complaint was then docketed, asserting their count under the APA. *See generally* Am. Compl, ECF No. 43. The claim challenges both Defendants' provision of Economic Support Funds and contributions provided to United Nations Relief and Works Agency. *See id.* Defendants moved to dismiss the Amended Complaint, ECF No. 48, which the Court denied on June 28, 2024, ECF No. 58. Accordingly, Defendants filed their Answer on July 19, 2024. *See* ECF No. 64

Thereafter, the parties submitted a Joint Status Report Regarding Further Proceedings. *See* ECF No. 67. Plaintiffs proposed filing a motion for partial summary judgment on their challenge pertaining to Economic Support Funds, which they believe can be resolved without an administrative record. *See id.* at ¶ 4. Plaintiffs ultimately filed their motion for partial summary judgment on September 30, 2024. *See* ECF No. 69.

**LEGAL STANDARD**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "In the context of a challenge under the [Administrative Procedure Act ("APA")], '[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Texas v. EPA*, 389 F. Supp. 3d 497, 503 (S.D. Tex. 2019).[1] When reviewing agency action under the APA, a court may set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011), *cert. denied*, 565 U.S. 834 (2011) (quoting 5 U.S.C. § 706(2)(A)). This standard is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021).

In reviewing a final agency action under the APA, "the court shall review the whole record or those parts of it cited by a party[.]" 5 U.S.C. § 706. "The focal point for judicial review" of an administrative agency's action "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). Therefore, review is limited to the administrative record that existed before the agency at the time of the decision. *See, e.g.*, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

**ARGUMENT**

**I. PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO ESTABLISH STANDING AT SUMMARY JUDGMENT**

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing contains three elements." *Id.* A plaintiff "must have (1) suffered an injury in

---

[1] Internal quotation marks and citations are omitted throughout this brief, unless noted.

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Plaintiffs bear the burden of proving their standing, and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," but at summary judgment "the plaintiff can no longer rest on such mere allegations, [and] must set forth by affidavit or other evidence specific facts" proving their standing. *Id.*; *see also, e.g.*, *Dep't of Com. v. U.S. House of Reps.*, 525 U.S. 316, 329 (1999) ("To prevail on a Federal Rule of Civil Procedure 56 motion for summary judgment—as opposed to a motion to dismiss—however, mere allegations of injury are insufficient. Rather, a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits.").

Here, Plaintiffs make no attempt to carry their heightened burden at this stage of the litigation. Their motion for summary judgment does not include any affidavits, declarations, or other evidence supporting their standing. For example, they do not include any description of their alleged "increased risk of physical harm or death" when traveling to Israel, Am. Compl. ¶¶ 13-15, let alone description of concrete plans to travel such that their purported injury can be considered certainly impending. *Cf. Lujan*, 504 U.S. at 654; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Moreover, Plaintiffs also have not submitted any evidence proving traceability or redressability—*i.e.*, that an order invalidating specific Economic Support Fund awards to nongovernmental organizations would actually reduce the purported increased risk of terrorism that Plaintiffs face when traveling to Israel. *Cf. Lujan*, 504 U.S. at 571 ("[I]t is entirely conjectural whether the nonagency activity that affects respondents will be altered or affected by the agency activity they seek to achieve.").

Beyond just Plaintiffs' lack of evidence, two additional factors further confirm that they have not adequately proven their standing at this stage. First, Plaintiffs here are not directly regulated by the State Department's foreign aid funding decisions—instead, Plaintiffs are complaining about the indirect results that purportedly flow from those funding decisions. The Supreme Court has recently emphasized that "when (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024); *see also Clapper*, 568 U.S. at 414; *Allen v. Wright*, 468 U.S. 737, 758-59 (1984). Second, in a number of similar challenges to the United States' foreign aid decisions, courts have uniformly concluded that private plaintiffs lack standing. *See Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127 (D.D.C. 2013), *aff'd* 584 F. App'x 7 (D.C. Cir. 2014); *Aerotrade, Inc. v. Agency for Int'l Dev., Dep't of State*, 387 F. Supp. 974, 975 (D.D.C. 1974); *Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24, 34 (D.D.C. 2017), *aff'd*, No. 17-5158 (D.C. Cir. June 19, 2018); *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 85-87 (D.D.C. 2022).

