**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
AMARILLO DIVISION**

_____

DR. RONNY JACKSON, STUART and ROBBI
FORCE, and SARRI SINGER,

                              *Plaintiffs,*

       v.

JOSEPH R. BIDEN, JR., et al.,                Civil Action No. 2:22-cv-241-Z

                          *Defendants.*

_____/


**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 2

   I.   The Plaintiffs have standing. ............................................................. 3

   II.   The Taylor Force Act limits funding to nongovernmental organizations that relieve the Palestinian Authority of its obligations. ................................................. 9

     A.   Statutory text and context refute the Defendants' reading. ........................ 10

     B. Legislative history and purpose refute the Defendants' reading. .................. 18

   III.   The Court should invalidate the ESF funding awards that relieve the Palestinian Authority of its obligations. ................................................. 23

CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Bruesewitz v. Wyeth LLC*,
    562 U.S. 223 (2011) ........................................................................... 21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................. 4

*Confederated Tribes & Bands of Yakama Nation v. City of Yakima*,
    No. 1:20-CV-03156-SAB, 2022 WL 1841614 (E.D. Wash. Mar. 7, 2022) ................ 4

*Crocker v. Austin*,
    115 F.4th 660 (5th Cir. 2024) .................................................................. 9

*Dunn v. Sw. Airlines Co.*,
    No. 3:21-CV-01393-X, 2022 WL 19006363, (N.D. Tex. Oct. 20, 2022) ................... 5

*Fanning v. HSBC Card Servs. Inc.*,
    No. CV-12-00885, 2014 WL 12783362 (C.D. Cal. May 5, 2014) ............................ 4

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................. 7

*FDIC v. Massingill*, 24 F.3d 768 (5th Cir.),
    *opinion supplemented on denial of reh'g*, 30 F.3d 601 (5th Cir. 1994).................... 5

*In re Ford Motor Co.*,
    591 F.3d 406, (5th Cir. 2009) ................................................................. 7

*K.P. v. LeBlanc*,
    729 F.3d 427 (5th Cir. 2013) .................................................................. 6

*KB Home Jacksonville LLC v. Liberty Mut. Fire Ins. Co.*,
    No. 3:18-CV-371-J-34MCR, 2019 WL 4228602 (M.D. Fla. Sept. 5, 2019) ............ 24

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004) ........................................................................... 11

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) (en banc)...................................................... 24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. 7

*Massachusetts Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*,
   698 F. Supp. 3d 10 (D.D.C. 2023) ............................................................... 4

*Massachusetts Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*,
   No. 1:20-CV-03438 (TNM), 2024 WL 4332121 (D.D.C. Sept. 27, 2024) ................. 4

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) ................................................................................. 21

*New Amsterdam Cas. Co. v. B. L. Jones & Co.*,
   254 F.2d 917 (5th Cir. 1958) ..................................................................... 5

*NLRB v. SW Gen., Inc.*,
   580 U.S. 288 (2017) ............................................................................. 18, 19

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ................................................................................. 20

*Sierra Club v. Duke Energy Indiana, Inc.*,
   No. 1:08-CV-437-SEB-TAB, 2010 WL 1381468, (S.D. Ind. Mar. 30, 2010) .......... 24

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................................. 7

*Travelers Indem. Co. v. Erickson's, Inc.*,
   396 F.2d 134 (5th Cir. 1968) ..................................................................... 5

*United States v. Atl. Rsch. Corp.*,
   551 U.S. 128 (2007) ................................................................................. 11

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................................. 7

**Statutes**

22 U.S.C. § 2346d note ................................................................................ 21

22 U.S.C. § 2378c-1 .................................................................................... 10

22 U.S.C. § 2378c-1 note ............................................................................. 18

22 U.S.C. § 2378c-1(a)(1) ................................................................... 20, 24, 25

22 U.S.C. § 2378c-1(b) ................................................................................ 25

22 U.S.C. § 2378c-1(b)(1) ............................................................................ 25

22 U.S.C. § 2378c-1(b)(1)(A) ............................................................ 15

22 U.S.C. § 2378c-1(b)(1)(B) ............................................................ 25

22 U.S.C. § 2378c-1(d) ..................................................................... 25

22 U.S.C. § 2378c-1(f)(1) .................................................................. 14

## Other Authorities

163 Cong. Rec. H9648, H9650 (daily ed. Dec. 5, 2017) ....................................... 11, 19

165 Cong. Rec. H11061, H11433 (Dec. 17, 2019) ................................................... 21

Black's Law Dictionary (12th ed. 2024) ................................................... 13

Business Meeting 47, S. Cmte. on Foreign Relations (Aug. 3, 2017) .......... 11, 19, 20

Consideration of the Taylor Force Act: Hearing Before the Senate Subcomm. on Foreign Relations, S. Hrg. No. 115-705 (July 12, 2017) ................... 10, 16, 20

GAO, 21-332, *West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks* 20 (Mar. 29, 2021) .................................................. 22

*USAID Provides an Additional $45.5 Million to the East Jerusalem Hospital Network* (Oct. 28, 2024), https://perma.cc/CD7T-UYWZ ....................................... 15

W.P. Rennert et al., *Introducing Rotavirus Vaccine to the Palestinian Territories: The Role of Public-Private Partnerships*, 41 J. Pub. Health (2018), https://perma.cc/CX6W-BT37 ............................................... 17

## Rules

Fed. R. Civ. P. 56(a) ..................................................................... 24

Fed. R. Civ. P. 56(c) ..................................................................... 4, 24

Fed. R. Civ. P. 56(e) ..................................................................... 3, 5

Fed. R. Civ. P. 56(f) ..................................................................... 3, 4

L. Civ. R. 56.2(b) ........................................................................ 6

L. Civ. R. 56.7 ........................................................................... 5

**Treatises**

10A Wright & Miller, Federal Practice & Procedure § 2720 (4th ed.)..................5

18B Wright & Miller, Federal Practice & Procedure § 4478.5 (3d ed.) ................6

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012) ......................................................................................................18

# INTRODUCTION

Despite the Taylor Force Act, the Defendants are flooding nongovernmental organizations in Gaza and the West Bank with U.S. taxpayer monies to carry out the legal obligations of the Palestinian Authority. Because that funding relieves the Authority of its obligations, it leaves the Authority more money to spend on pay-to-slay programs that foster terrorism and harm innocent victims like Taylor Force. The Defendants' efforts to avoid liability for this unlawful funding fail.