Particularly given these governing standards and past decisions, Plaintiffs' failure to submit any evidence at summary judgment underscores their lack of standing. Thus, the only proper result is dismissal for lack of subject-matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Nor can Plaintiffs attempt to rehabilitate their standing by submitting new affidavits or other evidence in connection with their reply brief. Plaintiffs bear the burden of establishing jurisdiction at summary judgment, and thus they were obligated to address that element of their claim in their opening motion—not solely in a reply brief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A]

13

party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."); *id.* at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[.]"). Indeed, "[t]he Local Rules governing summary-judgment motion practice in this Court do not permit a party to attach new evidence to its reply brief, except by *prior* permission from the Court." *Dunn v. Sw. Airlines Co.*, No. 3:21-CV-01393-X, 2022 WL 19006363, at *1 (N.D. Tex. Oct. 20, 2022); *see also Dethrow v. Parkland Health Hosp. Sys.*, 204 F.R.D. 102, 103 (N.D. Tex. 2001) (collecting cases). It would be fundamentally unfair to allow Plaintiffs to attempt to establish their standing—an element on which they bear the burden of proof—by submitting new evidence with their reply brief, to which Defendants do not have an opportunity to respond. And Plaintiffs cannot rectify this error by filing a new motion for summary judgment on this claim. *See* L. Civ. R. 56.2 (b) (noting that "a party may file no more than one motion for summary judgment"). Thus, given Plaintiffs' wholesale failure to address jurisdiction and carry their burden of establishing their standing with competent evidence at summary judgment, their motion should be denied and the claim should be dismissed.

## II.    THE TAYLOR FORCE ACT ALLOWS THE PROVISION OF ECONOMIC SUPPORT FUNDS THAT DO NOT "DIRECTLY BENEFIT" THE PALESTINIAN AUTHORITY

Plaintiffs' primary argument in support of summary judgment is a statutory one, namely that, absent the requisite certification under subsection (a), the Taylor Force Act allows the State Department to provide Economic Support Funds in West Bank and Gaza *only* for the three exceptions listed in subsection (b). In Plaintiffs' view, although the Taylor Force Act's prohibition on Economic Support Funds applies only to funding "that directly benefits the Palestinian Authority," 22 U.S.C.

§ 2378c-1(a)(1), that prohibition should be construed broadly to exclude *all* economic support fund awards outside the exceptions listed in subsection (b). *See* Pls.' MSJ at 11 ("[T]he sole interpretative question presented is whether sub-section (a)(1)'s phrase 'that directly benefits the Palestinian Authority' is a loop-hole[.]"); *id.* at 17 ("[T]he Defendants' policy of making Economic Support Fund assistance available in the West Bank and Gaza for programs, projects, and activities outside the ambit of the exceptions specified in subsection (b) is unlawful[.]"). But Plaintiffs' statutory argument is contrary to the plain text, structure, and purpose of the Taylor Force Act, as well as Congress's consistent actions in repeatedly appropriating money to continue providing assistance for the West Bank and Gaza. Both the text of the Taylor Force Act and Congress's subsequent actions confirm that the State Department is authorized to provide Economic Support Funds in West Bank and Gaza as long as the funds do not "directly benefit" the Palestinian Authority.

### A. The Plain Text Prohibits Only Those Economic Support Funds that "Directly Benefit" the Palestinian Authority

Plaintiffs' argument is that, absent the certification in subsection (a) or an exception in subsection (b), *all* economic support funding in West Bank and Gaza violates the Taylor Force Act. But this interpretation would read critical phrases out of the statutory text, render other provisions superfluous, and even on its own terms is not the best understanding of the phrase "directly benefits."

**1.** Plaintiffs' argument violates a cardinal principle of statutory interpretation; it effectively reads the phrase "that directly benefits the Palestinian Authority" out of the statutory text. As noted above, subsection (a)(1) contains the relevant prohibition, and its text provides:

> Funds authorized to be appropriated or otherwise made available for assistance under chapter 4 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2346 *et seq.*; relating to Economic Support Fund) and available for assistance for the West Bank and Gaza that directly benefits the Palestinian Authority may only be made available for such purpose if . . . the Secretary of State certifies in writing to the appropriate congressional committees that the Palestinian Authority [has satisfied certain criteria].

15

22 U.S.C. § 2378c-1(a)(1). Thus, this provision generally prohibits the State Department from making economic support fund awards that "directly benefit[] the Palestinian Authority" absent the required certification. *Id.* Plaintiffs, however, read this provision as prohibiting *all* economic support fund awards in West Bank and Gaza, except those specifically authorized by the later exceptions contained in subsection (b). *See* Pls.' MSJ at 11 ("[S]ubsection (b)(1) defines the *only* permissible exceptions to the general funding limitation[.]").

If Congress had intended to foreclose *all* economic support fund assistance in West Bank and Gaza except those specifically authorized in later subsections, however, then Congress could have commanded that simply by omitting the phrase "that directly benefits the Palestinian Authority." Instead, Congress included that phrase as a qualifier to the subsection (a) prohibition, and that qualifier must be given effect—not treated as surplusage, as Plaintiffs' theory requires. *See, e.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128-29 (2018) ("As this Court has noted time and time again, the Court is obliged to give effect, if possible, to every word Congress used."). The phrase should be construed to have particular salience, because the original version of the Bill introduced in the House of Representatives did not include this language, but the phrase was purposefully added later into the text. *Compare* H.R. 1164, 115 Cong. (Feb. 16, 2017), as introduced in House (stating that "[f]unds authorized . . . and available for assistance for the West Bank and Gaza . . . may only be made available for such purpose if" the Secretary of State makes the requisite certification), *with* H.R. 1164, 115 Cong. (Dec. 5, 2017), passed House as amended (stating "funds authorized to be appropriated . . . and available for assistance for the West Bank and Gaza that *directly benefits* the Palestinian Authority may only be made available for such purpose if" the Secretary makes the certification (emphasis added)). "Congress' rejection of the very language that would have achieved the result the [Plaintiffs] urge[] weighs heavily against the [Plaintiffs'] interpretation." *Hamdan v. Rumsfeld,* 548 U.S. 557, 579-80 (2006).