First, the Plaintiffs—Taylor Force's family, Rep. Ronny Jackson, and Sarri Singer who all have visited Israel and seek to do so again but face an increased risk of injury from the Defendants' unlawful acts—have standing. The Court has already rejected the Defendants' legal theories against standing; to challenge the factual underpinnings of the Plaintiffs' standing, they should have filed a cross-motion for judgment. They are not entitled to dismissal with no opportunity for the Plaintiffs to respond. Regardless, the Plaintiffs easily satisfy the constitutional standing requirements, as their complaint and declarations confirm.

Second, the Act arguably limits funding in Gaza and the West Bank to three narrow exceptions until the Palestinian Authority stops pay-to-say. At a minimum, it prohibits the Defendants from lawfully funding the Palestinian Authority's obligations under the Oslo Accords; relieving the Authority of its civil governance obligations directly benefits it. Money is fungible—every dollar the Defendants use in taxpayer-funded Economic Support Funds to pay for the education or health services that the Authority is obligated to provide is another dollar the Authority has to spend on pay-to-slay. The Defendants' reading—that the Act only forbids immediate payments to the Authority *that had already been halted*—nullifies the Act and contradicts its text, context, and history.

Third, the Plaintiffs are entitled to partial summary judgment because the Defendants do not contest the accuracy of the funding awards they have identified,

and all those awards are within the scope of the Palestinian Authority's legal obligations. Thus, each award "directly benefits" the Authority and is unlawful. The Defendants present no contrary evidence. The Court should grant partial summary judgment.

## ARGUMENT

The parties' arguments are properly considered in the light of a remarkable "non-public" report to Congress by the Department of State on November 5, 2024. *See* U.S. Dep't of State, *Determination on Imposition and Waiver of Sanctions under Sections 603 and 604 of the Foreign Relations Authorization Act, Fiscal Year 2003 (Public Law 107-228)* at 3 (Nov. 5, 2024) attached as Exhibit 1. Among other things, the Defendants admit that it is their "expressed willingness to partner with the [Palestine Liberation Organization] and [Palestinian Authority] leadership"; that terrorism increased beginning in March 2022, shortly after they began surging Economic Support Funds into Gaza and the West Bank (*contra* Answer ¶ 95); that the Palestinian Authority has been operating at all relevant times in Gaza as well as the West Bank, using post offices to transmit pay-to-slay bounties; and that the United States monitors to "mitigate," not "prevent" or "eliminate" the risk that Economic Support Funds are used for "terrorist purposes." Finally, the Defendants admit that the Palestinian Authority has very limited funds. *Id*. at 4–5, 8, 10–12. This report confirms the Plaintiffs' theory of the case: the Palestinian Authority chooses to fund terrorists, not teachers or health care workers as it is required to do; the Defendants choose to support the Palestinian Authority notwithstanding its support for terrorism; and so, the Defendants launder Economic Support Funds through third parties to directly benefit the Authority and its leaders by relieving them of their civil society obligations, avoid the Taylor Force Act, and knowingly subsidize pay-to-slay. Even apart from this report, there is no genuine dispute of material fact that the Plaintiffs have standing, the Taylor Force Act limits funding

that relieves the Palestinian Authority of its obligations, and the funding challenged in this motion all falls within the Authority's obligations. The Court should grant partial summary judgment.

## I.    The Plaintiffs have standing.

As this Court has held repeatedly, "Plaintiffs ha[ve] standing to challenge th[e] alleged violations because they faced an increased risk of harm in traveling to Israel—harm that was 'reasonably tied to Defendants and redressable by the relief sought.'" ECF 58 at 1 (quoting ECF 38 at 3). The Defendants' contrary argument "fails" because the Taylor Force Act "was predicated on an *existing* link between the PA's financial status and the terrorism it produces." ECF 38 at 3, 5. Therefore: "Plaintiffs demonstrate that their increased risk of harm is reasonably tied to Defendants, redressable by the relief sought, and sufficiently concrete and particularized. Hence, the requirements of standing are satisfied, and further analysis concerning Plaintiffs' alternative theories of standing is unnecessary." *Id.* at 7.

The Defendants again challenge the Plaintiffs' standing on just the same bases. Rather than cross-moving for summary judgment, they insist that the Plaintiffs should have anticipated that the government would relaunch its failed standing objection and thus should have included affirmative evidence—and because the Plaintiffs did not prebut the Defendants' standing challenge, their case should be dismissed. The Defendants' novel argument fails for at least four reasons.

*First*, the Defendants' demand is precluded by Fed. R. Civ. P. 56(f), providing that the court may "grant summary judgment for a nonmovant" only "[a]fter giving notice and a reasonable time to respond." If the Court wishes to consider additional evidence on standing now, Rule 56 also provides a more appropriate procedure to follow here for the Plaintiffs to "properly support an assertion of fact": "give an

opportunity to properly support or address the fact." Fed. R. Civ. P. 56(e)(1); *see also id.* 56(f). And the Plaintiffs have contemporaneously moved for leave to file declarations supporting their standing.

The Defendants cite no case in which a court dismissed a claim for lack of standing based on nothing but the Plaintiff's own partial summary judgment motion—especially from a court that had rejected a standing challenge on a legal basis. Rather, courts denying partial summary judgment motions related to standing simply let the case proceed to discovery. *See, e.g., Fanning v. HSBC Card Servs. Inc.,* No. CV-12-00885, 2014 WL 12783362, at *8 (C.D. Cal. May 5, 2014); *Confederated Tribes & Bands of Yakama Nation v. City of Yakima,* No. 1:20-CV-03156-SAB, 2022 WL 1841614, at *5 (E.D. Wash. Mar. 7, 2022).

The Defendants quote the Supreme Court as saying that "[t]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Opp. 14 (ECF 71). But they use ellipses to omit the crucial qualification: "after adequate time for discovery and upon motion." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The Defendants have not filed a cross-motion, and the Plaintiffs had no reason to believe standing would be relitigated again. *Cf. id.* at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with declarations or other similar materials *negating* the opponent's claim."). Immediate dismissal is improper.[1]

---

[1] Of note, the Defendants' own authority denied summary judgment on cross-motions about standing, and later found after a trial that some plaintiffs had standing. *See* ECF 34 (citing *Massachusetts Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.,* 698 F. Supp. 3d 10, 39 (D.D.C. 2023)); *Massachusetts Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.,* No. 1:20-CV-03438 (TNM), 2024 WL 4332121, at *1 (D.D.C. Sept. 27, 2024). Here, by contrast, the government has not even bothered to file a cross-motion, but nonetheless claims judgment in its favor without opportunity for the Plaintiffs to present evidence.