And when the statutory text was changed to include the "directly benefits" limitation, Congress plainly understood that it was limiting the reach of the Taylor Force Act's prohibition:

> This piece of legislation has been carefully written in order to target *only those funds that directly benefit the Palestinian Authority*, thereby creating real incentives for the PA to meaningfully end this practice. I congratulate the chairman and the ranking member for crafting today's amended language in a way that will pressure the PA to stop this practice *without damaging our vital investments in humanitarian assistance and grassroots people-to-people programs* that are essential to achieving our overall objective of peace.

H. Cmte. on Foreign Affairs, *Hrg. on Various Measures*, No. 115-79 (Nov. 15, 2017), at 182 (statement of Rep. Deutch) (emphasis added); *see also Business Meeting*, S. Cmte. on Foreign Relations (Aug. 3, 2017), https://perma.cc/578D-JC6B (statement of Sen. Cardin) (identifying one of the objectives of the bill as being "to protect the humanitarian needs of the innocent Palestinian people, particularly as we look at ways that we can distribute our aid through NGOs, which is what we do currently and which is not affected by this bill"). Thus, the presence of the phrase "directly benefits the Palestinian Authority" in the text of subsection (a)(1) confirms that Congress did not intend to foreclose *all* economic support fund assistance in West Bank and Gaza—only assistance that directly benefits the Palestinian Authority.

**2.** Not only would Plaintiffs' interpretation render the phrase "directly benefits" a nullity, but it would also render superfluous other subsections of the Taylor Force Act. *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009) ("We must interpret the statute to give effect to both provisions where possible."). In particular, it would make little sense for Congress to require that the Secretary of State submit "a list of the criteria that the Secretary uses to determine whether assistance for the West Bank and Gaza is assistance that *directly benefits* the Palestinian Authority," 22 U.S.C. § 2378c-1(f)(1) (emphasis added), if Congress thought that every award of assistance for the West Bank and Gaza inherently directly benefits the Palestinian Authority.

Moreover, Plaintiffs' interpretation would make ineffective the process in subsection (d). As Plaintiffs acknowledge, this subsection "creates a meaningful economic incentive for the Palestinian

Authority to meet the statute's anti-terrorism conditions." Pls.' MSJ at 19. Pursuant to the subsection (d) process, if the Secretary has not made the certification required by subsection (a), the Secretary may nonetheless withhold funds that would "directly benefit[] the Palestinian Authority"— and those withheld funds will remain available for a longer period of time, *see* 22 U.S.C. § 2378c-1(d)(1)-(2), thereby encouraging the Palestinian Authority to meet the certification conditions. If the Palestinian Authority does not meet the certification conditions within 180 days after the withheld funds would have originally expired, however, then the Secretary is authorized to use those funds for different purposes:

> (A) 50 percent for purposes of assistance other than that deemed benefiting the Palestinian Authority; and

> (B) 50 percent for purposes other than assistance for the West Bank and Gaza.

*Id.* § 2378c-1(d)(3). If Plaintiffs' argument were correct—*i.e.*, that every award of Economic Support Funds in West Bank and Gaza inherently benefits the Palestinian Authority—then subsection (d)(3)(A) would be meaningless, because there could *never* be an award within the West Bank and Gaza "for purposes of assistance other than that deemed benefiting the Palestinian Authority." That is not a reasonable way of understanding the Taylor Force Act's text. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus renders an entire subparagraph meaningless . . . the canon against surplusage applies with special force." (alterations omitted)). Instead, the presence of subsection (d)(3)(A) necessarily requires that some economic support fund awards be deemed not to "benefit[] the Palestinian Authority," contrary to the premise of Plaintiffs' statutory theory.

**3.** Even apart from rendering superfluous the surrounding provisions of the Taylor Force Act, Plaintiffs' statutory theory is not the best interpretation of the subsection (a) prohibition itself. Plaintiffs contend that "directly benefits" should be "construed to include *anything* useful or profitable to the Palestinian Authority[.]" Pls.' MSJ at 15. But that reads the word "direct" out of the statute.

Under a plain meaning analysis, an action is "direct" when it is "undeviating," "[f]ree from extraneous influence," or "immediate," *Direct*, Black's Law Dictionary (12th Ed. 2024), or when it is "without an intervening agency or step," *Direct,* Merriam-Webster.com Dictionary (2024). And a benefit is a "[p]rofit or gain," *Benefit*, Black's Law Dictionary (12th Ed. 2024). Thus, the only funds subject to the subsection (a) prohibition are those that immediately support the Palestinian Authority. *See also* Criteria Rept. at 2.