*Second*, if the Court wishes to consider any factual issues related to standing now,[2] it should order the Defendants to file a proper cross-motion for partial summary judgment or permit the Plaintiffs to file declarations (and the Defendants to sur-reply). *See* Fed. R. Civ. P. 56(e) (noting the Court's authority to "give an opportunity to properly support or address the fact" and "issue any other appropriate order"). The Defendants' assumption that they would be entitled to summary judgment on the current record is untenable. Even if the Plaintiffs did not "carry their heightened burden at this stage," Opp. 12, "[t]he fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied its burden" "of establishing that no genuine dispute of material fact exists and that the movant is entitled to a judgment as a matter of law." 10A Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed.).

Seeking to preempt any further consideration, the Defendants complain that fully briefing their rehashed standing argument "would be fundamentally unfair" if the "Defendants do not have an opportunity to respond." Opp. 14. But if the Defendants were to file an appropriate cross-motion, the parties could fully brief that motion; or, if the Court considers the Plaintiffs' declarations now, the Plaintiffs have no objection to granting the Defendants a sur-reply. Unlike in the cases cited by the Defendants, the Plaintiffs *have* "request[ed] leave to file [a] reply appendix," so have complied with L. Civ. R. 56.7. *Dunn v. Sw. Airlines Co.*, No. 3:21-CV-01393-X, 2022 WL 19006363, at *1 (N.D. Tex. Oct. 20, 2022). In the alternative, the Court could

---

[2] The Defendants seem to believe that a partial summary judgment is a final adjudication. *See* Opp. 12. But under Fifth Circuit precedent, "[a] partial summary judgment order . . . is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case. Such an order is interlocutory in nature, is subject to revision by the district court, and has no *res judicata* effect." *FDIC v. Massingill*, 24 F.3d 768, 774 (5th Cir.), *opinion supplemented on denial of reh'g*, 30 F.3d 601 (5th Cir. 1994); *see also Travelers Indem. Co. v. Erickson's, Inc.*, 396 F.2d 134, 136 (5th Cir. 1968); *New Amsterdam Cas. Co. v. B. L. Jones & Co.*, 254 F.2d 917, 919 (5th Cir. 1958).

permit the Plaintiffs leave to amend their original motion for partial summary judgment to include this evidence, and the parties could then brief that motion. The Defendants' insistence that a "new motion for summary judgment" cannot be filed (Opp. 14) is thus both irrelevant in light of these alternatives and wrong. *See* L. Civ. R. 56.2(b) permitting "more than one motion for summary judgment" if "directed by the presiding judge").

*Third*, the Defendants' already-rejected legal argument about traceability and redressability still lacks merit. The Defendants say that the Plaintiffs "have not submitted any evidence proving traceability or redressability—*i.e.*, that an order invalidating specific Economic Support Fund awards to nongovernmental organizations would actually reduce the purported increased risk of terrorism that Plaintiffs face when traveling to Israel." Opp. 12. But this Court already held that "Plaintiffs' increased risk of harm is reasonably tied to Defendants and redressable by the relief sought." ECF 38 at 3. And that holding was based not on any factual allegations, but primarily on the fact that "[i]n the [Taylor Force Act] itself, Congress acknowledged that the PA *incentivizes* terror." *Id.* at 4. As the Court explained, this "link" drawn by "Congress itself" "between the PA's financial status and the terrorism it produces" "is sufficient to establish redressability." *Id.* at 5; *see also id.* at 7 (noting the Taylor Force Act "and its findings about the PA and the terrorists it funds").

The Defendants do not explain their demand for more "evidence" on this point, Opp. 12, and this Court's previous legal holding on causation and redressability are law of the case. *See K.P. v. LeBlanc*, 729 F.3d 427, 437 (5th Cir. 2013) ("abid[ing]" by a prior standing holding); *see also* 18B Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 4478.5 (3d ed.) (explaining that "[a] court may accept its own earlier determination supporting subject-matter jurisdiction or justiciability").

The Defendants have not shown that this Court's prior determination on traceability and redressability now faces "substantially different" facts or "contrary"

"controlling authority," or "was clearly erroneous." *In re Ford Motor Co.*, 591 F.3d 406, 411–12 (5th Cir. 2009). And whether the Court's holding is considered "law of the case" or not, the Defendants present no substantive argument against traceability or redressability. To the extent they make any affirmative arguments, those arguments are unavailing. The Defendants trot out a "*cf.*" citation to *Lujan* about "entirely conjectural" events, Opp. 12, but they already made the same argument, *see* ECF 20-1 at 19 ("entirely conjectural")—and *Lujan* obviously did not address the situation here. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

Then the Defendants note "two additional factors" that they say "confirm that [the Plaintiffs] have not adequately proven their standing." Opp. 13. They note that the "Plaintiffs here are not directly regulated" so they "are complaining about" "indirect results." *Id.* But the Defendants already made the "directly regulated" point, ECF 27 at 6, and this is merely a restatement of their overarching argument that the effects of funding are too attenuated. The Court has rejected that argument, ECF 38 at 4–5, and the Defendants offer nothing new. Even if standing is "more difficult to establish" in indirect causation cases, "the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights." *Warth v. Seldin*, 422 U.S. 490, 505 (1975). Though some "unregulated parties may have more difficulty establishing causation," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024), as this Court has explained, here Congress has confirmed that a sufficient chain of causation exists such that the Plaintiffs' injury "is likely to be redressed by a favorable judicial decision"—which is all that is needed for standing. ECF 38 at 2–5 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

The Defendants' other "additional factor[]" is that "courts have uniformly concluded that private plaintiffs lack standing" in cases that the Defendants characterize as "similar." Opp. 13. But again, the Defendants discussed these string-cited cases at length in their original motion to dismiss, ECF 20-1 at 14–16, and this

Court already explained that none of these "casts clear, repeated, and unequivocal expressions of intent as mere speculation." ECF 38 at 4. The Defendants' drive-by string-cite of these cases does not contest, much less alter, that conclusion.

In sum, this Court's prior holdings on causation and redressability stand, and there is no need to reconsider or further analyze those issues.