This is the ordinary understanding of the word "direct," *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985) (holding that courts should assume "that the ordinary meaning of that language accurately expresses the legislative purpose"), and consistent with the interpretation of the phrase in other contexts, *see, e.g.*, *Lefemine v. Wideman*, 568 U.S. 1, 4 (2012) (holding that a plaintiff "directly benefit[ted]" from a court order when the order prevented the defendants from interfering with the plaintiff's protest); *Baskin v. Bottini & Bottini, Inc.*, -- F. Supp. 3d --, 2024 WL 3343019, at *3 (S.D. Tex 2024) (finding that a promise that attorneys' fees would be paid from a settlement was a "direct benefit" of the settlement).

On Plaintiffs' telling, however, a "direct benefit" is any incidental effect on the Palestinian Authority. *See* Pls.' MSJ at 15 ("[T]he phrase 'directly benefits' should be construed to include anything useful or profitable to the Palestinian Authority—not just direct monetary payments—but all the direct benefits flowing to the Palestinian Authority from the Defendants' making available Economic Support Fund assistance to pay for programs, projects, and activities within the areas of basic education and culture, health, social welfare, economic development, and infrastructure in the West Bank and Gaza."). To the extent that the Palestinian Authority receives any benefit from Economic Support Funds provided to nongovernmental organizations to support the education, health, social welfare, or economic development of individuals in West Bank and Gaza, any such benefit is at most indirect—a secondary effect of the funding provided to third parties for the benefit of those

individuals. Such a circuitous path—that assistance provided to independent third parties, allowing those third parties to take actions for the benefit of individuals in West Bank and Gaza—cannot be considered to "directly benefit[]" the Palestinian Authority itself. *Cf. NCMIC Ins. Co. v. Allied Professionals Ins. Co.*, 110 F.4th 1072, 1078-79 (8th Cir. 2024) (concluding that "benefitting in general" from an agreement is not the same as "directly benefiting" from it). And Congress knew how to prohibit indirect benefits through statutory text. *See, e.g.*, 20 U.S.C. § 40(e)(5) (allowing regulations "to prevent the credit . . . from *directly or indirectly benefiting* any person with a direct or indirect productive capacity of more than 60,000,000 gallons of agri-biodiesel during the taxable year" (emphasis added)). Even considering the text of subsection (a) in isolation, then, it still does not broadly prohibit the type of awards that Plaintiffs challenge here.

**4.** Finally, in an effort to get around the plain text of the Taylor Force Act, Plaintiffs invoke extraneous sources. *See* Pls.' MSJ at 13-14. Specifically, Plaintiffs argue that the section heading for the restriction is "Limitation on Assistance to the West Bank and Gaza," not "Limitation on Assistance to the Palestinian Authority." *Id.* at 13-14 (citing the heading in § 2378c-1). But the existing title ("Limitation on Assistance to the West Bank and Gaza") accurately describes the statute even under Defendants' interpretation (*i.e.*, limiting assistance in West Bank and Gaza that directly benefits the Palestinian Authority, unless the required certification is made). And in any event, the Supreme Court has repeatedly affirmed that "[a] title will not, of course 'override the plain words' of a statute." *Dubin v. United States*, 599 U.S. 110, 121 (2023) (*quoting Fulton v. Philadelphia*, 593 U.S. 522, 536-37 (2021)); *see also Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (noting section headings "cannot limit the plain meaning of statutory text"). Thus, where, as here, the text is clear that the limitation on funding for the West Bank and Gaza is only when it "directly benefits" the Palestinian Authority, the title is of little relevance.

### B.  The Exceptions in Subsection (b) Do Not Alter This Conclusion

The exceptions in subsection (b) bolster Defendants' construction of the Taylor Force Act as prohibiting only those forms of assistance that directly benefit the Palestinian Authority. In subsection (b), Congress exempted from the prohibition under subsection (a) three particular forms of assistance:

> (A) payments made to the East Jerusalem Hospital Network;
>
> (B) assistance for wastewater projects not exceeding $5,000,000 in any one fiscal year; and
>
> (C) assistance for any other program, project, or activity that provides vaccinations to children not exceeding $500,000 in any one fiscal year.

22 U.S.C. § 2378c-1(b). Plaintiffs argue that these exceptions prove their interpretation of subsection (a), because "Congress plainly considered" these exceptions in subsection (b) to "directly benefit" the Palestinian Authority, yet Congress chose not to create additional exceptions for other types of "projects, pro-grams [sic], and activities" of the type that the State Department funds. Pls.' MSJ at 16-17. Plaintiffs oversimplify the inquiry, however, and subsection (b) only further confirms that the subsection (a) prohibition is limited to assistance that directly benefits the Palestinian Authority.