*Fourth* and finally, the Plaintiffs have injuries that are "sufficiently concrete and particularized." ECF 38 at 7. In its first order denying the Defendants' motion to dismiss, the Court found sufficient the Plaintiffs' allegations that "they 'face an increased risk of terrorism *whenever* they enter Israel' due to Defendants' alleged violations," as "their fear is concrete, particularized, and a direct deterrent to 'visiting family, tourism, [and/or] religious pilgrimage.'" ECF 38 at 5. Particularly in light of the events of Oct. 7, 2023, and their aftermath, the Court found that the "Plaintiffs' fear" "was both legitimate and warranted by the circumstances." *Id.* at 7. Thus, the Court concluded that the Plaintiffs' "increased risk of harm" is "sufficiently concrete and particularized." *Id.* at 7.

The Plaintiffs' declarations reinforce these findings. The Plaintiffs have a history of past travel to Israel. For example, Stuart and Robbi Force traveled to Israel in 2018 and 2023, when they visited the site where their son Tyler was murdered. Stuart Force Decl. ¶¶ 17–21; Robbi Force Decl. ¶¶ 16–19; *see also* Jackson Decl. ¶ 6; Singer Decl. ¶¶ 5–12, 14–16, 18. The Plaintiffs also have concrete plans for future travel to Israel. Sarri Singer, for example, typically travels to Israel yearly to meet with and support victims of terror, and she intends to return to Israel at least yearly. Singer Decl. ¶¶ 17–18; *see also* Jackson Decl. ¶ 6; Stuart Force Decl. ¶ 22. The Defendants' unlawful conduct[3] causes an increased risk of injury to the Plaintiffs

---

[3] "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *Crocker v. Austin*, 115 F.4th 660, 664 (5th Cir. 2024).

when they enter Israel—as explained above, and as the Taylor Force Act itself confirms. The Plaintiffs' view of this increased risk of injury is "both legitimate and warranted." ECF 38 at 7. And again, as the Act confirms, this increased risk is likely to be redressed by a judgment that reduces funding that would otherwise flow to the Palestinian Authority's pay-to-slay programs. If the Defendants were to enforce the Taylor Force Act, they would reduce the risk of terror that currently deters the Plaintiffs from risking travel to Israel. *See* Stuart Force Decl. ¶¶ 22, 28; Robbi Force Decl. ¶¶ 21–26; Singer Decl. ¶ 19, 23–24, 27.

On top of the increased risk of injury, Plaintiffs Robbi and Stuart Force and Sarri Singer have standing based on past injuries and on the mental and physical harm caused by the Defendants knowingly and intentionally subsidizing the Palestinian Authority's support for terrorism and for its continued pay-to-slay bounty payments to the families of the terrorists who murdered Taylor and blew up a city bus, killing sixteen innocent people sitting with Ms. Singer. Stuart Force Decl. ¶¶ 7–13, 23–30; Robbi Force Decl. ¶¶ 7–12, 17–19, 21–26; Singer Decl. ¶¶ 7–21, 26.

Thus, the Plaintiffs have standing on their claim that the Defendants' Economic Support Fund awards to Gaza and the West Bank violate the Taylor Force Act. Again, the Plaintiffs do not object to a sur-reply by the Defendants limited to standing, or to briefing this issue on an appropriate cross-motion by the Defendants.

## II. The Taylor Force Act limits funding to nongovernmental organizations that relieve the Palestinian Authority of its obligations.

Under basic statutory interpretation principles, the Taylor Force Act's limitation on ESF funding "for the West Bank and Gaza that directly benefits the Palestinian Authority"—with three exceptions for a hospital, some wastewater projects, and childhood vaccination programs—applies to any funding that relieves the Palestinian Authority of its legal obligations and thereby frees up money for its pay-to-slay programs. 22 U.S.C. § 2378c-1. Whether one reads the statute to limit

ESF funding to these exceptions or to permit narrow ESF funding for areas outside these exceptions (which appear largely theoretical), the existence of these exceptions disproves the Defendants' reading. The Defendants' reading—that "assistance provided to independent third parties" can *never* "be considered to 'directly benefit[]' the Palestinian Authority" (Opp. 20)—has no support in text, structure, history, or purpose, and that reading would nullify the statute's protections. Congress had already stopped direct payments to the Palestinian Authority—so the point of the Taylor Force Act was to do more to reduce funding that relieved the Palestinian Authority of its legal obligations and thereby enabled its pay-to-slay programs.

### A. Statutory text and context refute the Defendants' reading.

The best statutory reading is that the Act limits ESF funding in Gaza and the West Bank to the exceptions listed in subsection (b)(1) until the Secretary of State can attest that the Palestinian Authority has ended its pay-to-slay programs. That reading is supported by the statute's caption, its exceptions, and its context. *See* Memo. 13–24 (ECF 69). Because "money is fungible"—as legislators recognized in passing the Act (CONSIDERATION OF THE TAYLOR FORCE ACT: HEARING BEFORE THE SENATE SUBCOMM. ON FOREIGN RELATIONS, S. Hrg. No. 115-705 at 4 (July 12, 2017) (statement of Sen. Corker))—the Act would accomplish little if it enabled money to be sent to nongovernmental organizations whose expenditures would free up money for the Palestinian Authority's pay-to-slay programs.

The Defendants insist that this reading would render the phrase "that directly benefits the Palestinian Authority" and other statutory language surplusage. *See* Opp. 15–18. But the judicial "hesitancy to construe statutes to render language superfluous does not require [courts] to avoid surplusage at all costs": "It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity." *United States v.*

*Atl. Rsch. Corp.*, 551 U.S. 128, 137 (2007). And here, as shown and as many legislators discussed, the Act was intended to go beyond Congress's preexisting policy of "stopp[ing] giving the Palestinian Authority direct assistance." Memo. 23 (quoting 163 CONG. REC. H9648, H9650 (daily ed. Dec. 5, 2017) (statement of Rep. Engel)). The Defendants' reading would nullify that central objective, limiting the Act's strictures to "immediate aid to the Palestinian Authority" (Opp. 25) that already did not exist.

Moreover, the Defendants cannot offer any non-ambiguous reading of their own. Though they sometimes describe their reading as limited to "immediate aid to the Palestinian Authority," Opp. 25, when convenient to their argument they expand their reading to include payments to third parties, Opp. 22. "Where there are two ways to read the text," one that involves some surplusage but a plain text and another that involves no surplusage but an ambiguous text, courts "should prefer the plain meaning" and decline to "apply[] the rule against surplusage." *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004). Not only does "that approach respect[] the words of Congress," it "avoid[s] the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Id.* Legislators recognized that there would be "a myriad of interpretations" of "directly benefits," BUSINESS MEETING 47, S. Cmte. on Foreign Relations (Aug. 3, 2017), https://perma.cc/578D-JC6B (statement of Sen. Murphy), and only the Plaintiffs articulate a reading that eliminates statutory ambiguities.