Plaintiffs contend that the exceptions in subsection (b) are all "programs for which the Palestinian Authority would otherwise be responsible," *id.* at 12, which, in their view, supports interpreting subsection (a)'s prohibition as extending broadly to *all* sectors for which the Palestinian Authority may have some involvement or potential responsibility. But the activities covered by the subsection (b) exceptions are ones that Congress considered important enough to carve out of the restriction even when they directly benefit the Palestinian Authority in a way that economic support fund awards to nongovernmental organizations for the benefit of individuals in the West Bank and

Gaza do not; thus, subsection (b) does not undermine Defendants' interpretation of the Taylor Force Act.

First, take the East Jerusalem Hospital Network (EJHN). The payments to EJHN include payments for debts owed by the Palestinian Authority to the Israeli-operated EJHN. *See, e.g.*, MTD App'x at 3 (noting, in connection with FY2020 funds, that the payments were for "the PA's outstanding debts" because "[t]he PA has agreements with EJHN hospitals for them to be reimbursed for services provided to Palestinian patients referred by the Palestinian Ministry of Health Referral Department"); *see also id.* at 10; MTD Suppl. App'x at 31. Congress was well aware of this practice of using Economic Support Funds to pay for the Palestinian Authority's debts to the EJHN. *See, e.g.*, S. Hrg. 115-705 at 13 (July 12, 2017) (statement of Hon. Daniel B. Shapiro) (noting that "the U.S. assistance program under [ESF] to Palestinians includes . . . debt payments paid directly to . . . the Israeli-run East Jerusalem Hospital Network to pay bills incurred by the PA"); *see also id.* at 9, 17. Because these funds (paying the Palestinian Authority's debts) would "directly benefit" the Palestinian Authority—or, in other words, provide the Palestinian Authority with immediate support—the ability to continue such payments needed an exception under the Taylor Force Act.

Similarly, the exceptions for childhood vaccinations and wastewater programs were intended to ensure that such projects could continue even in circumstances that would directly benefit the Palestinian Authority. Representative Connolly introduced the exception for childhood vaccinations, noting the importance of the issue and also that a previous program had been undertaken in conjunction with the Palestinian Authority:

> I want to thank the Chairman and Ranking Member for working with me on an amendment that creates another exception for programs that provide vaccinations to children. This is a straightforward, common sense amendment to ensure that we do not cut off lifesaving immunization for vulnerable children. . . .
>
> In FY 2016, USAID's West Bank and Gaza assistance program included a $500,000 vaccination program. *Because this project works with the PA's Ministry of Health*, this act would prohibit it. This project supports universal vaccination of all infants in the West

> Bank and Gaza against rotavirus infection, which is the leading cause of severe and fatal diarrhea in children under five years of age. . . . My amendment will ensure that this basic right is extended to all Palestinian babies in the West Bank and Gaza.

H. Cmte. on Foreign Affairs, Hrg. No. 115-79, at 209-10 (emphasis added). Thus, that exception was likewise intended to allow for a *direct* benefit to the Palestinian Authority. And given the "dire" wastewater situation in West Bank and Gaza that "threaten[s] basic human survival," MTD App'x at 11, Congress could also reasonably seek to ensure that wastewater programs could continue notwithstanding any potential direct benefits to the Palestinian Authority. *Cf. id.* at 4 (noting the need for a "comprehensive approach" to wastewater including "coordinat[ing] with municipal water authorities, service providers, and other donors").

Thus, Congress understood that these exceptions were necessary to allow assistance to continue even if such assistance would "directly benefit" the Palestinian Authority; but these exceptions were not the sole authorized forms of assistance, and were not to the exclusion of economic support fund assistance that does *not* "directly benefit[]" the Palestinian Authority. To the contrary, Congress recognized that the exceptions were separate from other types of assistance that were allowed to continue because they did not directly benefit the Palestinian Authority. For example, during the debate before the House of Representatives, Representative Engel described the bill as not only "allow[ing] the United States to continue humanitarian and democracy assistance . . . [i]t *also* includes a thoughtful exemption proposed by the gentleman from Virginia (Mr. Connolly) which exempts childhood vaccinations from the cuts required under this bill." 163 Cong. Rec. H9648, H9650 (2017) (statement of Rep. Engel); *see also Business Meeting*, S. Cmte. on Foreign Relations (Aug. 3, 2017), https://perma.cc/578D-JC6B (statement of Sen. Corker) ("The State Department knows full well that if they want these resources flowing to the Palestinian people, they can do it through reprogramming to NGOs so that we are not, again, propping up the Palestinian Authority's ability to

have dominion over people when they, in fact, are paying people to kill Israelis and other innocent people.").