Finally, the plain-text statutory reading is bolstered by the reality that because of the Palestinian Authority's overarching responsibilities and control over the West Bank and Gaza under the Oslo Accords, it is hard to conceive of ESF funding assistance for the West Bank and Gaza that does not directly benefit it. The Defendants never address those Accords or their significance in determining what funding benefits the Palestinian Authority. *See* Memo. 1–2; App. 5–23, 24–55 (ECF 69-2). Yet the Defendants agreed in their answer to the complaint "that the

11

Palestinian Authority's responsibilities are set forth in the Oslo Accords." Answer ¶ 6 (ECF 64). Under these Accords, the Palestinian Authority is generally responsible for governmental authority, "education and culture, health, social welfare, [and] direct taxation and tourism." App. 10–11; *see* App. 22, 38–39. For all these reasons, the best reading is that the statute limits ESF funding in Gaza and the West Bank to the listed exceptions in subsection (b)(1).

Even if the Court were not inclined to adopt this reading, the Defendants' atextual reading is wrong. At a minimum, the Act's limitation should be read to encompass "all the direct benefits flowing to the Palestinian Authority from the Defendants' making available Economic Support Fund assistance to pay for programs, projects, and activities within the areas of" governance, "basic education and culture, health, social welfare, economic development, and infrastructure in the West Bank and Gaza"—areas that the Palestinian Authority has an "obligation to pay for" under the Oslo Accords. Memo. 15; *see* Memo. 11 (noting "at least two bases for holding that the Defendants are violating the law").

The Defendants barely respond to this reading, and most of their arguments rebut reading the statute "to exclude *all* economic support fund awards [in West Bank and Gaza] outside the exceptions listed in subsection (b)." Opp. 14–15. The Defendants' arguments about surplusage of other provisions (Opp. 15–18), the meaning of the exceptions (Opp. 21–24), generalized purpose (Opp. 24–27), and post-enactment congressional action (Opp. 27–29) all focus on this broader reading. And though the Plaintiffs believe that reading is reasonable, as explained above, the Defendants' rebuttal is non-responsive to the Plaintiffs' showing that the statutory limitation could *not* be narrowed to immediate payments to the Palestinian Authority, as the Defendants propose. It must include payments to third parties that relieve the Palestinian Authority of its obligations—and thereby, dollar-for-dollar, frees up money for the Authority's pay-to-slay programs.

The Defendants offer hardly any support for their atextual reading that "directly benefits" never encompasses *any* "Economic Support Funds provided to nongovernmental organizations," Opp. 19, no matter the exceptions that Congress believed were needed to enable exactly such funding and no matter the context of doing more than stopping direct payments. The Defendants' attempts to rehabilitate their extreme reading are unavailing.

*First*, the Defendants claim that under "the ordinary understanding of the word 'direct,'" "the only funds subject to subsection (a) are those that immediately support the Palestinian Authority." Opp. 19. The Defendants thus exclude *all* "Economic Support Funds provided to nongovernmental organizations." *Id.* But in context, that is not a plausible reading of the phrase "directly benefits." Though the Defendants define "direct" as "immediate," the dictionary they cite first defines "directly" as "[i]n a straightforward manner." BLACK'S LAW DICTIONARY (12th ed. 2024); *accord* Memo. 15 ("natural, straightforward"). And the Defendants do not seem to dispute that "benefits" ordinarily means "to be useful or profitable to." *Id.*; *see* Opp. 19 ("[p]rofit or gain"). Funding to third parties that relieves the Palestinian Authority of its legal obligations under the Oslo Accords is useful or profitable to the Authority in a straightforward way. Each dollar that those third parties receive is a dollar that the Palestinian Authority does not have to contribute to its obligated function—and can contribute instead to its pay-to-slay programs.

Trying to avoid that commonsense reading, the Defendants try to rewrite "directly benefits the Palestinian Authority" as something like "directly funds the Palestinian Authority." At least at first, the Defendants say that *only* "immediate support" is covered, Opp. 22, suggesting that the term should be limited to "direct monetary payments," Opp. 19. But that understanding unduly limits the ordinary meaning of "benefits," which includes more than simple receipt of funding. And it unduly limits the ordinary meaning of "directly," which means in a natural or

straightforward way. Indeed, the Defendants end up contradicting their initial reading, as they say that debt payments to a third party that relieve the Palestinian Authority of its obligations "directly benefit" the Authority. Opp. 22. But if that's right, then other payments to third parties that relieve the Palestinian Authority of other legal obligations—like its obligations under the Oslo Accords—must also be considered "direct benefits." This understanding finds support in the Defendants' own criteria for "determining whether assistance for the West Bank and Gaza is assistance that directly benefits the Palestinian Authority," which includes "[w]hether the assistance or services provided directly replace assistance or services provided by the Palestinian Authority." MTD App. 19 (ECF 20-2); *see* 22 U.S.C. § 2378c-1(f)(1) (mandating "a list of the criteria that the Secretary uses to determine whether assistance for the West Bank and Gaza is assistance that directly benefits the Palestinian Authority"). Thus, the plain meaning of the statute refutes the Defendants' interpretation of the Act as never extending to "economic support awards to nongovernmental organizations." Opp. 21.[4]

*Second*, as the Plaintiffs explained, the statutory exceptions show that "Congress plainly considered payments to the East Jerusalem Hospital Network, wastewater project assistance not exceeding $5 million in any one fiscal year, and vaccinations to children not exceeding $500,000 in any one fiscal year to 'directly benefit' the Palestinian Authority" even though funding would not go directly to the

---

[4] In places, the Defendants add on a qualification of unknown origin saying the Act does not cover "economic fund awards to nongovernmental organizations *for the benefit of individuals in the West Bank and Gaza*." Opp. 21–22 (emphasis added). It is unclear whether the Defendants intend this qualification to mean anything, but it certainly has no basis in the statutory text. The subjective purpose of nongovernmental organizations says nothing about whether an award directly benefits the Palestinian Authority. And even the Defendants appear to recognize that a program could both be "for the benefit of individuals" *and* "directly benefit the Palestinian Authority," as shown by their explanation of the East Jerusalem Hospital Network payments as achieving both. *See* Opp. 22; MTD App. 3.

Palestinian Authority. Memo. 17. The Defendants' response is that Congress considered these "important enough to carve out of the restriction even when they directly benefit the Palestinian Authority in a way that economic support fund awards to nongovernmental organizations for the benefit of individuals in the West Bank and Gaza do not." Opp. 21–22. This response is nonsensical, because as the Defendants' subsequent explanation makes clear, these carve-outs *are* for "awards to nongovernmental organizations" that are not themselves the Palestinian Authority.