From the context, text, and history of the Act, it is therefore clear that the Congress did not intend to allow the provision of assistance in the West Bank and Gaza *only* with respect to the EJHN, wastewater management, and childhood vaccinations. *See* 163 Cong. Rec. H9648, H9650 (2017). Rather, those exceptions ensure that important provisions of aid continue, even when they directly benefit the Palestinian Authority—which refutes Plaintiffs' contention that these exceptions are rendered superfluous under Defendants' interpretation. *See* Pls.' MSJ at 17. Plaintiffs also assert that the Court cannot imply additional exceptions to the Taylor Force Act for "projects, pro-grams [sic], and activities such as 'Governance' all of which are funded by Defendants." *Id.* at 17. Again, such an implied exception is unnecessary when the text is clear—only funds that "directly benefit the Palestinian Authority" (such as debt payments for the EJHN) need an exception. Because Defendants' challenged economic support fund payments do not directly benefit the Palestinian Authority, they fall outside the Taylor Force Act's prohibition in subsection (a), and thus do not require an exception under subsection (b). *See* 22 U.S.C. § 2378c-1.

### C.    Defendants' Interpretation is Consistent with the Taylor Force Act's Purpose

As the Chairman of the Senate Committee on Foreign Relations noted when considering the Taylor Force Act, the legislation had two main purposes: to stop assistance that directly benefits the Palestinian Authority while still continuing assistance to individuals in the West Bank and Gaza. S. Hrg. 115-705, at 4 (statement of Sen. Corker) ("I hope our witnesses can help us consider different options to ensure assistance that goes directly to the Palestinian people does not also benefit their government."). Indeed, in passing the Taylor Force Act, Congress made several findings, including that the United States "supports community-based programs in the West Bank and Gaza that provide for basic human needs," and "that promote peace and development." 22 U.S.C. § 2378c-1 note, § 3.

Defendants' interpretation of the text is consistent with these purposes. By stopping assistance that "directly benefits" the Palestinian Authority, Defendants ensure that funds do not provide direct or immediate aid to the Palestinian Authority. But by continuing assistance implemented by nongovernmental organizations and other partners that provide valuable assistance to individuals, Defendants continue to "support[] community-based programs in the West Bank and Gaza that provide for basic human needs," and "that promote peace and development" *Id.* § 3; *see also* 163 Cong. Rec. H9648, H9653 (Dec. 5, 2017) (statement of Rep. Engel) (asserting the Taylor Force Act "allows the United States to avoid any unintended consequences such as the cessation of humanitarian assistance, the right thing to do").

Ignoring these dual purposes of the Taylor Force Act, Plaintiffs instead make several unsupported claims about statutory purpose. First, Plaintiffs argue that their interpretation of the Taylor Force Act must be correct, because the Taylor Force Act was not meant to "be simply 'more of the same.'" Pls.' MSJ at 13, 22. They note that prior to the Taylor Force Act, the United States "did not provide direct budgetary support to the Palestinian Authority," so the phrase "directly benefits" cannot mean what it says. *See id.* at 13-14. But Plaintiffs invoke only "annual appropriations legislation" foreclosing direct budgetary support, *id.* at 13, which includes a waiver authority; there is nothing inconsistent about Congress choosing to enact permanent legislation that restricts assistance that directly benefits the Palestinian Authority in addition to the provision of funds to the Palestinian Authority. Moreover, Plaintiffs ignore that the Taylor Force Act does go beyond prior restrictions. For example, apart from payments to EJHN, it forbids the United States from making other debt payments on behalf of the Palestinian Authority. *Cf. Consideration of the Taylor Force Act*, *S*. Hrg. No. 115-705, at 9 (statement of Hon. Elliot Abrams) (noting that the United States had previously "paid to cover debts owed directly to suppliers of power").

25

Plaintiffs also argue that the purpose of the Taylor Force Act was to restrict money from reaching the Palestinian Authority and rely on the general premise that "money is fungible." Pls.' MSJ at 21. Regardless of the fungibility of money, Congress decided to restrict only those economic support funds that "directly benefit" the Palestinian Authority to balance the Act's dual purposes of restricting assistance to the Palestinian Authority while still providing assistance to benefit individuals in West Bank and Gaza. Plaintiffs may have a different foreign policy preference, but that does not alter the Taylor Force Act's purpose or its operative text.

Similarly, nothing in the legislative history invoked by Plaintiffs, *see id.* at 23-24, can overcome the Taylor Force Act's text, let alone suggests that Congress understood the Taylor Force Act as prohibiting all economic support funding in West Bank and Gaza absent the certification in subsection (a) and outside the narrow exceptions in subsection (b). Instead, the legislative history reflects a careful congressional balance and recognition that the Taylor Force Act prohibits only economic support fund assistance *that directly benefits the Palestinian Authority. See, e.g.*, 163 Cong. Rec. H9648, H9650 (Dec. 5, 2017) (statement of Rep. Engel) ("This bipartisan bill cuts off assistance *that directly benefits the Palestinian Authority* unless the PA takes credible steps to end acts of violence[.]" (emphasis added)); *id.* at H9651 (statement of Rep. Deutch) ("I am proud of the bipartisan manner in which today's bill was crafted, and it is carefully written in a way that *targets only those funds that directly benefit the Palestinian Authority*, thereby creating real incentives for the PA to end [the prisoner payment system] without damaging the vital U.S. investments in humanitarian assistance and grassroots people-to-people programs that are essential to achieving our overall objective of peace." (emphasis added)); *id.* at H9652 (statement of Rep. Gottheimer) ("The Taylor Force Act will eliminate U.S. foreign aid to the West Bank and Gaza *that directly benefits the Palestinian Authority* until the Secretary of State can guarantee that they have ended these payments." (emphasis added)).