Start with the statutory exception for the East Jerusalem Hospital Network. The Defendants note that "payments to EJHN include payments for debts owed by the Palestinian Authority to the Israeli-operated EJHN." Opp. 22. But the statutory exception includes *all* "payments made to the East Jerusalem Hospital Network," 22 U.S.C. § 2378c-1(b)(1)(A), not merely those for the Palestinian Authority's debts. And the Defendants notably do not say that *all* prior ESF funding to EJHN were for debt payments. They were not, as the Defendants' own exhibit explains. *See* MTD Supp. App. 31 (ECF 50) ("In addition to debt relief, funds will provide technical assistance, capital improvements, and capacity building").[5]

In all events, *any* of these payments would still fall outside the Defendants' narrow reading of subsection (a), as their reading omits *any* "funding provided to third parties for the benefit of those individuals." Opp. 19–20. This is the exact substitution that the Plaintiffs attack—and the statute addresses: the United States gives money to a nongovernmental organization that relieves the Palestinian Authority of its obligations. Though the Defendants rely on the testimony of a former U.S. Ambassador to support the view that Congress was aware of the "practice of using Economic Support Funds to pay for the Palestinian Authority's debts to the

---

[5] A few days ago, USAID likewise announced "$27 million in direct debt relief to the hospitals and $18.5 million to bolster long-term sustainability of member hospitals." *USAID Provides an Additional $45.5 Million to the East Jerusalem Hospital Network* (Oct. 28, 2024), https://perma.cc/CD7T-UYWZ.

EJHN," Opp. 22, it is telling that the Ambassador testified at the same hearing that "debt payments to" "the hospital" are *not* "direct budget support." S. Hrg. No. 115-705, *supra*, at 36. Yet Congress believed an exception was needed anyway from the Act's limitation on funding that "directly benefits" the Palestinian Authority. At the same hearing, Chairman Corker connected these types of debt payments with the nongovernmental funding that the Defendants insist could never "directly benefit" the Authority:

> [A]ssistance is money, and money is fungible. And although we do not provide direct budgetary assistance to the PA, we do pay their debts. We also pay for a range of projects that the PA would otherwise fund themselves. That money frees up resources that are being used to incentivize terrorism.

*Id.* at 4. The Defendants' artificial distinction of third-party debt payments from other third-party monies that relieve the Palestinian Authority's obligation fails. Without the exception, the Taylor Force Act makes such transfers that "directly benefit" the Palestinian Authority unlawful. The existence of that exception belies the Defendants' reading.

The exceptions for certain childhood vaccinations and wastewater programs reinforce the point. Again, the Defendants do not appear to dispute that none of the ESF funding for such programs would go directly to the Palestinian Authority, making these programs outside the Defendants' reading of "directly benefits" from the start. On wastewater programs, the Defendants have no explanation of how their reading of subsection (a) would understand this exception to enable funding that would "directly benefit" the Palestinian Authority. Instead, the Defendants misdirect with the red herring that "given the 'dire' wastewater situation," "Congress could . . . reasonably seek to ensure that wastewater programs could continue notwithstanding any potential direct benefits to the Palestinian Authority." Opp. 23. In other words, the Defendants do not even try to hypothesize any direct benefit to

the Palestinian Authority from wastewater programs under their blinkered reading of "directly benefits." And their own exhibit's discussion of wastewater says that "USAID will not provide assistance for the PA but will coordinate with municipal water authorities, service providers, and other donors." MTD App. 4; *see* MTD Supp. App. 32 ("All tasks will be completed by USAID's contractors"). That Congress decided wastewater program funding required an exception even though that funding is "assistance provided to independent third parties, allowing those third parties to take actions for the benefit of individuals in West Bank and Gaza" (Opp. 20) disproves the Defendants' reading.

The Defendants' attempted distinction of childhood vaccine programs fares no better. The Defendants mention that in 2016, a childhood vaccination "project work[ed] with the PA's Ministry of Health," Opp. 22 (emphasis omitted), but again, the Defendants do not say that any childhood vaccination funding would otherwise have gone "immediately" to the Palestinian Authority. Funding a program that relieves the Palestinian Authority of obligations only counts as a "direct benefit" on the Plaintiffs' reading of the statute. The Defendants exclude "economic support fund awards to nongovernmental organizations for the benefit of individuals in the West Bank and Gaza," and an example of such awards is funds paid to the Rostropovich Vishneskaya Foundation for "universal vaccination of all infants in the West Bank and Gaza against rotavirus infection." Opp. 21–23.[6] In sum, the Defendants' reading makes a hash of the statutory exceptions, for they cannot explain why these exceptions were necessary on their reading of "directly benefits."

*Third*, the Defendants' reading tramples the statutory context, which is that Congress wanted to do more than stop direct payments *to* the Palestinian Authority.

---

[6] *See* W.P. Rennert et al., *Introducing Rotavirus Vaccine to the Palestinian Territories: The Role of Public-Private Partnerships*, 41 J. PUB. HEALTH, at 2 (2018), https://perma.cc/CX6W-BT37 (noting that this foundation was USAID's implementing partner for the vaccination program).

It had already done that. *See* Memo. 13; *supra* p. 10–11; *see also infra* p. 19. Though the Defendants rely on the legislative finding that the United States "supports community-based programs in the West Bank and Gaza that provide for basic human needs," Opp. 24, they ignore the more relevant finding that while "[t]he United States does not provide direct budgetary support to the Palestinian Authority," it "does pay certain debts held by the Palestinian Authority and funds programs for which the Palestinian Authority would otherwise be responsible." 22 U.S.C. § 2378c-1 note. Not only does this finding show that Congress wanted to go beyond "immediate" aid, but it also confirms that "directly benefits" should be read to encompass nongovernmental "programs" that relieve the Palestinian Authority of its obligations. Again, "interpretation always depends on context," "context always includes evident purpose," and "evident purpose always includes effectiveness." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63 (2012). Both the statutory text and context refute the Defendants' reading, and support the Plaintiffs' reading that, at a minimum, the Act prohibits aid in Gaza and the West Bank to nongovernmental organizations that relieves the Palestinian Authority of its obligations.