26

Indeed, Congressmembers recognized that Economic Support Funds would continue to be administered in West Bank and Gaza in ways that did *not* directly benefit the Palestinian Authority. *See, e.g.*, *id.* at H9650 (statement of Rep. Royce) ("We are now considering this legislation, which cuts all funds that directly benefit the Palestinian Authority . . . . At the same time, the bill allows the United States to continue humanitarian and democracy assistance, which is in our interest and the interest of our ally Israel."); *id.* at H9652 (statement of Rep. Frankel) ("This legislation, which correctly exempts humanitarian and democracy-promoting programs, tells the Palestinian Authority: No more pay to slay."); S. Hrg. 115-705 at 17 (statement by Sen. Corker) (noting that, with the passage of the Taylor Force Act, "[p]ayments that go directly to the Palestinian Authority, we would cut off" while "payments that actually go to the Palestinian people, the humanitarian aid and those kinds of things, those would continue"); *see id.* at 4 (Statement of Sen. Corker) (stating that the purpose of the hearing was to hear testimony to "help us consider different options to ensure assistance that goes directly to the Palestinian people does not also benefit their government"). Thus, the Taylor Force Act's text, purpose, and history does not support Plaintiffs' proposed interpretation, which would render portions of the text ineffective and essentially shut down all Economic Support Funds in West Bank and Gaza outside the narrow exceptions in subsection (b).

### D. Congress Has Confirmed Defendants' Interpretation of the Taylor Force Act by Consistently Appropriating Economic Support Funds for West Bank and Gaza

To the extent there were any doubt about the proper interpretation of the Taylor Force Act, Congress's own actions confirm that the ongoing awards of Economic Support Funds are lawful. In particular, Congress is well aware that the State Department and USAID are awarding Economic Support Funds in West Bank and Gaza to nongovernmental organizations, based on the assessment that such awards do not directly benefit the Palestinian Authority, and Congress has consistently appropriated money for those very purposes over the past several years. *See, e.g.*, *Ex parte Endo*, 323

U.S. 283, 303 n.24 (1944) ("Congress may of course do by ratification what it might have authorized. And ratification may be effected through appropriation acts." (citations omitted)); *Young v. Tenn. Valley Auth.*, 606 F.2d 143, 147 (6th Cir. 1979), *cert. denied*, 445 U.S. 942 (1980) ("Appropriation by Congress of funds for agency action in the face of a construction placed upon an enabling act by the agency has the effect of ratifying the agency action when the agency construction is consistent with the purpose of the legislation."); *Kovac v. Wray*, 109 F.4th 331, 340 (5th Cir. 2024) (recognizing the "long-settled principle" that Congress can ratify unauthorized agency actions).

As discussed above, the State Department and USAID have consistently made Congress aware of how they were administering Economic Support Funds in West Bank and Gaza pursuant to statutory reporting and notification requirements, the resolution of Congressional "holds" on assistance, and other engagement. *See* Background, Part I, *supra*; *see also, e.g.*, MTD App'x, Exs. A, B, D. Those materials make plain to Congress that State and USAID are providing Economic Support Funds for programs in the West Bank and Gaza that do not "directly benefit" the Palestinian Authority. And Congress, being fully aware of this approach to the implementation of Economic Support Funds and the criteria used in assessing whether such assistance directly benefits the Palestinian Authority under the Taylor Force Act, has since FY2020 consistently appropriated economic support funding and expressly directed that a minimum portion of that funding be directed to the West Bank and Gaza: $75 million in FY2020; $75 million in FY2021; $219 million in FY2022; $225 million in FY2023; and $175 million in FY2024. *See* Background, Part I.C, *supra*.

This consistent pattern of Congressional appropriation of funding is irreconcilable with Plaintiffs' theory that Congress intended to *foreclose* such funding from occurring. Moreover, Congress has in fact authorized *additional* types of Economic Support Funds for use in West Bank and Gaza, for activities that plainly fall outside the subsection (b) exceptions. *See* Nita M. Lowey Middle East Partnership for Peace Act of 2020, 22 U.S.C. § 2346d note (expressly authorizing a program in the

West Bank and Gaza under the Economic Support Fund chapter of the Foreign Assistance Act, including for the "development of the Palestinian private sector economy in the West Bank and Gaza"). Thus, Plaintiffs' statutory argument is incorrect as a matter of law; the Taylor Force Act allows State to provide economic support fund assistance within West Bank and Gaza, as long as that assistance does not directly benefit the Palestinian Authority. Plaintiffs therefore have not shown that Defendants' awards of Economic Support Funds violated the Taylor Force Act, and their motion for partial summary judgment should accordingly be denied.