### B. Legislative history and purpose refute the Defendants' reading.

The Defendants' resort to legislative history and atextual purpose arguments—almost entirely based on selectively edited snippets from single member statements—is unavailing. *See* Opp. 23–27. Because the statutory "text is clear," the Court "need not consider this extra-textual evidence" from the Defendants, which is "not compelling" in any event. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017). If anything, the legislative history confirms the Plaintiffs' interpretation of the Act.

The Defendants repeatedly invoke a floor statement by Rep. Engel, which they believe shows that the Act only stops "immediate aid to the Palestinian Authority."

Opp. 25; *see* Opp. 23. But in the same statement, Rep. Engel explained that "[w]e stopped giving the Palestinian Authority direct assistance, but the Palestinian Authority hasn't budged," so "[w]e are now considering this legislation." 163 CONG. REC. H9650. Not only is "[t]his is a good example of why floor statements by individual legislators rank among the least illuminating forms of legislative history," *SW Gen.*, 580 U.S. at 307, but it shows the absence of any support for the Defendants' extreme reading of the statute as limited to "immediate" aid to the Palestinian Authority. Opp. 25. It also undermines the Defendants' claim that the Act simply makes "permanent" prior annual limitations; the Defendants cannot even come up with a floor statement to support that understanding of the Act. *See id.* The Defendants selectively quote Sen. Cardin's statement, Opp. 17, but his full statement likewise undermines the Defendants' attempt to wave away the Act's significance:

> [N]o U.S. aid today goes to the direct budgetary support for the Palestinian Authority. We have already taken steps on that in the past, so there is no direct support to the administration of the Palestinian Authority. [And] we have already cut funds that would go to the Palestinian people in the amount of the funds that go for these payments that we want to get stopped. But we can do more, and this legislation moves in that direction.

BUSINESS MEETING, *supra*, at 5.

What's more, the Defendants ignore explanations—including by the Act's principal sponsor—that "[b]asically, if you agree with the sentiment behind the Taylor Force Act, you don't restore funding to the Palestinians." Memo. 16 n.8 (statement of Rep. Lamborn); *see* Memo. 22–24 (statements of Reps. Gottheimer, Engel, and Royce). The Defendants also ignore legislative statements explaining that "the State Department" itself "indicate[d]" to legislators "that as written, this bill would, in fact, cut off the funds to the nonprofits as well." BUSINESS MEETING, *supra*, at 46–47 (statement of Sen. Merkley). So while legislators "hear[d] language saying" that "directly benefits" would be read narrowly like the Defendants try to now, they

recognized that "clearly the print of the bill is indicating it is going to go a different way." *Id.* at 47 (statement of Sen. Booker).[7] One witness (relied on by the Defendants, Opp. 25) explained that "different way"—and confirmed that the Act's limitation extends to nongovernmental organization funding:

> USAID has distinguished between assistance to the Palestinian Authority and aid to other recipients, such as NGOs and municipalities. In my view, all the payments that give assistance to or directly benefit the PA itself should be stopped. Some of those payments no doubt support good programs and worthwhile goals, but money is fungible. So the payments must stop.

S. Hrg. No. 115-705, *supra*, at 8 (statement of Hon. Elliot Abrams).

Last, the Defendants claim that Congress's post-enactment appropriations "confirm that the ongoing awards of Economic Support Funds are lawful." Opp. 27. But the whole point of the Act is to limit "[f]unds authorized to be appropriated or otherwise made available for assistance," 22 U.S.C. § 2378c-1(a)(1), so the fact that Congress continued to authorize funds that might be limited by the Act—if the statutory triggers are not met—reveals little about the original meaning of the Act. "[I]t is a commonplace of statutory construction that the specific governs the general," and "[t]hat is particularly true where, as [here], Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up); *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644,

---

[7] *See also* BUSINESS MEETING, *supra*, at 47 (statement of Sen. Murphy) ("I just want to put it on the record before we go to a vote here that there is going to be a myriad of interpretations as to what ['directly benefits'] means," and though "other people may read that differently," "I just want to reserve for potentially future Administrations the ability to read that as money going directly to the Palestinian Authority.").

20

663 (2007) ("[A] statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.").[8]

Using omnibus appropriations measures, subject to their own inertias, compromises, and political considerations, as a reason to change the meaning of a statute designed to govern those omnibus measures makes little interpretive sense. As the Supreme Court has explained, "[p]ermitting the legislative history of subsequent funding legislation to alter the meaning of a statute would set a dangerous precedent. Many provisions of federal law depend on appropriations or include sunset provisions; they cannot be made the device for unenacted statutory revision." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011).

The ratification cases the Defendants cite, Opp. 27–28, have no apparent relevance to the Defendants' argument, which is focused not on ratification of an illegal action but on "the proper interpretation of the Taylor Force Act." Opp. 27. And general appropriations could not have "ratified" funding that violated the Act, given that it *governs* general appropriations.

Even if later appropriations were relevant, the Defendants' account of Congress's actions contradicts their own description of the budget process. The Defendants claim that Congress was "fully aware" of how ESF funds in West Bank and Gaza were being "administer[ed]" and yet "consistently appropriated economic support funding and expressly directed that a minimum portion of that funding be directed to the West Bank and Gaza." Opp. 28. Putting aside that the Act *governs* these appropriations, the Defendants had previously explained that "after Congress

---

[8] The very appropriations cited by the Defendants recognize that funding may not be released due to other statutes. *See, e.g.*, 165 CONG. REC. H11061, H11433 (Dec. 17, 2019) (Opp. 6) ("Such funds shall be made available if the Anti Terrorism [sic] Clarification Act of 2018 is amended to allow for their obligation."). Likewise, the new "program" cited by the Defendants, Opp. 29–30, says that it "shall be subject to all existing terms, conditions, restrictions, oversight requirements, and applicable provisions of law." 22 U.S.C. § 2346d note.

passes an annual appropriations act containing an overall amount of Economic Support Funds, there is an internal process by which *the State Department, through the Office of Foreign Assistance (and in coordination with USAID), determines the proper allocation of funds for specific countries and purposes*." Opp. 6 (emphasis added).[9] Subsequent agencies' policy determinations could have no effect on the original meaning of the Act. And whatever might be said of Congress's propensity to delegate decisions to agencies, its decision in the Act to limit those agencies' funding under general appropriations is not constrained by its subsequent passage of general appropriations.