## III.  PLAINTIFFS HAVE NOT PROVEN THAT ANY PARTICULAR AWARD OF ECONOMIC SUPPORT FUNDS WAS UNLAWFUL

Even if this Court had jurisdiction over Plaintiffs' challenge, and even if it were inclined to agree with Plaintiffs' underlying statutory theory, the Court should still decline to enter Plaintiffs' requested relief—*i.e.*, invalidating all of the approximately 179 awards listed in Plaintiffs' Exhibit 4, and also declaring that all future such awards are unlawful. *See* Pls.' MSJ at 25. Plaintiffs' motion makes no attempt to prove that any of the individual awards is unlawful, and it would be inappropriate to grant such wide-ranging relief at this stage.

As noted above, Plaintiffs' Amended Complaint contains a single claim under the APA. Pursuant to that statute, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *see also Fla. Power & Light Co.*, 470 U.S. at 743; 5 U.S.C. § 706. Thus, the Court should disregard Plaintiffs' extra-record materials, including those facts that even Plaintiffs acknowledge are disputed. *Cf.* Pls.' MSJ at 3, 6 n.5.

The foundation for Plaintiffs' requested relief is their Exhibit 4, which reflects their own compilation of data from a government website. *See id.* at 7-8 & n.6. But Plaintiffs' motion makes no effort whatsoever to explain how any individual award listed in Exhibit 4 is actually unlawful. And even a brief review of their Exhibit 4 highlights how, even if this Court were inclined to agree with

Plaintiffs' statutory theory, that does not necessarily mean every award was unlawful. For many of the awards, it is difficult (if not impossible) to discern how, even under Plaintiffs' theory, the award could plausibly be said to "directly benefit the Palestinian Authority." To take just a handful of examples from different categories:

- Exhibit 4A, "Governance" – Pls.' App'x at 63: Activity ID 229530 describes $5,000,000 for Education2Action, which is "creating a network of entrepreneurial Israeli and Palestinian youth peacemakers to address challenges in and between their communities," and does so through a two-year educational program for high-school students focusing on "specialized training in computer science, entrepreneurship, and leadership."

- Exhibit 4B, "Basic Education and Culture" – Pls.' App'x at 69: Activity ID 226371 describes approximately $542,000 for "techseeds for peace," which seeks to "harness technology as a common interest to bring together Palestinians and Israelis for skills development and career advancement to take advantage of this growing market and building lasting personal relationships." (modifications omitted).

- Exhibit 4C, "Public Health" – Pls.' App'x at 72: Activity ID 230656 describes $1,207,000 for the "Middle East Binational Psychotherapy School" which "convenes Israeli and Palestinian professionals in formal and informal settings to enhance their skills in child and adolescent psychotherapy and psychoanalysis."

- Exhibit 4D, "Social Services" – Pls.' App'x at 75: Activity ID 228127 describes approximately $3,294,000 for providing "businesswomen with training, seed funding, and connections with successful entrepreneur mentors," and also "train[ing] young women on business skills and expos[ing] them to role models, building the next generation of women entrepreneurs."

- Exhibit 4E, "Economic Development" – Pls.' App'x at 77: Activity ID 231282 describes approximately $2,939,000 for the "Women's Economic and Empowerment Program," which "aims to promote sustainable peace and cooperation by establishing a connected network of localized economic ecosystems, or hubs, led by [I]sraeli and [P]alestinian women micro-entrepreneurs."

- Exhibit 4F, "Infrastructure" – Pls.' App'x at 82: Activity ID 216854 describes approximately $354,000 for the "Consultative Group on International Agricultural Researc[h]."

As these descriptions make clear, even if the Court were inclined to agree with Plaintiffs' statutory theory, that still does not mean that every award was unlawful or inherently constitutes an "activit[y] for which the Palestinian Authority would otherwise be responsible[.]" Pls.' MSJ at 20. In

the absence of the Administrative Record regarding these actions—and especially in the absence of any individualized analysis from Plaintiffs demonstrating that any particular award is unlawful—it would be inappropriate for this Court to enter Plaintiffs' requested relief, declaring that the entire catalogue of awards set forth in Exhibit 4 was unlawful. Plaintiffs' motion for partial summary judgment should therefore be denied for this reason as well, because they have not actually carried their burden of proving, through legally admissible evidence, that the economic support fund awards challenged here were unlawful.

## **CONCLUSION**

For the reasons stated herein, the Court should deny Plaintiffs' motion for partial summary judgment and dismiss this action.

Dated: October 21, 2024

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

ALEXANDER K. HAAS
*Director*

DANIEL SCHWEI
*Special Counsel*

*/s/ Dorothy M. Canevari*
DOROTHY M. CANEVARI (NY Bar # 5989694)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel.: (202) 616-8040
Email: Dorothy.m.canevari@usdoj.gov

*Counsel for Defendants*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2024, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Dorothy Matilda Canevari*
Dorothy M. Canevari
U.S. Department of Justice