If anything, the appropriations history supports the Plaintiffs. As the Defendants explain, after "Congress enacted the Anti-Terrorism Clarification Act of 2018" deeming "anyone who accepted certain forms of foreign assistance—including Economic Support Funds— . . . to consent to personal jurisdiction in United States courts," the Palestinian Authority said that it would "no longer accept assistance." Opp. 7 (internal quotation marks omitted). In response, "USAID ended programmatic implemental of *all* assistance in the West Bank and Gaza." Opp. 7–8 (emphasis added) (cleaned up). As the GAO report relied on by the Defendants explains, USAID "halted implementation for all 27 ongoing projects in the West Bank and Gaza," and "[t]he projects halted supported all three development objectives—Governance and Civic Engagement, Economic Growth and Infrastructure, and Investing in the Next Generation." GAO, 21-332, *West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks* 20 (Mar. 29, 2021); *see* Opp. 8 (noting "the full stop of Economic Support Funds for the West Bank and Gaza"). But—and here is the crucial point—why would the government have stopped *all* funding in Gaza and the

---

[9] *See also* Opp. 7 ("[T]he State Department reprogrammed its FY2017 economic support funding intended for the West Bank and Gaza to other priorities.").

West Bank simply because the Palestinian Authority, wary of lawsuits, declined assistance? The obvious answer is that all the programmatic funding directly benefited the Palestinian Authority such that it feared liability from the continuation of those programs—and USAID determined that those fears warranted what the Defendants describe as a "full stop." Opp. 8. Thus, to the extent the funding history is relevant, it supports the Plaintiffs' reading of the Act as extending beyond "immediate aid to the Palestinian Authority." Opp. 25.

Text, context, and history all confirm the Plaintiffs' interpretation and refute the Defendants' narrowing of the Act to immediate payments to the Palestinian Authority.

## III. The Court should invalidate the ESF funding awards that relieve the Palestinian Authority of its obligations.

By flooding the West Bank and Gaza with U.S. funding to nongovernmental organizations—funding that relieves the Palestinian Authority of its obligations—the Defendants have flouted the Taylor Force Act and given pay-to-slay programs more money to incentivize terrorism. The Defendants do not dispute that the Act's "general limitation" in subsection (a) applies here "because the Palestinian Authority continues to pay terrorists to slay Israelis and Americans." Memo. 11 (citing Answer ¶¶ 24, 46, 58). Though they make some noise about material outside the administrative record, they do not dispute that the Plaintiffs' compilation of 179 ESF funding awards from an official government website is accurate or that anything relevantly different would appear in any administrative record. Opp. 29. They do not dispute that all of these awards are within the categories that the Palestinian Authority has legal responsibility for under the Oslo Accords. *See* Answer ¶ 6. Though the Defendants say that "every award" listed may not be "unlawful," Opp. 30, each *is* unlawful on the Plaintiffs' statutory reading: each funnels money in service of a goal

that the Palestinian Authority would otherwise be obligated to pursue. In that way, each "directly benefits the Palestinian Authority." 22 U.S.C. § 2378c-1(a)(1)(A).

Once the moving party on summary judgment shows "the absence of a genuine issue of material fact," "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see* Fed. R. Civ. P. 56(c)(1)(A). Yet the Defendants produce no evidence—nothing from a hypothetical administrative record or anything else. They simply list edited descriptions of six (of 179) awards and declare that "it is difficult (if not impossible) to discern how, even under Plaintiffs' theory, the award could plausibly be said to 'directly benefit the Palestinian Authority.'" Opp. 30. But again, these awards are all within categories that the Oslo Accords assign responsibility over to the Palestinian Authority, so their individual descriptions are beside the point.

Even assuming the Defendants' listing could raise a genuine factual dispute, the Defendants say nothing about the other 173 awards noted by the Plaintiffs. And at a bare minimum, even if the Court finds it premature to determine the legality of these awards, it could grant partial summary judgment in favor of the Defendants' statutory reading outlined above. *See* Fed. R. Civ. P. 56(a) (permitting summary judgment on "part of [a] claim"); *see also, e.g.*, *KB Home Jacksonville LLC v. Liberty Mut. Fire Ins. Co.*, No. 3:18-CV-371-J-34MCR, 2019 WL 4228602, at *5 (M.D. Fla. Sept. 5, 2019) (noting that "legal question[s]" are "is amenable to resolution on a motion for partial summary judgment"); *Sierra Club v. Duke Energy Indiana, Inc.*, No. 1:08-CV-437-SEB-TAB, 2010 WL 1381468, at *2 (S.D. Ind. Mar. 30, 2010) (similar).

## CONCLUSION

The Court should grant partial summary judgment and set aside the Economic Support Fund obligations and awards listed in App. 63–95, that do not fall within the

exceptions provided under 22 U.S.C. § 2378c-1(b)(1),[10] order the Defendants to comply with 22 U.S.C. § 2378c-1(d), and declare that all future Economic Support Fund obligations and awards funding programs, projects, and activities outside of the three enumerated exceptions specified in 22 U.S.C. § 2378c-1(b) and/or for which the Palestinian Authority is otherwise responsible are unlawful, until the Palestinian Authority has been certified in compliance with 22 U.S.C. § 2378c-1(a)(1)(A)–(D).

Respectfully submitted this 12th day of November, 2024,

/s/ *Reed D. Rubinstein*
REED D. RUBINSTEIN
D.C. Bar No. 400153
reed.rubinstein@aflegal.org
JULIE A. STRAUSS
D.C. Bar No. 387262
julie.strauss@aflegal.org
MICHAEL DING
Texas Bar No. 24129788
michael.ding@aflegal.org
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, D.C. 20003
(202) 964-3721
*Counsel for the Plaintiffs*

CHRISTOPHER E. MILLS
D.C. Bar No. 1021558
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
(843) 606-0640
cmills@spero.law
*Counsel to America First Legal Foundation*

CHRISTIAN D. STEWART
Texas Bar No. 24013569
Morgan Williamson LLP
701 S. Taylor, Suite 440, LB 103
Amarillo, TX 79101
(806) 358-8116
cstewart@mw-law.com
*Local Counsel for the Plaintiffs*

MORA NAMDAR
Texas Bar No. 24090288
Namdar Law PLLC
3811 Turtle Creek Blvd #275
Dallas, TX 75219
(972) 925-9061
mora@namdarlaw.com
*Counsel to America First Legal Foundation*

---

[10] The list (at App. 86–88) includes 24 Economic Support Fund awards that fall within the exception for "assistance for wastewater projects not exceeding $5,000,000 in any one fiscal year," 22 U.S.C. § 2378c-1(b)(1)(B), but the Defendants exceeded the $5,000,000 limitation in fiscal years 2022 and 2023. *See* App. 89–93.

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

/s/ *Michael Ding*
MICHAEL DING